**No. 23-15399**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

Alexander Behrend,

Plaintiff–Appellant,

v.

San Francisco Zen Center, Inc.,

Defendant–Appellee.

On Appeal from a Final Judgment of the
United States District Court for the Northern District of California
Case No. 21-cv-1905, Hon. Jacqueline S. Corley

**BRIEF FOR APPELLANT**

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

*Counsel for Appellant*

Aug. 18, 2023

## CORPORATE DISCLOSURE STATEMENT

Appellant is an individual. He has no parent corporation, and no publicly held corporation owns any part of him.

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ................................................................. i

Table of Authorities ................................................................................... iv

Introduction ................................................................................................ 1

Jurisdictional Statement ............................................................................. 2

Issues Presented .......................................................................................... 2

Standard of Review ..................................................................................... 3

Statement of the Case ................................................................................. 4

I.    Factual History ...................................................................................... 4

    A.   Alexander Behrend's initial connection to the San Francisco Zen Center. ...................................................... 4

    B.   The Zen Center hires Behrend to do largely menial labor as a work practice apprentice. .................................... 5

    C.   The Zen Center rejects Behrend's request for ministerial training. ................................................................. 11

    D.   The Zen Center fires Behrend. ................................... 14

II.   Procedural History ............................................................................ 15

Summary of Argument ............................................................................. 16

Argument .................................................................................................. 18

I.    The Zen Center cannot invoke the ministerial exception because Behrend was never in a leadership or teaching position. ........................................................................................... 18

    A.   The ministerial exception applies to employees responsible for instructing others in the faith or leading a religious institution, not faithful congregants or employees performing menial labor. ......................... 19

    B.   Because Behrend did not instruct, lead, or otherwise play a key role for the Zen Center, the district court was wrong to conclude that he was a minister. .............................. 26

Conclusion ................................................................................................ 34

## TABLE OF CONTENTS—continued

Certificates .............................................................................. 1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnes v. Chase Home Fin., LLC,*
934 F.3d 901 (9th Cir. 2019) ........................................ 23, 33

*Bostock v. Clayton County,*
140 S.Ct. 1731 (2020) ................................................. 23, 33

*Demkovich v. St. Andrew Apostle Parish,*
3 F.4th 968 (7th Cir. 2021) ......................................... 24, 25

*DeWeese-Boyd v. Gordon Coll.,*
487 Mass. 31 (Mass. 2021) ................................................ 24

*Duquesne Univ. of Holy Spirit v. Nat'l Labor Relations Bd.,*
975 F.3d 13 (D.C. Cir. 2020) ............................................. 25

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity Comm'n,*
565 U.S. 171 (2012) ..................... 19, 20, 21, 22, 26, 28, 30, 31, 32, 33

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania,*
140 S.Ct. 2367 (2020) ..................................................... 23

*Orr v. Christian Bros. High Sch.,*
No. 21-15109 (9th Cir. Nov. 23, 2021) ................................... 25

*Our Lady of Guadalupe School v. Morrissey-Berru,*
140 S.Ct. 2049 (2020) ................................. 1, 17, 18, 20, 22, 26, 32, 33

*Palmer v. Liberty University,*
No. 21-2390, __ F.4th __ (4th Cir. July 5, 2023) .......................... 24

*Rizo v. Yovino,*
854 F.3d 1161 (9th Cir. 2017) ............................................... 3

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,*
41 F.4th 931 (7th Cir. 2022) ............................................... 24

*Tucker v. Faith Bible Chapel Int'l,*
36 F.4th 1021 (10th Cir. 2022), *cert. denied,* No. 22-741, __ U.S. __
(June 12, 2023) ......................................................... 3, 24

**Statutes**

28 U.S.C. § 1291 ............................................................ 2
28 U.S.C. § 1331 ............................................................ 2
42 U.S.C. § 12101 ........................................................... 2

## INTRODUCTION

The "ministerial exception" to secular antidiscrimination law strikes an important balance. It ensures that a religious institution may exercise its discretion as to who plays key roles in making internal church decisions and transmitting the faith to others, but recognizes societal interest in preventing discrimination. So unfettered discretion applies only to those key roles. And in determining who holds such key roles, the Supreme Court has explained that "what matters, at bottom, is what an employee does." *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S.Ct. 2049, 2064 (2020). Does an employee have responsibilities that "lie at the very core of the mission" of the religious institution? *Id*. Or does an employee serve as essentially a cook and housekeeper, who also happens to practice the faith?

Here, Appellee San Francisco Zen Center fired Appellant Alex Behrend because of his disability, from a job that had him "cooking, dishwashing, bathroom cleaning, preparing guest rooms, and [doing] doan ryu ceremonial tasks." 1-ER-4. Despite this, the District Court granted summary judgment to the Zen Center, applying the ministerial exception to exempt the Zen Center from having to comply with the ADA as to those, like Appellant Behrend, doing comparatively menial tasks. In doing so, the District Court expanded a religious institution's unfettered discretion to ignore civil rights laws beyond people in its key roles to any believer in the institution's employ. The District Court's

1

sweeping misstatement of the law, if endorsed by this Court, risks excluding innumerable workers from important legal protections. Mere practice of faith is not enough; at bottom, Mr. Behrend's role was not key to Appellees' ability to preach and transmit their faith to others. This Court should reverse.

## JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as Plaintiff-Appellant Alexander Behrend appeals from a final judgment of the United States District Court for the Northern District of California. The trial court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as the complaint alleged claims pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. A final order was entered on Feb. 14, 2023 that disposed of all claims. 1-ER-15. The Notice of Appeal was timely filed on Mar. 15, 2023.

## ISSUES PRESENTED

Does the ministerial exception extend beyond religious institutions' autonomy and discretion over people playing key roles in religious governance or faith transmission, to allow discriminatory employment decisions over workers who practice the faith but whose jobs entail only menial roles for a religious employer?

## STANDARD OF REVIEW

When reviewing an appeal from a District Court granting summary judgment, this Court's reviews that grant of summary judgment "de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party," or here, Behrend. *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019). Upon construing all facts in favor of the non-movant, "[s]ummary judgment is proper if the pleadings and other evidence before the court show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56). Because the Zen Center "sought summary judgment on the basis of an affirmative defense"—here, the ministerial exception—"on which it would bear the burden of proof at trial, it must show at the summary judgment stage that no reasonable trier of fact could fail to find that it had proved that defense." *Rizo v. Yovino*, 854 F.3d 1161, 1164 (9th Cir. 2017) (internal citations omitted). And in considering how a reasonable trier of fact would assess the Zen Center's affirmative defense, construing all the facts in favor of Behrend especially matters here. "The Supreme Court deems the determination of whether an employee is a 'minister' to be a fact-intensive inquiry that turns on the particular circumstances of a given case." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1025 (10th Cir. 2022), *cert. denied*, No. 22-741, __ U.S. __ (June 12, 2023).

## STATEMENT OF THE CASE

### I.   Factual History

### A.   Alexander Behrend's initial connection to the San Francisco Zen Center.

Alexander Behrend's relationship to the San Francisco Zen Center is inextricably bound up with the disabilities that led the Zen Center eventually to fire him. In spring 2014, Behrend suffered a serious car accident that both severely injured him physically and left him with PTSD and other psychological disabilities. 1-ER-6. He initially found the Zen Center during his search for ways to take his mind off of his PTSD and other post-accident disabilities. 1-ER-40. Behrend, like other practitioners of Zen Buddhism, engaged in mediation at the Zen Center, and attended talks about the faith that the Center hosted for the public. Doc. 1-ER-42. He volunteered through the Zen Center to cook food and serve it to people who did not have homes. 1-ER-40-41. The Zen Center maintained a guest house, and Behrend also volunteered to cook and clean for the residents and guests there, eventually becoming friends with many people at the Zen Center. 1-ER-44.

Two years of volunteering later, Behrend learned that he would lose his personal housing and his employment simultaneously. 1-ER-46. Terrified about the prospect of homelessness—a particularly acute fear as a person with disabilities—Behrend discussed his situation with leadership at the Zen Center. 1-ER-46. David Zimmerman, Head of

Practice, recommended that Behrend become a "guest student" of the Zen Center, which would entail becoming a resident and continuing to do many of the tasks he had previously done as a volunteer, but as an employee. If Behrend liked it, he could apply to be a "work practice apprentice" (WPA) shortly thereafter. Behrend applied to become a guest student in summer or fall of 2016. 1-ER-45.

### B. The Zen Center hires Behrend to do largely menial labor as a work practice apprentice.

Behrend began as a guest student in November of 2016, and the next month became a WPA. In the WPA program, Behrend alternately worked on the guest-services crew, the kitchen crew, and later, the maintenance crew of the Zen Center. Those roles included largely menial work around the Zen Center and its guest house. While on the guest services crew, for example, Behrend checked guests in, handled payments, prepared rooms for new guests, cleaned conference rooms and event spaces available for rent, did laundry, and generally assisted guests of the Zen Center. *E.g.* 1-ER-7; 1-ER-62; 1-ER-101. On the kitchen crew, he washed dishes, chopped vegetables, and generally performed basic kitchen tasks. 1-ER-99. And during a brief time on the maintenance crew, Behrend operated heavy equipment. 1-ER-166.

Like many workers at the Zen Center, Behrend engaged in personal worship during the course of his employment. While he was assigned to these roles, for example, Behrend prayed at the start of each shift. That

prayer took different forms, but included bowing in front of a figurine of Buddha, bowing to an altar, reciting a prayer, sprinkling flowers, and reading aloud excerpts of a book about Buddhism. Some priests at the Zen Center regarded cooking and cleaning tasks themselves as practicing the Zen Buddhist religion. 1-ER-76. And Behrend "[took] the vows . . . to live as a Buddhist" as a condition of residence. 1-ER-76.

But there is "absolutely [] a difference" between "practicing Zen Buddhism and teaching Zen Buddhism." 1-ER-123. Behrend's practice of the faith included attending ceremonies—never leading them—and meditating. And these ceremonies were simply faith practice, they were "not a teaching event." 1-ER-144. The Full Moon Ceremony, for example, which Behrend attended each month, was the "same as going to mass" or "to church on Sundays." 1-ER-143. That ceremony was not limited to WPAs or other residents at the Zen Center, but rather, was "open to everyone." 1-ER-141; *see also* 1-ER-145; 1-ER-147. Behrend occasionally volunteered for or was assigned "doan" tasks—"these are ceremonial activities which support the forma practice, such as ringing bells, cleaning altars, watching the door during zazen, etc.," 1-ER-19—at meditations and other ceremonies. 1-ER-49. But just as those ceremonies were open to the public, any member of the public could volunteer for these tasks, and Behrend himself had volunteered for them before beginning to live and work at the Zen Center. *E.g.* 1-ER-44. This was

partly because people doing these tasks generally "do not need training." 1-ER-154.

By contrast, each of those ceremonies did include more important roles. WPAs were not allowed to perform those roles. The policy allowing volunteers, guests, or WPAs to perform discrete tasks but not lead ceremonies came from the Zen Center, which did not allow volunteers to perform any leadership roles at ceremonies and meditation. 1-ER-126. "Leading the ceremony is not one of those jobs that anyone can do." 1-ER-139. Regular apprentices, including Behrend, could not offer incense, direct the meditation, or play other key roles. 1-ER-138-40; *see also* 1-ER-150. People the Zen Center allowed to do those things required special training, training which Behrend never received and did not need for his own limited tasks.

The Zen Center itself did not view work practice apprentices, like Behrend, as senior staff or leaders at the Zen Center. During Behrend's time there, the Zen Center maintained a multi-level org chart with dozens of positions in a clear hierarchy. *See* Doc. 64-11, at 6. Behrend never filled any of those positions. As a senior leadership member of the Zen Center explained, "senior staff [] at the SF Zen Center between 2017 and 2019," when Behrend was there, included "the Tenzo [who] was head of the kitchen," "the Ino [who] was head of the hall," the "work leader responsible for guest students," "a facilities manager," and the "head of practice," which along with the director of the Center, comprised "the

main positions" at the Zen Center. 1-ER-94; *see also* 1-ER-70; *see also* 1-ER-18 (discussing "the abiding abbot, senior dharma teachers, the tanto (head of practice) and other practice leaders"); *see also* Doc. 64-11 at 19-20 (setting out seven senior staff positions); *id.* at 15-16 (identifying a dozen abbots and abbesses, the most senior priests). Behrend never served in any of those positions, or otherwise led any of the other work groups to which the Zen Center assigned him. Indeed, although people at the Zen Center "have different jumps and starts for what might be appropriate" on their path to teaching, to priestly ordination, or to leadership roles on staff, 1-ER-80, and although one could be a director in house without being a priest, or a priest without being an official teacher, 1-ER-80, Behrend never took any of those steps at all and never played any of those roles. *E.g.* 1-ER-154. No was he ever invited to do so—when the Zen Center identified a Work Practice Apprentice as worthy of stepping up to a staff role, they would ask, including as little as a month into someone's time at the Zen Center. 1-ER-116; 1-ER-111. And even to the extent that a "senior student who was in a relatively senior position" might "set an example for other people about practice" without being "responsible for specific instruction," 1-ER-122, Behrend never got to that level, either.

Policy documents and testimony from senior staff at the Zen Center underscore the comparative lack of authority of WPAs. WPAs "are expected to be willing to work at any position or location to which they

are assigned or reassigned by a senior administrator or teacher" and do not control their own schedule. 1-ER-34-35. The Work Practice and WPA Policies document also imposes a number of requirements on apprentices, including but not limited to maintaining "a regular relationship with one or more SFZC practice leaders," 1-ER-28, repeatedly referring to them as "student[s]" rather than teachers, *e.g.* 1-ER-29, and noting that all of them have "immediate work practice supervisor[s]" even below senior Zen Center leadership. 1-ER-32. Indeed, the Policies explain that a WPA "*may* by invited to take on senior staff positions before their two-year apprenticeship is completed," 1-ER-31 (emphasis added), specifically contrasting the WPA position with such senior staff positions, and further explaining that participation in the WPA program "does not include an agreement to offer an apprentice a staff position after they have completed the WPA program." 1-ER-31. (Behrend never received such an invitation.) Senior leaders at the Zen Center viewed WPAs as "beginner[s]," 1-ER-71, and far from letting them teach, they were "required to *have* a teacher" themselves. 1-ER-85 (emphasis added).

The Zen Center also made clear that for Apprentices like Behrend, cooking and cleaning work came first. As a matter of policy, "work practice may take precedence over classes and workshops." 1-ER-102. "Frequently," basic tasks conflicted with religious practice, and "oftentimes, [workers] would miss our morning service" as a result. 1-ER-

103. The Zen Center frequently assigned Behrend to miss religious ceremonies and even his own private meditation time to work in the kitchen or on the guest services crew. Behrend was not alone; numerous workers holding the same roles faced the same prioritization requirements and missed religious observances as a result. 1-ER-119. As one former leader explained, "they would be making rooms [for guests] when the rest of us were in the Zendo, or doing other scheduled activities." 1-ER-120. Workers understood this well, and WPAs adopted the Zen Center's prioritization assignments even at the expense of their own personal religious practice. 1-ER-102-03. Indeed, the Zen Center's own handbook both explained that work conflicting with religious practice would happen, clearly prioritized work over prayer, and set out a series of steps for people who would miss religious observances in favor of work assignments. 1-ER-17-18.

The Zen Center pushed Work Practice Apprentices to prioritize mundane tasks over religious observances, meditation, and other religious practice because, as leaders at the Zen Center explained, the point of the numerous programs that those tasks supported was to generate revenue and profit. 1-ER-136. Several programs were "a money-making venture for City Center." 1-ER-135. The Zen Center senior leaders "were more focused on profits or revenue generations," and spent "a considerable amount of time" on commercial activity. 1-ER-135. Even among the senior staffers, "we spent a lot of time thinking about how we

could generate more money," and senior staffers themselves often had their profit-generating responsibilities impede their religious practice. 1-ER-135-36.

**C.  The Zen Center rejects Behrend's request for ministerial training.**

The Zen Center had multiple levels of status for those with faith leadership or teaching roles. One level involved ordination as a priest. The Zen Center identified its priests clearly—they sewed their own distinctive robe, and shaved their heads as part of a traditional ceremony and thereafter. 1-ER-95-96. The Zen Center viewed the priestly ordination track as "a different set of gates" that one could walk through. 1-ER-96. Only once someone walked through those gates would the Zen Center allow that person to be "transmitted to teaching," or to "give ordination to other students and pass on the lineage." *Id*. People who did those things had "higher status in the organization," *id*., could "officiate at funerals or marriages or other transitions-of-life ceremonies," and were "the officiants of the ceremonies at Zen centers." 1-ER-97. Priests— and only priests—"pass on to the next generation" the tenets of the faith; even though other adherents "hold the practice and hold the precepts and embody the precepts," they do not fulfill the same role as ordained priests. *Id*. They officially held themselves out as such, and would "often relate to people as a priest." 1-ER-75. Work practice apprentices like

Behrend were, by contrast, prohibited from teaching. 1-ER-106; 1-ER-123; 1-ER-133.

The Zen Center also had religious leadership and teaching roles other than ordained priest: ordained layperson and Shuso. Someone who received lay ordination would "receive the precepts from the teacher." 1-ER-126. While it did not require specific training, 1-ER-127, the Zen Center did not allow just anyone to receive lay ordination. 1-ER-96-97. A Shuso was a "head monk," or "head student" of a practice period. 1-ER-124. A priest could serve as a Shuso, although a Shuso need not be a priest. *Id.* Shusos learned how to instruct others in the faith over a period of three to six months. *Id.* And on the rare occasions that a non-ordained person was allowed to serve as a Shuso, that person needed "a long history of practice" and the Zen Center made an exception because it wanted people "to see them as senior teacher." 1-ER-125. Such status would allow someone "to formally meet with students in a way that the Zen Center recognizes," in a way that even other ordained people might not be allowed to do—a restriction that the Zen Center imposes differently from other Zen Buddhist communities. *Id.*

Work Practice Apprentices lacked any of those statuses, and they did not have a path to faith leadership. People who wanted to seek either lay or priestly ordination could go through the "different set of gates" to follow a process set out by the Zen Center. 1-ER-96. They could "form a relationship with a teacher," "ask [their] teacher if [they] could receive

the precepts," and, if approved, undertake "a period of study." 1-ER-98. Although the Zen Center offered training for future leaders and a path to ordination, Behrend never even started that process. Behrend not only never received priest ordination, but he also never even received lay ordination. *E.g.* 1-ER-74. To the contrary, at no point during his time at the Zen Center did anyone train Behrend to teach, to give a Dharma talk—i.e., talk about the precepts of the faith—or even to lead meditation. *E.g.* 1-ER-106. Behrend never had the recognition or allowance as Shuso occasionally afforded to non-ordained people, either. He was only ever a Work Practice Apprentice, a role entirely separate from the path to faith leadership. Someone could have sought and received priestly ordination without having previously served as a Work Practice Apprentice; serving as a Work Practice Apprentice did not give anyone entrée into ordination. Indeed, "most teachers would never have been WPAs" previously. 1-ER-89. And most people "walking off the street" to become WPAs did not become ordained. 1-ER-153.

Behrend's lack of training or status was not for lack of interest or trying on his part. The Zen Center offered the required special training for people seeking ordination and leadership roles both within the faith generally and in mediation and other religious ceremonies at the Zen Center specifically. He did not initially intend to seek ordination as a priest when he joined the WPA program. 1-ER-153. Because his own personal practice of Buddhism had brought him such comfort in the wake

of his accident, however, Behrend eventually decided that he did want to pursue a teaching role. 1-ER-37. But in June 2018, when Behrend told Zen Center leadership that he "would like to work and train to ordain as a priest with an eye towards eventually becoming some kind of practice leader," 1-ER-37, the Zen Center rejected him out of hand. Not only did it decline to allow Behrend to participate in training for a leadership or teaching role, the Zen Center instead reassigned Behrend internally to a maintenance job—a job that was less desirable and that exacerbated Behrend's post-accident PTSD. Behrend did not receive any training in religious teaching or for a leadership role during his time on the maintenance crew.

### D. The Zen Center fires Behrend.

The Zen Center's denial of Behrend's request to seek out ordination and subsequent retaliatory transfer of Behrend to the maintenance crew not only foreclosed any path to Zen Center leadership or teaching responsibilities, but it exacerbated his PTSD. Behrend explained that and sought out reasonable accommodations for his disabilities under the Americans with Disabilities Act. 1-ER-164. The Zen Center failed to offer any reasonable accommodations, failed to engage in the interactive process, and, eventually, fired him—which cost him both his job and his housing at the Zen Center. 1-ER-166-67.

## II.    Procedural History

Behrend brought claims under the ADA for disparate treatment, failure to engage in the interactive process, failure to provide a reasonable accommodation, and, ultimately, wrongful termination in the District Court on March 17, 2021. 1-ER-164. The Zen Center filed an answer on January 31, 2022. The Parties engaged in discovery limited to the applicability of the ministerial exception, including litigating motions to compel and resolving other discovery disputes. The Zen Center filed for summary judgment on Nov. 23, 2022, presenting the sole question of whether it could prevail on its ministerial exception affirmative defense to Behrend's claims as a matter of law. The District Court granted summary judgment to the Zen Center on February 14, 2023. In holding that no reasonable juror could decline to apply the ministerial exception, it explained that "the record compels a finding that nearly all of his time at the Center involved the practice of Soto Zen Buddhism," 1-ER-10, and that "the SF Zen Center . . . considers all of a Work Practice Apprentice's work practice time an expression and practice of faith," 1-ER-11, and ultimately dismissed the fact that Behrend "neither held a leadership role at SF Zen Center nor was on a path to attain one." 1-ER-11. And it dismissed precedent holding that "an employee's own practice of the faith does not establish religious training or leadership." 1-ER-13-14. Behrend timely filed his notice of appeal to this Court on March 16, 2023.

15

## SUMMARY OF ARGUMENT

The Supreme Court has twice explained that the ministerial exception is an affirmative defense for religious institutions to nondiscrimination claims brought by people who play "key roles" in faith leadership or in transmitting the faith at those organizations. Maintaining the ministerial exception's limited application to those in key roles strikes an important balance—it serves the First Amendment rights of religious organizations, who must have autonomy as to who leads those groups and passes on the tenets of the faith; and it ensures that low-level employees and others in non-ministerial positions at those organizations do not fall entirely outside the protection of societally important non-discrimination laws. As the Supreme Court has explained, and the Courts of Appeals have confirmed in cases following recent clarification of the doctrine, not all church employees fall within the exception—they must have particular characteristics evincing organization leadership, responsibility for teaching and transmitting faith, or other indicia of ministry.

The District Court erred because it treated the Zen Center's insistence that all work amounted to an expression of faith as sufficient to apply the ministerial exception to Behrend (and every employee at the Zen Center). In other words, the District Court conflated whether an employee is an important "teacher or preacher," playing a "key role[]" in transmission of

the faith, *Morrissey-Berru*, 140 S.Ct. at 2060, with an inquiry into whether an employee privately practiced his faith while working.

But under the correct standard, Behrend's exercise of faith did not make him a minister—must less justify summary judgment as a matter of law on the Zen Center's affirmative defense that he fell within the ministerial exception. There is no dispute that Behrend played no leadership role, had no teaching responsibilities, and instead performed largely menial tasks. Indeed, when he asked to *begin* the process to ordain as a priest in the Buddhist faith and at the Zen Center, the Center rebuffed him.

This Court should reverse the District Court and remand for a trial on the merits of Behrend's nondiscrimination claim under the ADA.

## ARGUMENT

**I.** **The Zen Center cannot invoke the ministerial exception because Behrend was never in a leadership or teaching position.**

The ministerial exception protects religious employers' ability to select, free from government interference, "those holding certain important positions with churches and other religious institutions." *Morrissey-Berru*, 140 S.Ct. at 2060. Here, summary judgment is inappropriate on the Zen Center's affirmative defense because a reasonable juror could find that at no point did Behrend teach or instruct others in the faith, transmit it to others, serve in any leadership role at the Zen Center, or otherwise play a key role there. Instead, when he sought out that type of role, the Zen Center declined, moved him to an undesirable and untenable work assignment, and eventually fired him. The District Court correctly acknowledged that "an employee's own practice of the faith does not establish religious training or leadership." 1-ER-13-14. Yet it treated the fact that "Behrend's work was part of a religious practice program," 1-ER-3, and that his "work practice time was religious in nature," 1-ER-11, as sufficient to grant summary judgment on the Zen Center's ministerial-exception affirmative defense. This Court should reverse.

**A.    The ministerial exception applies to employees responsible for instructing others in the faith or leading a religious institution, not faithful congregants or employees performing menial labor.**

The ministerial exception reflects the First Amendment's guarantee that religious organizations have the "freedom to select the clergy" as "part of the free exercise of religion" *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity Comm'n*, 565 U.S. 171, 186 (2012). Ministers manage the "internal governance of the church," "personify its beliefs," and ultimately allow a religious institution "to shape its own faith and mission through its appointments." *Id*. at 188. And leadership and ministry hiring "affects the faith and mission of the church itself." *Id*. at 190. As a result, religious employers will prevail on certain employment-discrimination claims brought by ministers.

In *Hosanna-Tabor*, a teacher at a Lutheran school claimed that she was fired in violation of the ADA. In determining whether she was a minister, the Court looked to "all the circumstances" of her employment. *Id*. at 190. But it focused on four details.

*First*, the teacher had the "title as a minister." *Hosanna-Tabor*, 565 U.S. at 190. Indeed, the religious institution itself "held [her] out as a minister" for anyone to see, and the minister status was "a formal title given [her] by the Church." *Id*. at 190; 192. The ministerial role that she held was "distinct from most of [the organization's] members," and the

19

organization evaluated her skills and performance under a rubric for ministers. *Id*. at 190. And "she was classified as a 'called' teacher, as opposed to a lay teacher." *Morrissey-Berru*, 140 S.Ct. at 2062 (discussing facts of *Hosanna-Tabor*). While title is not dispositive to the ministerial exception, "the fact that an employee has been ordained or commissioned as a minister is surely relevant." *Hosanna-Tabor*, 565 U.S. at 193.

*Second*, she had "a significant degree of religious training followed by a formal process of commissioning," including "eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher." *Id*. Her commissioning as a minister involved not only "God's call for her to teach," but "election by the congregation" as preparation for and in recognition of both the leadership role that she would hold, and her weighty responsibility to "preach the Word of God boldly." *Id*. at 191.

*Third*, in keeping with her training and responsibilities and the mantle of leadership bestowed upon her by God and her congregation, the teacher "held herself out as a minister of the Church." *Id*. at 191. This included her taking a tax allowance "available only to employees earning their compensation in the exercise of ministry." *Id*. at 92. She also self-identified as teacher of religion in correspondence with the religious organization itself. *Id*. at 192.

*Fourth*, and most importantly, she played a key "role in conveying the Church's message and carrying out its mission." *Id*. at 191-92. She did

that in part by teaching "religion four days a week," and leading students "in prayer three times a day." *Id*. at 192. Indeed, even *after* she had been fired, which gave rise to the very suit before the Court, she underscored her duty to instruct others and maintained that she was "anxious to be in the teaching ministry again soon." *Id*. at 191.

Justices Alito and Kagan concurred, emphasizing the most important consideration: They directed courts to "focus on the function performed by persons who work for religious bodies." *Id*. at 198 (Alito, J., concurring). What matters is whether the person engages "in certain key religious activities, including the conducting of worship services and other religious ceremonies and rituals, as well as the critical process of communicating the faith." *Id*. at 199 (Alito J., concurring). The ministerial exception stretches only so far as to cover "the personnel who are essential to the performance of these functions," or, in other words, only to an employee "who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith." *Id*. For those "positions of substantial religious importance," including "positions of leadership," those who "perform important functions in worship services," and those "entrusted with teaching and conveying the tenets of the faith," the exception applies. *Id*. at 200 (Alito, J., concurring).

In 2020, the Court again applied the ministerial exception to "a teacher of religion" and adopted Justice Alito's *Hosanna-Tabor* approach.

*See Morrissey-Berru*, 140 S.Ct. at 2057. The Court explained that the ministerial exception protects religious institutions' "autonomy with respect to internal management decisions that are essential to the institution's central mission. And a component of this autonomy is the selection of the individuals who play certain key roles." *Id*. at 2060. The Court alternately referred to "certain key roles," "certain important positions," and those holding "an important position of trust." *Id*. at 2060, 2063. Church control over who fills those key roles matters because people who engage in "preaching, teaching, and counseling," *id*. at 2061, and "conveying the Church's message and carrying out its mission," *id*. at 2063, get to the heart of faith and doctrine, and "lie at the very core of the mission" of a religious institution. *Id*. at 2064.

In assessing whether someone fills such a key role, "[w]hat matters, at bottom, is what an employee does." *Id*. at 2064 (citing *Hosanna-Tabor*, 565 U.S. at 192.) Does the person "lead[] a religious organization, conduct[] worship services or important religious ceremonies or rituals, or serve[] as a messenger or teacher of its faith[?]" *Id*. (citing Justice Alito's *Hosanna-Tabor* concurrence). Because the teachers in *Morrissey-Berru* had been "teacher[s] of religion" who were "responsible for the faith formation of the students" they taught, and who were specifically evaluated on how successfully "Catholic values were infused through all subject areas," *id*. at 2057, the ministerial exception applied. *Id*. at 2064.

Other contemporaneous Supreme Court opinions have underscored the limited scope of the ministerial exception. Justice Alito, for example, has specifically contrasted a church's greater autonomy in decisions about whether to provide certain types of health care "to *all* its employees, from a minister to a building custodian," with the ministerial exception, which "extends only to *select* employees, having ministerial status." *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S.Ct. 2367, 2387 n.1 (2020) (Alito, J., concurring). And dissenting in *Bostock v. Clayton County*, Justices Alito and Thomas specifically criticized the outcome because of the perceived lack of protection it might provide to religious employees, noting that "even if teachers with [religious instruction] responsibilities qualify" for the ministerial exception, "what about other very visible school employees who may not qualify for the ministerial exception?" *Bostock v. Clayton County*, 140 S.Ct. 1731, 1781 (2020) (Alito, J., dissenting). These opinions adjacent to the ministerial exception context take as a given that the ministerial exception applies to the limited class of employees in key roles, cannot apply even to "very visible employees" outside of such key roles, and necessarily does not exempt religious institutions from secular non-discrimination laws as to all employees.

Decisions of the Courts of Appeals that have followed *Morrissey-Berru* and applied the Supreme Court's clear, recent explanation of the "key role" requirement to apply the ministerial exception share this

understanding. Circuit Courts have applied the ministerial-exception to people who provided spiritual guidance to students, who made important leadership decisions for religious institutions, or who served explicitly as ministers or faith leaders—straightforward applications of the ministerial exception. *E.g. Demkovich v. St. Andrew Apostle Parish*, 3 F.4th 968, 973 (7th Cir. 2021) (involving an avowed minister); *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 935 (7th Cir. 2022) (involving co-director of guidance at a Catholic school).[1] By contrast, the Massachusetts Supreme Court declined to apply the ministerial exception to tenured professors at a religious college who were "not required to attend prayers" or even "to attend regular chapel services on campus." *DeWeese-Boyd v. Gordon Coll.*, 487 Mass. 31, 37 (Mass. 2021). But in these decisions and others touching on similar subject matter, courts' explanations of the doctrine and its purposes have emphasized the importance of religious institutions' autonomy for people in key roles—as specifically distinct from people in less important roles. *See Demkovich*, 3 F.4th at 978 (explaining that "[a] minister is the chief

---

[1] Other courts have resolved appeals in discrimination cases where a religious organization sought to invoke the ministerial exception on other grounds. *E.g. Palmer v. Liberty University*, No. 21-2390, __ F.4th __ , *4 (4th Cir. July 5, 2023) (resolving appeal on merits of ADEA claim by teacher at religious institution, and avoiding constitutional question of ministerial exception); *Tucker*, 36 F.4th at 1026 (holding no appellate jurisdiction to hear purported interlocutory appeal from denial of ministerial exception, also involving teacher at religious institution).

instrument for a religious organization to fulfill its purpose.") (internal citations omitted); *see also DeWeese-Boyd*, 487 Mass. at 53 (discussing "individuals who play certain key roles" and the "existing understanding" of the ministerial exception post-*Morrissey-Berru* as applying to "personnel who are essential to the performance" of the religious institution). As the Seventh Circuit has explained, "a minister's legal status recognizes that ministerial employment differs from nonreligious employment, *or even from nonministerial employment within a religious organization.*" *Id.* (internal citations omitted) (emphasis added). This is partly because "[m]inisters, by their religious position and responsibilities, produce their employment environment" in ways that non-leadership employees outside of key roles do not. *Demkovich*, 3 F.4th at 978. Similarly, the D.C. Circuit has characterized *Hosanna-Tabor* and *Morrissey-Berru* as applying to "teachers who serve an important role in conveying [a religious school's] message and carrying out its mission." *Duquesne Univ. of Holy Spirit v. Nat'l Labor Relations Bd.*, 975 F.3d 13, 16 (D.C. Cir. 2020) (Pillard, J., concurring in denial of rehearing). And this Circuit, in an unpublished opinion, applied the ministerial exception to a teacher and school leader who "had supervisory authority over aspects of religious instruction and programming." *Orr v. Christian Bros. High Sch.*, No. 21-15109, at *3 (9th Cir. Nov. 23, 2021). No court has applied or affirmed the application of the ministerial exception to discrimination claims brought by a low-level employee with no teaching

or leadership responsibilities, who did solely menial work and merely practiced a religion's faith while employed by a religious institution.

In sum, the exception protects the ability to select religious leaders and "should be tailored to this purpose." *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). So it is reserved for teachers, leaders, and others in "key roles" of the religious institution—not any believer who happens to engage in work for the institution, even where the work involves practicing the faith.

**B.    Because Behrend did not instruct, lead, or otherwise play a key role for the Zen Center, the district court was wrong to conclude that he was a minister.**

**1.** As the Court requires, considering "all of the circumstances," *Hosanna-Tabor*, 565 U.S. at 190, of Behrend's employment, including most importantly, "what [Behrend] does," *Morrissey-Berru*, 140 S.Ct. at 2064, demonstrates that the Zen Center cannot prevail on the ministerial exception as a matter of law. Each of *Hosanna-Tabor*'s considerations show that Behrend did not play a key religious role for the Zen Center— making the ministerial exception inapplicable.

*First*, what Behrend did—the most important consideration, *see Morrissey-Berru*, 140 S.Ct. at 2064—was serve as a Work Practice Apprentice only. He worked on the guest services crew and the kitchen crew, checking guests in, handling payments, doing housekeeping tasks, washing laundry, cleaning dishes, chopping vegetables, and generally

performing basic tasks. *E.g.* 1-ER-62, 1-ER-101. He attended religious services, and prayed, including maintaining his own personal meditation practice, and he volunteered at meditations, for roles that required no training. 1-ER-49, 1-ER-154. Even then, he only participated in religious ceremonies and his own personal meditation practice when his religious observance did not conflict with the work schedule the Zen Center assigned him. 1-ER-102-03. Like others at his low level at the Zen Center, Behrend frequently missed religious ceremonies because the Zen Center prioritized people in his position doing their work—and making money for the Center—over those people getting to attend religious ceremonies (to say nothing of leading them). 1-ER-119-20.

By contrast, Behrend did not play a key "role in conveying the [Zen Center]'s message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 191-92. Although he attended faith ceremonies, participated in group prayers before work shifts, and undertook his own personal meditation practice, he never led any of those ceremonies or taught others. 1-ER-138-40, 1-ER-150, 1-ER-126. And there is "absolutely [] a difference" between "practicing Zen Buddhism and teaching Zen Buddhism." 1-ER-123. Behrend did not teach others about the faith. Indeed, people in his position, Work Practice Apprentice, were prohibited from teaching by the Zen Center. 1-ER-106, 1-ER-123, 1-ER-133. Nobody at the Zen Center ever trained Behrend to teach or to give a Dharma talk about the precepts of the faith, or to lead meditation. 1-ER-106. And he

did not serve in any of the positions that the Zen Center itself counted as senior leadership—the head of the kitchen crew, the head of the guest services crew, or the head of any of the other work groups. 1-ER-94. He was never a director at the Zen Center, nor the head of practice or a facilities manager.

Under the circumstances, Behrend's work looks very little like the religious teachers in *Hosanna-Tabor* and *Morrissey-Berru* to whom the ministerial exception applied. Neither of the teachers in those cases did menial labor. They taught religion, led students in prayer, took responsibility for passing the faith on to others—ultimately, they engaged in "the critical process of communicating the faith." *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). They were entirely "essential" to the religious functions of their religious schools, and they served as "a messenger or teacher of its faith." *Id*. Behrend did nothing of the sort. Even as to the tasks that he did perform at the Full Moon Ceremony and meditation, he was not "essential to the performance of those functions," *id.*, because those tasks could be performed by any attendee who volunteered, 1-ER-44, and the people "do not need training" to perform them. 1-ER-154. And for the roles that *were* essential in leading those ceremonies, Behrend did not receive the requisite training and was not allowed to fill them. 1-ER-138-40, 1-ER-150.

*Second*, Behrend did not have the "title as a minister." *Hosanna-Tabor*, 565 U.S. at 190. The Zen Center maintained a very clear

28

delineation of roles. Behrend was a Work Practice Apprentice. He never received priest ordination, never received lay ordination, and never even served as a Shuso, or head student, "surely relevant" to this analysis. *Id.* at 193. Unlike the teacher in *Hosanna-Tabor* who was evaluated on a rubric for ministers, *id.* at 190, Behrend and other WPAs were evaluated against personal conduct guidelines and, primarily, their attendance. 1-ER-5. The Work Practice Apprentice position was distinct from and on an entirely separate track from any of the ministerial roles at the Zen Center. 1-ER-96.

As relevant here, The Zen Center never "held [him] out as a minister," *Hosana-Tabor*, 565 U.S. at 191, and indeed, specifically prohibited him or any other Work Practice Apprentice from teaching, ministering, or playing ministerial roles at religious ceremonies. Behrend never led any prayers or ceremonies—"[l]eading the ceremony is not one of those jobs that anyone can do," 1-ER-139—and Behrend never fell into the category of people the Zen Center trusted or allowed to lead. 1-ER-154. Nor did his program make faith leadership even a likely prospect; most people who were teachers or leaders had never been WPAs previously, and most who became WPAs did not become faith leaders or ordained. 1-ER-31, 1-ER-189, 1-ER-153. The Zen Center never invited him to be more than a Work Practice Apprentice, even though it occasionally invited people in that role to take on leadership or staff responsibilities. Not only did Behrend never start the process for or receive priestly ordination, but he was never

"transmitted to teaching" or allowed to "pass on the lineage." 1-ER-96. Although the Zen Center occasionally made exceptions to the requirement that only an ordained priest could lead ceremonies and teach others, 1-ER-125, the Center never made such an exception for Behrend. Behrend never gave a dharma talk about the faith, and never led meditation. In fact, Behrend never even got to the level of "a senior student" who "set an example for other people about practice" merely by his own passive expression of his own personal faith. 1-ER-122. And when Behrend sought to begin the process to be identified as a minister and take on teaching responsibilities, 1-ER-37, the Zen Center specifically rebuffed him, underscoring that its actual faith leaders did not view him as a minister or even someone who had the potential to become one. *See* 1-ER-96.

Third, Behrend did not have "a significant degree of religious training followed by a formal process of commissioning." *Hosanna-Tabor*, 565 U.S. at 193. Behrend was avowedly a student, but specifically not on the track that would lead to religious leadership. The Zen Center had a required process for those who would receive either lay or priest ordination, including "form[ing[ a relationship with a teacher," "ask[ing] your teacher if you could receive the precepts," and, if approved, undertaking "a period of study." 1-ER-98. The Zen Center even had a three-to-six month process for someone to train as a Shuso, or head student, to give practice instruction to others. 1-ER-124. Behrend never received any of

30

that training. He never received training to teach, to give a Dharma talk, or even to lead meditation. 1-ER-106. And as noted, the Zen Center specifically rebuffed his request to seek out ordination. 1-ER-37.

Fourth, Behrend did not "hold [himself] out as a minister of the [Zen Center]." *Hosanna-Tabor*, 565 U.S. at 191-92. He did not enter the Zen Center's WPA program with the intention to serve as a minister. 1-ER-153. And while he eventually decided he wanted to seek ordination as a priest, when Behrend specifically sought permission to seek ordination, the Zen Center rebuffed him. At the time he asked, he explained that he "would like to work and train to ordain as a priest," emphasizing that he did not see himself as such at the time of his request. 1-ER-37. Moreover, at the Zen Center, priests very clearly identified themselves to others— they sewed and wore their own distinctive robe, and shaved their heads as part of a traditional ceremony and into the future after the ceremony. 1-ER-95-96. Behrend never did either of those things, either.

In all, Behrend did not have any of the hallmarks of an employee who plays an important role in teaching or preaching the faith. So he was not a minister—and certainly the Zen Center cannot prevail at summary judgment on the affirmative defense that he was one.

**2.** Yet the District Court determined as a matter of law that no reasonable juror could look at these facts and determine that Behrend was not a minister falling within the exception. It so held because "the record compels a finding that nearly all of his time at the Center involved

the practice of Soto Zen Buddhism," that "Mr. Behrend's work practice time was religious in nature," and that "SF Zen Center considers all of a Work Practice Apprentice's time an expression and practice of faith." 1-ER-11.

But that is not the correct standard. Whether an employee's work involves personal exercise of religious belief does not answer whether his role involves "leading a religious organization, conducting worship services or important religious ceremonies or rituals, or serving as a messenger or teacher of its faith." *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). At a religious organization, an employee must be "essential to the performance of those functions" to fall within the ministerial exception. *Id*. And any mere religious expression by an employee does not mean one that he "play[s] certain key roles." *Morrissey-Berru*, 140 S.Ct. at 2060.

Under the District Court's approach, any employee who engaged in personal worship would be a minister. Consider a janitor at a Catholic School who accepted the school principal's invitation to attend mass every morning before starting his tasks. Or a Muslim cashier at a Halal grocery store who uses the breakroom to pray Salah. Under the District Court's reasoning, each would be a minister, stripping each of protection of vital employment protections without protecting the right to choose religious leaders in any meaningful way.

Indeed, the District Court's understanding of the exceptions extends further than the expansive version twice suggested by Justice Thomas but rejected by the rest of the Supreme Court. In separate opinions in both *Hosanna-Tabor* and *Morrissey-Berru*, Justice Thomas articulated a version of the exception that would "defer to a religious organization's good-faith understanding of who qualifies as its minister." *Hosanna-Tabor*, 565 U.S. at 196 (Thomas, J., concurring). No other Justice has gone as far. But even Justice Thomas views that deference as extending to "the selection of those who will minister the faith," *id.*, not to people outside of those key roles or to people who happen work for a religious institution and believe in its doctrines. In pointing to a "religious landscape that includes organizations with different leadership structures," *id.* at 196-97, and "a religious group's right to shape its own faith and mission through its appointments," *Morrissey-Berru*, 140 S.Ct. at 2017 (Thomas, J., concurring), Justice Thomas limited his concept of deference to a religious organization's selection of "which individuals are charged with carrying out the organizations' religious missions," *id.*, in keeping with the purposes of the doctrine. It does not extend to every single position within a religious organization. And Justice Thomas joined Justice Alito's dissent in *Bostock* that specifically criticized that opinion because of the perceived lack of protection it would provide to even "very visible" employees of religious organizations who would

nevertheless not fall under the ministerial exception. *Bostock*, 140 S.Ct. at 1781 (2020) (Alito, J., dissenting).

The District Court asking the wrong question caused it to err in answering it. The District Court acknowledged the comparative lack of importance of Mr. Behrend's role, noting the "evidence that he neither held a leadership role at SF Zen Center nor was on a path to attain one." 1-ER-11. That should have precluded application of the ministerial exception. But it dismissed that, the mountain of case law in which "the question of religious leadership has featured prominently," 1-ER-11 (citing nine ministerial exception cases), and clear precedent that "an employee's own practice of the faith does not establish religious training or leadership," 1-ER-13-14, in analyzing the applicability of the ministerial exception. Certainly, the ministerial exception does not apply only to religious teachers, and the title of "minister" is not dispositive to that inquiry. 1-ER-12. But the District Court conflated performing work as an expression of one's own religious practice, with playing a key role in leadership for a faith organization or in transmitting the tenets of that faith to others. It erred as a result.

## CONCLUSION

The judgment of the District Court should be reversed.

Respectfully submitted,

 /s/ Jim Davy

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org


Counsel for Appellant

Aug. 18, 2023

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(5) and Ninth Cir. Rule 32-1 because it contains 7,916 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) and Ninth Cir. Rule 32-1 because it has been prepared using Microsoft Office Word 16.66.1, set in Century Schoolbook 14-point type.

/s/ Jim Davy

Jim Davy

## CERTIFICATE OF SERVICE

I certify that on Aug. 18, 2023, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

I further certify that, after receiving notice that the brief has been accepted for filing, I will file 6 paper copies of this brief and 3 paper copies of the accompanying excerpts of records with the Clerk of Court.

/s/ Jim Davy

Jim Davy