## No. 23-15399

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Alexander Behrend,

Plaintiff–Appellant,

v.

San Francisco Zen Center, Inc.,

Defendant–Appellee.

On Appeal from a Final Judgment of the
United States District Court for the Northern District of California
Case No. 21-cv-1905, Hon. Jacqueline S. Corley

## EXCERPTS OF RECORD
## SINGLE VOLUME

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

*Counsel for Appellant*

August 18, 2023

# EXCERPTS OF RECORD
## TABLE OF CONTENTS

Doc. 70, District Court Opinion:                                1-ER-3

Selected Summary Judgment Exhibits:

    Doc. 64-9, Zen Center conduct guidelines excerpts:        1-ER-16

    Doc. 64-12, Zen Center WPA policies:                      1-ER-26

    Doc. 64-18, Alexander Behrend email:                      1-ER-37

    Doc. 65-1, Alexander Behrend Deposition excerpts:         1-ER-39

    Doc. 65-4, Mary Stares Deposition excerpts:               1-ER-69

    Doc. 65-5, Michael McCord Deposition excerpts:            1-ER-76

    Doc. 67-6, Barbara Machtinger Deposition excerpts:        1-ER-90

    Doc. 67-7, Seigen Johnson Deposition excerpts:            1-ER-107

    Doc. 67-8, Zen Center work email                          1-ER-153

Doc. 30, Zen Center Answer:                                     1-ER-155

Doc. 1, Behrend Complaint:                                      1-ER-162

# EXCERPTS OF RECORD
## TABLE OF CONTENTS

Doc. 70, District Court Opinion:                          1-ER-3

Selected Summary Judgment Exhibits:

    Doc. 64-9, Zen Center conduct guidelines excerpts:       1-ER-16

    Doc. 64-12, Zen Center WPA policies:                     1-ER-26

    Doc. 64-18, Alexander Behrend email:                     1-ER-37

    Doc. 65-1, Alexander Behrend Deposition excerpts:        1-ER-39

    Doc. 65-4, Mary Stares Deposition excerpts:              1-ER-69

    Doc. 65-5, Michael McCord Deposition excerpts:           1-ER-77

    Doc. 67-6, Barbara Machtinger Deposition excerpts:       1-ER-91

    Doc. 67-7, Seigen Johnson Deposition excerpts:           1-ER-108

    Doc. 67-8, Zen Center work email                         1-ER-154

Doc. 30, Zen Center Answer:                               1-ER-156

Doc. 1, Behrend Complaint:                                1-ER-163

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALEXANDER BEHREND,

          Plaintiff,

   v.

SAN FRANCISCO ZEN CENTER, INC., et al.,

          Defendants.

Case No. 21-cv-01905-JSC

**ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 63

Alexander Behrend sues his former employer, the San Francisco Zen Center, for discrimination on the basis of his disabilities.[1] Before the Court is SF Zen Center's motion for summary judgment on its affirmative defense, the ministerial exception. (Dkt. No. 63.)[2] Having carefully considered the briefing, and with the benefit of oral argument on February 2, 2023, the Court GRANTS the motion. SF Zen Center has established as a matter of undisputed fact that Mr. Behrend's work was part of a religious practice program and implicates the organization's "power to decide for [itself], free from state interference, matters of church government[,] . . . faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 186 (2012) (cleaned up).

## FACTUAL BACKGROUND

### A. SF Zen Center

San Francisco Zen Center is the largest Soto Zen Buddhist church in North America. (Dkt. No. 64-2 ¶ 6; *see* Dkt. No. 64-28.) It consists of three temples: City Center, Tassajara Mountain

---

[1] Mr. Behrend has agreed to dismiss the other Defendants. (Dkt. No. 67 at 4 n.1.)

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Center, and Green Gulch Farm.  (Dkt. No. 64-2 ¶ 8.)  SF Zen Center "is a religious training institution, and offers several different types of programs for individuals interested in learning about and training in Zen Buddhism."  (*Id.* ¶ 10.)  While some programs are offered to the general public, it reserves others for those who live full-time at a temple through three residential programs, each of which requires having participated in the preceding program: guest student (2-6 week residency), Work Practice Apprentice (2-3 year residency), and Staff.  (*Id.* ¶¶ 10, 14–16; *see* Dkt. No. 64-12 (Work Practice Apprentice policies).)  SF Zen Center "is a Soto Zen residential training center, and all residents are admitted and supported to be in residency with this primary purpose in mind."  (Dkt. No. 64-9 at 2.)  All residents agree to follow the Shingi (Pure Standards or Guidelines for Conduct) and the Residents' Handbook.  (Dkt. No. 64-2 ¶¶ 11, 13; Dkt. No. 64-7 at 13; *see* Dkt. Nos. 64-9, 64-11.)

All residents participate in both "formal practice" and "work practice."  (Dkt. No. 64-2 ¶¶ 11–12.)  Formal practice includes morning and evening zazen meditations and services, soji (temple cleaning), dharma talks, classes, and events including monthly full moon ceremonies, one-day sit meditations, and three- to five-day sesshin meditations.  (Dkt. No. 64-9 at 5–6; Dkt. No. 64-10 at 2; *see* Dkt. No. 64-6 at 13; Dkt. No. 64-7 at 8–9, 15–16; Dkt. No. 67-7 at 50, 52.)

Work practice includes cooking, dishwashing, bathroom cleaning, preparing guest rooms, and doan ryo ceremonial tasks "which support the formal practice, such as ringing bells, cleaning altars, [and] watching the door during zazen [meditations]."  (Dkt. No. 64-9 at 5–7.)  Work practice is an "essential" and "indivisible" part of Zen training.  (Dkt. No. 64-2 ¶ 12; Dkt. No. 64-12 at 4.)  According to a document written by a SF Zen Center practitioner "about the importance of work practice in the practice of Zen Buddhism," (Dkt. No. 64-2 ¶ 12):

> When work is practice it is seen as part of our zazen (meditation) practice itself. It is an end in itself. Work and zazen go hand in hand. Both are necessary and without one, the other suffers. When work is practice, it is a Buddha doing what a Buddha does, how a Buddha does it.
>
> . . . "Zen Mind" is a willingness to engage ourselves wholeheartedly in whatever we are doing in the present moment, whether it is making up a bed, cleaning a toilet, chopping a carrot, or serving a guest in the dining room. . . . When we bring our zazen practice into our work, we take a leap out of that conditioned small mind and into the freedom

1-ER-004

United States District Court
Northern District of California

> and generosity of the mind that is accepting, fresh, and full of possibility.
>
> . . . Silence supports our practice of full engagement and mindfulness. At first, this silence may feel uncomfortable. And just like in zazen, when you notice the mind wandering off into fantasy, criticism, the urge to chat, or any other distraction, you gently but firmly bring it back to the breath, the body, and the task at hand.

(Dkt. No. 64-10 at 2–3; *see also* Dkt. No. 64-4 at 8 ("It's a meditation in the kitchen as well as in the Zendo [temple]. The only difference is people are sitting still in the Zendo, and they're doing work practice in the kitchen."); Dkt. No. 64-6 at 7 ("[T]he way that [SF] Zen Center approaches work practice is . . . to develop this idea of beginner's mind. . . . [W]e try to . . . have people look at discomfort, look at work as a—an element of their practice and look at how their mind is working while they're practicing . . . ."); Dkt. No. 64-9 at 7 ("Enter wholeheartedly into the work that has been assigned. Maintain silence as much as possible at work.").) In particular, for Work Practice Apprentices:

> [Work Practice Apprentice] positions at [SF Zen Center] are part of the religious training. Communal work practice is an integral and indivisible part of the Zen training and spiritual practice offered at [SF Zen Center]. The terms "work practice" and "work" as used in these guidelines incorporate these fundamental principles.
>
> . . . [SF] Zen Center is primarily a Zen training temple and therefore work practice positions are temporary training positions. Work practice positions have a specific term and are rotated.

(Dkt. No. 64-12 at 4, 10.)

The Pure Standards (Guidelines for Conduct) for Residential Zen Training disclose that "Residents are asked to attend 100% of the formal practice schedule," and "[a]ny month in which a resident's attendance falls below 80% is a matter of high concern." (Dkt. No. 64-9 at 3.) Further, "[a] consistent pattern over an extended period of time of less than 80% attendance of the formal schedule, and/or a lack of fulfillment of other communal and work practice responsibilities . . . may be cause for the Practice Committee to consider whether a student is thriving and/or able to make a residential practice at City Center a priority." (*Id.*)

There are three levels of ordination in Soto Zen Buddhism at SF Zen Center: lay, priest, and teacher ordination. (*See* Dkt. No. 64-7 at 10 ("I, myself, am a Zen priest and I have been ordained and I have students, but I am not actually officially a teacher. Because that is another

3

1-ER-005

ordination usually ten or twenty years down the road where you become an official, quote-unquote, 'teacher' and you can ordain teachers."); Dkt. No. 67-7 at 24–25, 27–29.)  Becoming lay ordained, a priest, or a teacher has a unique timeline for each practitioner.  (Dkt. No. 64-7 at 10–12, 21–22.)  For example, one SF Zen Center resident of 21 years is lay ordained; one former resident of 10 years is a priest with plans to ordain as a teacher; and another resident was lay ordained for three years before becoming priest ordained.  (*Id.* at 12.)  The processes are non-linear and non-Western.  (*Id.* at 11, 20–21.)

### B.  Mr. Behrend and SF Zen Center

Mr. Behrend learned about SF Zen Center by searching online for volunteer opportunities.  (Dkt. No. 67-3 ¶ 2.)  In May 2014, Mr. Behrend had suffered serious injuries from a car accident and been diagnosed with post-traumatic stress disorder ("PTSD").  (*Id.* ¶ 1.)  That summer, he volunteered a few times with SF Zen Center's food outreach program as a way to take his mind off the car accident.  (*Id.* ¶ 2.)  He was not interested in adopting a new religion and did not think SF Zen Center was a religious organization.  (*Id.*)  Since the accident, Mr. Behrend has not been able to return to the high-performance industry in which he built a career, which in turn has made it difficult to afford stable housing.  (*Id.* ¶ 1.)

In fall 2015, Mr. Behrend resumed volunteering with SF Zen Center's food outreach program.  (*Id.* ¶ 3.)  He became more involved by attending meditations one to three times a week and participating in the Saturday sangha, a group of non-residents who assisted by watching the door, guiding visitors through the building, cooking lunch, cleaning up, and listening to a dharma talk.  (*Id.* ¶¶ 3–4.)  At this time, Mr. Behrend "knew that Buddhism was a type of religion and viewed these dharma talks as a type of sermon."  (*Id.* ¶ 4.)  In 2016, Mr. Behrend continued attending SF Zen Center programs as a non-resident.  He also participated in a "practice period" lasting several months, which involved weekly book discussions, monthly one-day sits, and a three-day sesshin.  (*Id.* ¶ 6.)

In summer or fall 2016, Mr. Behrend was given one month's notice of losing his housing.  (*Id.* ¶ 9.)  He spoke with David Zimmerman, SF Zen Center's head of practice, who encouraged him to apply for a residential program.  Mr. Behrend was "eager to have housing and

United States District Court
Northern District of California

employment," had met friendly and supportive residents, and appreciated how meditation and the physical, repetitive work he did at SF Zen Center helped him manage his PTSD symptoms. (*Id.* ¶¶ 8–9.) He applied to be a guest student and began in November 2016. (*Id.* ¶ 10.) As a guest student, he attended morning meditation, worked from 9:00 a.m. to midday, ate lunch with other residents, worked from 1:30 to 3:30 p.m., and attended evening meditation. He also attended dharma talks twice a week and met with the work leader once a week.

Mr. Behrend applied to be a Work Practice Apprentice and began in January 2017. (*Id.* ¶ 11.) By then, he considered himself "a practicing Zen Buddhist, but was not interested in becoming an ordained priest." (*Id.*) As a Work Practice Apprentice, he kept a similar schedule to a guest student, and received room, board, and a stipend. (*Id.* ¶ 12; *see* Dkt. No. 64-12 at 6, 10.) His first work practice assignment was guest services (shika crew), where his duties included "checking guests into the lodging that [SF Zen Center] offered to paying customers, handling and processing payments, preparing guest rooms, preparing conference rooms and event spaces for organizations that rented the space, cleaning and folding laundry, answering guest's questions, and revising and expanding a concierge packet." (Dkt. No. 67-3 ¶ 13.) "Each morning before work began, members of the guest services crew would spend five minutes . . . bowing in front of a small figurine of Buddha," "sprinkling flowers," and "read[ing] a few paragraphs from a book about Buddhism." (*Id.*) Mr. Behrend was later assigned to the kitchen (tenzen crew), where he cooked and washed dishes. (*Id.* ¶ 14.) "Each morning . . . , we would bow to an altar in the kitchen and recite out of the Tenzo Kyokun ('Instructions for the Cook'), for 5-10 minutes before starting work." (*Id.*)

In September 2018, SF Zen Center told Mr. Behrend he would be reassigned to the maintenance crew. (*Id.* ¶ 24.) He "briefly worked on the maintenance crew, but this work exacerbated [his] PTSD symptoms, and [he] sought employment on another work crew, which was denied." (*Id.*) Mr. Behrend alleges SF Zen Center's course of dealing after September 2018, including demanding he move out in January 2019, was disability discrimination in violation of the Americans with Disabilities Act and the Rehabilitation Act. (Dkt. No. 1 at 4–5.) He alleges disparate treatment, failure to engage in the interactive process, failure to provide reasonable

accommodation, retaliation, and termination.  (*Id.* at 2.)  Mr. Behrend eventually left residency in August or September 2019.  (Dkt. No. 67-3 ¶ 25.)

## PROCEDURAL HISTORY

Mr. Behrend, without representation by counsel, filed this action after he left SF Zen Center.  The Court referred him to the Northern District of California Legal Help Desk for possible appointment of counsel, and pro bono counsel was located and appeared on his behalf.  Following a case management conference, the Court ordered SF Zen Center to file a summary judgment motion on its First Amendment Religion Clauses affirmative defense following discovery on this issue.  It did so, and the Court heard oral argument on the motion on February 2, 2023.

## DISCUSSION

## I.    Legal Standard

The Constitution's "Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) (cleaned up).  "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion.  The First Amendment outlaws such intrusion."  *Id.*

Matters of church governance are closely linked to the independence of religious institutions in matters of "faith and doctrine."  *Id.* (cleaned up).  This linkage means the Religion Clauses protect a religious institution's "autonomy with respect to internal management decisions that are essential to the institution's central mission.  And a component of this autonomy is the selection of the individuals who play certain key roles."  *Id.*  What is known as the "ministerial exception" to employment discrimination laws arises from these principles.  "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions."  *Id.*  A religious institution's "independence on matters of faith and doctrine requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities."  *Id.* (cleaned up).

1-ER-008

United States District Court
Northern District of California

"In determining whether a particular position" falls within the ministerial exception, "a variety of factors may be important." *Id.* at 2063. In *Hosanna-Tabor*, the plaintiff-teacher's role "in conveying the Church's message and carrying out its mission" was important, as was her title of "minister." *Id.* at 2062 (citing *Hosanna-Tabor*, 565 U.S. at 192). Further, to be awarded that title, she had to satisfy significant academic requirements. *Id.* (citing *Hosanna-Tabor*, 565 U.S. at 191). But in *Guadalupe*, the Supreme Court explained its consideration of those factors in *Hosanna-Tabor* "did not mean that they must be met—or even that they are necessarily important—in all other cases." *Id.* at 2063; *see also Hosanna-Tabor*, 565 U.S. at 190 (The Supreme Court has declined "to adopt a rigid formula for deciding when an employee qualifies as a minister," but has explained the exception "is not limited to the head of a religious congregation"); *Puri v. Khalsa,* 844 F.3d 1152, 1159 (9th Cir. 2017) ("neither the Supreme Court nor this court has ever expressly limited the ministerial exception to particular types of positions"). So, while giving an employee the title of minister is not enough on its own to satisfy the ministerial exception, it is also not a necessary requirement. *Guadalupe*, 140 S. Ct. at 2063. "Requiring the use of the title would constitute impermissible discrimination, and this problem cannot be solved simply by including positions that are thought to be the counterparts of a 'minister,' such as priests, nuns, rabbis, and imams." *Id.* at 2064. Similarly, "the academic requirements of a position may show that the church in question regards the position as having an important responsibility in elucidating or teaching the tenets of the faith. . . . But insisting in every case on rigid academic requirements could have a distorting effect." *Id.* "[T]hese circumstances, while instructive in *Hosanna-Tabor*, are not inflexible requirements and may have far less significance in some cases." *Id.*

Instead, the Supreme Court has commanded that "[w]hat matters, at bottom, is what an employee does." *Id.* In *Hosanna-Tabor* and *Guadalupe*, what mattered "was the recognition that educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* In light of that understanding, the Supreme Court concluded the teachers in *Guadalupe* "performed vital religious duties." *Id.* at 2066.

> Educating and forming students in the Catholic faith lay at the core of the mission of the schools where they taught, and their employment agreements and faculty handbooks specified in no uncertain terms that they were expected to help the schools carry out this mission and that their work would be evaluated to ensure that they were fulfilling that responsibility. . . . And both their schools expressly saw them as playing a vital part in carrying out the mission of the church, and the schools' definition and explanation of their roles is important. . . . A religious institution's explanation of the role of such employees in the life of the religion in question is important.

*Id.*

The ministerial exception is an affirmative defense and SF Zen Center's burden to prove. *Hosanna-Tabor*, 565 U.S. at 195 n.4. As the party bearing that burden at trial, to prevail on its summary judgment motion SF Zen Center "must affirmatively demonstrate that no reasonable trier of fact could find other than for" it, *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007), "such that every element of [the defense] must be resolved in [its] favor as a matter of law based on undisputed evidence," *Terraza v. Safeway Inc.*, No. 16-CV-03994-JST, 2019 WL 12872959, at *3 (N.D. Cal. Mar. 27, 2019) (cleaned up).

## II. Analysis

Mr. Behrend does not dispute SF Zen Center is a religious organization. (Dkt. No. 67 at 4 n.1.) The question is whether Mr. Behrend falls within the First Amendment Religion Clauses exception. Drawing all reasonable inferences in Mr. Behrend's favor, the totality of the undisputed facts compel the conclusion that the First Amendment bars application of the discrimination laws to Mr. Behrend's position at SF Zen Center.

Mr. Behrend's title was Work Practice Apprentice, and he held himself out as a Work Practice Apprentice. And, at SF Zen Center he acted as a Work Practice Apprentice—fulfilling both the formal practice and work practice requirements. These facts are undisputed. It is also undisputed that as a participant in the Work Practice Apprentice program he was practicing and training in Soto Zen Buddhism. Indeed, the record compels a finding that nearly all of his time at the Center involved the practice of Soto Zen Buddhism. *See Hosanna-Tabor*, 565 U.S. at 194 (noting "[t]he amount of time an employee spends on particular activities is relevant in assessing that employee's status, but that factor cannot be considered in isolation," and concluding ministerial exception applied to employee whose "religious duties consumed only 45 minutes of

United States District Court
Northern District of California

each workday").

Mr. Behrend's focus on his work responsibilities does not change the analysis. There is no genuine dispute that Mr. Behrend's work practice time was religious in nature. The undisputed record shows SF Zen Center considers work practice an integral part of Soto Zen Buddhism training. It considers all of a Work Practice Apprentice's work practice time an expression and practice of faith—not merely the ceremonial opening activities and bowing and chanting throughout the day, but all the work duties in between. *See Guadalupe*, 140 S. Ct. at 2066 ("A religious institution's explanation of the role of such employees in the life of the religion in question is important."). Evidence that work practice took precedence over formal practice activities does not create a material dispute, because SF Zen Center considers work practice an equal expression of faith as formal practice. Likewise, evidence that some Work Practice Apprentices took the Shingi less seriously than others or talked inappropriately during work practice does not create a genuine dispute that they were involved in a religious training program. *See Hosanna-Tabor*, 565 U.S. at 193 (noting it is "surely relevant" that "a recognized religious mission underlie[s] the description of the employee's position"); *Markel v. Union of Orthodox Jewish Congregations of Am.*, No. 2:19-CV-10704-JWH-SK, 2023 WL 1093676, at *8 (C.D. Cal. Jan. 3, 2023) ("As *mashgiach*, [Plaintiff] was integral to the koshering of wine for use by Orthodox Jews and the greater Jewish community, and his efforts were necessary in fulfilling an important function of the Jewish faith.").

Mr. Behrend's evidence that he neither held a leadership role at SF Zen Center nor was on a path to attain one does not alter the result. The question of religious leadership has featured prominently in recent ministerial exception cases, which tend to involve a teacher or comparable employee at a religious school. *See Guadalupe*, 140 S. Ct. at 2056–59 (elementary school lay teachers); *Hosanna-Tabor*, 565 U.S. at 177–78 ("called" teacher); *Palmer v. Liberty Univ., Inc.*, No. 6:20-CV-31, 2021 WL 6201273, at *3–4 (W.D. Va. Dec. 1, 2021) (Professor of Art), *appeal docketed*, No. 21-2434 (4th Cir. Dec. 29, 2021); *Ostrander v. St. Columba Sch.*, No. 3:21-CV-00175-W-LL, 2021 WL 3054877, at *1 (S.D. Cal. July 20, 2021) (preschool teacher); *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1199–1200 (S.D. Ind.

United States District Court
Northern District of California

1    2020) (guidance counselor); *Tucker v. Faith Bible Chapel Int'l*, No. 19-CV-01652-RBJ, 2020 WL

2    2526798, at *1–5 (D. Colo. May 18, 2020) (science teacher, Director of Student Life, Chaplain);

3    *Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132, 1145 (D. Or. 2017) (Assistant Professor

4    of Exercise Science); *DeWeese-Boyd v. Gordon Coll.*, 487 Mass. 31, 34–41 (2021) (Associate

5    Professor of Social Work), *cert. denied*, 142 S. Ct. 952 (2022); *see also Skrzypczak v. Roman*

6    *Cath. Diocese of Tulsa*, 611 F.3d 1238, 1243–44 (10th Cir. 2010) (Director of Diocese's

7    Department of Religious Formation, who supervised and taught at Pastoral Studies Institute).

8    Teaching is a position of leadership with respect to that teacher's students, and the Supreme Court

9    has concluded that if such leadership is religious in nature, it reflects a role in carrying out the

10   religious school's mission. *See Guadalupe*, 140 S. Ct. at 2064 ("[E]ducating young people in their

11   faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at

12   the very core of the mission of a private religious school."); *id.* at 2066 (noting "the close

13   connection that religious institutions draw between their central purpose and educating the young

14   in the faith"). Other cases have involved employees "actively in the process of becoming ordained

15   ministers," and thus on a path to religious leadership. *Alcazar v. Corp. of the Catholic Archbishop*

16   *of Seattle*, 627 F.3d 1288, 1292 (9th Cir. 2010) (en banc).

17           But the ministerial exception does not "appl[y] only to leaders" of the faith. *Guadalupe*,

18   140 S. Ct. at 2067 n.26 (cleaned up). Courts must "take all relevant circumstances into account"

19   and "determine whether each particular position implicate[s] the fundamental purpose of the

20   exception." *Id.* at 2067; *see id.* at 2064 ("[T]hese . . . are not inflexible requirements and may

21   have far less significance in some cases."); *see Hosanna-Tabor*, 565 U.S. at 198 (Alito, J.,

22   concurring) ("The term 'minister' is commonly used by many Protestant denominations to refer to

23   members of their clergy, but the term is rarely if ever used in this way by Catholics, Jews,

24   Muslims, Hindus, or Buddhists. . . . [I]t would be a mistake if the term 'minister' or the concept

25   of ordination were viewed as central to the important issue of religious autonomy that is presented

26   in cases like this one. Instead, courts should focus on the function performed by persons who

27   work for religious bodies.").

28           Every reasonable trier of fact would be compelled to find training in the practice of Soto

10

United States District Court
Northern District of California

1   Zen Buddhism, both the formal practice and the work practice, "lie[s] at the very core of the

2   mission of" SF Zen Center. *Guadalupe*, 140 S. Ct. at 2064. And so, drawing all reasonable

3   inferences in Mr. Behrend's favor, every reasonable trier of fact would be compelled to find his

4   position implicates the fundamental purpose of the ministerial exception. The Work Practice

5   Apprentice position was undisputedly a residential religious training program, and work practice

6   was undisputedly a part of that religious training. Work as part of learning to practice the faith

7   and work as part of training to lead the faith implicate the same fundamental purpose of the

8   exception. *See id.* at 2060 (describing purpose of protecting a religious institution's "autonomy

9   with respect to internal management decisions that are essential to the institution's central

10  mission"); *see also Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 309 (4th

11  Cir. 2004) ("[Plaintiff] supervised and participated in religious ritual and worship. . . . [He]

12  arguably lacked independent authority to make some decisions regarding food preparation, but

13  there is no requirement that an individual have the final say on spiritual matters." (cleaned up)).

14  Therefore, the ministerial exception protects SF Zen Center's autonomy in deciding what kinds of

15  work practice are proper training in the faith.

16          Mr. Behrend's reliance on the declaration of Seigen Johnson does not create a genuine

17  dispute as to whether Mr. Behrend trained and practiced in Soto Zen Buddhism as a Work Practice

18  Apprentice. Her after-the-fact opinion that she had been part of the Work Practice Apprentice

19  program and as part of that program did not receive any religious training is not relevant to Mr.

20  Behrend's experience, or more precisely, SF Zen Center's view of Mr. Behrend's position.

21  Further, her declaration actually supports the finding that the Mr. Behrend resided at SF Zen

22  Center to practice and train in Soto Zen Buddhism. She observes SF Zen Center refers to

23  residents as "monks," but that "several residents" would not refer to themselves as monks

24  "because that would imply a stronger relationship to practice than they actually had." (Dkt. No.

25  67-4 at ¶ 3.) Ms. Johnson's testimony confirms residents were practicing Soto Zen Buddhism,

26  some more seriously than others.

27          The Court's conclusion that Mr. Behrend resided at SF Center to practice and train in Soto

28  Zen Buddhism is distinguishable from cases reasoning that an employee's own practice of the

faith does not establish religious training or leadership. *See Palmer*, 2021 WL 6201273, at *6 ("The Court does not credit Liberty's argument that Palmer's personal religious devotion and experience somehow constitutes 'informal qualification' as a minister. The controlling cases clearly indicate that what is important is formal religious training in preparation for a ministerial role, not personal devotion."); *DeWeese-Boyd*, 487 Mass. at 51 n.22 ("DeWeese-Boyd has made several statements concerning the importance of her faith to her life and how it motivates her personal choices, including her choice of profession and the manner in which she practices it. . . . [W]e cannot, as the defendants suggest, rely on her professions as evidence that DeWeese-Boyd was a minister. Her personal statements of faith are not equivalent to expressly holding herself out as a minister, as Perich did in *Hosanna-Tabor*; as the defendants themselves testified, being a Christian and being a ministerial employee are not the same."); *see also Guadalupe*, 140 S. Ct. at 2068 ("Respondents go further astray in suggesting that an employee can never come within the *Hosanna-Tabor* exception unless the employee is a 'practicing' member of the religion with which the employer is associated."). Here, the Court's analysis is based on the importance of residential practice and training of Soto Zen Buddhism, including work practice, to SF Zen Center and not the importance of practicing Soto Zen Buddhism to Mr. Behrend in particular. The Court does not conclude Mr. Behrend's practice of the faith qualified him as a leader. Rather, it concludes the undisputed importance of practicing and training in Soto Zen Buddhism to SF Zen Center implicates the fundamental purpose of the ministerial exception.

Mr. Behrend insists that applying the First Amendment here is at the outer edges (indeed, beyond the outer edges) of the ministerial exception. The Court disagrees. To the contrary, the undisputed facts are closer to prohibited interference in a religious institution's matters of faith and doctrine than those involving the teachers in *Hosanna-Tabor* and *Guadalupe*. To illustrate, consider what Mr. Behrend is asking a court or jury to do: rule, in effect, that SF Zen Center must allow him to continue to practice and train in Soto Zen Buddhism as a resident at the Center. It is difficult to imagine a more direct interference with a religious institution's constitutional right to decide matters of faith and doctrine than commanding it to continue to house and train a particular person in the practice of the faith.

\* \* \*

SF Zen Center has met its burden to establish the ministerial exception applies as a matter of law. *See Hosanna-Tabor*, 565 U.S. at 195 n.4; *Soremekun*, 509 F.3d at 984. Accordingly, SF Zen Center is entitled to judgment as a matter of law.

## CONCLUSION

SF Zen Center's motion is GRANTED.

This Order disposes of Docket No. 63.

**IT IS SO ORDERED.**

Dated: February 14, 2023

_____
JACQUELINE SCOTT CORLEY
United States District Judge

1-ER-015

**Exhibit 7**
Behrend, A.
10/14/22
@ptus

### San Francisco Zen Center
### Beginner's Mind Temple

# PURE STANDARDS (Guidelines for Conduct)
# FOR RESIDENTIAL ZEN TRAINING
## (Updated February 6, 2018)

*"All students should be like milk and water—more intimate than that even, because we are all good friends from past lives, sharing eternal Buddha Nature as each one's own."*

*"Just sit and see what happens…Following the rules lets you find yourself…The rules are not something to restrict you, but something to support your practice."*

—Shunryu Suzuki Roshi

Beginner's Mind Temple/City Center is a Soto Zen residential training center, and all residents are admitted and supported to be in residency with this primary purpose in mind. Since the birth of Zen training in China over a thousand years ago, it has been common practice for residential practice communities to compose "pure standards" that enable the residents to live with each other in mutual respect, peace, and harmony. This way of life is the body and mind of Zen training and practice. Please follow these guidelines completely and wholeheartedly.

## 16 Bodhisattva Precepts

Our practice is grounded in the 16 Bodhisattva Precepts. These ethical principles provide skillful means for the ways we interact as individuals within the community and serve as guidelines for our embodiment of the practice.

Residents explicitly reflect on and renew their commitment to practicing with the precepts in a Bodhisattva ceremony, held each month at the time of the full moon. The precepts, as we chant them during our monthly Full Moon Ceremony, are as follows:

I take refuge in Buddha.
I take refuge in Dharma.
I take refuge in Sangha.

I vow to refrain from all evil.
I vow to make every effort to live in enlightenment.
I vow to live and be lived for the benefit of all beings.

I vow not to kill.
I vow not to take what is not given.
I vow not to misuse sexuality.
I vow to refrain from false speech.
I vow to refrain from intoxicants.
I vow not to slander.
I vow not to praise self at the expense of others.
I vow not to be avaricious.
I vow not to harbor ill will.
I vow not to disparage the Three Treasures.

1

SFZC_Behrend_000112

## Formal Practice Schedule

First-year residents participate fully in all practice periods, in one class each practice period, and one seven-day sesshin (and three-day sesshin if possible). Those who continue in residency beyond the first year participate fully in one practice period each year, one class and one seven-day sesshin. All residents are expected to attend all monthly one-day sittings.

Please make a commitment to completely follow the formal practice schedule. This means attending morning zazen and service, soji (pre-breakfast temple cleaning), dharma talks and special ceremonies. WPAs and staff members whose work does not conflict time-wise are expected to attend noon service during practice periods and encouraged to attend evening zazen and service.

Attendance is taken for all weekday morning programs, the full Saturday morning public program (except for 9:25am zazen), and the Wednesday evening dharma talk. Residents are asked to attend 100% of the formal practice schedule. Any month in which a resident's attendance falls below 80% is a matter of high concern. The tanto and ino will inquire of the individual as to the reasons as well as explore with them what support may be needed going forward. A consistent pattern over an extended period of time of less than 80% attendance of the formal schedule, and/or a lack of fulfillment of other communal and work practice responsibilities (as outlined below), may be cause for the Practice Committee to consider whether a student is thriving and/or able to make residential practice at City Center a priority. A process may be initiated to explore with the student whether continued residency is appropriate and in their best interest or for that of the residential sangha as a whole.

Be on time for all scheduled events; arrive early enough to be settled at your place before an event begins.

If you cannot attend a practice event because of work, illness or any other reason, please write your name, what event(s) you are missing, and the reason in the tenken notebook outside the ino's (meditation hall manager's) office. There is a page in the notebook for each day. Alternatively, you may send the ino an email explaining your absence. Some crews will need to miss some zendo events because of their work schedules.

If you leave City Center for more than one night, please inform the ino of your absence, the reason and how long you will be away. This includes time away for any vacations, business trips or to attend to medical or personal affairs. If a person's work (as an RBT Resident) involves travel, there is a maximum of four (4) weeks per calendar year that one can be away from temple practice. Be sure to consult ahead of time with the director or tanto regarding whether your time away is in general accord with the City Center residential training parameters. If you are a work practice resident, also speak with your immediate supervisor if your time away will affect your availability for work.

## Zendo and Buddha Hall Decorum

Like the schedule, the guidelines for how we move and act in the zendo help create an environment that supports our practice. When we commit to practice traditional Zen forms, we are more likely to notice what it is that we are actually doing.

Observe silence in and around the zendo whenever people are sitting. Move slowly when in the zendo, and refrain from making eye contact with others. Do not cross in front of the altar. Be in the zendo by the end of the second rolldown on the han. If late, sit or stand in the gaitan and wait for the three bells signaling the start of zazen before entering.

2

SFZC_Behrens000119

Stay in the zendo for kinhin unless it is necessary to leave; this is a time for walking meditation. Do not go to the small kitchen, student lounge or drink tea or coffee during kinhin. You may use the restroom during kinhin.

Muffle sounds such as coughing, sneezing, nose blowing, yawning, or throat clearing.

Handle zendo (and Buddha Hall) cushions carefully and do not move them with your feet. Do not place your feet on the meal boards.

Wear clean and loose-fitting clothes to the zendo and be sure that your face, hands and feet are clean. Appropriate zendo attire is dark and subdued in color, extends beyond the shoulders and below the knees, and is not revealing.

Always wear at least one layer of clothing under your robe if you are wearing a sitting robe. Change in and out of robes and sitting attire in private. Keep robes and sitting attire clean and in good repair.

Carry okesa, rakusu or oryoki one at a time at heart level outside the zendo and at eye level in the zendo using both hands.

If you have long hair, tie it back and wear it off the neck. Do not cover your head.

Refrain from wearing scented products or perfume, watches or jewelry, including mala beads, in the zendo.

Do not bring cell phones or other electronic equipment into the zendo.

### Service

Attend morning service unless you have assigned work or practice discussion during this time. If you are late to service for whatever reason, enter the Buddha Hall and do three bows facing the front of the room on the floor just inside the door, and then step onto the nearest tatami to join a row.

"Chant with your ears," i.e. listen to and blend in with others and to the pace set by the mokugyo.

### Dharma Discussion

The abiding abbot, senior dharma teachers, the tanto (head of practice) and other practice leaders are available for formal or informal discussions regarding Zen practice, living in community at City Center, and any difficulties that may arise. All residents are asked to choose and be in regular communication with a resident practice leader, (even if you have someone who is your primary teacher and who does not reside at City Center).

### The Practice of Silence

Observe silence from the goodnight bell (approximately 9:30pm) through the breakfast chant the following morning (7:20am), and from the end of evening service until after the meal chant and clackers at dinner.

If it is necessary to speak during this time, do so in a way that supports the communal silence and does not disturb others.

3

SFZC_Behrens 000114

(While not an official guideline, you may wish to consider the ways in which it may be personally beneficial to extend the practice of silence to the realm of internet and social media use, visual entertainment (TV/movies), and the reading of non-dharma-related materials during the hours in which the community observes silence.)

### The Practice of Bowing

Stop and bow in gassho (with palms joined) when passing other practitioners in hallways during formal practice times (e.g. during the morning program), including one-day sittings and sesshins.

Do not stop and bow during soji, or in functional spaces such as bathrooms, kitchen, etc.

Stop and bow to any procession, e.g. doshi and jiko/jisha, Buddha tray, wake-up bell, nightwatch bell, etc.

Stop and bow to the bathroom/toilet altar when entering and leaving bathroom/toilet.

### Community Responsibilities

As is outlined in the Residents' Handbook, you agree to the following communal responsibilities and commitments as a City Center resident:

- Complete morning program six (6) times a week, consisting of two periods of zazen, service and soji, as well as oryoki (during practice periods) on Saturday mornings. Sometimes the schedule request may be adjusted.
- All Saturday morning and Wednesday evening dharma talks.
- Doan jobs (2x weekly): these are ceremonial activities which support the formal practice, such as ringing bells, cleaning altars, watching the door during zazen, etc.
- Temple/House job (which takes about one hour a week, and is assigned by work leader)
- Dish shift (1x weekly)
- Weekly bathroom cleaning assignment (15-45 minutes a week, depending on specific task); students living in the 366-368 flats will do house soji one day a week along with other flat mates.
- Night watch (1x month)
- Desk duty (1x month)
- All one-day sittings
- All resident meetings (1x month; currently the meetings are at 8:45 am on Saturdays)
- All sesshins in first year of residency, and one (1) per year after that
- Resident's Retreat (1x yearly, approx 4-5 days)
- All practice periods for first year of residency; and one (1) per year after that
- Regular meetings with a practice leader (at least 1x a month) and one-to-two (1-2) meetings per year with the Tanto.
- Kitchen/meal prep shift (1x weekly, as needed), consisting of approximately two-and-a-half hours each week: *currently this is not requested due to adequate staffing, but can be reinstated at any time depending on staffing need.*

SFZC_Behrend_000116

## Community Responsibilities – cont' (graphic presentation)

| DAILY | WEEKLY | MONTHLY | YEARLY |
|---|---|---|---|
| **Daily Morning Program** *(6x weekly)* Consisting of two periods of zazen, service and soji, as well as oryoki and a dharma talk on Saturday mornings | **Dharma Talks** *(2x weekly)* Saturday morning and Wednesday evening dharma talks | **Night Watch** *(1x month)* | **Practice Period Classes** *(2-3x yearly, depending on student 1 per year after)* |
| **Optional and Encouraged** Late afternoon zazen and service | **Doan Jobs** *(2x weekly)* Ceremonial roles such as ringing bells, cleaning altars, and watching the door during zazen | **Desk Duty** *(1x month)* | **Sesshins** *(All during first year of residency, 1x per year thereafter)* |
| | **Temple or House Job** *(1x weekly)* Assigned by Work Leader, requiring about one hour per week | **One-Day Sittings** *(1x month)* | **Resident's Retreat** *(1x yearly, approx 4-5 days)* |
| | **Dish Shift** *(1x weekly)* | **Resident Meetings** *(1x month)* | **Practice Periods** *(All during first year of residency and 1x yearly thereafter)* |
| | **Bathroom Job** *(1x weekly)* Students living in the 366-368 flats perform house soji one day a week along with other flatmates | **Practice Discussion** *(at least 1x a month, minimum)* | **Tangaryo** *(1x total)* Formally enter the temple as a resident after two practice periods |
| | **Kitchen Shift** *(1x weekly, as needed)* | | **Practice Discussion with Head of Practice** *(2x yearly, minimum)* |

5

SFZC_Behrendt 000016

1-ER-020

## Work Practice

The 9:00 am work meeting is the beginning of our work day. WPAs, staff members and practice period work students are all expected to attend work meeting Monday through Friday and after service on Saturdays unless work commitments require otherwise. RBT students are encouraged to attend if it is possible given their schedules.

Please be on time for work meeting. The weekday morning work meeting is signaled by a drum at 8:55 am, and you should be in the dining room by the time the densho is rung at 9 am. We observe a period of silence (to reflect on peace) between the time of the densho and the communal bow in. General labor students and guest students also attend the afternoon work meeting in the dining room at 1:30 pm.

Refrain from bringing food or drinks to work meeting. Water bottles, coffee/tea mugs, etc. may be left on the radiator outside dining room during meeting.

Enter wholeheartedly into the work that has been assigned.

Maintain silence as much as possible at work. Functional speech is encouraged during work hours.

Notify the work leader or your crew head if you are unable to work for any reason.

## Kitchen and Meal Practice

Refrain from entering the working area of the kitchen without permission. If you need to speak with a member of the kitchen crew, first ask the permission of the fukuten or tenzo.

If you are ill and need food to be brought to you, please notify both the ino and the current resident representatives by sending an email (ccino@sfzc.org / residentrep@sfzc.org). The resident reps are responsible for making sure that food is brought to those unable to collect it for themselves.

The morning program extends through the breakfast food offering, meal drum and chant until the clackers. Please go to the kitchen immediately after soji to participate in the before-breakfast chant. Refrain from reading the newspapers in the Student Lounge any time before the 7:20am meal chant.

Dinner, and getting one's food in the kitchen, is silent until after the chant and clackers in the dining room.

Eat only in the dining room and front or back courtyards. You may sit at the silent table in the dining room if you prefer not to be involved in conversation. Refrain from reading during meals. Meals may be eaten in the student lounge on days/times when a formal meal isn't being served, (ie. Saturday evenings, Sundays and holidays).

Eat only what is served unless you have dietary restrictions or special needs, in which case please consult with the tenzo about your dietary requirements.

Between meals, snacks are available in the small kitchen, including fruit, bread, spreads, coffee and occasional leftovers or other items. You may also store personal food in the small kitchen refrigerator; be sure to label it with your name and the date. Leftovers are also available for

6

residents who work outside the temple and wish to make a bag lunch for themselves. If you have other needs regarding food, please check with the tenzo.

SF Zen Center is a vegetarian community. Please do not prepare or store animal products in any communal kitchen designated as SFZC residential space.

Please be respectful of the property of others, including their food stored in the small kitchen. Also be mindful of severe food allergies and to not cross-contaminate, eg. peanut butter, nuts, garlic, etc.

We encourage the practice of sitting down to eat or drink anything except water.

It's important that residents fully take up the responsibility of keeping the main kitchen and small kitchen both clean and free of used dishes on weekends. Please respect, support and care for the kitchen crew and the sense of communal harmony through this considerate effort.

## Clarity of Mind and Good Health

Refrain from the use or possession of alcohol in the 300 Page temple building and all shared/communal areas in 293-295 Page, 308-310 Page, 340 Page and 366-370 Page.

Refrain from the use or possession of any illegal or other inappropriate drugs in any of SFZC's buildings. In case of medical marijuana needs, speak to the Director about requests and parameters.

Not following these guidelines around alcohol and drug use may result in a student in being asked to leave City Center residence.

Due to reasons of fire hazard and environmental health concerns, smoking is discouraged. Do not smoke in any area of 300 Page Street, in either courtyard, on the steps of 300 Page Street, on the roof or in your room. Similarly, smoking is prohibited in 293-295 Page, 308-310 Page, 340 Page and 366-370 Page. While smoking is permitted outside these buildings on the sidewalk curb, please be sensitive to the ways in which smoke may still affect those nearby and near open windows.

In order to enable the 300 Page Street temple building and the 366-370 Page Street flats to be a practice space for those with various environmental and health sensitivities, incense is no longer burned in indoor public or private areas. Flower petals are instead used as a 'fragrance' offering at altars. For safety reasons, do not leave altar candles burning unattended in any ceremonial space. Residents are asked not to burn candles in their rooms.

SFZC has environmental and sustainability practices which residents and sangha members are requested to follow. Please review the following documents (available from the director) for more information: *Environmental Practices at City Center*; *SFZC's Food Purchasing Guidelines; SFZC's Flower Purchasing Guidelines*; and *SFZC's Building and Maintenance Guidelines.*

## Relationship Practice

San Francisco Zen Center supports people in a wide variety of relationships, from celibate to committed and regardless of sexual orientation. In the interest of establishing a harmonious life together, and in accordance with the third Bodhisattva precept (*I vow not to misuse sexuality*),

7

residents are asked to observe the following guidelines regarding romantic and sexual relationships.

Be aware of how sexual energy is communicated through speech and non-verbally through touch, eye contact, body language, and attitude. Be sensitive to offering a respectful space for practice for residents and non-residents alike. This includes being sensitive to the ways that people of different cultures and gender identities may interpret or experience unwelcome romantic and sexual interest.

If you are part of a couple, please maintain behavior that supports residential practice. Do not isolate yourself from the community, respect silent times, and be sensitive about public displays of affection.

Be aware of how the time and energy needed in relationships may conflict with the City Center practice schedule. Practice leaders are available for consultation regarding this and other relationship topics. Residents beginning a new relationship within the residential or extended sangha are asked to consult with a practice leader, the tanto, or the abbot. The purpose of this conversation is to ensure that relationships are formed with consideration for the impact on the community and individuals involved.

To support new students in finding their practice without the distractions and complications of forming relationships, residents are expected not to begin or express interest in a new sexual or romantic relationship with another resident if either has lived at City Center for less than six months. Residents are also asked not to begin or express interest in relationships with a participant of the wider community (eg. non-resident) for that person's first six months of practice at the center.

Observe the policy of San Francisco Zen Center which prohibits sexual harassment. All residents are also expected to follow the law regarding age of consent, and thus are not to initiate or engage in a romantic or sexual relationship with any individual under the age of 18.

Not following the 6-month guideline or engaging in illegal relationships or sexual harassment may result in a resident being asked to leave residential practice, or not being accepted for future Practice Periods.

## Appropriate Attire

Dress in a manner that is appropriate to and supportive of our life of practice. For example, refrain from going without a shirt or wearing short shorts, thin-strapped tank tops or tops with bare midriffs or very low-cut necklines. Be sensitive about the effect your attire may have on the community, and particularly to how clothing is at times used (whether consciously or unconsciously) to attract sexual attention.

Refrain from going barefoot outside of the Zendo, Buddha Hall, practice discussion and personal rooms; wear closed-toe shoes when working in the kitchen, shop and garden.

## Use of Electronic Devices

In order to establish and preserve a refuge from media and technological bombardment at City Center, please do not use your cell phone to make calls , engage in casual emailing/texting, or to surf the internet in any communal or public space at 300 Page Street. You may use your cell phone to make calls on the sidewalk (but not the steps) in front of 300 Page, in the phone booth

8

on the second floor, or in your single room. You may use also your cell phone to make calls or text in the Art Lounge with the door closed to take or make extremely brief and urgent calls/texts if it is not otherwise in use. Do not use your cell phone to make calls or engage in casual email, texting or internet use in either courtyard or in any other space at 300 Page Street except as listed above, including a shared room, as well as on the roof if others are present. Do not use you cell phone for calls/emails/texting/etc. during meal times in the kitchen serving area, dining room or small kitchen. You may use your cell phone or tablet for note-taking during meetings and classes. Please limit any texting or checking of email in public spaces to "functional" purposes, e.g. doing so is necessary for timely communication or completion of a work-practice related or sangha-related task.

Outside the hours of morning practice (5:10-7:20am), laptops and tablets may be used in the residents' lounge and the roof. The residents' lounge and roof is for light computer use only, limited to one hour. Laptops, tablets and e-readers may be used in the dining room on Saturday afternoons and Sundays when other events are not happening there. E-readers may be treated like a book.

Please do not wear headphones or earbuds in any communal or public space or in the hallways of 300 Page Street, including the front or back courtyard, the kitchen, dining room, etc. You may use them in the privacy of your room, and in the residents' lounge and the reading room only for limited work or study purposes, or in the dining room on Sundays when other events are not happening there.

### Listening to Music and Playing Musical Instruments

Musical instruments may be played during times when there is no scheduled practice event between 7:45 am and 8:30 pm, as long as neighbors are not disturbed. If you wish to listen to music, please do so in the privacy of your room using headphones or earbuds. While residents may listen to music on the roof using headphones/earbuds, be sensitive to the volume of the headsets to insure that the music/sound is not heard by others in the vicinity.

### Diversity

Students at SFZC aspire to view all beings as Buddha, treating each person we meet equally with care and respect. As part of a diverse community and world, SFZC acknowledges that diversity practice and dharma practice are not separate. In actively promoting, nurturing, and maintaining a diverse, equitable and inclusive community, SFZC aspires to express and manifest the Bodhisattva Way. The temple's diverse and inclusive community forms the foundation of each sangha member's spiritual well-being and development as well as the institution's integrity and vitality. In this context, SFZC as an institution commits to embody and support diversity, equity, inclusion and cultural humility.

So that all people may be warmly welcomed and truly supported to join, realize and embody this way of life, SFZC does not discriminate nor tolerate discrimination on the basis of race, nationality, class, gender, sexual orientation, age, or physical ability. City Center welcomes people of every gender, age, race, ethnicity, class, sexual orientation, political belief, language spoken, and physical ability, and will try to accommodate the requests of the sangha. If you feel hurt by the words or actions of another person, or you observe a harmful situation, you may speak to the tanto, director, a practice leader, or a Senior Staff member.

9

SFZC_Behrend 000920

## Conflict Resolution

San Francisco Zen Center now has a *Communications Protocol for Practicing with Conflicts and Disagreements*. This protocol has been developed to encourage members of the SFZC community to take the initiative for informal, face-to- face communication when there is disagreement or conflict. It offers a respectful and considerate way to promote resolution and restore harmony in accord with our values and practices.

If a conflict arises, try to work it out directly. If you need supportive communication tools or have questions about work practice policies, ask your practice leader or crew head for help, or ask the tanto, director, HR staff or other designated person to act as a facilitator to create a neutral space in which both people can be heard and assisted to work out the conflict.

Observe the policy of San Francisco Zen Center which prohibits verbal, physical and sexual harassment. This means refraining from contact with a person who requests no contact. Please speak with the tanto or director if you believe that this policy has been violated, in an effort to seek resolution and re-establish harmony.

———————————

*"To train constantly…requires unstinting support. The structure of the Practice Period [and the guidelines for conduct] provides such support. It is the head and face of Buddha Ancestors. It has been intimately transmitted as their skin, flesh bones and marrow."*

—Eihei Dogen Zenji

*"The assembly of practitioners in the hall should blend like milk and water to support the activity of the Way. Although now for some period you are guest and host, later you will be Buddha Ancestors equally throughout time. Therefore, you should not forget the feeling of gratitude. It is rare to meet one another and to practice what is rare to practice. This is called the body and mind of Buddha-Dharma.*

—Eihei Dogen Zenji

10

SFZC_Behrend 000921


**Exhibit**

Behrend, A.
10/14/22
@ptus



SAN FRANCISCO ZEN CENTER

San Francisco Zen Center posts various state and federal "official' notices as a public service to our students, staff, employees and visitors. However, given its status as a religious organization, many state, federal and local laws either do not apply to SFZC, or have limited application. Please be advised that, by posting these informational placards, SFZC does not waive its special status as a qualifying religious organization and the exemptions that arise from that status.

**San Francisco Zen Center
Work Practice and WPA Policies
O&D Approved working policy**

## TABLE OF CONTENTS

1                                                               INTRODUCTION    **2**

2                        PURPOSE, IDEALS & VALUES    **2**

3                        DIVERSITY & MULTICULTURALISM    **3**

4                WORK PRACTICE WORK PRACTICE
APPRENTICESHIP DEFINED    **3**

5        IMPERMANENCE OF WORK PRACTICE POSITIONS    **8**

6                           HARASSMENT PROHIBITED    **9**

7                   DRUGS AND ALCOHOL PROHIBITED    **10**

8              RESOLVING CONFLICTS WITHIN THE SANGHA    **10**

                                    ACKNOWLEDGEMENT    **11**

## 1. INTRODUCTION

This document provides general information regarding the structure and policies for Work Practice Apprenticeship (WPA) students engaged in work practice at the San Francisco Zen Center (SFZC). It is the responsibility of each WPA student to read and understand these policies. These policies are subject to modification at any time. The director of each practice place will maintain a current copy of these work practice policies, and a copy will be kept in an accessible place (office, library, reading room or student lounge). A copy of these policies will be made available to each incoming WPA student.

## 2. PURPOSE, IDEALS & VALUES

The purpose of the SFZC is to express, make accessible, and embody the wisdom and compassion of the Buddha. The ideals are based on the example of the Buddha, and guided by the teachings and lineage of the Soto School as conveyed to us by our founder, Shunryu Suzuki Roshi, and other Buddhist teachers. Our central value is to express the nonduality of practice and awakening through the practice of Zen and the Bodhisattva Precepts. SFZC acknowledges and values equally the expression of practice in formal settings and in daily life: thus, we affirm both lay and monastic practice as expressions of the Bodhisattva Way.

Guidelines for behavior at the SFZC are contained in the following Bodhisattva Precepts:

A disciple of the Buddha does not kill.
A disciple of the Buddha does not take what is not given.
A disciple of the Buddha does not misuse sexuality.
A disciple of the Buddha does not lie.
A disciple of the Buddha does not intoxicate self or others.
A disciple of the Buddha does not slander.
A disciple of the Buddha does not praise self at the expense of others.
A disciple of the Buddha is not possessive of anything.
A disciple of the Buddha does not harbor ill will.
A disciple of the Buddha does not disparage the Three Treasures.

## 3. DIVERSITY & MULTICULTURALISM

SFZC's intention is to see everyone as the Buddha. Our practice is to treat everyone with the same respect we accord to the Buddha. To do this, it is part of

SFZC_Behrendt 0007

our work practice program to offer equal opportunity for all those who want to study and practice the Dharma at the three practice centers.

SFZC is engaged in a multi-faceted process to facilitate diversity and multiculturalism. SFZC offers and supports programs, events, and affirmative steps to uphold the humanity and inherent value of every person and group.

Any student or staff member who witnesses discriminatory behavior or who believes that they themselves have been subjected to discrimination should follow the steps outlined in Section 6, below.

## 4. **WORK PRACTICE & WORK PRACTICE APPRENTICESHIP DEFINED**

WPA positions at SFZC are part of the religious training. Communal work practice is an integral and indivisible part of the Zen training and spiritual practice offered at SFZC. The terms "work practice" and "work" as used in these guidelines incorporate these fundamental principles.

Ongoing practice requirements for all WPA students include: a regular practice relationship with one or more SFZC practice leaders; observance of the Buddhist precepts; and full participation in temple practice. WPA students are expected to exemplify high standards of conduct. It is necessary for WPA students to live at the practice center where they hold their work practice positions in order to accomplish both their practice obligations and their specific work practice responsibilities. Outside employment or activity by a WPA student should not interfere with primary performance of their SFZC work practice responsibilities.

Each WPA student will receive a work practice position orientation when they take a new position by the crew head. Each new WPA student shall also receive a copy of SFZC's Work Practice Policies and SFZC's *Process for complaints and protocol for conflicts guide.*. Confirmation of the receipt of Work Practice Policies for WPA students will be signed by WPA students at the time their work practice residency begins and a copy of the confirmation placed in their file.

Several apprenticeship programs are available at Zen Center. Successful completion of a two-year Work Practice Apprenticeship (WPA) is a prerequisite to joining the work practice staff.

- ZMC has a five-month apprenticeship program April to September, including the full guest season and two weeks of work period preferably in the spring that earns two practice period credits ZMC also offers a three-month term during these five months if housing space is available that will earn one practice period credit

- GGF has a six-month farm and garden apprenticeship program available mid-April to mid-October. GGF also offers three to four month programs

SFZC_Behrendt 000043

in other areas at GGF from June to October. After 2 practice periods no more credits can be earned

- CC has three to six-month terms available from April to September that one or two credits may be earned. From September to April WPA students will work and participate in the practice period simultaneously but will not earn credits. Students be required to use credits eared from other temples while at CC between September to April. A maximum of two practice period credits can be earned at CC that can be used at a future date. If a student is asked to commit to a work practice position in the city for one year or more, no credits will be used.

Apprentices participate fully in the practice, work and community schedule as described in the WPA program at the practice center of residence. The details at each practice center vary, including dates of the apprenticeship program, dates of practice periods, and breaks. *See the specific information provided by each practice center.*

To qualify for a practice period credit as a WPA, the student must sign the WPA agreement and complete a minimum of three-four months of continuous work practice in the program, usually at the practice center to which they applied.

### Qualification for WPA Practice Period Credits

| Location | Time towards 1 Practice Period (PP) Credit | Time towards 2 Practice Period (PP) Credits |
|----------|---------------------------------------------|----------------------------------------------|
| ZMC | 3 months continuous work practice in the program during the summer guest season: credit for 1 PP | 5 months continuous work practice in the program during the summer guest season plus two weeks during spring work period: credits for 2 PPs |
| GGF | 3-4 months continuous work practice in the program: credit for 1 PP | 6-8 months continuous work practice in the program: credits for 2 PPs |
| CC | 3 months continuous work practice in the program: credit for 1 PP | 6 months continuous work practice in the program: credits for 2 PPs |

Credits for practice periods are given in writing by the director of the location at which the WPA time was successfully completed. Records of these practice period credit will be documented in the students TIS (Time in Service) record.

ZMC (Tassajara) Practice Period Participation
*Prerequisite to applying for a ZMC practice period, a student typically has completed full-time, residential participation in a practice period at CC or GGF. Generally, WPA students will apply their first credit to participation in a practice period at CC or GGF.*

SFZC_Behrend 0009

Apprentices receive room and board during the two-year program. During the first six months of the program, when they are qualifying for practice period credits, apprentices receive a small scholarship to cover essentials. And increase in the scholarship for essentials begins with the seventh consecutive month of enrollment in the apprenticeship program.

| | Monthly Scholarship | | |
|---|---|---|---|
| | City Center | Green Gulch | Tassajara |
| **WPA 1A – first 6 months** | $75 | $25 | $25 |
| **WPA 1B – second 6 months** | $125 | $75 | $75 |
| **WPA 1C – beginning in 13th month \*** | $200 | $200 | $125 |
| **WPA 2 – after 2 PPs, up to 24 months** | $275 | $250 | $175 |
| **WPA 2 – if in Level 2 position** | $350 | $350 | $245 |

\*WPA IC applies only if the apprentice is unable to complete two practice periods in the first 12 months of apprenticeship.

**WPA Training Program, Phase One and Two**

**Phase One:**
A student may apply to the WPA program at any of the three centers for Phase One, which is typically completed in one year, including six months of continuous Work Practice and participation in two practice periods. It is possible to complete a three-month continuous Work Practice training and participate in one Practice Period as partial completion of Phase One of the WPA program.

- Work Practice: A WPA 1 apprentice will take part in 30-35 hours per week of continuous work training for three to six months. This includes hands-on work experience as well as discussions related to work practice in a Buddhist community. Also offered are talks, discussions, and classes on work practice and on Buddhism and Buddhist principles with the Tanto and other teachers.

- Meditation and Curriculum: 20 hours per week. An apprentice will participate in two practice periods. Work Practice training continues within the context of practice period. Talks, discussions, and classes on work practice and on Buddhism and Buddhist principles continue. During practice periods there may be addition sitting periods and ceremonies.

SFZC_Behrend 0000

**Phase Two:**
During Phase Two the student continues engagement with Work Practice and meditation curriculum training. Phase Two includes taking responsibility for completion of tasks and projects, and development of supervisory skills in the context of community and institutional modes and ethics. In addition to participation in the meditation schedule and regularly scheduled lectures, apprentices will continue to participate in talks, discussions, and classes on work practice and on Buddhism and Buddhist principles. WPA 2 students may be invited to training positions that require 35 hours dedicated to Temple Administration and Maintenance.

Phase One and Phase Two may be combined in different ways under the advice and guidance of the Tanto and Director. WPA students may be invited to take on senior staff positions before their two-year apprenticeship is completed. In these cases, WPA students will become staff members and be compensated with staff benefits.

Being accepted into the apprenticeship program does not include an agreement to offer an apprentice a staff position after they have completed the 24-month WPA program at SFZC.

It is expected that the entire WPA program will be completed in no more than three years from the time an apprentice begins as a WPA at any center. After a lengthy absence or non-completion of the apprenticeship program within three years, an apprentice must re-apply to the Officers and Directors for approval to return to the WPA program or to continue as an apprentice and retain credit for any part of the program already completed. Under no circumstances shall a student be part of these entry-level residential programs including practice periods for longer than a total of 24 months/two years without review by the Officers and Directors.

Towards the end of a WPA student's program, WPA 2 students will go through a review process that reflects on their practice path, explores their practice plans for the future while also determining the student's next steps at SFZC. At that point a student may be asked to practice at a different center, offered continued international student scholarships, asked to part with the community after the send of their WPA program or invited to join a staff.

Zen Center School will give apprentices transcripts for them to keep track of what they have participated in. Apprentices who leave in good standing will receive a letter of recommendation and signed transcripts by the Tanto and Director.

SFZC_Behrens 0000

## 5.  **WPA Program Benefits:**

*Apprentices do not qualify for benefits such as health insurance, accrual of vacation time, or other benefits as enumerated in SFZC's work practice policy. The WPA program is under the direction of Zen Center School and not covered by the work practice staff or employment policies of SFZC. Apprentices will not accrue seniority until after they have completed their 24 months/two years in the apprenticeship program. WPA students are scholarship students and therefore do not receive self elected accrued vacation time. GGF and CC temples do have "off days" and observation of national holidays. Time away may be granted by the local campus director taking into account the 3 year completion request as stated in the section describing the WPA training program of Phase Two.*

The Affordable Care Act (ACA) requires that all legal residents of the United Sates have health insurance. Apprentices are expected to apply for insurance under the exchanges offered in California, Covered California – see http://www.coveredca.com – or remain on their parents' coverage if they are under 26 years of age.

**Program End/Transition time:** (Zen Mountain Center only)
Students who receive SFZC stipends, and who are continuing full time at ZMC, are eligible for vacation as follows:

  4 days during the spring work period for continuing residents;
  4 days during the summer guest season, provided the student works at ZMC for t least 5 months in the summer;
  8 days during the fall work period for continuing ZMC residents; and
  8 days during the winter interim.

Days off may be used to extend vacations by two days. Any exceptions to the above schedule must be discussed with the ZMC director. Vacation dates should be approved by the appropriate work area head and the director <u>before</u> making final arrangements.

**Break Credits (CC and GGF only)**
WPA students accumulate one break credit for every full calendar month they are in attendance. Each "break credit" is worth one day off from all temple activities and work practice duties. Before using a break credit, students must timely inform, and receive the approval of, their immediate work practice supervisor. Break credits may be retained for up to 12 months, and may be taken in conjunction with weekends, holidays and regular days off. Break Credits must be used before transferring to another temple unless O&D makes an exception.

**Additional Program End/Transition time:** (CC and GGF)
All WPA students at CC and GGF take the following as holidays: New Year's Day, Martin Luther King Jr. Day, President's Day (at CC only), Memorial Day, July 4th, Labor Day, Thanksgiving, the day after Thanksgiving (at CC only), and Christmas.

SFZC_Behrend 0098

Any requests for additional time must be in written form to the crew head and campus director.

At their discretion and after informing the O & D, the directors at City Center and Green Gulch Farm can determine up to 3 additional holidays each calendar year for their practice center

### Sick Days:
Sick time is not accruable by WPA students. If a WPA student is sick and needs time off, the student must give notice by email to their direct supervisor and copying the campus director for each day the WPA student is out. ZMC students may notify their supervisors by written note since email is not available.

### Disability:
Work Practice Apprentices (WPA) will be given up to, but not more than four weeks time to determine their health status/disability at the discretion of their department head. A physician's note may be required. WPA students will have up to 4 weeks of time to recuperate and get a prognosis regarding return to work and training or completing a plan to leave residential practice. If unable to fully re-engage in work practice and training, the WPA will be asked to leave the residential WPA program. While out training, practice period credit accrual will paused and will not resume again until the student returns to their work practice position.

### Tuition for SFZC Classes & Workshops:
WPA students receive full tuition for SFZC Study Center classes. For a workshop offered by a teacher not engaged in work practice at SFZC, the WPA student must pay the teacher-fee per student. Work practice may take precedence over classes or workshops.

### SFZC Membership:
After one year of long-term residency at Zen Center, residential practitioners at Zen Center will automatically be enrolled as Dharma Light members. Long-term residency is defined as Work Practice Apprentices (WPA), Staff and Room, Board and Tuition (RBT) residents. If you want to opt out of membership, please contact the membership manager: membership@sfzc.org

Zen Center residents do not pay membership dues, and membership will be applied retroactively to the start date of the student' s continuous residency. One important aspect of being a member is that after one year of continuous membership, you may vote in yearly elections to determine the Zen Center Board of Directors and changes to the by-laws. Upon leaving residential practice at City Center, you are encouraged to continue Dharma Light

SFZC_Behrend 000013

1-ER-033

Membership at a minimum cost of 10$/month, organized through the Development Office.

## 6. **WORK PRACTICE AND TEMPLE SUSTENANCE:**

Depending upon the needs of the community, senior staff members are responsible for the well-being of their crew members and may work additional hours in a given week.

Work practice positions are generally not suitable for a part-time schedule. To sustain full-time WPA students during the term of their work practice, the SFZC provides room, board, SFZC tuition, and a modest scholarship paid monthly. All SFZC scholarships and payments are set by SFZC Officers and Directors and may be changed at will by the Officers and Directors, within the context of the budget passed by the Board.

[*Note: SFZC has no formal policy regarding compensatory time. WPA students whose work practice hours regularly exceed the expectation contained in their position description should consult with their supervisor about substitute time off and flex schedules. Such time may or may not be granted at the sole discretion of the SFZC and should be taken as soon as possible after the additional hours have occurred. There is no accrual or carryover of such time.*]

The housing committee or director of each practice center assigns housing on the basis of seniority, special needs and position. Decisions will be made with as much compassion and participation by the WPA member as possible, but when it is necessary for the resident WPA student to move from one facility to another, the administrative decision will be final. Free room, board and SFZC tuition is conditional on the WPA students active and satisfactory participation in the work practice program and the zendo program determined at the sole discretion of the SFZC. When resident WPA students cease participation in work practice at the SFZC, they relinquish the privilege to live in the SFZC housing and may be required to vacate as soon as possible, when asked by the SFZC.

## 7. **IMPERMANENCE OF WORK PRACTICE POSITIONS**

Zen Center is primarily a Zen training temple and therefore work practice positions are temporary training positions. Work practice positions have a specific term and are rotated. Prior to the end of the term, the position and WPA student are reviewed to determine whether the WPA student will continue in the position. In making this determination, consideration will be given to others who would benefit from training in the work practice opportunities afforded by the position. WPA students are expected to be willing to work at any position or

SFZC_Behrend 0009

1-ER-034

location to which they are assigned or reassigned by a senior administrator or teacher.

Participation in work practice positions is entirely voluntary on the part of the participant, who may withdraw at any time at their sole discretion. Similarly, SFZC may decide, at its sole discretion, that continued participation in a work practice position is not in the best interests of the participant and/or SFZC, and SFZC may require that a participant vacate the position or the program.

## 8. HARASSMENT PROHIBITED

SFZC prohibits the harassment of its students, staff members and the public. Prohibited behavior includes, but is not limited to:

- Verbal harassment: derogatory comments regarding another's race, color, age, gender, gender identity or expression, sexual orientation, national origin/ancestry, citizenship, political or union affiliation, marital status, pregnancy, disability, or any other basis prohibited by law.
- Physical harassment: hitting, pushing or other aggressive physical conduct, or threats to take such action.
- Sexual harassment: making unwelcome sexual advances or requests for sexual favors; making submission to or rejection of such conduct the basis for decisions affecting the student, staff member or guest; sexual innuendos, propositions or threats; unwanted physical contact; creating a hostile environment that is offensive to the gender of the recipient.
- Prohibited harassment may also occur if a hostile environment has been created that is sufficiently severe, pervasive, or persistent so as to unreasonably interfere with a person's work performance or participation in Zen Center activities.

Any student, staff person or visitor to any Zen Center campus who witnesses, or who believes that they themselves have been the victim of, improper conduct should report the matter immediately to the Director or Tanto (or, if necessary, the Abbess/Abbot/Resident Dharma Teacher) at the practice center where the incident occurred. The People Development Department (PDD) at 415 354 0378, by email at humanresources@sfzc.org or regular mail to 300 Page St. SF, CA. 94102.

## 9. DRUGS AND ALCOHOL PROHIBITED

The possession and use of alcohol (except as part of a ceremonial toast offered at New Years) and illegal drugs, and the misuse of prescription drugs are prohibited on the premises of SFZC. Anyone under the influence of such

SFZC_Behrend 0009 5

substances or ingesting such substances while on the premises, is subject to review and may be subject to appropriate disciplinary action, including being asked to leave the SFZC community. SFZC is committed to assisting those who need help with a drug or alcohol problem.

## 10. RESOLVING CONFLICTS WITHIN THE SANGHA

When work-related disagreements arise, our practice is to attempt to resolve such conflicts directly between the parties whenever possible.
Students are encouraged to use the SFZC conflict resolution process with options of reviewing the protocol sheet, requesting a facilitated meeting or making a formal complaint. For further information, complete details and tools, please visit hr.sfzc.org. Students may be referred to a trained facilitator to assist in resolving the conflict. The director and tanto at each center will have a list of available facilitators on all SFZC campuses. Staff members can utilize facilitators from any campus.
If the complaint or conflict is urgent or serious, please contact the local director or tanto immediately. If the director and tanto are unavailable, please contact human resources or a local practice leader. You can also contact the People Development Department (PDD) at 415 354 0378, by email at humanresources@sfzc.org or regular mail to 300 Page St. SF, CA. 94102.

**11 |** P a g e

SFZC_Behrend 000058
1-ER-056

Exhibit

Behrend, A.
10/14/22
*aptus*

From: **Alex Behrend** <alex.s.behrend@gmail.com>
Date: Sun, Jun 10, 2018 at 11:14 AM
Subject: Ordaining
To: <victoria.austin@sfzc.org>, David Zimmerman <cctanto@sfzc.org>, T. Lien Shutt <lien@awakeinlife.org>

*Hi, all. I wrote the following email before I learned the news of Jordan's passing this morning. And given what he shared about his own ordination "process" something is guiding me to send this note now. Obviously this is not urgent!! (Finally, considering Jordan's penchant for irreverence, I'll share that perhaps what is actually moving me to hit send now is a bit too much green tea with breakfast.)*

🙏🙏🙏

Good morning, Vicki, Lien and David.

I hope this note finds you all well. And that the news I'm about share is as pleasant to you all as it is for me.

Should I keep residing with SFZC for the next few years (and that's what I want), I would like to work and train to ordain as a priest with an eye towards eventually becoming some kind of practice leader.

When the time is right, may we explore together what that might entail, and how we might fashion an appropriate training container to further develop my ability to freely offer to other people what has been so freely offered to me these past few years.

Also on an entirely selfish note, further delighting in the virtue of our training, availing my own self of the wisdom of our teachings, and enhancing my reliance on our community is really enjoyable for me. (Like totes enjoyable, as the kids might say these days!)

And furthermore ...

Given my extensive and unique experience serving and advocating for the inclusion of people historically shut out of policy-making roles and leadership, I would like to explore with you all together (and others of course) the idea that it would be possible and compatible for me to resume project work from my public affairs profession and undertake priest training at the same time.

In fact, it could very well be the most ideal environment for me to do the RBT program, find public interest work, and begin training as a priest.

On a final note and as I've discussed with each of you respectively, it seems to me and others that I am already acting as a skillful and beneficial resource to fellow residents, peers, friends and my family as we all contend with the opportunities of living and being together.

"Please take good care of yourselves," and thank you all for your support.

Bowing,
Alex

========
Alex Behrend
415-810-9047

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4   ALEXANDER BEHREND,            )
                                   )
 5            Plaintiff,           )
                                   )
 6   vs.                          ) Case No.2:21-cv-01905-JSC
                                   )
 7   SAN FRANCISCO ZEN CENTER,     )
     INC.; SAN FRANCISCO           )
 8   EVERYDAY, INC.; SAN           )
     FRANCISCO THIRD WAY, INC.;    )
 9   THE ZEN FOUNDATION,           )
                                   )
10            Defendants.          )
                                   )
11   _____)

12

13

14   REMOTE VIDEOCONFERENCE DEPOSITION OF ALEXANDER S. BEHREND

15          Monday, October 17, 2022, at 9:09 a.m.

16

17

18

19

20

21

22

23   Reported by:
     Alyssa Pacheco
24   Stenographic Reporter
     CSR No. 13391
25   Job No. 10109190
```

1    Zen Center that you consider yourself a Zen Buddhist?

2        A.  I don't remember.

3        Q.  When you say you don't remember, you don't

4    remember one way or the other whether you did or you

5    didn't; is that right?

6            ATTORNEY QUACKENBUSH:  Object to form.

7            THE WITNESS:  I don't remember one way or the

8    other.

9    BY ATTORNEY RIDLEY:

10       Q.  Okay.  When did you start becoming involved with

11   San Francisco Zen Center?

12           ATTORNEY QUACKENBUSH:  Object to form.  Vague,

13   ambiguous.

14           THE WITNESS:  I believe the first time I visited

15   San Francisco Zen Center was in the summer of 2014.

16   BY ATTORNEY RIDLEY:

17       Q.  And what did you do in the summer of 2014?

18       A.  What did I do in the summer of 2014?

19       Q.  Right.  When you first visited the SF Zen Center.

20       A.  I volunteered with their food outreach program.

21       Q.  And what did that entail?

22       A.  Making food and serving -- making food and serving

23   it to people at, I believe, homeless shelters.

24       Q.  And was that a single event?

25       A.  No.

1-ER-040

1    Q.  How frequently did you do that in the summer of

2    2014?

3    A.  Three, four, five times approximately.

4    Q.  Okay.  And this was at San Francisco Zen Center?

5    A.  We made the food at San Francisco Zen Center.

6    Then we took it to a shelter.

7    Q.  Okay.  In 2014, were you participating in any

8    religious activities at San Francisco Zen Center?

9         ATTORNEY QUACKENBUSH:  Object to form.  Vague,

10    ambiguous.

11         THE WITNESS:  Could you repeat the question,

12    please.

13         ATTORNEY RIDLEY:  Would the court reporter please

14    re-read it.

15         (Whereupon the requested portion was read back.)

16         THE WITNESS:  I didn't consider activities that I

17    participated in in 2014 to be religious.

18    BY ATTORNEY RIDLEY:

19    Q.  Okay.  Where were you living in 2014?

20    A.  Oh, what's -- in the -- in the Castro

21    neighborhood, and I can see the place, but I can't

22    remember the street right now.

23    Q.  Okay.  And where were you working at the time, if

24    you were working?

25    A.  I -- I don't remember.

1-ER-041

1  with the San Francisco Zen Center in the summer of 2014,

2  did you have any other involvement with San Francisco Zen

3  Center that year?

4       ATTORNEY QUACKENBUSH:  Object to form.

5  Mischaracterized his prior testimony.

6       THE WITNESS:  Could you repeat the question,

7  please.

8       ATTORNEY RIDLEY:  Would the court reporter please

9  re-read it.

10       (Whereupon the requested portion was read back.)

11       THE WITNESS:  I don't know.

12  BY ATTORNEY RIDLEY:

13     Q.  Okay.  Do you recall having any involvement with

14  San Francisco Zen Center in 2015?

15     A.  Yes.

16     Q.  What involvement do you recall having with San

17  Francisco Zen Center in 2015?

18     A.  I would go to the -- I would intermittently go to

19  the Wednesday and Saturday lectures.  I believe I still

20  volunteered with the food outreach program, and I started

21  participating with a group of people who didn't live or

22  work at San Francisco Zen Center called Saturday Sangha,

23  and I attended meditation.

24     Q.  Anything else?

25     A.  That's all I remember for 2015.

1-ER-042

Case 3:21-cv-01905-JSC Document 52-17 Filed 11/23/22 Page 41 of 86
Case 3:21-cv-01905-JSC Document 75-37 Filed 01/23/22 Page 44 of 186

**Behrend vs.**
**San Francisco Zen Center, Inc.**

Alexander S. Behrend

1      Q.  Okay.  When you say "Saturday Sangha," how do you

2  spell "sangha"?

3      A.  S-A-N-G-H-A.

4      Q.  Okay.  Do you know -- what does it mean?  What

5  is -- what is sangha?

6      A.  I understand it to mean congregation.

7      Q.  Okay.  Did you -- do you recall what Wednesday and

8  Saturday lectures you attended to 2015?

9      A.  I don't remember the specific ones.

10      Q.  Do you generally recall what the topics were?

11      A.  I don't remember generally even the topics.

12      Q.  Okay.  Do you know whether or not they concerned

13  the practice of Zen Buddhism?

14      A.  Could you repeat that question, please.

15      ATTORNEY RIDLEY:  Could the court reporter please

16  re-read it.

17      (Whereupon the requested portion was read back.)

18      THE WITNESS:  No, I don't know if they concerned

19  the practice of Zen Buddhism.

20  BY ATTORNEY RIDLEY:

21      Q.  You don't know one way or the other, correct?

22      A.  Correct.

23      Q.  Okay.  And then you -- with regard to Saturday

24  Sangha, you said you were participating with a group of

25  people who didn't live or work at SF Zen Center; is that

1-ER-043

 1    correct?

 2        A.  Yes.

 3        Q.  Okay.  And what did you do at Saturday Sangha?

 4        A.  Mostly prepare lunch and then sometimes help out

 5    with meditation.  In 2015, usually it would have been,

 6    like, watching the door, like, when people came and

 7    entered the actual building, not entered the meditation

 8    room.  And then attend the talk.  And then afterwards,

 9    you know, like, four to eight of us would eat lunch

10    together and talk about -- in 2015, talk about reading

11    from a book by Pema Chödrön.

12        Q.  Okay.  When you said attend the -- was it

13    bock (phonetic)?  Is that what you said?

14        A.  Bock?

15        Q.  Yeah.  You said watching the door and then

16    attending the -- I -- I heard bock.  I didn't -- what was

17    it?

18        A.  Talk.

19        Q.  Attending the talk.  I see.  What's the talk?

20        A.  The Dharma talk.  They refer to it as -- San

21    Francisco Zen Center refers to it as the Dharma talk.

22        Q.  I see.  And what is the Dharma talk?

23        A.  It's a lecture.  It seemed to me like a -- a

24    lecture, someone would -- yeah, a lecture.

25        Q.  Okay.  Did it have to do with Zen Buddhism?

1   I'm asking, no, you don't know, or do you know one way or

2   the other?

3       A.   No, I don't know one way or the other.

4       Q.   **Was there any result of the one-on-one?**

5            ATTORNEY QUACKENBUSH:  Object to form.  Vague,

6   ambiguous.

7            THE WITNESS:  I -- I liked her, and I continued to

8   participate at San Francisco Zen Center.

9   BY ATTORNEY RIDLEY:

10      Q.   **Okay.  Do you recall any other activities that you**

11  **had with SF Zen Center in 2015?**

12      A.   No, I don't recall other activities other than --

13      Q.   **Okay.**

14      A.   -- what we've discussed.

15      Q.   **Okay.**

16      A.   In 2015.

17      Q.   **When did you apply to become a guest student at SF**

18  **Zen Center?**

19      A.   The summer or fall of 2016.

20      Q.   **Prior to applying to be a guest student, do you**

21  **recall doing any activities with SF Zen Center?**

22      A.   Yes.

23      Q.   **Okay.  What activities do you recall participating**

24  **in prior to applying to become a guest student?**

25      A.   Meditation, Saturday Sangha, going to lectures.  I

```
 1    religious organization, correct?

 2              ATTORNEY QUACKENBUSH:  Object to form.

 3              THE WITNESS:  Yes.

 4    BY ATTORNEY RIDLEY:

 5       Q.  Okay.  Why did -- I'll go back to 2016.  Why did

 6    you decide to apply --

 7       A.  One five or one six?

 8       Q.  One six.

 9       A.  Okay.  Thank you.

10       Q.  Yeah, no problem.

11           We were talking about your applying to become a

12    guest student at SF Zen Center.  Do you recall?  What

13    did --

14       A.  Do I recall what?

15       Q.  Hang on.  In 2016, why did you decide to apply to

16    be a guest student at SF Zen Center?

17       A.  I needed a place to live.  I had lost my

18    apartment.  I had lost my job.  So it seemed like a very

19    interesting thing to do.  They were all my friends, and I

20    was interested in Zen Buddhism.

21       Q.  And why did you lose your job and your apartment?

22       A.  The job was a temp job, and they found a permanent

23    replacement for me.

24           The apartment, the master tenant was moving in his

25    son.
```

Alexander S. Behrend

```
 1       Q.  And the lectures on Wednesday and Saturday, those
 2   are the Dharma lectures?
 3       A.  Yes.
 4       Q.  And the work in the afternoon was from what time
 5   to what time?
 6       A.  Roughly, like, 1:30 to 3:30.
 7           There was also a weekly meeting of the guest
 8   students with the work leader, was his title.
 9       Q.  So at this time you were a resident at City
10   Center, correct?
11       A.  I lived at San Francisco Zen Center as a guest
12   student.
13       Q.  At the City Center?
14       A.  Yes.
15       Q.  And where's that located?
16       A.  300 Page Street.
17       Q.  Did your participation as a guest student involve
18   religious ceremonies?
19           (Reporter clarification.)
20           ATTORNEY QUACKENBUSH:  Yeah.  Object to form.
21           ATTORNEY RIDLEY:  Start it over again.
22       Q.  When you were participating as a guest student,
23   did you participate in any religious ceremonies?
24           ATTORNEY QUACKENBUSH:  Object to form.
25           THE WITNESS:  Yes.
```

**Page 54**

```
 1    BY ATTORNEY RIDLEY:

 2         Q.  What religious ceremonies did you participate in?

 3         A.  There was service Tuesdays through Saturdays.

 4    There was a -- like, we bowed to an altar at the start of

 5    work circle.  I mean, I don't know if that's a ceremony.

 6    And there were other ceremonies performed at San

 7    Francisco Zen Center.  I don't know if those were

 8    performed during the time I was a guest student, like,

 9    monthly -- I forget, like -- I forget all the ceremonies

10    and I don't know if they were performed specifically when

11    I was -- during that, you know, guest student period.

12         Q.  What ceremonies are you referring to?

13         A.  There would be ceremonies at an altar that -- I

14    think called a kaisando, K-A-I-S-A-N-D-O.  There were --

15    we would bow to an altar.  If I -- if I was assigned to

16    the kitchen during my time as a guest student, you know,

17    we would bow to an altar before we started the workday,

18    and we'd recite out of a Zen scripture, the name of which

19    is escaping me right now.  Actually, we would -- we would

20    recite out of something called the Tenzo Kyokun.

21         Q.  Can you spell that?

22         A.  I think that's -- I think it's spelled T-E-N-Z-O

23    K-Y-U-K-E-N [sic].

24         Q.  Any other religious ceremonies you were thinking

25    of?
```

Alexander S. Behrend

```
 1        A.   That's what I'm remembering now.
 2        Q.   Okay.  And the meditations that you were
 3   attending, did you consider those to be religious
 4   activities related to Zen Buddhism?
 5        A.   At that point, yes.
 6        Q.   And how about the Dharma talks?  Did you
 7   understand those talks to relate to the practice of Zen
 8   Buddhism?
 9        A.   Yes.
10        Q.   Okay.  Previously -- I want to follow up on
11   something you mentioned before and I failed to follow up
12   on.  Previously you talked about a doanryo.  Do you
13   remember that testimony?
14        A.   Yes.
15        Q.   What is doanryo?
16        A.   That's the group of people who administer the
17   meditation.  So one person would keep time.  One person
18   would watch the door as people came in and keep an eye on
19   the coat closet.  One person would strike this wooden
20   block called the han, H-A-N, letting know -- letting
21   people know that meditation was starting in -- in a
22   number of -- you know, soon.  Then after meditation --
23   not everyone in the doanryo participated in the
24   evening -- in the evenings after the meditation, there
25   was a short service, and some people in the doanryo would
```

1-ER-049

Alexander S. Behrend

1    participate in the service.

2         Oh, another person in the doanryo would carry

3    dried flowers and follow the priest who would, at the

4    start of meditation, go to the altar and then sprinkle

5    the -- like, sprinkle the dried flowers in the -- in some

6    water on the altar.

7    Q.  Anything else?

8    A.  There was one person -- I never did this job --

9    that they called a kokyo.  I think it's K-O-K-Y-O.  And

10   they would, you know, kind of sing, chant something

11   during the short service right after meditation.

12   Q.  So I take it you did participate in the doanryo?

13   A.  Yes.  I participated in the evening doanryo and

14   then, like, in the morning doanryo when I started living

15   there.

16   Q.  Okay.  Did you participate in the doanryo in 2016?

17   A.  Yes.

18   Q.  Did you do so in 2017?

19   A.  Yes.

20   Q.  How about 2018?

21   A.  Yes.

22   Q.  Do you recall how many times you did it in 2016?

23   A.  No.

24   Q.  Do you recall how many times you did it in 2017?

25   A.  I -- no.

Alexander S. Behrend

1    Q.   And you applied to become a work practice

2    apprentice, correct?

3    A.   Yes.

4    Q.   You understood the position was literally named

5    "work practice apprentice," correct?

6    A.   Yes.

7    Q.   When did you decide to apply to be a work practice

8    apprentice?

9    A.   I -- so I -- I decided to apply for the work

10   practice apprentice program in the -- you know, during

11   that conversation with David Zimmerman, even before I

12   became a guest student.

13   Q.   So you decided you were going to apply to be a

14   work practice apprentice some time in the late 2016?

15   A.   Yeah, like, summer or fall 2016.

16   Q.   Okay.  What -- why were you applying to be a work

17   practice apprentice?

18   A.   Because I needed a place to live, I liked the

19   work, and I was interested in Zen Buddhism.

20   Q.   When you were applying, did you understand that in

21   applying to be a work practice apprentice, part of the

22   apprenticeship regarding Zen Buddhism would include

23   performing work?

24   A.   Could you repeat the question, please.

25        ATTORNEY RIDLEY:  Could I have it re-read, please.

1           (Whereupon the requested portion was read back.)

2           THE WITNESS:  Yes.

3    BY ATTORNEY RIDLEY:

4       Q.  Okay.  When you joined as a work practice

5    apprentice, did you have any goal of being ordained as a

6    priest in the Zen Buddhism?

7       A.  When I joined, I don't know.

8       Q.  Did you tell anyone that you had the goal of being

9    ordained?

10          ATTORNEY QUACKENBUSH:  Counsel, are you referring

11   to when he joined?

12          ATTORNEY RIDLEY:  When he joined as a work

13   practice apprentice.

14          THE WITNESS:  I don't recall one way or the other

15   when I join -- saying -- communicating that when I

16   joined.

17   BY ATTORNEY RIDLEY:

18      Q.  Do you recall communicating when you were joining

19   or applying for the work practice apprenticeship that you

20   had a goal of deepening your religious practice?

21      A.  Yes, I recall that.

22      Q.  And the deepening of the religious practice was

23   Zen Buddhism, correct?

24      A.  Yes.

25      Q.  What did being an apprentice mean to you?

1    in residence at Zen Center before?  If so, when and where

2    did you reside?"  And you gave dates of November 13,

3    2016, to December 22nd, 2016, and you say, "I've been a

4    guest student during this time," correct?

5        A.  Yes.

6        Q.  And when they ask, "Have you practiced in

7    residence?" the practice is practice Zen Buddhism,

8    correct?

9        A.  Yes.

10       Q.  Okay.  Okay.  On the second page, Question 1 asks,

11   "Your interest in Zen and in participating in the WPA

12   Program at this time.  What are your plans for using your

13   earned practice period credits?"

14           What did you understand to be a earned practice

15   period credit?

16       A.  At the time?  I don't remember what I understood

17   that to be at the time.

18       Q.  Okay.  In the first paragraph you talk about your

19   participation since 2014, and at the last sentence it

20   says, "My time as a guest student has been wonderful and

21   the Rohatsu sesshin, my first seven-day session, was an

22   amazing experience."

23           What made your time as a guest student wonderful?

24       A.  Living there, working in the kitchen, getting to

25   spend lots of time with people I'd become friends with

Alexander S. Behrend

1  and gotten to know as a -- as a nonresident.  Meditation

2  was really good for me physiologically.  The -- the quiet

3  and calm nature of the place was really good for me.  I

4  really liked the food.  Yeah, I'll leave it at that.

5      Q.  Okay.  And your time as a guest student involved

6  religious practice, too, correct?

7          ATTORNEY QUACKENBUSH:  Object to form.

8          THE WITNESS:  Yes.

9  BY ATTORNEY RIDLEY:

10     Q.  In fact, the last paragraph -- last sentence of

11  that paragraph says, "The more I sit and the more I

12  practice, the more positive impact I'm experiencing in my

13  life," correct?

14     A.  Yes, that's what that sentence says.

15     Q.  When you say "the more I sit," do you mean

16  meditation?

17     A.  Yes.

18     Q.  And when you say "the more I practice," do you

19  mean practice Zen Buddhism?

20     A.  I -- I mean Zen Buddhism and sitting meditation,

21  yes.

22     Q.  Okay.  Next paragraph says, "I would like to do a

23  work practice apprenticeship to deepen my practice and

24  continue working with how practice is helping me grow and

25  thrive."

Alexander S. Behrend

1        You wrote that, correct?

2        A.  Yes.

3        Q.  You didn't say you wanted to apply to work

4   practice apprenticeship in order to have housing,

5   correct?

6        A.  I did -- wait.  What's the question?

7            ATTORNEY RIDLEY:  Can the court reporter read it.

8            (Whereupon the requested portion was read back.)

9            THE WITNESS:  I didn't include that in my

10  application.

11  BY ATTORNEY RIDLEY:

12       Q.  You said "to deepen my practice."  The practice of

13  Zen Buddhism?

14       A.  Yes.

15       Q.  Did you expect that as a WPA you would continue

16  having participation in religious activities at SF Zen

17  Center?

18            ATTORNEY QUACKENBUSH:  Object to form.

19            THE WITNESS:  Yes.

20  BY ATTORNEY RIDLEY:

21       Q.  Was your time as a guest student similar to your

22  time as a WPA?

23       A.  Yes.

24       Q.  Do you recall when you started as a WPA?

25       A.  Yes.

Alexander S. Behrend

```
1        A.   Yes.

2        Q.   What's your estimate of how many times you had

3    recite the precepts?

4        A.   I think every full moon.

5        Q.   Okay.  Did some people refer to the precepts as

6    the vows?

7        A.   I don't know.

8        Q.   Do you recall attending full moon ceremonies?

9        A.   Yes.

10       Q.   Did you -- did you attend full moon ceremonies as

11   a WPA?

12       A.   Yes.

13       Q.   Do you recall reciting these precepts at that

14   ceremony as a WPA?

15       A.   Yes.

16       Q.   Did you understand the full moon ceremony was a

17   religious activity?

18       A.   Yes.

19       Q.   I'm going to have you take a look at page 45 under

20   Number 3, "Work Practice and Work Practice Apprenticeship

21   Defined."  Do you see where I am?

22       A.   No.  4.  Okay.  Yes, I see it now.

23       Q.   Okay.  Do you recall ever reading a WPA policy

24   handbook that described and defined "work practice and

25   work practice apprenticeship"?
```

Alexander S. Behrend

1      A.  Yes.

2      Q.  Okay.  Do you recall it saying that WPA

3  position -- this is the first sentence on the first

4  paragraph -- "WPA positions at SFZC are part of the

5  religious training"?

6      A.  Do I recall reading that when I was an apprentice?

7      Q.  Yes.

8      A.  I don't recall.

9      Q.  Okay.  You don't recall one way or the other?

10     A.  I don't recall one way or the other.

11     Q.  Okay.  Do you recall reading that -- the next

12  sentence, "Communal work practice is an integral and

13  indivisible part of the Zen training and spiritual

14  practice offered at SFZC"?

15     A.  I don't recall reading that specifically.

16     Q.  Okay.  Do you -- but you recall being told that,

17  correct?

18     A.  Yes.

19     Q.  Okay.  Let's see.  I'm going to go to page 5.

20  It's Bates stamp 47.  Let me know when you're there.

21     A.  I'm there.

22     Q.  Okay.  Under the first bullet point it says, "Work

23  practice:  A WPA 1 apprentice will take part in 30 to

24  35 hours per week of continuous work training for three

25  to six months."

1          Did you understand that would be the case when you

2    applied for the WPA position?

3          A.  Yes.

4          Q.  Okay.  And you recall being a WPA 1; is that

5    correct?

6          A.  I don't recall, like, the specific, you know,

7    terminologies, like, WPA 1, or 2 or whatever.

8          Q.  Okay.  The next sentence says, "This includes

9    hands-on work experience as well as discussions related

10   to work practice in a Buddhist community."

11          Do you see that?

12          A.  Did you just read the second sentence?

13          Q.  I did.

14          A.  Okay.  And what's the question?

15          Q.  So did you understand that that would -- that was

16   part of your experience as a WPA?

17          A.  Yes.

18          Q.  I think I'm done with that document.

19          When you became a WPA, is that when you became a

20   resident at the SF Zen Center, City Center?

21          A.  Could you repeat the question.

22          Q.  Sure.  When you became a WPA, is that when you

23   became a resident of the City Center at SF Zen Center?

24          A.  No.

25          Q.  Okay.  Did you first become a resident when you

1-ER-058

1  about?

2  A.  The abbot, the -- the tanto, the director, the

3  practice committee.  Apprentices and Dharma Bridge

4  students -- like, people who lived and worked at San

5  Francisco Zen Center were not required to do the evening

6  zazen or service ever.

7  **Q.  Which -- which abbot are you talking about?**

8  A.  You know, I'm not -- I -- I'm not exactly sure who

9  the abbots were at the time.  I think the abbot -- head

10  abbot was Linda Ruth Cutts and then the abbot of City

11  Center was Ed Sattizahn.

12  **Q.  Can you spell their names?**

13  A.  Linda, L-I-N-D-A; Ruth, R-U-T-H; Cutts, C-U-T-T-S.

14  Ed, E-D; Sattizahn, S-A-T-T-I-Z-A-N [sic], is my best

15  guess.

16  **Q.  Okay.  Who is the tanto you're referring to?**

17  A.  David Zimmerman.

18  **Q.  Okay.  How about the director you're referring to?**

19  A.  Mary Stares and then Mike Smith.

20  **Q.  And the practice committee?**

21  A.  I can't remember all the members of the practice

22  committee.  I know David was on it.  I know Ed Sattizahn

23  was on it.  Paul Haller was on it.  The other members I'm

24  not sure of.

25  **Q.  Okay.  As a WPA, did you ever attend the service**

```
1      at 6:20?

2           A.  As a WPA, I did attend the service at 6:20.

3           Q.  How about as a Dharma Bridge student?

4           A.  No.

5           Q.  What is a zendo?

6           A.  Meditation hall.

7           Q.  Okay.  Did you attend the Wednesday lectures at

8      7:45 as a WPA?

9           A.  Yes.

10          Q.  What is the Buddha hall?

11          A.  It's the room where the Dharma talks were given.

12     Also, meetings were held in there.  Yoga was held in

13     there.  Community events in the evenings were held in

14     there.

15          Q.  Okay.  Did you attend the Wednesday lecture as a

16     Dharma Bridge student?

17          A.  I don't know.

18          Q.  When you were a WPA -- do you see where it says

19     "Saturday morning program"?

20          A.  Yes.

21          Q.  Did you experience that program as described as a

22     WPA?

23          A.  No.

24          Q.  What was different in your experience?

25          A.  There -- there was almost never oryoki meal.
```

1    Q.   Okay.   Other than that, any other difference?

2    A.   No.

3    Q.   Okay.   And did you attend those services other

4    than the oryoki -- oryoki meal?

5    A.   Yes.   I followed that schedule.

6    Q.   Okay.   And how about as a Dharma Bridge student,

7    did you follow that schedule?

8    A.   I don't remember.

9    Q.   Okay.   Earlier -- I'm turning to page 6 of the

10   document.   It's on the left-hand side when you toggle

11   down and it starts "doanryo."   Do you see where I am?

12   A.   Yes.

13   Q.   Okay.   That's in reference to the doanryo we had

14   previously talked about, correct?

15   A.   Yes.

16   Q.   Okay.   And then underneath it, it has "doan,

17   fukudo, kokyo, jiko."   Those are the Japanese names for

18   the various jobs that you were describing, correct?

19   A.   Yes.

20   Q.   Okay.   As I understand it, you've acted as the

21   doan, the sounds of the bells to begin and end, correct?

22   A.   Yes.

23   Q.   And you've acted as the fukudo, correct?

24   A.   Yes.

25   Q.   And you -- have you acted as the kokyo?

1-ER-061

1        A.  No.

2        Q.  Have you acted as the jiko, J-I-K-O?

3        A.  Yes.

4        Q.  Who -- who is a doshi?  Is that the priest?

5        A.  Yes.

6        Q.  Okay.  Did you do the chiden, C-H-I-D-E-N?

7        A.  Yes.

8        Q.  And you did the door watch, correct?

9        A.  Yes.

10       Q.  Okay.  Did you ever work in the kitchen during

11   sittings or sesshin?

12       A.  Yes.

13       Q.  And did you do so when you were a W -- WPA?

14       A.  Yes.

15       Q.  And did you do so as a Dharma Bridge student?

16       A.  No.

17       Q.  Okay.  When you were a WPA, did you have a weekly

18   dishwashing shift?

19       A.  Yes.

20       Q.  Did you have a weekly temple job?

21       A.  Yes.

22       Q.  And did you have a weekly bathroom cleaning

23   assignment?

24       A.  Yes.

25       Q.  And as a Dharma Bridge student, did you have a

1    A.  Yes.

2    Q.  And did you attempt to do so as a Dharma Bridge

3    student?

4    A.  I don't know.

5    Q.  Okay.  When you were participating in the work

6    practice as a WPA, there were religious elements to the

7    work you were doing, correct?

8         ATTORNEY QUACKENBUSH:  Object to form.

9         THE WITNESS:  And I didn't catch the first half of

10   the question.

11        ATTORNEY RIDLEY:  Sure.  Could the court reporter

12   re-read it, please.

13        (Whereupon the requested portion was read back.)

14        THE WITNESS:  Yes.

15   BY ATTORNEY RIDLEY:

16   Q.  Okay.  Did that include bowing?

17   A.  Yes.

18   Q.  Did that include a period of silence?

19   A.  Yes.

20   Q.  And in the Dharma lectures, did -- when you were a

21   WPA, did you attend lectures that talked about the -- the

22   place of work practice in the practice of Zen Buddhism?

23   A.  Could you repeat the question, please.

24        ATTORNEY RIDLEY:  Sure.  Could I have the court

25   reporter read it.

Alexander S. Behrend

1    Q.  Then why would you put it in this e-mail?

2    A.  I was -- I mean, because -- I mean, I was

3  mistaken.

4    Q.  When you wrote it, did you believe you took vows

5  in morning service?

6    A.  I sent off an e-mail without, you know, checking

7  every single word, you know, so, you know, I used -- I

8  used that word.  I don't think it's correct, though.

9    Q.  Did you believe when you wrote it that you took

10  vows in morning service?

11    A.  I don't know.

12    Q.  Can't say one way or the other?

13    A.  I can't say one way or the other.

14    Q.  Did you intend to lie to Mr. Zimmerman when you

15  were e-mailing him?

16    A.  No.

17    Q.  At the bottom on page 1170 after the refuges,

18  you -- you note after two asterisks, do you see it?  It

19  says, "Please note."

20    A.  Okay.  Yeah, I see it.  Yep.

21    Q.  It says, "Please note that at the end of your PD,

22  I mentioned the gift of Dharma which I meant to refer to

23  the teachings and sutras of Zen and other schools of

24  Buddhism."

25        Does this refresh your recollection as to whether

1-ER-064

1      or not you, at the time, considered yourself to be a

2      practicing Zen Buddhist?

3           A.  Now that I've read it -- would you please repeat

4      the question.

5               ATTORNEY RIDLEY:  Would the court reporter please

6      read it again.

7               (Whereupon the requested portion was read back.)

8               THE WITNESS:  So I didn't convert to Zen Buddhism,

9      but I definitely practiced the Zen Buddhism that was

10     offered at San Francisco Zen Center.

11     BY ATTORNEY RIDLEY:

12          Q.  Okay.  When you wrote this in e-mail, were you

13     writing it sincerely?

14          A.  Yes.

15          Q.  Okay.  And you thought enough of it that you

16     also -- at the top of the document, it says, "Hi, Mary.

17     As I reflect on our conversation today, I thought I'd

18     share an e-mail I sent to David in November about how I

19     take refuge in Buddha, Dharma and sangha."

20          Who's the Mary you're referring to?

21          A.  Mary Stares.

22          Q.  So you thought enough of it to forward it to her?

23          A.  Yes.

24          Q.  And you did so in December of 2018?

25          A.  Yes.

1  looking at on Exhibit 9, correct?

2      A.  Yeah, they were the recipients on the previous

3  exhibit.

4      Q.  Okay.  And the subject of this e-mail is

5  "ordaining," correct?

6      A.  Yes.

7      Q.  Is this the document you reviewed in preparation

8  for your deposition?

9      A.  No.

10     Q.  Okay.  Do you recall sending this document?

11     A.  Yes.

12     Q.  Okay.  On the second paragraph of the e-mail, it

13  says, "Should I keep residing with SFZC for the next few

14  years, and that's what I want, I would like to work and

15  train to ordain as a priest with an eye towards

16  eventually becoming some kind of practice leader."

17          Do you remember writing that?

18     A.  Yes.

19     Q.  Did you mean it when you wrote it?

20     A.  Yes.

21     Q.  So at least by this point you considered yourself

22  a practicing Zen Buddhist?

23     A.  I really liked what San Francisco Zen Center was

24  doing, and I wanted to secure a spot there.  And I

25  definitely -- yeah, I considered myself a Zen Buddhist

1    practitioner.

2        Q.   When you say you wanted to secure a spot there, do

3    you mean housing?

4        A.   Work and housing, yes.

5        Q.   You don't mention housing in this e-mail, correct?

6        A.   No.

7        Q.   Okay.  You tell them you want to train towards

8    ordination, correct?

9        A.   Yes.

10       Q.   Were you lying?

11       A.   In the e-mail?

12       Q.   Yes.

13       A.   No.

14       Q.   Okay.  And -- and you had been having religious

15    studies up to that point, correct?

16       A.   Yes.

17       Q.   Okay.  And this is during the time you were a WPA,

18    correct?

19       A.   Yes.

20            ATTORNEY RIDLEY:  I'm going to have marked as

21    Exhibit 11 the document under Tab P, as in panda.

22            (Exhibit 11 marked for identification.)

23    BY ATTORNEY RIDLEY:

24       Q.   Can you see the document?

25       A.   Yes.  And I'm pulling it up.  Yes.  Yes and yes.

1    Q.  Did you assist with the flower chiden?

2    A.  Yes.

3    Q.  While you were a WPA, did you assist with the

4    wake-up bell?

5    A.  Yes.

6    Q.  While you were a WPA, did you assist with morning

7    services?

8    A.  Yes.

9    Q.  While you were a WPA, did you assist with noon

10   services?

11   A.  Yes.

12   Q.  While you were a WPA, did you assist with evening

13   services?

14   A.  Occasionally, yes.

15   Q.  While you were a WPA, did you assist at

16   celebrations of Buddha's birthday?

17   A.  I don't know.

18   Q.  While you were a WPA, did you assist with lay

19   ordination?

20   A.  I don't think so.

21   Q.  Okay.  While you were a WPA, did you assist with

22   the Sejiki, S-E-J-I-K-I, ceremony?

23   A.  I don't remember that ceremony.

24   Q.  Okay.  While you were a WPA, did you ever assist

25   in the full moon ceremony?

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN FRANCISCO DIVISION

 4         _____

 5    ALEXANDER BEHREND,              )

 6                    Plaintiff,      )

 7    v.                             )No. 3:21-cv-01905-JSC

 8    SAN FRANCISCO ZEN CENTER, INC.,)

      SAN FRANCISCO EVERYDAY, INC.,  )

 9    SAN FRANCISCO THIRD WAY, INC., )

      THE ZEN FOUNDATION,            )

10                                   )

                    Defendants.      )

11         _____

12                 DEPOSITION OF MARY STARES

           _____

13

                        9:00 a.m.

14                   October 26, 2022

                 San Francisco, California

15

16

17

18

19

20                   File #5516408

21

22

23

24

25         Reported By:  Judy Robinson, CCR #2171
```

Page 1

r

1   Exhibit No. 35.

2        A    Yes, I see that.

3        Q    As far as you can tell, is Exhibit 35 a true and

4   accurate copy of your bio on San Francisco Zen Center's website?

5        A    Yes, it is.

6        Q    You have no reason to doubt that Exhibit 35 is a true

7   and accurate copy of your bio, correct?

8        A    That is correct.

9        Q    Here it states that you've been at San Francisco Zen

10  Center on and off since 2000, which I believe you just

11  represented to me.

12            When did you first begin working at San Francisco Zen

13  Center?

14       A    The concept of working as opposed to practicing is

15  indistinguishable.  I began living at Zen Center in the summer

16  of 2000, and I continued on and off and more permanently in the

17  -- in March of 2009, and at -- at those -- through until 2021,

18  and the concept of work as opposed to practice is an incorrect

19  concept.

20       Q    Okay.  What positions have you held at San Francisco

21  Zen Center?

22       A    So I've been in the -- the -- the workshop.  I was part

23  of a guest practice program.  I have been the Fuguten, which is

24  the manager of the kitchen.  Or the Fuguten, the Tenzo, which is

25  the kitchen manager at both Tassajara and City Center.  I have

                                                        Page 21

1-ER-070

1   what job they would like to do.  So it was -- it was sometimes

2   about comfort.  I don't think we ever made assignments when

3   somebody said they absolutely did not want to do something.

4       Q    Okay.  And when you assigned WPAs to work on crews with

5   things that they were not familiar with, was that just to expand

6   their knowledge base?

7              MR. HAMLING:  Objection, form.

8       A    The -- one of the principles, as I understand it, about

9   living in a temple is the -- or the way that San Francisco Zen

10  Center approaches work practice is that it's -- it's to develop

11  this idea of beginner's mind.  So to do something that you know

12  really well and are familiar with means you rely on habit

13  pattern and how you always have done things.  And so we try to

14  do the exact opposite, which is have people look at discomfort,

15  look at work as a -- an element of their practice and look at

16  how their mind is working while they're practicing, and examine

17  their intention while they're both in formal practice and doing

18  work practice, and that I would say -- the idea is that we think

19  -- we thought -- we think that it's easier if you're doing

20  something that you're not familiar with.

21  BY MS. MACEY:

22      Q    Okay.  So would you say it was preferred for the

23  individual to not have any experience in the work crew that they

24  were assigned; is that fair to say?

25             MR. HAMLING:  Objection.  Foundation and vague and

                                                        Page 40

1    Saturday there was a thing called meditation Zazen instruction.

2    There was also an offering called Zendo forms.  So people that

3    were interested in participating at San Francisco Zen Center

4    were encouraged to do those two things.

5           Often we invited people to do Zazen training many times

6    with different people who are leading and to ask questions.  And

7    the -- the Ino always noticed -- the Ino would sit facing out,

8    so they always noticed when somebody was coming in for the first

9    time into Zazen or service and seemed very unfamiliar, and they

10   would get up and assist people.  So I -- I -- I do not think the

11   statement that you made is true.

12   BY MS. MACEY:

13       Q    Okay.  So there was no formal training required?

14            MR. HAMLING:  Objection.  Misstates testimony.

15       A    No, I said there -- there was formal training.  There

16   was training offered but not required.

17   BY MS. MACEY:

18       Q    Okay.  Thank you.  So the practitioners involved in the

19   Doan-ryo did not have to be trained every time for performing in

20   a religious ceremony; is that correct?

21            MR. HAMLING:  Objection.  Vague and ambiguous as to

22       religious ceremony and speculation and foundation.

23       A    The members of the Doan-ryo received training before

24   they did specific jobs.  They would not -- the technical nature

25   of all those jobs, aside from door watch, would make it

Page 55

1    <mark>impossible to do those jobs without training.</mark>

2    BY MS. MACEY:

3        Q    Okay.  So in Ms. Pietranera's email, it seems that this

4    Doan-ryo crew was not doing -- they had not been trained on

5    these particular positions prior to performing this Doan-ryo?

6        A    I -- I would say what we're suggesting there is the way

7    people were combined.  The -- what had happened before this, if

8    my memory serves me, is that somebody was asked to do door watch

9    and they would have done door watch for many months.

10        The experiment -- again, if I'm relying on my memory,

11    was instead it have having Mary be door watch for the entire

12    length of the practice period, what I was proposing and what

13    Paulo was suggesting, directing -- by direction from me, was

14    that one week I would be door watch or one day -- one week I

15    would be door watch on the crew.  The next week with that same

16    crew, I would be a Kokyo.  The next week I would be on the Doan.

17    The next week Fukudo.  So the positions in the crew themselves

18    were rotating.  It's not that these were people that were

19    untrained to do those positions.

20        Q    Okay.  Was it ever the case that someone would serve on

21    the Doan-ryo without having performed that position previously

22    and never having received training for that position?

23        MR. HAMLING:  Objection, form and speculation.

24        A    I -- I believe that because of the technical nature of

25    the jobs on the Doan-ryo that it is impossible to perform those

Page 56

```
 1        A     Correct.

 2        Q     And is every person at San Francisco Zen Center doing

 3   those things?

 4             MR. HAMLING:  Objection, form.

 5        A     No.

 6   BY MS. MACEY:

 7        Q     Okay.  Were any Zen Center residents referred to as

 8   Ordinands?

 9        A     Yes.  That applies to a specific ceremony.

10        Q     Okay.  That's what an Ordinand is, just to clarify?

11        A     It's -- it's somebody that is either -- so there are

12   two different ceremonies.  One is lay ordination and another is

13   priest ordination.  And the -- the -- the folks that are doing

14   that ceremony are referred to as those individuals.

15        Q     Okay.  Lay and priest ordination?

16        A     Yes.

17        Q     Did you ever refer to Mr. Behrend as an Ordinand?

18        A     I do not believe that Alex was in the process of sewing

19   a Rakusu or was taking formal lay ordination.

20        Q     Okay.  What is a Rakusu?

21        A     A Rakusu is a piece of fabric that, in the tradition of

22   San Francisco Zen Center, you live at the temple for a time.

23   You have a relationship with a teacher.  You ask for permission

24   to be -- or receive lay ordination, which means that you

25   acknowledge that you're a student of Zen Buddhism.
```

Page 81

1     A    Yes, I am.

2     Q    Is Zen Buddhism a religion?

3     A    I would say it is a religion.  Some people say it's a

4  philosophy.  But my experience living in the temple, like the

5  fact that I'm a priest and take vows, often daily, means that I

6  feel like it's a -- it's a religion.

7     Q    So you actually just touched on my next question.

8          Is San Francisco Zen Center a religious organization?

9     A    Yes, it is.

10    Q    How do you know that?

11        MS. MACEY:  I'm going to object to speculation real

12   quick.

13    A    Because I believe in the teachings of the Buddha.  I

14  follow the Dharma and I take guidance from the Sangha.  Because

15  I'm an ordained priest in the organization, because I often

16  relate to people as a priest.

17  BY MR. HAMLING:

18    Q    And the practice of Zen Buddha is not exclusively done

19  at San Francisco Zen Center, correct?

20    A    Correct.

21        MS. MACEY:  Speculation.  Sorry.

22  BY MR. HAMLING:

23    Q    Does the fact that -- in -- in your opinion, does the

24  fact that a religious organization collects revenue mean that it

25  is no longer a religious organization?

                                                        Page 98

```
 1        for a legal conclusion.
 2        A    Yes.
 3   BY MR. HAMLING:
 4        Q    Is cleaning the temple within the context of Zen
 5   Buddhism considered practice?
 6        A    Yes, it is.
 7        Q    Is sitting Zazen in a Zen Buddhist temple considered
 8   practice?
 9        A    Yes, it is.
10        Q    Is sitting a Sesshin considered practice within the
11   context of Zen Buddhism?
12        A    Yes, it is.
13        Q    Does the practice of Zen Buddhism by any individual
14   impact another individual's own practice of Zen Buddhism?
15                MS. MACEY:  Objection.  Speculation, foundation.
16        A    That can be answered on two levels.  Yes, absolutely.
17   As we in community touch one another, other people's actions
18   affect us and touch us.  And on a second level, we are -- we --
19   we are -- we are responsible for our own thoughts and how we
20   react to other things.  And like my -- my thoughts make my
21   world.
22   BY MR. HAMLING:
23        Q    At San Francisco Zen Center is following any schedule
24   necessary to be practicing Zen Buddhism?
25        A    It is -- it supportive to practice Zen Buddhism,
```

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4    _____

 5   ALEXANDER BEHREND,              )

 6              Plaintiff,           )

 7   v.                             )No. 3:21-cv-01905-JSC

 8   SAN FRANCISCO ZEN CENTER, INC.,)

     SAN FRANCISCO EVERYDAY, INC.,  )

 9   SAN FRANCISCO THIRD WAY, INC., )

     THE ZEN FOUNDATION,            )

10                                  )

              Defendants.           )

11    _____

12         30(B)(6) SAN FRANCISCO ZEN CENTER

              DEPOSITION OF MICHAEL MCCORD

13    _____

14                  9:00 a.m.

              October 28, 2022

15          San Francisco, California

16

17

18

19

20              File #5516419

21

22

23

24

25      Reported By:  Judy Robinson, CCR #2171
```

                                              Page 1

r

```
 1     practices.
 2                 But a formal teacher would be someone
 3     who has not only ordained as a Zen priest but then
 4     has been in the practice for a number of years; and
 5     then a teacher officially in Zen Buddhism is a person
 6     who could ordain other teachers.
 7                 But I, myself, am a Zen priest and I
 8     have been ordained and I have students, but I am not
 9     actually officially a teacher.  Because that is
10     another ordination usually ten or twenty years down
11     the road where you become an official, quote-unquote,
12     "teacher" and you can ordain teachers.
13                 But up until then people, when I was a
14     WPA and when I was a staff member and even after my
15     ordination as a priest, I certainly taught meditation
16     instruction on many different aspects of our
17     religious training.
18          Q.     So you were ordained as a priest; is
19     that correct?
20          A.     I was in 2014.
21          Q.     Was that lay ordination or priest
22     ordination?
23          A.     My lay ordination was in 2011 and my
24     priest ordination was in 2014.
25          Q.     What was the process for receiving
```

1-ER-078

1    priest ordination?

2         A.    The process for receiving priest

3    ordination is one that starts from the moment you

4    enter the temple.   There is not a -- if you were to

5    take a Western Catholic or Protestant process and lay

6    that on top of Zen Buddhism it would be a big

7    misunderstanding.

8              Because it is not like going to Catholic

9    seminary where if you do these things, study these

10   things, and after four years then we will baptize you

11   as a priest.   That is not what is going on, and

12   that's a Westernization, if you will.   A Western

13   mindset on top of something that is not Western.

14              So in Zen Buddhism it very much respects

15   the individual growth and the enlightenment moments

16   the students have.

17              So, for instance, someone comes in and

18   they work with their teacher and they work with the

19   head of practice from day one; and from that point

20   forward, whether or not you should be a WPA, whether

21   or not you should be a staff member, whether or not

22   you should be Dharma Bridge, whether or not you

23   should ordain as a priest, whether or not you should

24   ordain as a teacher, it is something that is on a

25   unique timeline to each student.

Veritext Legal Solutions
866 299-5127

1          And it has to do with their personal

2    growth, their emotional maturity, their awareness of

3    the people around them, how well that they reflect

4    the Dharma.  And so you might be in residence for

5    20 years.

6          And you've got a great example that

7    you've had in this court case right here where you've

8    had a witness with Barbara Machtinger, who's been in

9    residence for 21 years, she's lay ordained, and is

10   not a priest.

11          You have Mary Stares, who has been --

12   was in residence and is no longer in residence, but

13   she was for 10 years and she is ordaining next year

14   as a teacher, and she has students, and she was a

15   former director and priest inhouse.

16          And then you have me, where I'm ordained

17   as a priest but I'm not a teacher.

18          And so all along this pathway people

19   have different jumps and starts for what might be

20   appropriate for their growth based upon their

21   relationship with their teacher and how they're

22   growing.

23          And we have people who have come back

24   here and been the head of practice in 2020, or head

25   of practice was Nancy Petrin, and Nancy Petrin was

                                        Page 42

```
 1                    WITNESS:  I would say that is the
 2        primary reason people join SF Zen Center.
 3                         Because in order to practice Buddhism
 4        you are engaging in openness to what it is that's
 5        appropriate for you.  So everyone is in the exact
 6        same bucket, and you know from day one that you are
 7        in a religious training program.
 8                         If you just want to practice Buddhism
 9        and have no desire for it to ever be formalized,
10        well, you can come to the temple and you can join us
11        for meditation any day of the week and you can take
12        classes.
13                         But if you join the temple you are a
14        monk, and when I say "you are a monk," that means you
15        -- you read the Shinghi, the S-H-I-N-G-H-I, the rules
16        for monastic life, and you take the vows every month
17        in the Full Moon Ceremony to live as a Buddhist.
18                         And so the people that are on the
19        outside, they're not required to take those vows.
20        They're not required to live by the Shinghi.  They
21        are not required to end their job, carry the pot with
22        two hands, and to when you're chopping carrots you
23        put down the knife if you want to talk, and you look
24        at the person in the eyes and you, you know, you have
25        your mouth shut and you breathe through your nose.
```

Page 49

1            And, you know, if you're engaging in

2    this all day long you're in a religious training

3    program that you have had vows and you've committed

4    to the Shinghi and all the rest of it.

5            Now, are you just a, quote-unquote, a

6    Buddhist practitioner?  Still to this day I am just a

7    Buddhist practitioner who is seeing how this is

8    unfolding for me.

9            But I engaged from day one in a very

10   clear religious training program that the people who

11   are coming here from the outside do not have to

12   commit to.

13   BY MR. QUACKENBUSH:

14       Q.    So is it possible to read the Shinghi

15   and take the vows and do all those things that you

16   said and not live at San Francisco Zen Center?

17       A.    You would -- you would not commit to

18   the Shinghi if you lived outside.

19            I mean, I guess you could personally if

20   you wanted to, but we have no process for that and

21   it's never -- there is no -- there's no setup for

22   that.

23       Q.    What does that mean there's no setup

24   for that?

25       A.    Well, it's a commitment that all the

Page 50

1-ER-082

1       practice.  And so all of these things once learned

2       could be continued in your daily life.

3  BY MR. QUACKENBUSH:

4          Q.     In your view, does anyone that attends

5  ceremonies at San Francisco Zen Center but lives

6  outside of the residence San Francisco Zen Center,

7  are they in religious training?

8          A.     In a vague way, yes.  But they are not

9  a part of a religious training program.  Because

10 they're not in the WPA policy.  They do not have that

11 structure.  They do not have to meet with a teacher.

12 They do not have to attend religious events.  They

13 don't have to say yes when someone says now you need

14 to learn how to be a Chiden.  Now you need to learn

15 how to be a Doan.  There is no relationship that has

16 been agreed to by those people.

17             So in a casual way, they could continue,

18 quote-unquote, training in all sorts of things that

19 are Zen.  But they are not a part of our religious

20 training program because there are no Zen

21 requirements on them.  And if they decide to go visit

22 their family in Hawaii for eight months and not come

23 to the temple, it's completely up to them.

24             But the people living here, well, they

25 need to go to community meetings.  They need to read

Page 52

1    the class documents that are passed out.  They need

2    to go to morning meditation.  They need to talk to

3    the head of practice.  They are in -- they are in a

4    -- in an active training program, whereas those other

5    folks are not in an active training program.

6          Q.    And residents at San Francisco Zen

7    Center have to meet all those obligations unless

8    their work interferes with those obligations,

9    correct?

10          MS. RIDLEY:  Objection, assumes facts.

11    Vague.  You can respond.

12          WITNESS:  No, that's not true.

13          MR. QUACKENBUSH:  Okay.  I'll wait to

14    bring out in the documents where it says that.

15          MS. RIDLEY:  We've been going over an

16    hour.  Can we take a break?

17          MR. QUACKENBUSH:  Yeah, happy to.

18            (Off the record.)

19          MR. QUACKENBUSH:  So I just want to

20    note on the record that defendants produced what

21    appears to be one document entitled San Francisco Zen

22    Center Work Practice Staff Policies 34 minutes into

23    this deposition, and this deposition covers staff

24    compensation, process for becoming a staff member,

25    and also handbooks and policy documents.

Veritext Legal Solutions
866 299-5127

1      continue with this deposition.

2      BY MR. QUACKENBUSH:

3              Q.      Mr. McCord, welcome back.

4              A.      Hi.

5              Q.      You understand that you're still under

6      oath?

7              A.      I do.

8              Q.      What is a work practice apprentice?

9              A.      A work practice apprentice is someone

10     who has applied to be a part of our training program

11     in one of our three temples during the first two

12     years of their residency and study.

13                     And the work practice apprentice is a

14     person that lives as monk in a monastery, and when I

15     say "monk," I mean following the monastic guidelines

16     as set out in the Shinghi and committing to follow

17     those guidelines.

18                     They are a person that is in residence.

19                     They are a person that's required to

20     follow the schedule.

21                     They are a person that's required to

22     have a teacher, a formal teacher that they meet with

23     once a month.

24                     And the work practice apprentice is

25     assigned a work crew so they can learn work practice.

                                                Page 55

1          And they are also assigned house jobs.

2          And they are assigned a dish shift.

3          And so all of those were elements are

4   something that is designed to create a container for

5   an individual, and the name of it is a work practice

6   apprentice.

7          And it is requested that they be in the

8   program for two years.  However, the program, based

9   upon other experiences the person might have, is

10  something that could end in one year or shorter if

11  they come in and say as an ordained priest from

12  another lineage or --

13          Oh, I should state the WPA program was

14  not formalized until 2013, so many individuals, such

15  as myself, such as Seigen Johnson, such as Mary

16  Stares might have not been, quote-unquote, in their

17  time in service record WPAs.  That program was only

18  formalized in the last ten years or so, and that was

19  to give a little more continuity and shape to the

20  first couple of years of practice.

21          And the WPA program, when you apply to

22  it and you're accepted, those individuals have --

23  have the most strict parameters around following the

24  schedule.  So they are not able to opt out of evening

25  classes, or they have to attend all of the practice

Page 56

1    periods that are offered in the temple that they're

2    in.  And it's really the -- the launch -- it's

3    described as the launch and the foundation for your

4    Zen training.

5            Q.    If I refer to work practice apprentice

6    as WPA will you understand what I mean?

7            A.    I will.

8            Q.    Is it a requirement at San Francisco

9    Zen Center to be -- in order to become an ordained --

10   a lay ordained member of San Francisco Zen Center, is

11   it a requirement to be a WPA?

12           A.    There's two parts to this, and it has

13   to do with the fact you said San Francisco Zen

14   Center.

15                 I want to clarify that teachers can have

16   students that are outside the temple.  So this is not

17   the only place that people do Zen training in order

18   to be lay ordained.

19                 For instance, there is no temple in some

20   parts of South America.  But students will come here

21   and maybe spend, you know, however long their Visa

22   is, six months, nine months living in the temple and

23   go back.

24                 And they will continue working with

25   their priest remotely, and they'll even sew their

                                              Page 57

```
 1              A.      No.

 2              Q.      Is it a requirement of San Francisco

 3       Zen Center to receive priest ordination to be a WPA?

 4              A.      No.

 5              Q.      Does every WPA receive priest

 6       ordination?

 7                      MS. RIDLEY:  Asked and answered.

 8       BY MR. QUACKENBUSH:

 9              Q.      Can you describe the process for

10       becoming a teacher?

11              A.      The process for becoming a teacher is

12       the one that we were talking about earlier, which is

13       the coming in and being a person that is trained in

14       the monastic principles, lives as a monastic, and

15       graduates through different significant, I guess you

16       would say, milestones through that relationship with

17       the teacher and with San Francisco Zen Center in

18       their training program.

19                      And it will look different for each

20       person.  Some people will become a teacher after, you

21       know, 13, 15 years, and other people after 30 years.

22       It is, again, very different than the Western concept

23       of Catholic seminary or Episcopalian minister

24       training of, you know, you go and do your four to

25       six years and then you go out as a, you know, a
```

Page 59

1    minister.

2            This is like watching corn grow on a

3    time lapsed photograph.  There are jumps and starts

4    and you don't know what stalk is going to grow to

5    what length, and if that is what is happening -- you

6    create the container.  You create the commitment.

7    You create the schedule.  And you create the

8    relationship with the Sangha and with the teacher,

9    and then you let it unfold.  And that is the process

10    of becoming a Zen teacher.

11        Q.    You mentioned graduate through

12    significant milestones.  What are those milestones?

13        A.    Well, acceptance into the WPA program

14    will be probably the first one.

15            The graduation from the WPA program

16    would be the second one.

17            And again, a lot of these things are not

18    -- well, anyway.

19            So then the -- the -- the next one would

20    be, you know, being accepted to join staff.  Some

21    people would not continue on with their training

22    after being a WPA.  You have to apply to staff.  If

23    you're accepted onto staff then that's a continuation

24    of the -- the training.

25            And in that process along the way you

Page 60

1-ER-089

1  might receive lay ordination, you might receive

2  priest ordination, and you might receive teacher

3  ordination.  And for each person depends on really

4  their -- their -- their growth and how their life

5  unfolds.

6          Q.     Does San Francisco Zen Center have a

7  requirement that -- to become a teacher you have to

8  have been a WPA?

9          A.     No.  The program only started I think

10  officially ten, eleven years ago.  And so most

11  teachers would never have been WPAs just based on the

12  length of time it usually takes to be a teacher,

13  although I'm sure there might be one.

14          MR. QUACKENBUSH:  Move to strike

15  everything after "no."

16          MS. RIDLEY:  Denied.

17  BY MR. QUACKENBUSH:

18          Q.     Does San Francisco Zen Center currently

19  have a requirement that to become a teacher you have

20  to have been a WPA?

21          A.     No.

22          Q.     Does every WPA become a teacher?

23          A.     Is it okay to go back to a previous

24  question?

25          Q.     If it needs to be clarified, sure.

Page 61

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4   _____

 5   ALEXANDER BEHREND,              )

 6              Plaintiff,           )

 7   v.                             )No. 3:21-cv-01905-JSC

 8   SAN FRANCISCO ZEN CENTER, INC.,)

     SAN FRANCISCO EVERYDAY, INC.,  )

 9   SAN FRANCISCO THIRD WAY, INC., )

     THE ZEN FOUNDATION,            )

10                                  )

                Defendants.         )

11   _____

12           DEPOSITION OF BARBARA MACHTINGER

     _____

13

                     9:00 a.m.

14               October 18, 2022

               San Francisco, California

15

16

17

18

19

20               File #5512409

21

22

23

24

25       Reported By:  Judy Robinson, CCR #2171

                                           Page 1
```

 1   getting faster

 2   BY MS. BOCK:

 3       Q    So I'm now showing you what's been marked for

 4   identification as Exhibit 26.  I'll represent to you this is

 5   your bio from the Zen Center website from October 10th, 2022.

 6   As far as you can tell, Exhibit 26 is a true and accurate copy

 7   of your bio, correct?

 8       A    It looks like it.

 9       Q    And you have no reason to doubt that Exhibit 26 is a

10   true and accurate copy of your bio?

11       A    I have no reason to doubt this is true and accurate.

12       Q    And this document lists your current position as the

13   assistant to the Abbot?

14       A    Yes.

15       Q    And the Abbot is a different role from the president,

16   yes?

17       A    Yes.

18       Q    What are your job responsibilities as assistant to the

19   Abbot?

20       A    I attend meetings.  I -- I schedule meetings, I field

21   email for him, I assist with document production, I assist with

22   correspondence, I follow up on delegated responsibilities, I --

23   kind of like that.

24       Q    All right.  So we've -- any other positions we haven't

25   discussed that you can recall during your time at the SF Zen

Page 44

```
 1    Center?
 2        A     Yes.  I currently -- I currently also, this bio is a
 3    little old.  I currently hold two other positions.  I am the
 4    assistant to the City Center Abiding Habit, and I am the acting
 5    board secretary.
 6        Q     Anything else you can recall?
 7        A     Well, I mentioned that I was Shika for several years.
 8        Q     And what is the Shika?
 9        A     Shika is the guest manager.
10        Q     So one of your previous positions was the guest
11    programs and conference manager, correct?
12        A     Yes.
13        Q     Okay.  What were your job responsibilities as the guest
14    programs conference manager?
15        A     Well, let's see.  I supervised the crew of students who
16    performed a lot of the day-to-day work of maintaining guest
17    rooms in the conference center, making sure they were clean and
18    ready for guests and conferences.  And I handled bookings that
19    came through our website and managed our online, kind of online
20    programs that had to do with guest -- guest bookings and
21    conferences bookings, and I led the crew in our morning -- I led
22    the crew, which I -- you'll probably ask me about.  And I was --
23    as a guest program manager or Shika, I was a member of the
24    senior staff, and that's a group of managers who take care of
25    the temple.  And I would attend weekly meetings with the senior
```

Page 45

```
 1    staff.
 2        Q    Okay.  Approximately how many senior staff were at SF
 3    Zen Center between 2017 and 2019?
 4        A    Well, just the Tenzo was head of the kitchen.  The Ino
 5    was the head of the hall.  The temple care crew, the work
 6    leader, we called them at the time, took care of them, was
 7    responsible for guest students.  There was a facilities manager.
 8    And -- and then the director is above the senior staff but
 9    attended those meetings.  And the head of practice also attended
10    those meetings but is maybe not considered senior staff.
11             I may be forgetting a position but I think those are
12    the main positions.
13        Q    Okay.  So did -- I'm going to circle back to senior
14    staff.  Did you directly supervise any employees as the guest
15    programs and conference manager?
16        A    Yes.
17             MS. ABARBANEL:  Vague and ambiguous as to
18        "employee."
19    BY MS. BOCK:
20        Q    And yes, correct, you testified yes?
21        A    Yes.
22        Q    And approximately how many?
23             MS. ABARBANEL:  Objection.
24                  WITNESS:  Pardon?
25             MS. ABARBANEL:  I just said "same objection."
```

Page 46

1-ER-094

1    A    I think it's a long -- longer than most people.

2  Oftentimes -- I'm a lay student.  I haven't received priest

3  ordination, and oftentimes, once you're priest ordained, there's

4  a period of time, maybe four or five years of practice before a

5  priest becomes a Shuso, is invited to be a Shuso.  But for lay

6  people, it -- there's not that -- I think it's -- it's a similar

7  maybe, you know, five to seven years, maybe.  Something like

8  that.

9    Q    So it's possible for someone who has been ordained to

10  not become a Shuso and to not teach; is that correct?

11    A    Yes.

12    Q    Okay.  Do you have to -- and you don't have to be

13  ordained to be a Shuso?

14    A    Correct.  You don't have to be priest ordained, but I

15  was lay ordained.  And I think you -- most -- most people would

16  be lay ordained before being a Shuso.

17    Q    Okay.  Can you tell me the difference between lay

18  ordained and priest ordained?

19    A    Basically, the ceremonies involve the same precepts

20  that you take, however with a priest ordination you actually --

21  and in both cases you sew your own robes that you wear for

22  ceremonies, including a Rocksan that I am wearing here.  It's a

23  garment that priests also sew.  But priests also sew an Okesa,

24  which is a bigger robe that they wear.  They shave their head as

25  part of the ceremony.  They generally keep their heads shaved

Page 56

1  traditionally.  They have a relationship with the teacher that

2  is kind of a part of being the priest is you have a relationship

3  with your teacher, and you go through a period of training with

4  that teacher.

5      And so as a priest you can ultimately become what we

6  call a -- you go through a different set of gates, I would --

7  you could call them, or initiation, in which ultimately, the

8  color of your robe changed.  As you become a transmitted -- as

9  you're transmitted to teaching, and at that point you can give

10  ordination to other students and pass on the lineage.

11      So priests generally have higher status in the

12  organization and they're -- so anyway, that's -- that's part of

13  the explanation.

14      Q    So I just want to make sure I got it right:  So you go

15  through the same ceremony whether you're lay ordained or priest

16  ordained, correct?

17      A    The ceremonies are different, but in the ceremonies you

18  take the same Bodhisattva precepts.  But the pre-ceremony is

19  more involved, involving cutting hair and has more elements than

20  the lay ordination ceremony.

21      Q    So does someone generally enter, like, a path to become

22  like priest ordained, which is kind of separate from the lay

23  path when entering?

24          MS. ABARBANEL:  I'm going to object as to form.

25      A    It's -- I think the path is -- it's -- it's similar.  I

Page 57

1    think some people, I think the path is very similar.  Some

2    people have -- develop a relationship with the teacher and have

3    a calling to become a priest and -- and -- and priests tends to

4    be the ones who officiate at funerals or marriages or other

5    transitions-of-life ceremonies.

6            And they -- so some -- some people and they are the

7    officiants of the ceremonies at Zen centers.  We have services.

8    The priests are the ones who officiate.  They hold the forms.

9    They hold the forms that we maintained and pass on to the next

10   generation.  Some people are called to hold that kind of

11   practice position and others who are lay ordained want to

12   practice and hold the precepts and embody the precepts, but they

13   don't necessarily take on the roles that the priests take on.

14   BY MS. BOCK:

15       Q     And when you say "roles," you mean like the life change

16   ceremonies you mentioned earlier?

17       A     Yes.

18       Q     When you first started practicing with SF Zen Center

19   around 1998, did you enter with the intention of becoming a

20   priest, either a lay priest or an ordained priest?

21       A     The lay priests are not called priests.  They are just

22   called lay practitioners.

23       Q     Thank you.

24       A     When I say I started in 1998, that was with, as you see

25   on my bio, I was practicing with a different Buddhist

                                                      Page 58

1    organization, Community of Mindful Living, which was in

2    Thich Nhat Hanh's tradition.  So I came to the Zen Center in

3    2000.  When I came to Zen Center I wasn't coming to become

4    ordained.

5        Q    You were coming to practice?

6        A    Yes.

7        Q    And when did you make that decision to become ordained?

8        A    In probably 2001.

9        Q    If a lay person who is involved in Zen Buddhism wants

10   to become ordained at SF Zen Center, what's the path they would

11   take to reach the position?

12       A    Yes, generally, when somebody comes to any of the

13   temples they are asked to have a relationship with the teacher

14   to talk about their practice and issues that are arising for --

15   for them in the result of living in community and -- and all the

16   things that arise during meditation.

17            So they form a relationship with a teacher.  And at

18   some point in time, they may wish to receive the precepts, which

19   is lay ordination.  And by the way, almost without exception,

20   all priests receive lay ordination first, and then they receive

21   priest ordination afterwards.

22            So you might ask your teacher if you could receive the

23   precepts, and usually there's a period of study.  They might ask

24   you to study certain texts or to study certain, you know,

25   teachings, or to, you know, they may recommend a period of

Page 59

    1    know, they would -- there's movement between crews with various

    2    reasons, but there's no set time to start out with.

    3         Q    Okay.  I'm going to go one-by-one.  So the -- kitchen

    4    crew, can you give me some examples tasks that the kitchen crew

    5    would perform?

    6         A    Yes, if you're in the kitchen crew you're given an

    7    assignment by the -- either the head of the kitchen or the --

    8    called Tenzo, or a person named the Fukuten, F-U-K-U-T-E-N, and

    9    they're the assistant kitchen manager.  And they would give you

   10    an assignment, like, take this box of lettuce, wash it and spin

   11    it dry.  Or here's a box of carrots.  We need one gallon.  Can

   12    you wash them thoroughly, then take a cutting board with a

   13    special knife and a special cutting board, and can you continue

   14    to cut them into pieces of a certain size?  And then when you're

   15    done, can you cover it and label it in such-and-such a way, and

   16    put it away in the walk-in?  Or here is the soup we're having

   17    today.  Here are all the ingredients, here is the recipe.  Can

   18    you make the soup for today?

   19         Q    And the general labor, can you give me one or two

   20    examples of what they would do?

   21         A    Yes, the banister.  There's four stories in the main

   22    building.  There's a basement, the first floor, second floor,

   23    third floor, there's a banister, there's steps.  Can you -- can

   24    you sweep the steps, starting with the first floor.  And go down

   25    to the first floor, and can you dust the banister?  Can you

Veritext Legal Solutions
866 299-5127

1    sweep the leaves outside and put them into this bag?  Can you,

2    you know, sweep the courtyard of the leaves?

3        Q    Okay.

4        A    Things like that.

5        Q    And then, we'll get into the guest services crew.  So

6    the guest services crew is who you managed between 2017 and

7    2019, correct?

8        A    I managed it sometime starting sometime around 2016.

9    I'm not quite sure when I started.  And I left it in March of

10   2019.

11       Q    And then, in what capacity did you supervise the WPA?

12   Can you describe your role as a supervisor?

13       A    I was kind of the leader.  And I was, you know, we had

14   our own -- when we met we had our own rituals to begin the day

15   of work, which I can go into.

16            And then after we did those services and readings, we

17   would talk about the day's work, and sometimes there would be

18   room for comments by the crew members of questions or comments.

19            If issues came up between crew members, they would feel

20   free to talk to me about those issues and complain, and I

21   received a lot of complaints from various crew members about

22   each other.

23            And I would try to support the person to, you know,

24   continue to practice and to talk to their practice leaders, if

25   needed, and to try to resolve the problems.  I would be, you

                                                    Page 70

1     know, be the one to make all these, you know, determine what

2     work need to be done that day and make sure it was understood by

3     the crew.

4          Q    So you said, determine what work needed to be done that

5     week.  Did you assign the WPAs the tasks in the guest services

6     group?

7          A    As I said before, sometimes I -- I did, but with

8     certain crews they like to talk among themselves and make their

9     own decisions about who did what and I allowed that to happen.

10         Q    What type of work did you generally assign?

11              MS. ABARBANEL:  I'm going to object as vague and

12         ambiguous, form.

13         A    So we have student rooms that needed to be -- that may

14    need to be turned over a new student is coming, a former student

15    has left.  So that room needs to be prepared and cleaned.  And

16    prepared means putting out a set of sheets and towels.  And the

17    student would make their own bed.  And sometimes there would be

18    student laundry to -- to wash, and so that would be a frequent

19    assignment, to wash and fold the student laundry and label it,

20    according to the size of the sheets and things like that, put

21    them away.

22              Then, you know, guests would depart from their rooms

23    and we would collect the guest sheets, and they would be sent

24    out once a week to a service to be cleaned.  So at a certain

25    date, somebody would be assigned to take the linen out

                                                          Page 71

```
 1        Q    Did you ever ask anyone to work instead of
 2   participating in classes?
 3        A    I don't have any recollection.  I think that people
 4   understood the policy.  And if somebody wanted to make a
 5   request, they would have made it.  I'm not aware of any
 6   situations that come to mind about that.
 7        Q    When you said that people understood the policy, who
 8   did you mean by, "people"?
 9        A    Residents.
10        Q    Okay.  And by "policy," which policy are you referring
11   to?
12        A    The one under tuition.  In the paragraph you mentioned,
13   where it says, "For a workshop offered by a teacher not engaged
14   in work practice at Zen Center, the WPA student must pay the
15   teacher fee per student.  Work practice may take precedence over
16   classes or workshops."
17             That policy of having work practice and other Zen
18   required events taking precedence over other offerings that
19   somebody might want to participate in.
20        Q    So, the work practice students understood that?  The
21   policy of work taking precedence, is that what you're saying?
22        A    Of -- yeah, work practice, as well as other commitments
23   in the temple.  For instance, if we're having a one-day sitting
24   and there's a workshop being offered in the Conference Center by
25   a non-Zen Center teacher, people would understand that the
```

Page 93

```
 1   sitting would take precedence over this other activity that

 2   otherwise they might have been able to participate in.

 3       Q    Did you ever ask anyone to work instead of

 4   participating in a ceremony?

 5       A    Frequently, we would have to set-up the Conference

 6   Center during early morning times.  And oftentimes, people would

 7   miss our morning service.  That instead of going to morning

 8   service, they would go to the Conference Center to set up.

 9   So -- and this -- this is true for other crews too.  But anyway,

10   sometimes people would miss a particular service in order to set

11   up for a conferences or something like that.

12       Q    So to clarify, yes, students did occasionally miss the

13   practice too?

14       A    Yes.

15       Q    For whatever reason?

16       A    Yes.

17       Q    Okay.

18            MS. BOCK:  I'm going to introduce another exhibit.

19   BY MS. BOCK:

20       Q    That should be available to you now.

21       A    Okay.

22       Q    Okay, I'm now showing you what's been marked for

23   identification as Exhibit 30.  And this document is an email

24   exchange between you and Mr. Behrend, correct?

25       A    Yes.
```

Page 94

```
 1      Q    Sent from your email address ccfrontiffce@sfzc.org,
 2   yes?
 3      A    Yes.
 4      Q    And as far as you can tell, Exhibit 30 is a true and
 5   accurate copy of an email that you sent, right?
 6      A    Yes.
 7      Q    And you have no reason to doubt that Exhibit 30 is a
 8   true and accurate copy of this email, correct?
 9      A    Yes.
10      Q    Okay.  What is ODS?
11      A    It stands for one-day sitting.
12      Q    Can you tell me what at that entails?
13      A    Generally, every month on a Saturday, we have a one-
14   day sitting for all the residents and outside people to come in for
15   those.  And they -- the sitting, as I mentioned earlier, it
16   starts at the -- usually, at about 5:40 a.m., and it goes
17   through.  They're -- they're sitting all morning, interrupted by
18   a lecture at 10 a.m., a Dharma talk.  And then we go back to
19   sitting, which is also interspersed with walking meditation.
20           And then there's a lunch break, there's lunch at a
21   certain time.  And then, we -- oftentimes, there's a work period
22   in the afternoon that everybody participates in.  And then, we
23   come back to sitting.  Sometimes there's a tea break.  We come
24   back to sitting.  There's dinner, and usually one-day sittings
25   end at dinner.  Sometimes during a practice period, they might
```

Page 95

1-ER-104

```
 1        A    Could you say that again?

 2        Q    Well, I'm trying to -- to determine whether one needs

 3    to be in residential practice to become priest ordained.  So you

 4    gave an example of someone who may be priest ordained outside of

 5    the Zen Center.

 6             But I'm wondering:  To be priest ordained at the Zen

 7    Center, would you have to be in residential practice?

 8        A    Yes.  For a certain period of time at least, yeah.

 9        Q    And what's that period of time?

10             MS. ABARBANEL:  I'm just going to object as to

11        she's here in her personal capacity, foundation,

12        speculation.

13             If you know.

14        A    I don't know.  I think it varies.  I think there's a

15    request for people to reside for several years to be in training

16    with their teacher after they are ordained.  And sometimes it

17    doesn't -- some teachers ask for five years of residency after

18    priest ordination as a commitment to their training as a priest.

19             And other teachers may have looser requirements, but

20    it's the more -- I think it's encouraged to reside after priest

21    ordination as a part of your training.

22    BY MS. BOCK:

23        Q    Do you know of any WPA participants who continued on as

24    staff after their two years?

25        A    Me.
```

Page 110

1-ER-105

1     Q     Approximately how many?

2     A     Everyone who's on staff has been on the WPA program.  I

3     mean, yeah.  Most everybody on staff has gone through the WPA

4     program.

5     Q     What is a Dharma talk?

6     A     It's a talk by a teacher who is qualified to teach, who

7     gives a talk that has to do with the Dharma, which I guess you

8     could call it Buddhist teachings.  So, a subject that has to do

9     with Buddhist teachings.

10    Q     Did you ever see Mr. Behrend lead a Dharma talk?

11    A     No.

12    Q     Did you ever see Mr. -- oh, strike that.

13          Okay.  So, WPAs are not allowed to formally teach,

14    correct?

15    A     Unless they were Shuso, correct.  And it's unlikely

16    they would have been Shuso.

17    Q     Okay.  Have you ever received any training from the SF

18    Zen Center regarding the American's Disabilities Act?

19    A     No.

20    Q     Have you ever received any training from the Zen Center

21    regarding the religious exemption?

22    A     I don't think so.

23    Q     Has the religious exemption ever been discussed in a

24    staff meeting?

25    A     I don't think so.

Page 111

```
 1      Q    Have you ever read any communications or a formal
 2   memoranda regarding the religious exemption?
 3             MR. MCCLUNE:  Sara, what do you mean by the
 4        religious exemption?  I'm objecting on the basis of --
 5             MR. QUACKENBUSH:  Greg, I don't think you're
 6        allowed to object.  You can have your Counsel object.
 7             MR. MCCLUNE:  All right.  Sara?
 8             MS. ABARBANEL:  I will object as to vague and
 9        ambiguous.
10             MR. MCCLUNE:  Thanks, Kyle.
11      A    So, what's the question?
12   BY MS. BOCK:
13      Q    Have you ever read any memoranda regarding the
14   religious exemption?
15             MS. ABARBANEL:  Same objection, vague and
16        ambiguous.
17      A    Zen Center memoranda?
18   BY MS. BOCK:
19      Q    Correct.
20      A    No.
21      Q    Have you ever seen it referenced in email
22   communication?
23             MS. ABARBANEL:  Objection to the extent that it
24        violates the attorney/client privilege, as well as vague and
25        ambiguous.
```

Page 112

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

   _____

 4  ALEXANDER BEHREND,            )

 5             Plaintiff,         )

 6  v.                            ) Case No.

 7  SAN FRANCISCO ZEN CENTER, INC.,) 3:21-cv-01905-JSC

 8  SAN FRANCISCO EVERYDAY, INC.,  )

 9  SAN FRANCISCO THIRD WAY, INC., )

10  THE ZEN FOUNDATION,           )

11             Defendants.        )

   _____

12

13

14           DEPOSITION OF SEIGEN JOHNSON

15                  9:00 a.m.

16              October 21, 2022

17            San Francisco, California

18

19

20

21  Reported By:

22  Judy Robinson, CCR #2171

23  Job No. 5541008

24

25  PAGES 1 - 111

                                        Page 1
```

1     A    Yes, please.

2     Q    Why did you -- why did you start attending San

3   Francisco Zen Center -- why did you start attending events and

4   meditations at San Francisco Zen Center?

5     A    I began attending because I wanted to practice with

6   other people who are practicing in the tradition with which I

7   wanted to become more familiar, which is Soto Zen Buddhist.  I

8   started practice in Thich Nhat Hanh's lineage, which is

9   Vietnamese Zen.  It's slightly different.

10    Q    At the time I began attending events at San Francisco

11  Zen Center, did you know you wanted to be an ordained minister

12  in Zen Buddhist tradition?

13    A    Yes.

14    Q    So after you began attending events and meditations at

15  San Francisco Zen Center, did you become a resident at San

16  Francisco Zen Center?

17    A    Yes, I did.

18    Q    And when was that?

19    A    I entered residency in August, 2011.

20    Q    And what location did you become a resident?

21    A    City Center.

22    Q    When you first became a resident at City Center, did

23  you start as a guest student?

24    A    No.

25    Q    Do you know what a guest student is?

Page 11

```
 1        A    I do know what a guest student is.  I started at San
 2   Francisco Zen Center with a practice period, which is different
 3   than being a Green Gulch.
 4        Q    How is it?
 5        A    Green Gulch's generally have a shorter stay.  They are
 6   there for a minimum of two weeks.  It's what it's like in a
 7   community before -- it's generally what someone does before they
 8   would do a full practice period.  But I knew that I wanted to
 9   practice.  I knew I wanted to do a practice period and I was
10   accepted as a practice student.  I wasn't -- I wasn't asked to
11   do the Green Gulch program.
12        Q    Do you know why you weren't asked to do the Green Gulch
13   program?
14             MS. ABARBANEL:  Objection, vague.
15        A    I don't.
16             MS. ABARBANEL:  Sorry.
17             WITNESS:  No worries.
18        A    No, I don't.
19   BY MR. QUACKENBUSH:
20        Q    At the time you applied -- strike that.
21             Did you have to apply for the practice period?
22        A    Yes.
23        Q    And at the time you applied to do a practice period,
24   how many years of Buddhist practice had you performed?
25             MS. ABARBANEL:  I'm going to object as to form.
```

Page 12

```
 1       A    Six years.

 2   BY MR. QUACKENBUSH:

 3       Q    So you began -- so you participated in the -- the

 4   practice period and then did you become a work practice

 5   apprentice?

 6       A    I did not.

 7       Q    What is a work practice apprentice?

 8            MS. ABARBANEL:  Objection, foundation.

 9       A    A work practice apprentice is the second step before

10   someone would become either on staff or allowed to be a

11   full-time resident of Zen Center.  The process is you would

12   graduate essentially from Green Gulch to work practice student.

13   Someone who -- someone who expressed an interest in being a

14   long-term resident.  Before you're accepted into residency, you

15   typically do a work practice apprentice.  I was not asked to do

16   that practice.  I was immediately asked to be on staff.

17   BY MR. QUACKENBUSH:

18       Q    And that description that you gave a work practice

19   apprentice, how do you know what a work practice apprentice did?

20       A    It's in the paperwork.  In the handbook or something.

21       Q    Did you review that handbook?

22       A    No.  I don't -- no, no, I didn't.

23       Q    So you mentioned your next step at San Francisco Zen

24   Center was you were asked to be a staff member; is that right?

25       A    Yes.
```

                                                        Page 13

1-ER-111

```
 1      Q     And in your role as a staff member, did you interact

 2    with work practice apprentices?

 3      A     Yes, all the time.

 4      Q     And did that interaction with work practice apprentices

 5    provide insight into what their role was at San Francisco Zen

 6    Center?

 7                MS. ABARBANEL:   Objection as to form.

 8      A     Yes.  At that point we had it know what a work practice

 9    apprentice was differently than what a staff person was.  So at

10    that point we're trained and we get materials on the difference

11    between the two.

12    BY MR. QUACKENBUSH:

13      Q     And so that explanation that you just gave, did that --

14    sorry, strike that.

15            Was the training that you received and the materials

16    that you received about the difference between the two jobs,

17    work practice apprentice and staff, did that -- did that inform

18    your explanation of what work practice apprentice is that you

19    gave previously?

20      A     Yes, the -- what I gave previously was my own

21    relationship to the materials.  Like, before I moved in I didn't

22    really read any of the stuff that they gave me in the handbook.

23    But afterwards, once I became a resident, I kind of had to,

24    because I would be living by the rules. And once I became a

25    staff person who was responsible for the other staff, I needed
```

Page 14

```
1    to be aware of all of the job descriptions and all of the inner

2    workings of the -- the different ways that staff were supposed

3    to interact with regular residents.

4          People who were work practice apprentices, people who

5    were guest students, and people who were -- at the time there

6    was something called -- I actually can't remember the title for

7    it, but essentially, people who worked outside of the temple,

8    but who were full-time residents.  So there were sort of

9    different categories of ways of being at the temple, and you had

10   to know those if you were on staff.

11    Q    And why did you have to know those if you were on

12   staff?

13          MS. ABARBANEL:  Objection, speculation.

14    A    We needed to know them partly because the schedule and

15   the responsibilities for each one of those is very different.

16   So, for example, the folks who work outside didn't have to do

17   certain jobs, and they didn't have to follow the schedule that

18   the regular residents who were in the building all day had to

19   do.  So you're excused from certain things based on what it is

20   you do essentially.

21          And also, how we related to a Green Gulch would be

22   different than how I related to someone who was part of the --

23   who -- who -- another person who was on staff.  I wouldn't

24   expect the same things in terms of their knowledge of what

25   happened in the temple.  I wouldn't expect the same thing.  I
```

Page 15

```
 1    wouldn't expect the same understanding of what they had.  And
 2    essentially, a Green Gulch doesn't have the same
 3    responsibilities as someone who's a full-time staff person, or
 4    who's a WPA, which is work practice apprentice.  When I say
 5    that, that's what I mean.
 6    BY MR. QUACKENBUSH:
 7         Q    Okay.  So we're going to talk more about the
 8    responsibilities of the various staff members.
 9              What was -- well, first, you mentioned that you started
10    a staff position at City Center; is that correct?
11         A    Yes, I did.
12         Q    How long were you at City Center for?
13         A    I'm having to count.
14         Q    It's all right.
15         A    It's not as straightforward of a question as it might
16    seem, simply because I lived -- so I was at City Center for a
17    year.  My first year I lived at City Center.  And then I moved
18    to Tassajara for a practice period.  Then I moved back to City
19    Center for a year and a half, I think.  So I think I lived, of
20    the six-and-a-half years I lived as the Zen Center proper, I
21    think I lived at City Center for two-and-a-half of those years,
22    or three-and-a-half of those years all total.
23         Q    Did you live at all of the locations for San Francisco
24    Zen Center?
25         A    Yes, I did.
```

Page 16

1-ER-114

1    Q    You lived at City Center, Tassajara and Green Gulch

2    Farm?

3    A    Yes.

4    Q    To the extent possible, I'll try to ask if there are

5    any differences between the location when I ask the question.

6    If your response to a question differs based on the location,

7    please let me know, okay?

8    A    Okay.

9    Q    So at City Center your first staff position, what was

10   your first staff position?

11            MS. ABARBANEL:  Objection, form.

12   BY MR. QUACKENBUSH:

13   Q    And let me -- let me try to reask that question.

14            What was your first staff position at the San Francisco

15   Zen Center?

16            MS. ABARBANEL:  Same objection.

17   A    My first staff position was as reservationist for the

18   Tassajara guest season.

19   BY MR. QUACKENBUSH:

20   Q    What did the reservationist do?

21   A    I worked with -- I'm not exactly sure what Minoria's

22   title was.  But I worked with a person who was responsible for

23   overseeing the guest season at Tassajara.  And that entailed

24   taking reservations, working with the annual party that's done

25   for the early folks who get to register -- the folks who can

Page 17

1   register early for retreats at Tassajara.  Things related to the

2   -- the guest season in the summer at Tahasahari.

3      Q   I want to go back for a minute.  You said you were

4   asked to become a staff member of your first practice period; is

5   that correct?

6      A   I was asked to become a staff member approximately a

7   month into my first practice period.  It wasn't after that.  I

8   started -- my first practice period, I think, was that -- I

9   think it started in September.  It was shortly after I moved in

10   in August.  And then in October I was asked to be on staff.

11      Q   Did you have to apply for a staff position?

12      A   No, I didn't even know you could do that.

13      Q   And do you know why you were asked to be a staff

14   member?

15           MS. ABARBANEL:  Objection.

16      A   I do.

17           WITNESS:  Sorry, I kind of --

18           MS. ABARBANEL:  No worries.  We all try and we

19     always fail.

20           WITNESS:  Right.  Apologies for that.

21           MS. ABARBANEL:  No need to apologize.

22      A   Yes I do.  I was offered a staff position informally.

23   I was offered a staff position to have my own room in the

24   building.  During my practice period I lived with two other

25   people in the, one of the buildings that Zen Center owns, which

Page 18

1-ER-116

```
 1    handbook that way but Shika would show up as a job that you
 2    could have.  It just wouldn't show up as a part of a Eihei
 3    Shinigi, I think.
 4        Q    And so, you mentioned that Shika is one of the five
 5    jobs.  What are the other four?
 6        A    Director, Tenzo, which is the head of the kitchen.
 7    Shisui, which is the work leader.  Shika, and Ino, which is the
 8    head of the meditation hall.
 9        Q    And I might have missed this, I apologize.  Is Tenzo
10    responsible for the kitchen crew?
11        A    Yes.
12        Q    And were there material differences between the crew
13    across the locations in their job responsibilities?
14        A    Material --
15              MS. ABARBANEL:  Objection, foundation, and
16        speculation.
17              But please continue.
18        A    Material differences in terms of, like, housing and
19    finances?  Like, how much were you paid and where you live?  Is
20    that what you consider a material difference, or in terms of
21    like --
22    BY MR. QUACKENBUSH:
23        Q    Job responsibilities?
24        A    Job responsibility.  Yeah, yeah.  They're all very
25    different.
```

                                                    Page 25

```
 1        Q     Okay.

 2        A     They're very particular.

 3        Q     So, was the -- was the area of job responsibilities

 4   different for each of the five primary jobs at the different

 5   locations?

 6        A     Yes.

 7               MS. ABARBANEL:  Form.

 8   BY MR. QUACKENBUSH:

 9        Q     So, let's take the Shika crew.  How is the Shika crew

10   -- did -- did you have -- did you have experience with the Shika

11   crew at both City Center and Green Gulch?

12        A     Yes, I did.

13        Q     And how were the job responsibilities different between

14   those two locations?

15        A     I don't know that they were.  Well, so at -- at Green

16   Gulch, do you mean depending on how the person who was doing the

17   job was classified?  So essentially, the roles are the same in

18   that you're getting beds ready and you're preparing the

19   Conference Room spaces.  They're different in terms of who does

20   the job.

21               So Green Gulch, mostly WPAs are assigned to do that.

22   At City Center, WPAs and/or staff could be generally assigned to

23   do it.  But the functional differences between the two is that

24   at Green Gulch, like, WPAs are more closely follow a WPA

25   schedule.  So at Green Gulch, they have, like, times they have
```

Page 26

```
 1   to be out of the workspace.  And at City Center, there's less of
 2   of a container -- container meaning defined schedule for the
 3   WPAs.
 4            They have one, but it's not as, like, there's no study
 5   time at City Center.  There's no, like, group meetings with the
 6   Tanto at City Center.  And Tanto is T-A-N-T-O.
 7       Q    In your experience with the Shika crew, at either
 8   location -- sorry.
 9            In your experience with the Shika crew at the Green
10   Gulch location, did you ever have to work instead of
11   participating in an event or ceremony?
12       A    All the time.  Well, I shouldn't say all the time.
13   Yes, I did.  Yes.
14       Q    And did you ever witness a WPA that had to work in --
15   as -- on the Shika crew instead of participating in an event or
16   ceremony?
17       A    If we're talking event or ceremony, like, going to
18   meditation or going to Dharma talk.  And so if they skip that in
19   order to do work, yes.  If that's what you mean by event.
20       Q    Okay.  And in your interactions with the Shika crew at
21   City Center, is the same true?
22       A    Uh-huh, yes.
23       Q    Now just so I get a clearer record because I didn't ask
24   a very good question:  At -- at your -- in your experience with
25   the Shika crew at City Center, did WPAs have to skip ceremonies
```

Page 27

1    or events to do work?

2                    MS. ABARBANEL:   Objection, foundation.

3        A    Yes.

4    BY MR. QUACKENBUSH:

5        Q    And how do you know that?

6        A    How do I know that they had to skip events?

7        Q    Uh-huh.

8        A    Because they would be making rooms when the rest of us

9    from were in the Zendo, or doing other scheduled activities.

10       Q    Okay.  So, is it your first-hand experience that --

11   strike that.

12                    (Clarification by reporter.)

13       A    Sorry, the Zendo is the meditation hall.  So, there's a

14   schedule at each temple, and part of that schedule requires all

15   residents to sit in meditation depending on the day, and also go

16   to talks and/or various ceremonies.

17                    So, those things differ if you have a work-related

18   responsibility and that work-related responsibility is either

19   your staff position or a position that is dealing with the

20   public.

21       Q    Are you familiar with the Tenzo crew?

22       A    Yes.

23       Q    And that's -- we will use layman's terms, is that the

24   kitchen staff crew?

25       A    I was going to say that's the kitchen crew.

                                                    Page 28

1-ER-120

1    Q    All right, kitchen crew.

2         What's your experience with the kitchen crew?

3    A    My experience with the kitchen crew at City Center is I

4    have -- everyone had to do a kitchen shift as part of your --

5    you're assigned a shift as part of your responsibilities as

6    resident, and I was the Fukitan Tassajara, which is a person

7    that is just under the Tenzo.  So, I ran the staff in the

8    kitchen as Tassajara.

9    Q    Can you describe your role as Fukitan a little bit

10   more?

11   A    Sure.  The Tenzo created the menus for all of the meals

12   that we had.  And it was my responsibility to manage, like, the

13   day-to-day operations of the crew to make sure that we prepped

14   the food, and cooked according to whatever the -- the menu was

15   that we were supposed to be having each day.

16   Q    In your role as Fukitan, did you provide religious

17   instruction?

18   A    Yes, we studied the Tenzokyokun together.  That simply

19   means instructions to the cook.

20   Q    And so, describe what studying the Tenzokyokun

21   entailed.

22   A    I don't -- it's not really instruction.  We -- we read

23   it together; we talked about it together.  That's basically what

24   we did.

25   Q    Okay.

1    A    It's not -- it's not formal, really.

2    Q    And -- and -- and I think you mentioned that -- so, my

3    initial question was did you provide any religious instruction

4    as Fukitan?

5    A    So, that's what I was going to say.  Like, how would

6    you define instruction?

7    Q    That's fair.

8    A    So, I would not -- so, I would say that my job wasn't

9    to provide religious instruction, in that environment.

10    Q    Okay.  How would characterized your job?

11         MS. ABARBANEL:  Objection, form.

12    A    I don't remember what, like, I think I got job

13    description when I did it.  But essentially, I -- I managed the

14    staff, and it's like this gray area of -- I was a senior student

15    who was in a relatively senior position, which meant that I kind

16    of set an example for other people about practice and related

17    things.

18         But, that's not really -- I wouldn't consider that

19    instruction.  And no one ever told me that I was responsible

20    for, like, specific instruction, right?  Like...

21    BY MR. QUACKENBUSH:

22    Q    Uh-huh.

23    A    I mean, it's -- it's -- it's hard -- it's really

24    difficult to talk about instruction because there's, like,

25    formal kinds of things that I would consider, like, if I was

Page 30

1  teaching someone how to do a ceremony or something.  That's,

2  like, a more formal instruction, but if I was just showing

3  somebody how to -- you know, Dogan side, puts high things in

4  high places, and low things in low places.  It's Dogan, so

5  technically it's practice-related instruction, but I don't that

6  I would, like, consider that practice instruction.

7         It's all nebular.  Sorry, I wish I could give a clearer

8  answer.  I apologize, but I can't.

9     Q    That's okay.  Do you think there's a difference between

10 practicing Zen Buddhism and teaching Zen Buddhism?

11         MS. ABARBANEL:  Objection, foundation.

12    A    Absolutely, there's a difference.

13 BY MR. QUACKENBUSH:

14    Q    Before I ask you what the difference is, how do you

15 know that there's a difference?

16    A    I -- well, I know there's a difference between --

17 because there are things that I could do as -- things that I --

18 would be assumed I could do and teach.  There's a way that I can

19 teach the Dharma now that I'm ordained, that I wouldn't be able

20 to do if I wasn't ordained.

21         And there are things that I would not be allowed to do

22 in the temple because I received, like, I haven't been Shuso

23 yet, and I'm not -- I don't have Dharma transmission.  So, there

24 are clear differences between what you can and can't do in

25 certain leadership roles, depending on whether you're ordained.

                                                    Page 31

```
 1            As a priest -- I should say, I'm priest-ordained, which
 2       is different than being lay ordained, also.  So, those are
 3       pretty clear -- well, they're clear and nebulous at the same
 4       time, if you're in the residential community.
 5            Q    Okay.  So, there's lot to unpack there.  Why don't we
 6       start with what is a Shuso?
 7            A    Shuso, S-H-U-S-O, I'll spell it.  I apologize.  I'll
 8       try to just use -- it comes out in the Japanese because that's
 9       what I'm used to.
10            Q    Honestly, I preferred it if you used the Japanese and
11       then we can clear it up.
12            A    Okay.
13            Q    Because, you know, yeah.
14            A    Okay.  Shuso is a position called a head monk, is the
15       head student of a practice period.  And it's a position that a
16       priest isn't -- is not always a priest, but generally speaking
17       is a priest -- who is invited to be Shuso, as part of their
18       ongoing priest training.  And that's how they -- that's the
19       period of time that they learn how to do ceremonies, and they
20       learn how to give practice instruction.
21                 And up until that point -- up until the end of the
22       Shuso practice period, and I want to say it's practically up to
23       3 or 6 months after the Shuso practice period.  It's only after
24       a certain period of time that you can give practice instruction
25       to other practitioners.
```

Page 32

1-ER-124

1        So, like, before I was ordained, I could, you know,

2    just talk to someone about practice. Now that I'm ordained, I

3    can still do that but I wouldn't be able to really call it a

4    practice discussion. Practice discussion is considered

5    something that's more formal, that priest would offer to a lay

6    practitioner and potentially another priest, after they have

7    been Shuso and six months after their Shuso period.

8        But, like, if a -- if a non-ordained person was asked

9    -- was invited to be Shuso, it's essentially recognizing that

10    this person has a long history of practice and we want to be

11    able to see them as senior teacher. And we want that person, by

12    we, I mean we in the community. So, the community of the senior

13    staff or the practice committee of City Center wanted, for

14    example, Nancy Petrin to be able to give practice discussion,

15    like, formally, they made her Shuso. I think she was Shuso at

16    Green Gulch first.

17        So, Nancy is not priest-ordained, but they wanted her

18    to be able to -- I think they wanted to recognize her practice,

19    and also, like, allow her to formally meet with students in a

20    way that Zen Center recognizes your ability to meet with

21    students. So, after being Shuso, she could do that. But, like,

22    I can't do that. I wouldn't be able to walk into the temple as

23    an ordained person, and offer a practice discussion because I

24    haven't been Shuso. At least not at Zen Center, like, I could

25    outside because we don't have those rules outside.

Page 33

1-ER-125

1       And a non-Shuso person, or non-priest-ordained person

2   who is Shuso, they're not allowed to do ceremonies.  So, for

3   example, part of the priest training is learning how to do the

4   Jundo, J-U-N-D-O, which is opening the -- it's like opening the

5   meditation hall.  They wouldn't open the hall unless the Abbot

6   or Abbis wasn't there.

7       But they would learn how to do that, amd they would

8   learn how to perform the -- the priest duty part of, like, any

9   service.  So, like, morning service.  That's what a Shuso is

10  learning how to do that.  But if you're not ordained and you're

11  asked to be Shuso, you can't do that.  They won't -- like, you

12  would not be allowed to learn the ceremonial part of it.

13      I hope that answers the question between the

14  difference.  How I see the difference between, like, what's

15  formal teaching and what's informal teaching.

16  Q    Yeah.  And you so, you mentioned lay ordination and

17  priest ordination.  Can you explain what those two are, and the

18  differences between the two?

19  A    Yes.  Lay ordination is essentially, like, I don't

20  know, it's like our version of baptism.  It's where you receive

21  the precepts from the teacher because you want to be considered

22  a Buddhist who is practicing according to Buddhist precepts.

23      A priest-ordained person is ordained, I don't know, for

24  different reasons.  But, a priest is someone who can receive

25  more training to do formal ceremonial things.

                                              Page 34

1     Q     And what training, if any, is required to receive lay

2     ordination?

3     A     None.

4     Q     None, okay.  And how do you know that?

5     A     Because when I wanted to sow my lay Rakusu, and that's

6     R-A-K-U-S-U, that's all one word.  That's how you spell Rakusu.

7     When I wanted to receive the precepts, I just asked to receive

8     the precepts as a lay person.

9     Q     So, are you lay --

10    A     And I said yes.

11    Q     So, are you lay ordained?

12    A     In addition to being priest-ordained, yes.

13    Q     Okay.  And is there a period of time that you need to

14    practice, generally, before your -- you're allowed to be lay

15    ordained?

16    A     It depends on the --

17          MS. ABARBANEL:  Real quick, I'm just going to

18          object as to foundation.

19          But please continue.

20          WITNESS:  Okay.

21    A     That depends on the teacher, really.  Yeah.  There's no

22    hard and fast rule for that.  There's no hard and fast rule for

23    any of it.

24    BY MR. QUACKENBUSH:

25    Q     Okay.  And so, you mentioned that you need no specific

                                                    Page 35

1 training to be lay ordained, right?

2     A   Uh-huh.

3     Q   Okay.  Do you need any training to become

4 priest-ordained?

5             MS. ABARBANEL:  Objection, foundation.

6     A   That's a hard -- that's a harder question to answer.  I

7 honestly don't know how to answer that question.

8     Q   Okay, that's okay.  Once you are priest-ordained, do

9 you then receive further training?

10             MS. ABARBANEL:  Objection, foundation.

11     A   Yes, you do.

12 BY MR. QUACKENBUSH:

13     Q   So, will the -- let me back up a second.

14          When you're priest-ordained -- and you may have said

15 this and I haven't kept it all in my head -- when you're

16 priest-ordained, are you then allowed to minister to the Zen

17 Buddhist Temple?

18             MS. ABARBANEL:  Objection, form.

19     A   You are allowed to do it.  You are not necessarily

20 expected to do it.  I guess that's what my hesitation is.  You

21 don't have to, but you can.

22 BY MR. QUACKENBUSH:

23     Q   Okay.  And so, I guess I'm just trying to understand

24 the process from becoming a WPA to becoming an Abbot,

25 right?  If those are the extremes?

                                          Page 36

```
 1     A     Do you want me to tell you how I think that could
 2  happen?
 3     Q     Yeah.
 4     A     Okay.
 5           MS. ABARBANEL:  I'm going to object as to
 6     foundation.
 7     A     Great.  Wow, that's a -- that's a long road.  A WPA --
 8  well, God.  You -- there are so many different ways that could
 9  happen, but I will tell you absolutely the only way it could
10  happen right now is if at some point that WPA was ordained.  And
11  that person would have to be not only priest-ordained, but they
12  would have to be given Dharma transmission because only an
13  Abbot -- you have to be an Abbot.  In order to be Abbot, you
14  have to ascend to the mountain seat.
15           And in order to ascend to the mountain, you have to
16  have Dharma transmission.  So, you can't lead the temple in a
17  ceremonial fashion as Abotts if you aren't ordained.  So, while
18  there are a variety of ways that Dharma transmission could be
19  offered to someone, a WPA -- someone who -- who started as a WPA
20  would, no matter what, have to be ordained.  As a -- as a
21  priest, and then they would have to receive Dharma transmission.
22     Q     And you have been -- have you -- and you have been
23  priest-ordained and lay ordained; is that correct?
24     A     Yes.
25     Q     Have you received Dharma transmission?
```

Page 37

1     A    No.

2     Q    So, explain to us how you -- how you kind of know of

3 this process.

4     A    Well, it's -- it's in the Soto Zen, like, Soto Shu.  I

5 think the Soto Shu is the guidelines from, like, the Japanese

6 Soto Shu Zen Buddhist Association of how a ordained person be

7 formally recognized, right?

8       So, I am not formally recognized by the Soto Shu

9 because I have not submitted a picture of my shaved head during

10 my ordination ceremony to the association in Japan.  So, like,

11 so there are ways that you can be formally recognized.  And then

12 there are ways that, like, I'm ordained and seen as an ordained

13 Soto Zen Buddhist priest, but not by the Soto Shu Organization.

14       And now, here's where it gets tricky.  So Zen -- also,

15 Zen Center doesn't -- I don't think -- I don't remember Seigen

16 in the handbook any, like, specific requirements of, like, the

17 path to being Abbot.  But we also know it's never happened that

18 an Abbot of Zen Center hasn't ascended the mountain seed.  And

19 in order to ascend the mountain seed, you had to have Dharma

20 transmission.

21       We know there's a difference between regular priest

22 ordination and Dharma transmission, first of all, because they

23 wear different robes; but the ceremonies are very different, and

24 what you can do is very different.  So I, as a priest-ordained

25 person can't ordain someone else.  Only someone who has Dharma

Page 38

1-ER-130

1    transmission can ordain someone as a priest.  And only someone

2    who has Dharma transmission, or this new thing that we have

3    called lay entrustment, which is a whole other category.  Any

4    way, those are the only -- I don't even know if a lay entrusted

5    person -- a lay entrusted person can't do ceremonies.  I know

6    that because Leslie can't do ceremonies at Tassajara, but she

7    can give practice discussion and she is considered part of Reb

8    Anderson's land.

9         So, yeah.  So, like, formally, the structure of --

10   that's how you would know because, I mean, that's how it's

11   explained.  And we watch it, right?  Like, I watched it for six

12   and a half years.  I watched a bunch of people ascend the

13   mountain top, and I watched a bunch of people leave the

14   Abbessey, so yeah.

15   Q    And do you know if there's praying that's required

16   after priest ordination to become -- I'm going to screw this up

17   -- ascend the mountain top?

18        MS. ABARBANEL:  Object as to foundation.

19        WITNESS:  Okay.

20   A    So, this is where it kind of really depends on your --

21   it depends on the teacher.  So, no one really knows what you

22   have to do in order to get Dharma transmission.  So, that's sort

23   of, like, up to the person who gives you Dharma transmission.

24   There's no real sense of, like, the timelines for it or, like,

25   how it happens.  So, I can't say what the requirements are.

                                                        Page 39

1-ER-131

1    Just at some magical time, you get a brown robe.

2          Then you either learn certain things about being a --

3    being a brown robe after you do it.  Like, I mean, Abbot Ed

4    hadn't lived in the temple for years before he ascended the

5    mountain seed.  But he couldn't be Abbot, but he lived outside.

6    We needed somebody to be Abbot after Steve Stucky passed away.

7    And so, they brought Ed in but Ed needed to have Dharma

8    transmission before he could ascend the mountain seed.

9          I don't know what training went, involved in that.  But

10   I do know that he can just be regular Ed coming in off the

11   street and be Abbot, you have to ascend the mountain seed.  I

12   don't know if that helps.

13       Q    It does.  We've been going --

14       A    And I will also say, ascending the mountain seed is a

15   ceremony.  It itself isn't a period of training or something

16   like that.

17               MR. QUACKENBUSH:  Okay.  We've been going for about

18         an hour and a half.  Do we want to take a 10-minute break,

19         and go use the restroom?

20               WITNESS:  Yes.

21               (Off the record.)

22   BY MR. QUACKENBUSH:

23       Q    Ms. Johnson, I believe you testified earlier that when

24   you began your first practice period at San Francisco Zen

25   Center, you knew that you wanted to become an ordained priest;

                                                        Page 40

```
 1        A    I honestly don't know.

 2   BY MR. QUACKENBUSH:

 3        Q    We may have covered this, but I just want to clarify:

 4   Were WPAs allowed to teach Zen Buddhism at San Francisco Zen

 5   Center?

 6             MS. ABARBANEL:  Objection, speculation, foundation.

 7        A    No.  Only -- wait -- in terms of, like, a class?

 8   BY MR. QUACKENBUSH:

 9        Q    In -- in terms ever formal teaching?

10        A    No, no.

11        Q    As a staff member at San Francisco Zen Center, did you

12   participate in any staff meetings?

13        A    Yes.

14        Q    How often?

15        A    At least weekly.

16        Q    And was that true across all three locations?

17        A    Yes.

18        Q    And did you ever attend any staff meetings with people

19   who -- staff from all of the locations?

20        A    Yes.

21        Q    How often did you do that?

22        A    Well, there's an annual meeting that has staff from all

23   three temples.  It's called an all-temple meeting.  That happens

24   once a year.

25             And then, depending on what I was doing and who was
```

Page 42

```
 1      Q    So, let's focus in on a couple of sentences.  Do you

 2   see where it says, "their focus seems heavily weighted towards

 3   administrative and fiscal decisions, and control instead of

 4   people"?

 5      A    Yes.

 6      Q    And is it your understanding that, "their," refers to

 7   Ed, Mary, and David?

 8      A    Yes.

 9      Q    And then further down, it says, "I understand the

10   importance of fiscal responsibility as for any nonprofit, that

11   is biggest challenge.  But I think that should be done in the

12   interests of the people"?

13      A    Yeah.

14      Q    Did you agree with Natalia -- did you agree with what

15   Natalia said at this meeting?

16      A    I --

17           MS. ABARBANEL:  I know I have objected blanket to

18      responsive -- or to relevance, but I'm just going to

19      reiterate in particular here.

20      A    Did I agree with it?  Yes, she was talking -- this

21   particular part of the meeting was just our celebrations and

22   mournings, but this was referring to decisions that were being

23   made about the RBT programs, specifically, I think at the time,

24   they were considering -- that's when they were really starting

25   to shutdown the program and/or raise the rates for the RBT
```

Page 53

1     students.

2            And there was a lot of uncomfortable back and forth

3     regarding use -- the use of RBTs as a money-making venture for

4     City Center.  So, it was pretty -- RBT was always a fairly

5     contentious topic at City Center.

6        Q    Did you ever feel that at times senior staff members at

7     San Francisco Zen Center were more focused on profits or revenue

8     generations than other aspects of the Zen Center?

9            MS. ABARBANEL:  Objection, speculation.

10       A    Yes.  If -- one of the concerns that, as someone who is

11    on staff and who is also a resident, there was a considerable

12    amount of time spent trying to balance what our responsibilities

13    were in terms of the profit center versus our lives as just

14    residents.

15           So, for example, me being the bookstore manager, I was

16    often tasked with either, you know, sort of, like, missing parts

17    of the schedule so that the bookstore could be opened.  We spent

18    a lot of time thinking about how we could generate more money

19    because the bookstore is considered a profit loss, you know,

20    like a loss center for Zen Center.  I was in -- seemed like

21    never ending, but that's how it was.

22           There were ongoing conversations about how to make the

23    bookstore more profitable, and how to make it generate more

24    money for Zen Center.  And that was always just -- so, it was --

25    there was always tension there.  So, it was a hard part of life

                                                        Page 54

1-ER-135

1   days of -- it's like multiple one-day sittings back-to-back.  If

2   that fell on a Saturday, I would have to skip some of it, so

3   that I could be working in the bookstore.  And if it included a

4   Wednesday evening, then I would also almost always have to skip

5   that.  There are also evening times when the bookstore would be

6   opened that we generally have volunteers to cover that, but if

7   we didn't, then I would have to be there.

8           I think I mentioned inventory days.  Yeah, so training

9   days, inventory days.  There are a number -- any number of

10  reasons why I would have to be out of the schedule.

11      Q    Did work take priority over the schedule?

12           MS. ABARBANEL:  Objection, speculation, form.

13      A    Yes, it did.

14  BY MR. QUACKENBUSH:

15      Q    And is the basis for that understanding your experience

16  at San Francisco Zen Center?

17      A    Yes.  The basis for that was we would lose revenue if

18  the bookstore wasn't open.

19      Q    Now, can you please turn to page 6 or scroll to page 6?

20      A    (Witness complies.)  Where it says Doanryo at the top?

21      Q    Yep.

22      A    Okay.

23      Q    Is the description of Doanryo consistent with your

24  understanding of that term?

25      A    Yes.

                                                        Page 63

```
 1        Q    Moving down to Doan, is the description in this

 2   document consistent with your understanding of that term?

 3        A    Yes.

 4        Q    Did you ever practice Doan?

 5        A    Yes.

 6        Q    What training was required for you to act as Doan?

 7        A    I mean, I had to learn how to -- I had to learn how to

 8   do all of these elements.  So, it was a period of time, Zazen.

 9   So, I had to learn how to sound the bell, basically.

10        Q    Do you recall how long that took you to learn?

11        A    I don't know.  Like, they just sort of tell you to do

12   it.

13        Q    It didn't take much instruction?

14        A    No.

15        Q    How would you compare acting as Doan to leading the

16   entire ceremony as an Abbot?

17        A    They are entirely different things.

18        Q    How so?

19        A    The -- the Doanryo is a position that you generally do

20   because of the place it represents in your -- I mean, anyone can

21   do it, so I don't want to say it's just beginners do it.  Like,

22   anyone who lived in residents could do it.  But it's you're a

23   part of the group that is just keeping the time for everyone

24   there.  So, you're basically, like, the, I don't know, the

25   secretary or something like that.  You're essentially just
```

Veritext Legal Solutions
866 299-5127

1-ER-137

```
 1    marking time for people.
 2            But anybody can be a Doan, right?  Like, you don't have
 3    to be specially trained to do it.  You don't have to have
 4    permission to do it.  But you can't be someone who would lead
 5    service, right?  You couldn't -- in that same -- in the service
 6    where a Doan would be doing something, anyone can be the Doan,
 7    but that Doan would never be able to get up and, like, actually
 8    perform the offerings at the altar.  They wouldn't be able to
 9    offer incense.  They wouldn't be directing the activity that's
10    happening there.
11            And no one would think of them as responsible for --
12    well, I shouldn't say no one.  You generally wouldn't think of
13    the Doanryo as responsible for creating the spiritual space, and
14    setting the spiritual tone for what's happening in the room.
15    And up wouldn't look to the Doan to, like, if you didn't -- you
16    weren't sure what was happening, you would look to the Abbot for
17    instruction about what you were supposed to be doing in that
18    space.  You wouldn't -- you wouldn't ask the Doan.
19        Q    And when you -- you referred several times to the
20    Doanryo.  So, is the --
21        A    Oh.
22        Q    -- explanation that you just gave reflective of all of
23    these jobs that are listed under the Doanryo?
24        A    Yes.  Let me make sure, I'm looking.  Yes, and Ryo is
25    R-Y-O.  Oh, yeah.  It's spelled right at the top of page.  So,
```

Page 65

1    that's all of the group of people who do -- they manage the

2    space of the meditation hall, essentially.  And of the temple

3    proper, so, like, there are sounds -- because you wouldn't

4    normally wear a watch.  The Doanryo essentially keeps time.  So,

5    they made all of the sounds that let you know where you're

6    supposed to be and what you're supposed to be doing.

7          So, anybody can do those jobs.  As is typical for Zen

8    practice, there's some jobs that anyone can do because it's part

9    of the practice to just have beginner's mind and be expected to

10   do anything.  And then there are certain ceremonial jobs that

11   you -- that aren't open like that, right?  So, it's leading the

12   ceremony is not one of those jobs that anyone can do.

13      Q   And how would you compare the training for these jobs

14   with the training to lead the ceremony?

15      A   They're entirely different.  So -- I'm sorry, I'm

16   trying to -- there's a little bit of qualification in how I

17   would answer because if you are -- it's all the same.  Doanryo

18   training is the same for everyone.

19         So, the training for that, what you would need to do

20   for that is the same, no matter what position you had on a

21   Doanryo or not.  They just stick you in front of it, and say

22   here's how you do it.  And then part of the practice is being

23   uncomfortable with it.  Being able to lead ceremony is --

24   there's an association of spiritual and experiential kind of

25   leadership.  So, either experience by length of time, or

Page 66

```
 1   experience by depth of time.

 2          So, someone who lived at Tassajara for a long time for

 3   example or something.  But in order to take up the ceremonial

 4   pieces that a priest would normally do, is the assumption of the

 5   community would be that this ordained person has the validation

 6   of their teacher, and of -- essentially, their teacher, the

 7   person who ordained them.  They're saying that this person has

 8   the capacity, the skill set, the experience, the maturity, and

 9   practice to be able to guide others in this practice.

10          The -- a senior student who is a member of the Doanryo,

11   for example, or, you know, like, if I were to go back right now

12   and be a member of the Doanryo, I think that there's a way that

13   I would be imbued with a sense of maturity and practice.  But I

14   wouldn't a be allowed to, like, train people and things, right?

15          So, there's a difference between, like, the kinds of

16   training I would get, right?  So, like, to get back to the Shuso

17   for example, like, the Shuso gets trained on how to give a

18   Dharma talk.  Now, as a -- as a priest, I could go in and talk

19   to people.  And even if I was invited to give an informal

20   talk -- which wouldn't happen at Zen Center because I've never

21   been a Shuso -- but if I was invited to, like, speak to people

22   just informally at Zen Center, I wouldn't be able to do any

23   ceremonies.  I wouldn't be able to do any of those things.

24          There's a level of respect that would be given to me

25   because I'm ordained.  There's a level of respect that would be
```

Page 67

1     A    Yes.  The full moon ceremony, and the Suzuki Roshi

2    Memorial.

3             (Off the record.)

4             (A brief break was taken.)

5    BY MR. QUACKENBUSH:

6     Q    Ms. Johnson, what is full moon ceremony?

7     A    A full moon ceremony is one that's performed every

8    month, generally speaking.  And it's a ceremony that's -- it's

9    like a repentance and vowing ceremony that the entire community

10   does together.

11     Q    Did you attend full moon ceremonies?

12     A    Yes.

13     Q    In your experience, was everyone that attended a full

14   moon ceremony either ordained or training to be ordained?

15     A    No.

16     Q    Was a full moon ceremony open to the public?

17     A    That's kind of murky.  It depends on the temple.

18   Tassajara, no because it's -- at least not during the practice

19   period.  I honestly don't remember.  I don't remember ever doing

20   a full moon ceremony at Tassajara during the summer guest

21   season, bit it could have happened.  In which case, the public

22   would have been invited to join us.

23         At City Center, it's open to everyone.  And I don't

24   know what Green Gulch's practice is.

25     Q    Would you agree with an analogy maybe someone created

                                        Page 74

1-ER-141

1    that attending a full moon ceremony is akin to attending mass in

2    Catholocism?

3                MS. ABARBANEL:  Objection, speculation, foundation.

4        A    I would absolutely say yes to that.

5    BY MR. QUACKENBUSH:

6        Q    And why would you say yes to that?

7                MS. ABARBANEL:  Same objections.

8        A    That's how I describe it often to people when I'm

9    talking about a full moon ceremony.  It's helpful to equate it

10   to other religious experiences.  It kinds of like when I said

11   that lay practice is like baptism.  The full moon ceremony is a

12   communal activity where you're expressing -- you're -- you're

13   confessing essentially wrongdoings or having broken the

14   precepts, and then you would sort of retake the precepts again.

15            And so, that's very similar to what I would think of as

16   mass.  A group of believers who are vowing and renewing a

17   commitment to their spiritual practice.

18   BY MR. QUACKENBUSH:

19       Q    Do you believe that attending a full moon ceremony

20   meant that a participant was training for ordination?

21       A    No.

22               MS. ABARBANEL:  Objection, speculation and

23       foundation.

24       A    No.  It's -- it's a ceremony.

25   BY MR. QUACKENBUSH:

                                              Page 75

1    Q    Did WPAs the lead full moon ceremony?

2         MS. ABARBANEL:  Same objections.

3    A    No, no.

4    BY MR. QUACKENBUSH:

5    Q    Did WPAs teach at full moon ceremonies?

6         MS. ABARBANEL:  Same objections.

7    A    No.

8    BY MR. QUACKENBUSH:

9    Q    And are you -- are you basing your answers off of your

10   experience attending full moon ceremonies?

11   A    Attending them and participating in them -- in them

12   when I was the Doanryo.  You would -- you're not teaching

13   events.  They're community ceremonies.  There's nothing to be

14   taught.  There's nothing to be learned.  There's -- you're

15   practicing.  You're -- -- it's a practice that you do together,

16   same as going -- yeah, going to mass.  You just go to church on

17   Sundays.  It's ceremony, it matters, it's important.  But

18   there's no teaching happening.

19   Q    What is the Suzuki Roshi memorial ceremony?

20   A    It's similar to the full moon ceremony in that it's

21   just a once month ceremony that honors Suzuki Roshi as the

22   founder of San Francisco Zen Center.

23   Q    And --

24   A    And it's important.  But it's just a ceremony.

25   Q    And are the -- are the same answers you gave for how

Page 76

```
 1   you interpret the full moon ceremony the answers you would give
 2   regarding the Suzuki Roshi memorial ceremony?
 3        A    Yes, there's a --
 4             MS. ABARBANEL:  Objection, form.
 5             Please continue.
 6        A    Yeah, it's not a teaching event.  It's a communal
 7   ceremony of appreciation and respect.
 8   BY MR. QUACKENBUSH:
 9        Q    What are one -- moving to page 9, what are one-day
10   sittings and Sesshins?
11        A    One-day sitting is an activity that is -- oh my God,
12   it's kind of just a one-day sit.  It's something that certain
13   Buddhists do as part of our practice.  It's a day of meditation,
14   essentially.  It's a day of silence where you do a combination
15   of sitting meditation, walking meditation, Dharma study, attend
16   a lecture and you eat meals.
17             Usually, they're formal in the Zendo, but again, it
18   depends on a lot on the factors as to whether or not the meals
19   -- the factors -- which temple you're at, and, like, who all is
20   coming because sometimes there's a lot of nonresidents who
21   participate, and so that can change things.
22        Q    So, you guessed my next question.  So in your
23   experience --
24        A    Oh.
25        Q    -- do nonresidents attend one-day sitting?
```

Page 77

1     A    Oh, yeah.

2     Q    Okay.

3     A    Again, depending on the temple.

4     Q    Yeah.  And is the reason perhaps that it's less likely

5  at Tassajara because Tassajara was much more remote than City

6  Center?

7           MS. ABARBANEL:  Objection, speculation.

8     A    Tassajara is closed to the public during practice

9  periods.  And practice periods are the only time you would do a

10  one-day sit or Sesshin at Tassajara.  Unless it was the summer,

11  and it was your day off and you wanted to create your own kind

12  of personal one-day sit.  But they don't happen outside of the

13  practice period at Tassajara.

14           And so, you were asking do nonresidents attend?

15     Q    Yeah.  But I -- I think you answered my question.

16     A    Okay.

17     Q    In your experience, was everyone that attended a one --

18  so, let me back up for a second.

19           What's the difference between a one-day sit and a

20  Sesshin, if there is one?

21     A    Oh.  Yeah, there's a huge difference.  A one-day sit is

22  just one day.  It's, you know, morning to evening.  Sesshin is

23  multiple days -- is a one-day sit over multiple days, in which

24  the silence carries over from the evening into the next morning.

25     Q    And how often were one-day sits?

Page 78

1    A    Once a month at City Center.  You don't have a one-day

2    sit at Tassajara during the practice period because the whole

3    day is basically a one-day sitting.  And at Green Gulch, I don't

4    know what regularity they did one-day sits.

5          But Green Gulch actually has a lot of half-day sits.

6    Green Gulch has half-day sits too, but I feel like Green Gulch

7    had more half-day sits.  But, I don't know.  I'm not really

8    sure.

9    Q    And how often did City Center had Sesshins?

10   A    Well, there's one Sesshin per practice period.  So,

11   it's generally how the practice period ends.  They last anywhere

12   from three to seven days.  I don't think there were ever any

13   Sesshins that were longer than seven days at City Center.  Some

14   of the other ones have 9, 11-day sits.

15         Any way, so the fall -- in the fall practice period and

16   the spring practice period, and then sometimes there's a short

17   summer practice period at City Center, there's usually like a 3

18   or 4-day Sesshin during that.  And then sometimes at City Center

19   there's what's called a residents' retreat.  And that would be

20   Sesshin like.  So, anywhere from 3 to 4 times a year.

21   Q    And in your experience, was everyone that attended a

22   one-day sit either ordained or training to be ordained?

23            MS. ABARBANEL:  Objection, speculation, foundation.

24   A    Not at all.

25   BY MR. QUACKEBUSH:

Page 79

1-ER-146

1    Q    And in your --

2    A    Anyone could come in.

3    Q    Anyone could come in.  And in your experience, was

4    anyone who attended a Sesshin either ordained or training to be

5    ordained?

6         MS. ABARBANEL:  Same objection, speculation,

7    foundation.

8    A    No, again, it's open to anyone.

9    BY MR. QUACKENBUSH:

10   Q    Do you believe that attending a one-day sit meant that

11   participant was training for ordination?

12        MS. ABARBANEL:  Objection, speculation, foundation.

13   A    In order to be ordained?

14   BY MR. QUACKENBUSH:

15   Q    Uh-huh.

16   A    Like, is that what it would mean?  No.  No.

17   Q    Do you believe that attending a Sesshin meant that a

18   participant was training to be ordained?

19        MS. ABARBANEL:  Same objections, speculation,

20   foundation.

21   A    No, no.

22   BY MR. QUACKENBUSH:

23   Q    And why do you think that?

24   A    Because it's an activity that anyone does.  There's no

25   bearing -- I mean, attending a Sesshin or one-day sit has no

Page 80

1     bearing on whether or not you're -- who -- it's just, like,

2     going to church, right?  Like, just because you go to church

3     doesn't mean that you're trying to be a minister.  That's --

4     it's a weird question, sorry.  I don't --

5          Q    We appreciate your answers, even with my weird

6     questions.

7               To your knowledge, did anyone ever have to miss a

8     one-day sit to work at San Francisco Zen Center?

9               MS. ABARBANEL:  Objection, foundation.

10         A    Yes, I did.

11    BY MR. QUACKENBUSH:

12         Q    You had had to miss a one-day sit to work at San

13    Francisco Zen Center?

14         A    Yes, to attend to the bookstore.  To attend to things

15    that were happening in the reservation's offices, but mostly the

16    bookstore.  But I -- I think there were times during that first

17    year when I worked for the reservations office, yeah.

18         Q    And did you ever have to miss Sesshin to work at the

19    San Francisco Zen Center?

20         A    Yes.

21         Q    And are you aware of others that had to miss a Sesshin

22    to work at San Francisco Zen Center?

23              MS. ABARBANEL:  Objection, foundation.

24         A    Yes, that's common.

25    BY MR. QUACKENBUSH:

                                                        Page 81

1     Q    We've discussed this a bit, but what is a practice

2   period?

3     A    A practice period is a specific period of time, usually

4   it's three months, where the community is engaged in a more

5   intense period of communal practice and study.  So, it's almost

6   like a semester at school, and that the schedule becomes a

7   little more strict.

8         There are more things added to the schedule than what

9   would normally be there outside of the practice period.

10     Q    And --

11     A    And it usually has a theme of some kind.

12     Q    And in your experience, was everyone that attended a

13   practice period either ordained or trained to be ordained?

14         MS. ABARBANEL:  Objection, speculation, foundation.

15     A    No, it's not a training activity.

16   BY MR. QUACKENBUSH:

17     Q    Do you believe that attending a practice period meant

18   that a participant was training for ordination?

19         MS. ABARBANEL:  Same objections.

20     A    No, no.

21   BY MR. QUACKENBUSH:

22     Q    Why do you think that?

23     A    Because it's open to anybody.

24     Q    Anyone from the public can attend a practice period?

25     A    Yeah, you can register.  You don't always have to be

```
 1    there in person.  You can do it online.  There's no attendance

 2    requirements, except, like, if you're a resident.  They are

 3    required, but.

 4         Q    Did WPAs lead practice periods?

 5              MS. ABARBANEL:  Objection, lead?  Foundation.

 6         A    Would WPA lead a practice period?  No, no.

 7    BY MR. QUACKENBUSH:

 8         Q    Did WPAs teach at practice period?

 9              MS. ABARBANEL:  Same objection.

10         A    No.

11    BY MR. QUACKENBUSH:

12         Q    And sitting back for a second, did WPAs ever lead

13    one-day sittings?

14              MS. ABARBANEL:  Same objections.

15         A    No.

16    BY MR. QUACKENBUSH:

17         Q    And in your experience, did WPAs ever lead one-day --

18    or lead Sesshins?

19              MS. ABARBANEL:  Same objections.

20         A    No.

21    BY MR. QUACKENBUSH:

22         Q    And in your experience, did WPAs teach at one-day

23    sittings?

24              MS. ABARBANEL:  Same objection.

25         A    No.
```

Page 83

```
 1    BY MR. QUACKENBUSH:

 2         Q    And in your experience, did WPAs ever teach at

 3    Sesshins?

 4              MS. ABARBANEL:   Same objection.

 5         A    No.

 6    BY MR. QUACKENBUSH:

 7         Q    And on page 9, it says, "classes"; do you see that?

 8         A    Yes, I do.

 9         Q    What is a class?

10         A    Class is -- do you mean at City Center?

11         Q    Yeah.

12         A    Because they're different.

13         Q    What is a class at City Center?

14         A    Okay.  A class at City Center is usually a practice

15    period, has a theme, and then there are different classes that

16    are offered in relationship to that theme.  And they're lead by

17    senior leaders of the temple.

18              I mean, usually -- yeah, they're lead by senior

19    leaders.  I don't know if there's ever been one where someone

20    from the outside was invited in.  I want to say it's possible,

21    but I don't think so.

22         Q    Invited in, do you mean invited in to teach or invited

23    in to participate?

24         A    Invited to teach, invited to teach.  So, anyone can,

25    again, practice periods at City Center are open to the public.
```

Page 84

1    So, they pay a fee to participate in -- it's, like, a

2    revenue-generating opportunity for Zen Center in addition to

3    just standard practice.

4        So, anyone can sign up to take the class.  They're

5    usually -- at City Center, there are usually more than one.  So,

6    you would just register and pay for the class, except for

7    residents.  Like, we're required to attend at least one class

8    for the practice period.

9    Q   And did you attend any of these classes at San

10   Francisco Zen Center City Center?

11   A   Yes.

12   Q   And in your experience, was everyone that attended a

13   class either ordained or training to be ordained?

14        MS. ABARBANEL:  Objection, speculation, foundation.

15   A   No, it's not a requirement.

16   BY MR. QUACKENBUSH:

17   Q   Do you believe that it -- in your experience attending

18   classes, do you believe that attending a class meant that a

19   participant was training for ordination?

20        MS. ABARBANEL:  Objection, speculation.

21   A   No, not at all.  All of the ordained people don't go to

22   classes.  They don't have to.

23   BY MR. QUACKENBUSH:

24   Q   Did they have to be -- did they have to attend classes

25   to become ordained?

Page 85

```
 1        Q     Are you familiar -- in your personal experience, are

 2    you familiar with Alex Behrend's practice of Zen Buddhism?

 3        A     I wouldn't say so, no.

 4        Q     Are you familiar with Alex Behrend's intent when he

 5    entered residency at San Francisco Zen Center?  And by intent,

 6    whether or not he was intending to become a priest?

 7        A     Yeah, I know he wasn't.

 8        Q     How do you know that?

 9        A     I'm pretty sure he said that he wasn't intending to

10    become a priest.

11        Q     When did he say that?

12        A     We were sort of all sitting in the back of the dining

13    room, having conversations about ordination and things like

14    that.  And so, I'm trying to -- I don't -- I don't have a date,

15    but essentially, there were several of us talking about plans

16    for ordination and whether -- sort of like what we thought about

17    our lives there.

18        Q     Going back to I was asking about somebody walking in

19    off the street and becoming ordained, and you said it's entirely

20    possible.

21              Did you ever witness somebody who became ordained from

22    walking off the street?

23        A     No, I don't -- I mean, I wasn't trying to be gloom

24    about that.  I don't think it's likely that it would happen.

25        Q     Okay.
```

                                                    Page 100

| | |
|---|---|
| **From:** | City Center Front Office [ccoffice@sfzc.org] |
| **Sent:** | 3/26/2018 12:57:04 PM |
| **To:** | sfzc-res [sfzc-res@googlegroups.com]; SFZC Employees Group [sfzc-employees-group@sfzc.org]; Work Mtg Notes [other-work-mtg-notes-recipients@sfzc.org] |
| **Subject:** | Work Meeting Notes March 26 |

## Calendar

7:00am - 8:00am: Recovery Meeting
3:30pm - 4:30pm: Kitchen Crew Training, Buddha Hall
7:30pm - 9:00pm: Meditation in Recovery, Buddha Hall

## Arrivals

**Christian** - not usually at work circle, but taking today off work to ease into it after sesshin

## Departures

**Kaishin** - away for 1 week
**Joshin** -  missing work circle for a few days as family will be in town

## Senior Staff Announcements

**Diego** - We are on interim, which means Zazen is led by volunteers. If you are planning to be in the zendo in the morning or evening please sign up for doan or doorwatch. If there's only one person you can do both. There are instructions on how to do the job under the seats, you do not need training.

**Darcy** - The Zen-mobile is repaired, and should be here tomorrow.

Dillon is sitting sesshin at Tassajara, so Darcy will be filling in for him on urgent requests while he's gone. He does not have access to workrequest@sfzc.org, so please send your requests to ccmaintenance@sfzc.org -- you can also ask the front office to contact Darcy in case of emergency

**Gentoku** - Thank you very much to everyone who helped the Practice Period and Sesshin happen. We are now in a transition period -- Many people will be coming from Tassajara to City Center, and some from Green Gulch to City Center.   If you are interested in moving to a different temple, please speak with Gentoku about it this week in order to facilitate the planning of housing, work crews, and more.

**David** - Thank you all for your support and presence during the Practice Period and Sesshin. Big thanks to Tova and Wendy.

Interim will last through Friday. Saturday we will resume our regular schedule, and have a full moon ceremony.

Interim means that residents are not tenkened in the zendo, there is no wednesday dharma talk, and no service.

## General Announcements

**Alex**: Desk duty is still happening during interim. During interim it is very important that night watch meet the door watch in the morning, as many of the door watch people are coming in from outside.

**Night Watch & Desk Duty: Mimi**

**Allison:** Allison understands that it can be discouraging for newer students to not see priests and senior students in the zendo. Allison has been diagnosed with anemia and is having a lot of difficulty in the morning. She apologizes for not being in the zendo much, and hopes to be back soon.

On a note as insurance coordinator: receiving mental health care is quite difficult through the current zen center insurance. If you're trying to receive care, and are having difficulties, you are welcome to reach out to Allison who can help you get approved. This is mainly for staff on Zen Center insurance, however she is willing to help anyone, just doesn't have as many connections.

**Jonathon:** Jonathon's life partner, Louie, is arriving tonight and will be staying for one week. Thank you for being warm and welcoming to him in advance.

**Diego:** Many of Diego's family and friends will be arriving over the next week. Thank you for being warm and welcoming in advance.

1-ER-154

SFZC_Behrend_000275

**Dustin:** Is on call for jury duty for the next week.

## Lost and Found

**Vicki -** Missing a couple yoga block from Sesshin

**Edward -** Missing a bike lock key

**Gregory -** Missing a red mug with a duck on it


\*\*\*\*\*\*\*\*\*\*\*\*

Summer butterfly
   one-meeting one-lifetime
deep valley

 *- Mitsu Suzuki*


--

*Front Office*
*San Francisco Zen Center*
*300 Page St.*
*San Francisco, CA 94102*
*415.863.3136*
*ccoffice@sfzc.org*

*9:30am-4:00pm Mon-Fri*
*11:00am-12:00pm Sat*

Stay connected to us! Become an SFZC member by signing up online

--
You received this message because you are subscribed to the Google Groups "SFZC Employees Group" group.
To unsubscribe from this group and stop receiving emails from it, send an email to sfzc-employees-group+unsubscribe@sfzc.org.
To post to this group, send email to sfzc-employees-group@sfzc.org.
To view this discussion on the web visit https://groups.google.com/a/sfzc.org/d/msgid/sfzc-employees-group/CABJMEoZ6E%2BAt8nQQOtmMAEywqn%3DeJ_MLJWDNWLRqanxP5tAXFQ%40mail.gmail.com.

SFZC_Behrend_000276

1    EILEEN R. RIDLEY, CA Bar No. 151735
        eridley@foley.com
2    **FOLEY & LARDNER LLP**
     555 CALIFORNIA STREET
3    SUITE 1700
     SAN FRANCISCO, CA 94104-1520
4    TELEPHONE: 415.434.4484

5    SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
        sabarbanel@foley.com
6    **FOLEY & LARDNER LLP**
     11988 EL CAMINO REAL, SUITE 400
7    SAN DIEGO, CA 92130-2594
     TELEPHONE: 858.847.6700

8

9    Attorneys for Defendants SAN FRANCISCO ZEN
     CENTER, INC.; SAN FRANCISCO EVERYDAY,
10   INC.; SAN FRANCISCO THIRD WAY, INC.; and
     THE ZEN FOUNDATION

11

12                  **UNITED STATES DISTRICT COURT**

13                **NORTHERN DISTRICT OF CALIFORNIA**

14                    **SAN FRANCISCO DIVISION**

15   ALEXANDER BEHREND,                    Case No. 3:21-cv-01905-JSC

16                     Plaintiff,
                                           **DEFENDANTS' ANSWER TO PLAINTIFF'S**
17          vs.                            **COMPLAINT**

18   SAN FRANCISCO ZEN CENTER, INC.; SAN
     FRANCISCO EVERYDAY, INC.; SAN         Judge:    Hon. Jacqueline Scott Corley
19   FRANCISCO THIRD WAY, INC.; THE ZEN
     FOUNDATION,
20
                     Defendants.
21

22

23

24

25

26

27

28

Defendants San Francisco Zen Center, San Francisco Everyday, Inc., San Francisco Third Way, Inc., The Zen Foundation (collectively, "Defendants"), by their undersigned counsel, answer the Complaint filed by Plaintiff Alexander Behrend ("Plaintiff"), as set forth below. Defendants deny each and every allegation contained in the Complaint that is not expressly admitted below. Any factual allegation below is admitted only as to the specific admitted facts, not as to any purported conclusions, characterizations, implications, or speculations that arguably may follow from the admitted facts. Defendants deny that Plaintiff is entitled to the relief requested in the Complaint or to any other relief.

1. Defendants deny that Plaintiff's address in his Complaint is current. Plaintiff filed a change of address notice with the Court.

2. Defendants admit that Defendants San Francisco Zen Center and The Zen Foundation are located at 300 Page Street, San Francisco, CA 94102. Defendants deny each and every remaining material allegation in paragraph 2.

3. Defendants admit that the U.S. District Court has subject matter jurisdiction because the action relates to the Americans with Disabilities Act of 1990. Defendants each and every remaining material allegation in paragraph 3.

4. Defendants deny each and every material allegation in paragraph 4.

5. Defendants deny each and every material allegation in paragraph 5.

6 Defendants deny each and every material allegation in paragraph 6.

a.[1] Admit.

b. Admit that Plaintiff met with Michael Smith on September 27, 2018 pursuant to an email Mr. Smith sent Plaintiff on September 26, 2018. Admit that Plaintiff was reassigned to the maintenance crew. Defendants each and every remaining material allegation in paragraph 6b.

c. Admit that Plaintiff received Plaintiff's request for medical leave was approved by Defendants. Defendants lack sufficient information to admit or deny the remaining allegations stated in paragraph 6c, and on that basis deny them.

///

---

[1] Because Plaintiff did not number or otherwise label the paragraphs in the fact section attached to his Complaint, Defendants refer to each paragraph by letter in the order in which they are written.

DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT
Case No. 3:21-cv-01905-JSC                    -2-

4884-8743-2713.5

d.     Admit that Plaintiff emailed Mr. Smith on October 25, 2018 and Mr. Smith responded the same day.  Admit the Plaintiff wrote back to Mr. Smith on October 29, 2018.  The text of the email correspondence speaks for itself, and Defendants deny each and every material allegation inconsistent with the text of the emails.  Defendants lack sufficient information to admit or deny the remaining allegations stated in paragraph 6d, and on that basis deny them.

e.     Admit that Plaintiff submitted his application for the Dharma Bridge program on November 2, 2018.  Admit that Mr. Smith emailed Plaintiff on November 8, 2018.  The text of the email correspondence speaks for itself, and Defendants deny each and every material allegation inconsistent with the text of the emails.  Defendants lack sufficient information to admit or deny the remaining allegations stated in paragraph 6e, and on that basis deny them.

f.     Admit that Mr. Smith emailed Plaintiff on November 21, 2018.  The text of the email correspondence speaks for itself, and Defendants deny each and every material allegation inconsistent with the text of the emails.  Admit that Plaintiff accepted Plaintiff's offer to transfer to the Dharma Bridge program on November 21, 2018.  Defendants lack sufficient information to admit or deny the remaining allegations stated in paragraph 6f, and on that basis deny them.

g.     Admit that Plaintiff submitted a Winter 2019 practice period application on January 10, 2019 and that Mr. Smith wrote to Plaintiff by email on January 23, 2019.  The text of the email correspondence speaks for itself, and Defendants deny each and every material allegation inconsistent with the text of the emails.  Defendants lack sufficient information to admit or deny the remaining allegations stated in paragraph 6e, and on that basis deny them.

h.     Defendants deny each and every material allegation in paragraph 6h.

7.     Defendants deny each and every material allegation in paragraph 7.

8.     Defendants deny that Plaintiff filed a charge with the federal Equal Employment Opportunity Commission on July 19, 2019 and lack sufficient information to admit or deny the remaining allegations in paragraph 8 and on that basis deny them.

9.     Admit.

10.     Defendants lack sufficient information to admit or deny the allegations stated in paragraph 10, and on that basis deny them.

11.     Defendants deny Plaintiff is entitled to all relief prayed for, including injunctive orders, damages, costs, and attorney fees.

## AFFIRMATIVE DEFENSES

12.     Without admitting to the truth of any of the allegations in Plaintiff's Complaint that have been previously denied; without conceding that Defendants bear any burden of proof as to the allegations in Plaintiff's Complaint or that any of the following necessarily must be pled as an affirmative defense; and without conceding that any of the following is not already at issue by virtue of the foregoing denials, Defendants assert the following affirmative defenses, and reserves the right to supplement and/or amend its affirmative defenses as may be necessary and appropriate as this litigation proceeds.

### FIRST AFFIRMATIVE DEFENSE

### (Failure to State Sufficient Facts)

13.     The Complaint, and each and every cause of action therein, fails to set forth facts sufficient to constitute a cause of action upon which relief may be granted against Defendants.

### SECOND AFFIRMATIVE DEFENSE

### (Failure to State a Claim Upon Which Relief Can Be Granted)

14.     The Complaint, and each and every cause of action therein, fails to state a claim upon which relief may be granted against Defendants.

### THIRD AFFIRMATIVE DEFENSE

### (No Damages)

15.     Plaintiff has suffered no damage by any acts, events, or occurrences alleged in the Complaint, whether or not attributable to Defendants.

### FOURTH AFFIRMATIVE DEFENSE

### (Ministerial Exemption)

16.     Defendants allege that Plaintiff's relationship with Defendant San Francisco Zen Center was, at all times, that of a "minister" and that Defendant San Francisco Zen Center was at all times a Church. Therefore, Defendant further alleges that Plaintiff's relationship was, at all times, covered by the doctrine known as the "Ministerial Exemption" arising under the First Amendment to the United

States Constitution, which precludes Plaintiff from asserting a claim under the Americans with Disabilities Act of 1990 and prohibits recovery by the Plaintiff.

### FIFTH AFFIRMATIVE DEFENSE

### (Not Employee)

17.     Defendants allege Plaintiff was not an employee of any Defendant within the statutory period prior to his filing a claim with the Equal Employment Opportunity Commission.

### SIXTH AFFIRMATIVE DEFENSE

### (No Legal Obligation to Accommodate and Participate in Interactive Process)

18.     Defendants allege that because Plaintiff's relationship with Defendants was, at all material times, covered by the ministerial exemption, Defendants had no legal obligation to accommodate any disabilities asserted by Plaintiff.

### SEVENTH AFFIRMATIVE DEFENSE

### (Granted Reasonable Accommodation and Participated in Interactive Process)

19.     Defendants allege to the extent that Plaintiff had a disability covered by the Americans with Disabilities Act of 1990 and to the extent they were required to reasonably accommodate Plaintiff and/or engage in the interactive process with Plaintiff, they satisfied their obligations to do so.

### EIGHTH AFFIRMATIVE DEFENSE

### (Failure to Timely Propose Any Accommodation and Participation in Interactive Process)

20.     Defendants allege that, to the extent that Plaintiff was employed by Defendants at any time, and to the extent that Plaintiff had a disability covered by the Americans with Disabilities Act of 1990, and to the extent they were required to reasonably accommodate Plaintiff and/or engage in the interactive process with Plaintiff, Plaintiff did not propose any accommodation or participation in the interactive process at a time when he was employed by Defendants.

### NINTH AFFIRMATIVE DEFENSE

### (Improper Claim for Relief)

21.     Defendants allege that Plaintiff is not entitled to some or all of the relief sought.

///

///

21-ER-160

## TENTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

22. Defendants allege that Plaintiff lacks standing to sue.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Good Faith)

23. Defendants, and their agents, if any, acted reasonably and in good faith at all times material herein, based on all relevant facts, law, and circumstances known by them at the time that they acted. Accordingly, Plaintiff is barred, in whole or in part, from any recovery in this action.

## TWELFTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

24. Defendants allege that Plaintiff did not exhaust his administrative remedies within the appropriate statute of limitations.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

25. Defendants allege that Plaintiff failed to mitigate his damages and is therefore precluded from recovery of damages alleged in the Complaint.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Poor Performance)

26. Defendants allege that Plaintiff failed to perform competently in any position regardless of the reasonable accommodations provided.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Entanglement)

27. Defendants allege that Plaintiff's position at Defendant San Francisco Zen Center established a minister-church relationship and any civil court inquiry into Defendant San Francisco Zen Center's alleged failure to reasonably accommodate or engage in the interactive process would be prohibitively intrusive and constitute excessive government entanglement with religion in violation of the First Amendment.

///

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Right to Assert Additional Affirmative Defenses)

28. Defendants preserve and assert all affirmative defenses available under any applicable law. Defendants presently have insufficient knowledge or information upon which to form a belief as to whether they may have other, as yet unstated, defenses available. Therefore, Defendants reserve the right to supplement this Answer and to assert additional defenses in the event that discovery or other means indicate they would be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray for relief as follows:

1. That Plaintiff take nothing by way of his Complaint;

2. That Plaintiff's Complaint be dismissed in its entirety, with prejudice;

3. That Defendants be granted their reasonable attorneys' fees, costs, and expenses; and

4. For such other and further relief as the Court deems just and proper.

DATED: January 31, 2022       **FOLEY & LARDNER LLP**

      /s/ Sara A. L. Abarbanel
      SARA A. L. ABARBANEL
      Attorneys for Defendants SAN FRANCISCO ZEN CENTER, INC.; SAN FRANCISCO EVERYDAY, INC.; SAN FRANCISCO THIRD WAY, INC.; and THE ZEN FOUNDATION

FILED BY FAX

FILED (5)

MAR 17 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

*JSC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**CV21    1905**

Alexander Behrend

Plaintiff,

vs.

San Francisco Zen Center, Inc.
San Francisco Everyday, Inc
San Francisco Third Way, Inc,
The Zen Foundation
                              Defendant(s).

CASE NO. _____

EMPLOYMENT DISCRIMINATION
COMPLAINT

1.    Plaintiff resides at:

Address   219 South Fifth Avenue

City, State & Zip Code   Wilmington, NC   28401

Phone   415 - 810 - 9047

2.    Defendant is located at:

Address   300 Page Street

City, State & Zip Code   San Francisco, CA   94102

3.    This action is brought pursuant to Americans with Disabilities Act of 1990 & the Rehabilitation Act of 1973.   Jurisdiction is conferred on this Court by 42 U.S.C. Section 2000e-5.

Equitable and other relief is sought under 42 U.S.C. Section 2000e-5(g).

4.    The acts complained of in this suit concern:

a.  __ Failure to employ me.

b.  X  Termination of my employment.

- 1 -

1-ER-163

1       c. __ Failure to promote me.

2       d. __ Other acts as specified below.

3  Disability-based discrimination including disparate

4  treatment, failure to engage in the interactive process,

5  and failure to provide reasonable accommodation;

6  retaliation; wrongful termination.

7

8

9  5.    Defendant's conduct is discriminatory with respect to the following:

10      a. __ My race or color.

11      b. __ My religion.

12      c. __ My sex.

13      d. __ My national origin.

14      e. X Other as specified below.

15        My disabilities.

16  6.    The basic facts surrounding my claim of discrimination are:

17  Due to the limited space provided here, please

18  find the basic facts surrounding my claim of discrimination

19  attached.

20

21

22

23

24

25  7.    The alleged discrimination occurred on or about September 2018 - June 2019

26                             (DATE)

27  8.    I filed charges with the Federal Equal Employment Opportunity Commission (or the

28  California Department of Fair Employment and Housing) regarding defendant's alleged

- 2 -

1    discriminatory conduct on or about _July 19, 2019_.

2                                           (DATE)

3    9.      The Equal Employment Opportunity Commission issued a Notice-of-Right-to-Sue letter

4    (copy attached), which was received by me on or about _12/17/2020_.

5                                           (DATE)

6    10.     Plaintiff hereby demands a jury for all claims for which a jury is permitted:

7        Yes _X_     No ____

8    11.     WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate,

9    including injunctive orders, damages, costs, and attorney fees.

10

11    DATED: _March 16, 2021_                     

12                                          SIGNATURE OF PLAINTIFF

13

14    (PLEASE NOTE: NOTARIZATION        Alexander Behrend

15    IS NOT REQUIRED.)                  PLAINTIFF'S NAME

16                                           (Printed or Typed)

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

#6 The basic facts surrounding my claim of discrimination are:

My name is Alex Behrend. I applied to be a work practice apprentice ("WPA") for the San Francisco Zen Center (the "Center") in 2016. I had been forthcoming about my disabilities (ADHD and PTSD) with Head of Practice, David Zimmerman prior to applying to be a WPA. I also disclosed that I took medication for ADHD in my WPA application. I began working as a WPA on approximately January 10, 2017. I was assigned to work in the kitchen and transferred to housekeeping in approximately July 2017.

On September 26, 2018, the Director of City Center Michael (aka Gentoku) Smith asked me to meet with him on September 27, 2018. During our meeting, he informed me that the Center was reassigning me to work on the maintenance crew. I told Mr. Smith that I had concerns about how working on the maintenance crew might impact my disabilities and that I needed to check with my doctor regarding this job change. Mr. Smith told me repeatedly that the decision to reassign me to maintenance was made, there were no other options for me, and it was "not up for discussion". Mr. Smith then directed me to show up to work on the maintenance crew on October 1, 2018. After the meeting, I checked in with my doctor, who told me that he did not recommend that I work in maintenance due to past trigger hypervigilance when working around heavy-duty equipment as well as the realistic risk of harm when someone with attention deficit disorder has to maintain consistent attention to avoid injury. Later the same day, I wrote an email to Human Resources Representative Eli Brown-Stevenson and David Zimmerman informing them that my doctor did not want me to work on the maintenance crew. I asked them to relay this message to Mr. Smith and asked Mr. Zimmerman to help facilitate a conversation between Mr. Smith and myself regarding this topic. They did not offer me another option but to show up on Monday to work on the maintenance crew. On October 1, 2018 at 1:30p.m. I showed up to work on the maintenance crew. My supervisor was not told about my disabilities and immediately asked me to put heavy-duty equipment on to clean. I had a severe panic attack an hour into my shift. I was not able to continue working that day.

I went to see my doctor on October 2, 2018 and notified my supervisors that I was unable to come to work. That day, my doctor provided me a note ordering me to go on medical leave for four (4) weeks as the Center had, instead of accommodating me by allowing me to remain in my housekeeping position or reassigning me to another position that would not trigger my disabilities, forced me to work on the maintenance crew. I left this note for Mr. Smith on October 2, 2018. Mr. Smith emailed me back on October 3, 2018 approving my medical leave. When my doctor and I discussed my return to work, my doctor recommended that I request permission to work outside the Center.

On October 25, 2018, I emailed Mr. Smith and attached a note (dated October 22, 2019) from my doctor recommending that the Center transfer me to work outside of the temple as an accommodation, and I asked Mr. Smith to engage in the interactive process with me. The same day, Mr. Smith wrote me back confirming his understanding that I requested a transfer to the Dharma Bridge program. Mr. Smith further asked me if I had received a diagnosis from my doctors regarding my disabilities and asked if I would be willing to have the practice committee contact my doctors regarding my condition. On October 29, 2018 I wrote back to Mr. Smith

giving my consent to speak with my treating medical professionals and referred him to the October 22, 2019 note regarding my doctor's request that the Center accommodate my disabilities. I informed him I was going to apply for the Dharma Bridge program, as he suggested. I also informed him I was ready to come back to work beginning October 31, 2019 and included requests for accommodations until a decision was made regarding my application for Dharma Bridge. No one responded to me regarding returning to work on October 31, 2019 and no one provided me with a work assignment.

I submitted my Dharma Bridge application on November 2, 2018. On November 8, 2018, Mr. Smith emailed me extending me a "provisional invitation" to the Dharma Bridge program. Mr. Smith explained "the reason the practice committee is making the offer to Dharma Bridge program a provisional one is out of a frank acknowledgment that the Dharma Bridge program is difficult, and that being in this program while meeting the challenges presented by the disabilities you've been diagnosed with raises the degree of difficulty considerably." In the alternative, Mr. Smith offered that I "engage in the Dharma Bridge program from now until January 20**' as a way to transition out of residency at City Center."

On November 14, 2019 I informed Mr. Smith that I declined his offer to transition out of residency and accepted the Center's offer to join the Dharma Bridge program. I again asked the practice committee to speak with my medical professionals regarding my accommodations. I requested that the Center do a mutual assessment beginning December 1, 2018 instead of waiting three (3) months as Mr. Smith initially proposed and I suggested a process surrounding the mutual assessment. On November 21, 2018, Mr. Smith wrote me that he discussed my proposal with the Practice Committee and stated the "committee is basically in agreement with you on engaging in a collaborative effort going forward" and that "[m]eeting the fundamental of the Dharma Bridge program would apply." Mr. Smith reiterated that the offer continued to be a three-month provisional acceptance, beginning November 21, 2018 and ending February 20, 2019.I accepted this offer in the Dharma Bridge program on November 21, 2018.

On January 10, 2019, I submitted a Winter 2019 practice period application and requested flexible hours to accommodate my disabilities. On January 23, 2019, Mr. Smith wrote me that the practice committee rejected my application stating "[I]t [was] time for [my] current residential experience at City Center to come to a close." Mr. Smith further informed me that Dharma Bridge was not a "good fit" for me and demanded I leave no later than January 31, 2019.

The Center has discriminated against me in violation of the ADA by failing to accommodate my disability, failing to engage with me in the interactive process, retaliating against me for having requested reasonable accommodations, and firing me.

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Alexander Behrend<br>801 Morrell Ave<br>San Francisco, CA 94010 | From: | Oakland Local Office<br>1301 Clay Street<br>Ste. 680-North<br>Oakland, CA 94612 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 550-2019-01657 | Sarah Lamm,<br>Investigator | (510) 956-0013 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

| | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
| | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| X | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

| | For | Sarah Lamm | | 12/17/2020 |
|---|---|---|---|---|
| Enclosures(s) | | Steven T. Hunt,<br>Director | | (Date Mailed) |

cc:
Eli Brown-Stevenson
Human Resources Representative
SAN FRANCISCO ZEN CENTER INC.
300 Page Street
San Francisco, CA 94102

Katherine Fiester
LEGAL AID AT WORK
180 Montgomery Street, Ste. 600
San Francisco, CA 94104

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --**    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed within 90 days of the date this Notice was *mailed* to you (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --**    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred more than **2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit **before 7/1/10** -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --**    **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --**    **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, please make your review request **within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):** The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

<u>If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability regulations.cfm.</u>

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities"** now include **the operation of major bodily functions,** such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
➢ **Only one** major life activity need be substantially limited.
➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**
➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability regulations.cfm.

**Query     Reports     Utilities     Help     Log Out**

ADRMOP,APPEAL,CLOSED,CONSENT,E-ProSe,PROTO

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:21-cv-01905-JSC

Behrend v. San Francisco Zen Center, Inc. et al
Assigned to: Judge Jacqueline Scott Corley
Cause: 42:2000e Job Discrimination (Employment)

Date Filed: 03/17/2021
Date Terminated: 02/14/2023
Jury Demand: Plaintiff
Nature of Suit: 445 American with
Disabilities - Employment
Jurisdiction: Federal Question

**Plaintiff**

**Alexander Behrend**                    represented by    **Scott M Grzenczyk**
Girard Gibbs LLP
601 California Street, 14th Floor
San Francisco, CA 94108
415-981-4800
Fax: 415-981-4846
Email: smg@girardgibbs.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly Macey**
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
415-981-4800
Fax: 415-981-4846
Email: kmacey@girardsharp.com
*ATTORNEY TO BE NOTICED*

**Kyle Paul Quackenbush**
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
Email: kquackenbush@girardsharp.com
*ATTORNEY TO BE NOTICED*

**Mikaela M. Bock**
Girard Sharp LLP

601 California Street
Suite 1400
San Francisco, CA 94108
415-981-4800
Fax: 415-981-4846
Email: mbock@girardsharp.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**San Francisco Zen Center, Inc.**    represented by    **Eileen Regina Ridley**
Foley & Lardner LLP
Attorneys at Law
555 California Street
Suite 1700
San Francisco, CA 94104
415-434-4484
Fax: 415-434-4507
Email: eridley@foley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Hamling**
Foley & Lardner LLP
Litigation
555 California Street
Suite 1700
San Francisco, CA 94104
415-438-6425
Email: ehamling@foley.com
*ATTORNEY TO BE NOTICED*

**Sara Alexis Levine Abarbanel**
Foley & Lardner LLP
11988 El Camino Real, Suite 400
92130
San Diego, CA 92130
858-847-6700
Fax: 858-792-6773
Email: sabarbanel@foley.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**San Francisco Everyday, Inc.**    represented by    **Eileen Regina Ridley**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Hamling**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara Alexis Levine Abarbanel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**San Francisco Third Way, Inc.**        represented by   **Eileen Regina Ridley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Hamling**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara Alexis Levine Abarbanel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Zen Foundation**        represented by   **Eileen Regina Ridley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Hamling**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara Alexis Levine Abarbanel**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/17/2021 | 1 | COMPLAINT against San Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. Filed byAlexander Behrend. Consent/Declination due by 3/31/2021. (Attachments: # 1 Civil Cover Sheet)(arkS, COURT STAFF) (Filed on 3/17/2021) (Entered: 03/23/2021) |
| 03/17/2021 | 2 | MOTION for Leave to Proceed in forma pauperis filed by Alexander Behrend. (arkS, |

| | | |
|---|---|---|
| | | COURT STAFF) (Filed on 3/17/2021) (Entered: 03/23/2021) |
| 03/23/2021 | [3] | **Initial Case Management Scheduling Order with ADR Deadlines: This case may fall within the Initial Discovery Protocols for Employment Cases Alleging Adverse Action. See General Order 71. Parties and Counsel are directed to review General Order 71 to determine whether it applies to this case, and to comply with that General Order if applicable. Case Management Statement due by 6/10/202 1. Initial Case Management Conference set for 6/17/2021 01:30 PM in San Francisco, - Videoconference Only. (arkS, COURT STAFF) (Filed on 3/23/2021)** <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> **(Entered: 03/23/2021)** |
| 03/23/2021 | 4 | Remark: Mailed [3] to plaintiff (arkS, COURT STAFF) (Filed on 3/23/2021) (Entered: 03/23/2021) |
| 03/24/2021 | [5] | **ORDER by Magistrate Judge Jacqueline Scott Corley granting [2] Motion for Leave to Proceed in forma pauperis. No service/under 1915 review. (ahm, COURT STAFF) (Filed on 3/24/2021)** <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> **(Entered: 03/24/2021)** |
| 04/05/2021 | [6] | **CLERK'S NOTICE** Re: Consent or Declination: **Plaintiff** shall file a consent or declination to proceed before a magistrate judge by **4/19/2021.** Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. (ahm, COURT STAFF) (Filed on 4/5/2021) <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> (Entered: 04/05/2021) |
| 04/06/2021 | [7] | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Alexander Behrend.. (Behrend, Alexander) (Filed on 4/6/2021) (Entered: 04/06/2021) |
| 06/14/2021 | [8] | **ORDER CONTINUING INITIAL CASE MANAGEMENT CONFERENCE. Signed by Judge Jacqueline Scott Corley on 6/14/2021.** Initial Case Management Conference reset for 8/12/2021 at 1:30 p.m. by Videoconference. (ahm, COURT STAFF) (Filed on 6/14/2021) <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> (Entered: 06/14/2021) |
| 06/23/2021 | [9] | **SCREENING ORDER PURSUANT TO 28 U.S.C. § 1915. Signed by Magistrate Judge Jacqueline Scott Corley on 6/23/2021. (ahm, COURT STAFF) (Filed on 6/23/2021)** <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> **(Entered: 06/23/2021)** |

| 06/23/2021 | 10 | Summons Issued as to San Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. (Attachments: # 1 USM 285, # 2 USM 285, # 3 USM 285, # 4 USM 285)(arkS, COURT STAFF) (Filed on 6/23/2021) (Entered: 06/23/2021) |
|---|---|---|
| 06/23/2021 | 11 | Remark: Service packets sent to USMS for service (arkS, COURT STAFF) (Filed on 6/23/2021) (Entered: 06/23/2021) |
| 07/15/2021 | 12 | Acknowledgement of Receipt from USM (arkS, COURT STAFF) (Filed on 7/15/2021) (Entered: 07/15/2021) |
| 07/29/2021 | 13 | Summons Returned Unexecuted as to San Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. (Attachments: # 1 Returned Service)(arkS, COURT STAFF) (Filed on 7/29/2021) (Entered: 07/30/2021) |
| 08/09/2021 | 14 | **ORDER TO SHOW CAUSE WHY THIS CASE SHOULD NOT BE DISMISSED WITHOUT PREJUDICE FOR INABILITY TO SERVE. Signed by Magistrate Judge Jacqueline Scott Corley on 8/9/2021.** Show Cause Response due by 8/23/2021. (ahm, COURT STAFF) (Filed on 8/9/2021)<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)<br>Order emailed to Plaintiff at alex.s.behrend@gmail.com on 8/9/2021. (Entered: 08/09/2021) |
| 08/20/2021 | 15 | RESPONSE TO ORDER TO SHOW CAUSE by Alexander Behrend . (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Summons)(Behrend, Alexander) (Filed on 8/20/2021) (Entered: 08/20/2021) |
| 09/03/2021 | 16 | Letter from Plaintiff Alexander Behrend . (Behrend, Alexander) (Filed on 9/3/2021) (Entered: 09/03/2021) |
| 09/13/2021 | 17 | **ORDER TO REATTEMPT SERVICE. Signed by Magistrate Judge Jacqueline Scott Corley on 9/13/2021.** Case Management Statement due by 12/2/2021. Initial Case Management Conference set for 12/9/2021 at 1:30 p.m. by videoconference. (ahm, COURT STAFF) (Filed on 9/13/2021)<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)<br>(Entered: 09/13/2021) |
| 09/13/2021 | 18 | **CLERK'S NOTICE SETTING ZOOM HEARING.** Initial Case Management Conference set for December 9, 2021 at 1:30 p.m. before Magistrate Judge Jacqueline Scott Corley will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jsc<br><br>**Court Appearances:** Advanced notice is required of counsel or part ies who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. **A list of names must be sent to the CRD at jsccrd@cand.uscourts.gov no later than 12:00 p.m. by December 8, 2021.** |

**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.

**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.

(This is a text-only entry generated by the court. There is no document associated with this entry.)

(ahm, COURT STAFF) (Filed on 9/13/2021)

Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)

(Entered: 09/13/2021)

| 11/23/2021 | 19 | NOTICE of Change of Address by Alexander Behrend (Behrend, Alexander) (Filed on 11/23/2021) (Entered: 11/23/2021) |
| --- | --- | --- |
| 12/01/2021 | 20 | Remark: Resent Service packet to USM (ark, COURT STAFF) (Filed on 12/1/2021) (Entered: 12/01/2021) |
| 12/02/2021 | 21 | Letter from Alexander Behrend *re Reschedule Initial Case Management Dates*. (Behrend, Alexander) (Filed on 12/2/2021) (Entered: 12/02/2021) |
| 12/03/2021 | 22 | **CLERK'S NOTICE CONTINUING CASE MANAGEMENT CONFERENCE.** Please take notice the case management conference set for December 9, 2021 is continued to January 27, 2022 at 1:30 p.m. by videoconference, to allow time to serve the defendants. Case management conference statement is due by January 20, 2022.<br><br>(This is a text-only entry generated by the court. There is no document associated with this entry.)<br><br>(ahm, COURT STAFF) (Filed on 12/3/2021)<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)<br><br>(Entered: 12/03/2021) |
| 01/10/2022 | 23 | SUMMONS Returned Executed San Francisco Everyday, Inc. served on 1/10/2022, answer due 1/31/2022; San Francisco Third Way, Inc. served on 1/10/2022, answer due 1/31/2022; San Francisco Zen Center, Inc. served on 1/10/2022, answer due 1/31/2022. (Attachments: # 1 Third Way, # 2 San Francisco Zen Center)(ark, COURT STAFF) (Filed on 1/10/2022) (Entered: 01/11/2022) |
| 01/20/2022 | 24 | NOTICE of Appearance by Sara Alexis Levine Abarbanel (Abarbanel, Sara) (Filed on 1/20/2022) (Entered: 01/20/2022) |
| 01/20/2022 | 25 | Certificate of Interested Entities by San Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation (Abarbanel, Sara) (Filed |

| | | |
|---|---|---|
| | | on 1/20/2022) (Entered: 01/20/2022) |
| 01/20/2022 | [26](#) | JOINT CASE MANAGEMENT STATEMENT filed by San Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. (Abarbanel, Sara) (Filed on 1/20/2022) (Entered: 01/20/2022) |
| 01/20/2022 | 27 | **CLERK'S NOTICE SETTING ZOOM HEARING.** Initial Case Management Conference set for 1/27/2022 at 1:30 p.m. before Magistrate Judge Corley will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jsc<br><br>**Court Appearances:** Advanced notice is required of counsel or parties who wish to be ident ified by the court as making an appearance or will be participating in the argument at the hearing. **A list of names must be sent to the CRD at jsccrd@cand.uscourts.gov no later than 12:00 p.m. on 1/26/2022.**<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>(This is a text-only entry generated by the court. There is no document associated with this entry).< p> (ahm, COURT STAFF) (Filed on 1/20/2022)<br><br><small>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)</small><br><br>(Entered: 01/20/2022) |
| 01/20/2022 | [28](#) | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by San Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation.. (Abarbanel, Sara) (Filed on 1/20/2022) (Entered: 01/20/2022) |
| 01/21/2022 | 29 | **ORDER CONTINUING CASE MANAGEMENT CONFERENCE. Signed by Magistrate Judge Jacqueline Scott Corley on January 21, 2022.**<br><br>Upon review of the parties' case management conference statement, and because Defendants' deadline to answer the complaint is January 31, 2022, the case management conference scheduled for January 27, 2022 is continued to February 10 at 1:30 p.m. via Zoom video. An updated joint case management conference statement that includes information omitted from the current statement due to Defendants not yet answering the complaint shall be filed by February 8, 2022.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jsc |

**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. **A list of names must be sent to the CRD at jsccrd@cand.uscourts.gov no later than 12:00 p.m. on February 9, 2022.**

**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.

**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.

(This is a text-only entry generated by the court. There is no document associated with this entry.)

(ahm, COURT STAFF) (Filed on 1/21/2022)

---

Any non-C M/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)

(Entered: 01/21/2022)

| | | |
|---|---|---|
| 01/31/2022 | 30 | *Defendants'* ANSWER to Complaint bySan Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. (Abarbanel, Sara) (Filed on 1/31/2022) (Entered: 01/31/2022) |
| 02/08/2022 | 31 | JOINT CASE MANAGEMENT STATEMENT filed by San Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. (Abarbanel, Sara) (Filed on 2/8/2022) (Entered: 02/08/2022) |
| 02/10/2022 | 32 | **Minute Entry for proceedings held before Magistrate Judge Jacqueline Scott Corley: Initial Case Management Conference held and recorded by Zoom videoconference on 2/10/2022. Mr. Behrend to schedule another appointment with the Legal Helpdesk, to determine if he qualifies for a pro bono counsel. The Court intends to refer Mr. Behrend for pro bono counsel and refer the case to the Court's ADR Program for mediation. (Recording Time 1:36-1:44)**<br><br>Pro Se Plaintiff: Alexander Behrend<br>Attorney for Defendant: Sara Abarbanel<br><br>**Further Case Management Conference is set for 3/24/2022 at 1:30 p.m. via a Zoom webinar. Updated case management statement due by 3/17/2022.**<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jsc<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone o r videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. |

| | | |
|---|---|---|
| | | **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>(This is a text-only entry generated by the court. There is no document associated with this entry.)<br><br>(ahm, COURT STAFF) (Date Filed: 2/10/2022) (Entered: 02/10/2022) |
| 03/08/2022 | 33 | **ORDER APPOINTING PRO BONO COUNSEL. Signed by Magistrate Judge Jacqueline Scott Corley on 3/8/2022. (ahm, COURT STAFF) (Filed on 3/8/2022) (Entered: 03/08/2022)** |
| 03/08/2022 | 34 | **CLERK'S NOTICE SETTING ZOOM HEARING.** The Further Case Management Conference set for 3/24/2022 is continued to 4/7/2022 at 1:30 p.m. before Magistrate Judge Jacqueline Scott Corley will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jsc<br><br>**Court Appearances:** Advanced notice is req uired of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. **A list of names must be sent to the CRD at jsccrd@cand.uscourts.gov no later than 12:00 p.m. on 4/6/2022.**<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>(This is a text-only entry generated by the court. Th ere is no document associated with this entry.)<br><br>(ahm, COURT STAFF) (Filed on 3/8/2022) (Entered: 03/08/2022) |
| 03/16/2022 | 35 | NOTICE of Appearance by Evan Hamling (Hamling, Evan) (Filed on 3/16/2022) (Entered: 03/16/2022) |
| 03/31/2022 | 36 | JOINT CASE MANAGEMENT STATEMENT filed by Alexander Behrend. (Quackenbush, Kyle) (Filed on 3/31/2022) (Entered: 03/31/2022) |
| 04/07/2022 | 37 | NOTICE of Appearance by Kimberly Macey (Macey, Kimberly) (Filed on 4/7/2022) (Entered: 04/07/2022) |
| 04/07/2022 | 38 | NOTICE of Appearance by Eileen Regina Ridley (Ridley, Eileen) (Filed on 4/7/2022) (Entered: 04/07/2022) |
| 04/07/2022 | 39 | **Minute Entry for proceedings held before Judge Jacqueline Scott Corley: Further Case Management Conference held and recorded by Zoom videoconference on 4/7/2022. Defendants are not interested in mediation at this time. The parties to** |

meet and confer on a discovery plan. The parties to identify what discovery they will need and submit a proposed briefing schedule on Defendants' dispositive motion. (Digital Recording Time: 1:30-1:38)

Attorneys for Plaintiff: Mikaela Bock/Kyle Quackenbush
Attorneys for Defendants: Eileen Ridley/Sara Abarbanel

**Further Case Management Conference is set for 5/11/2022 at 1:30 p.m. via a Zoom webinar. Updated Case Management Statement is due by 5/4/2022.**

**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. **A list of names must be sent to the CRD at jsccrd@cand.uscourts.gov no later than 12:00 p.m. on 5/10/2022.**

**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.

**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.

(This is a text-only entry g enerated by the court. There is no document associated with this entry.)

(ahm, COURT STAFF) (Date Filed: 4/7/2022) (Entered: 04/07/2022)

| 04/20/2022 | 40 | **ORDER APPOINTING PRO BONO COUNSEL. Signed by Judge Jacqueline Scott Corley on 4/20/2022. (ahm, COURT STAFF) (Filed on 4/20/2022) (Entered: 04/20/2022)** |
| 05/04/2022 | 41 | Proposed Order *Re: Case Schedule* by Alexander Behrend. (Quackenbush, Kyle) (Filed on 5/4/2022) (Entered: 05/04/2022) |
| 05/04/2022 | 42 | STIPULATION WITH PROPOSED ORDER *Re: Protective Order* filed by Alexander Behrend. (Quackenbush, Kyle) (Filed on 5/4/2022) (Entered: 05/04/2022) |
| 05/04/2022 | 43 | STIPULATION WITH PROPOSED ORDER *Re: Rule 502(d) and Privileged Materials* filed by Alexander Behrend. (Quackenbush, Kyle) (Filed on 5/4/2022) (Entered: 05/04/2022) |
| 05/04/2022 | 44 | STIPULATION WITH PROPOSED ORDER *Re: Discovery of Electronically Stored Information* filed by Alexander Behrend. (Quackenbush, Kyle) (Filed on 5/4/2022) (Entered: 05/04/2022) |
| 05/04/2022 | 45 | STIPULATION WITH PROPOSED ORDER *Re: Deposition Protocol* filed by Alexander Behrend. (Quackenbush, Kyle) (Filed on 5/4/2022) (Entered: 05/04/2022) |
| 05/04/2022 | 46 | STIPULATION WITH PROPOSED ORDER *Re: Expert Protocol* filed by Alexander Behrend. (Quackenbush, Kyle) (Filed on 5/4/2022) (Entered: 05/04/2022) |

| 05/04/2022 | 47 | JOINT CASE MANAGEMENT STATEMENT filed by Alexander Behrend. (Quackenbush, Kyle) (Filed on 5/4/2022) (Entered: 05/04/2022) |
|---|---|---|
| 05/04/2022 | 48 | **ORDER RE: CASE SCHEDULE. Signed by Judge Jacqueline Scott Corley on 5/4/2022. (ahm, COURT STAFF) (Filed on 5/4/2022) (Entered: 05/04/2022)** |
| 05/04/2022 | 49 | **ORDER by Judge Jacqueline Scott Corley granting 42 Stipulated Protective Order. (ahm, COURT STAFF) (Filed on 5/4/2022) (Entered: 05/04/2022)** |
| 05/04/2022 | 50 | **ORDER by Judge Jacqueline Scott Corley granting 43 Stipulation Re: Rule 502(d) and Privileged Materials. (ahm, COURT STAFF) (Filed on 5/4/2022) (Entered: 05/04/2022)** |
| 05/04/2022 | 51 | **ORDER by Judge Jacqueline Scott Corley granting 44 Stipulation Re: Discovery of Electronically Stored Information. (ahm, COURT STAFF) (Filed on 5/4/2022) (Entered: 05/04/2022)** |
| 05/04/2022 | 52 | **ORDER by Judge Jacqueline Scott Corley granting 45 Stipulation Re: Deposition Protocol. (ahm, COURT STAFF) (Filed on 5/4/2022) (Entered: 05/04/2022)** |
| 05/04/2022 | 53 | **ORDER by Judge Jacqueline Scott Corley granting 46 Stipulation Re: Expert Protocol. (ahm, COURT STAFF) (Filed on 5/4/2022) (Entered: 05/04/2022)** |
| 05/04/2022 | 54 | **CLERK'S NOTICE VACATING CASE MANAGEMENT CONFERENCE.** In light of the case schedule set forth in 48 , the case management conference set for May 11, 2022 is vacated.<br><br>(This is a text-only entry generated by the court. There is no document associated with this entry.)<br><br>(ahm, COURT STAFF) (Filed on 5/4/2022) (Entered: 05/04/2022) |
| 09/14/2022 | 55 | Joint Discovery Letter Brief filed by Alexander Behrend. (Attachments: # 1 Declaration of Kyle P. Quackenbush, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D) (Quackenbush, Kyle) (Filed on 9/14/2022) (Entered: 09/14/2022) |
| 09/16/2022 | 56 | **CLERK'S NOTICE SETTING ZOOM HEARING.** Please take notice a Discovery Hearing is set for 9/21/2022 at 11:00 a.m. before Judge Jacqueline Scott Corley by a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jsc<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>(This is a text-only entry generated by the court. There is no document associated with |

| | | |
|---|---|---|
| | | this entry.)<br><br>(ahm, COURT STAFF) (Filed on 9/16/2022) (Entered: 09/16/2022) |
| 09/19/2022 | 57 | Joint Discovery Letter Brief filed by San Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. (Hamling, Evan) (Filed on 9/19/2022) (Entered: 09/19/2022) |
| 09/21/2022 | 58 | **Minute Entry for proceedings held before Judge Jacqueline Scott Corley: Discovery Hearing held and recorded by Zoom videoconference on 9/21/2022.The Court ruled on the parties' joint discovery dispute letter briefs (Dkt. Nos. 55 , 57 ) as stated on the record. The scope of discovery on the ministerial exception is relatively broad pursuant to Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049 (2020). Additionally, Plaintiff may depose Ms. Johnson. (Digital Recording Time: 11:02-11:24) Proceedings Transcribed by Dipti Patel (Liberty Transcripts) dbpatel1180@gmail.com.**<br><br>**Attorneys for Plaintiff: Kyle Quackenbush/Kimberly Macey**<br>**Attorneys for Defendants: Eileen Ridley/Evan Hamling**<br><br>**(This is a text-only entry generated by the court. There is no document associated with this entry.)**<br><br>**(ahm, COURT STAFF) (Date Filed: 9/21/2022) Modified on 4/17/2023 (knm, COURT STAFF). (Entered: 09/21/2022)** |
| 10/07/2022 | 59 | STIPULATION WITH PROPOSED ORDER *regarding Remote Deposition Protocol* filed by Alexander Behrend. (Quackenbush, Kyle) (Filed on 10/7/2022) (Entered: 10/07/2022) |
| 10/11/2022 | 60 | **ORDER by Judge Jacqueline Scott Corley granting 59 Stipulation regarding Remote Deposition Protocol. (ahm, COURT STAFF) (Filed on 10/11/2022) (Entered: 10/11/2022)** |
| 11/16/2022 | 61 | JOINT STIPULATION AND [PROPOSED] ORDER *to Extend Briefing Schedule for Summary Judgment* filed by Alexander Behrend. (Quackenbush, Kyle) (Filed on 11/16/2022). (Entered: 11/16/2022) |
| 11/16/2022 | 62 | **ORDER by Judge Jacqueline Scott Corley granting 61 Stipulation to Extend Briefing Schedule for Summary Judgment. (ahm, COURT STAFF) (Filed on 11/16/2022) (Entered: 11/16/2022)** |
| 11/23/2022 | 63 | MOTION for Summary Judgment *Or In The Alternative, Summary Adjudication; Memorandum Of Points And Authorities In Support* filed by San Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. Motion Hearing set for 2/2/2023 09:00 AM in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley. Responses due by 12/21/2022. Replies due by 1/11/2023. (Attachments: # 1 Proposed Order Granting Defendants' Motion For Summary Judgment, Or In The Alternative, Summary Adjudication) (Ridley, Eileen) (Filed on 11/23/2022) (Entered: 11/23/2022) |

| | | |
|---|---|---|
| 11/23/2022 | | Set/Reset Deadlines as to 63 MOTION for Summary Judgment *Or In The Alternative, Summary Adjudication; Memorandum Of Points And Authorities In Support*. <br><br> Motion Hearing is reset for 2/2/2023 at **10:00 a.m.** in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley. <br><br> (ahm, COURT STAFF) (Filed on 11/23/2022) (Entered: 11/23/2022) |
| 11/23/2022 | 64 | Appendix *of Supporting Evidence In Support Of Their [63 Motion For Summary Judgment* filed bySan Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. (Attachments: # 1 Exhibit Ex 1, # 2 Exhibit Ex 2, # 3 Exhibit Ex 3, # 4 Exhibit Ex 4, # 5 Exhibit Ex 5, # 6 Exhibit Ex 6, # 7 Exhibit Ex 7, # 8 Exhibit Ex 8, # 9 Exhibit Ex 9, # 10 Exhibit Ex 10, # 11 Exhibit Ex 11, # 12 Exhibit Ex 12, # 13 Exhibit Ex 13, # 14 Exhibit Ex 14, # 15 Exhibit Ex 15, # 16 Exhibit Ex 16, # 17 Exhibit Ex 17, # 18 Exhibit Ex 18, # 19 Exhibit Ex 19, # 20 Exhibit Ex 20, # 21 Exhibit Ex 21, # 22 Exhibit Ex 22, # 23 Exhibit Ex 23, # 24 Exhibit Ex 24, # 25 Exhibit Ex 25, # 26 Exhibit Ex 26, # 27 Exhibit Ex 27, # 28 Exhibit 28) (Ridley, Eileen) (Filed on 11/23/2022) Modified on 11/23/2022 (ecg, COURT STAFF). (Entered: 11/23/2022) |
| 11/23/2022 | 65 | Declaration of Eileen R. Ridley in Support of 63 MOTION for Summary Judgment *Or In The Alternative, Summary Adjudication; Memorandum Of Points And Authorities In Support* filed bySan Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. (Attachments: # 1 Exhibit 3, # 2 Exhibit 4, # 3 Exhibit 5, # 4 Exhibit 6, # 5 Exhibit 7)(Related document(s) 63 ) (Ridley, Eileen) (Filed on 11/23/2022) (Entered: 11/23/2022) |
| 11/23/2022 | 66 | Declaration of Michael McCord in Support of 63 MOTION for Summary Judgment *Or In The Alternative, Summary Adjudication; Memorandum Of Points And Authorities In Support* filed bySan Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen Center, Inc., The Zen Foundation. (Attachments: # 1 Exhibit 8, # 2 Exhibit 9, # 3 Exhibit 10, # 4 Exhibit 11, # 5 Exhibit 12, # 6 Exhibit 13, # 7 Exhibit 14, # 8 Exhibit 15, # 9 Exhibit 16, # 10 Exhibit 17, # 11 Exhibit 18, # 12 Exhibit 19, # 13 Exhibit 20, # 14 Exhibit 21, # 15 Exhibit 22, # 16 Exhibit 23, # 17 Exhibit 24, # 18 Exhibit 25, # 19 Exhibit 26, # 20 Exhibit 27, # 21 Exhibit 28)(Related document(s) 63 ) (Ridley, Eileen) (Filed on 11/23/2022) (Entered: 11/23/2022) |
| 12/21/2022 | 67 | Plaintiff's OPPOSITION/RESPONSE to Defendants' Motion for Summary Judgment; Memorandum of Points and Authorities in Support (re 63 MOTION for Summary Judgment *Or In The Alternative, Summary Adjudication; Memorandum Of Points And Authorities In Support*) filed by Alexander Behrend. (Attachments: # 1 Appendix of Supporting Evidence, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(Quackenbush, Kyle) (Filed on 12/21/2022) (Entered: 12/21/2022) |
| 01/11/2023 | 68 | Defendants' REPLY in Support of Motion for Summary Judgment, or in the Alternative, Summary Adjudication (re 63 MOTION for Summary Judgment *Or In The Alternative, Summary Adjudication; Memorandum Of Points And Authorities In Support*) filed by San Francisco Everyday, Inc., San Francisco Third Way, Inc., San Francisco Zen |

CAND-ECF

| | | |
|---|---|---|
| | | Center, Inc., The Zen Foundation. (Ridley, Eileen) (Filed on 1/11/2023) (Entered: 01/11/2023) |
| 02/02/2023 | 69 | **Minute Entry for proceedings held before Judge Jacqueline Scott Corley: Motion Hearing held and recorded by Zoom videoconference on 2/2/2023 re 63 Defendants' Motion for Summary Judgment. The Court will issue a written order. (Court Reporter: Marla Knox)(TIme 00:25)**<br><br>Attorneys for Plaintiff: Kyle Quackenbush/Mikaela Bock<br>Attorneys for Defendants: Eileen Ridley/Evan Hamling<br><br>**(This is a text-only entry generated by the court. There is no document associated with this entry.)**<br><br>(ahm, COURT STAFF) (Date Filed: 2/2/2023) (Entered: 02/02/2023) |
| 02/14/2023 | 70 | **ORDER by Judge Jacqueline Scott Corley granting 63 Motion for Summary Judgment. (ahm, COURT STAFF) (Filed on 2/14/2023) (Entered: 02/14/2023)** |
| 02/14/2023 | 71 | **JUDGMENT. Signed by Judge Jacqueline Scott Corley on 2/14/2023. (ahm, COURT STAFF) (Filed on 2/14/2023) (Entered: 02/14/2023)** |
| 03/15/2023 | 72 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Alexander Behrend. Appeal of Judgment 71 (Appeal fee of $505 receipt number ACANDC-18076359 paid.) (Quackenbush, Kyle) (Filed on 3/15/2023) (Entered: 03/15/2023) |
| 04/12/2023 | 73 | TRANSCRIPT ORDER for proceedings held on 9/21/2022 before Judge Jacqueline Scott Corley by Alexander Behrend, for Court Reporter not listed - San Francisco. (Macey, Kimberly) (Filed on 4/12/2023) (Entered: 04/12/2023) |
| 04/14/2023 | 74 | Transcript Designation Form for proceedings held on 1/11/2023 before Judge JSC, re 72 Notice of Appeal to the Ninth Circuit Transcript due by 5/15/2023. (Quackenbush, Kyle) (Filed on 4/14/2023) (Entered: 04/14/2023) |
| 04/14/2023 | 75 | TRANSCRIPT ORDER for proceedings held on 1/11/2023 before Judge Jacqueline Scott Corley by Alexander Behrend, for Court Reporter Marla Knox. (Quackenbush, Kyle) (Filed on 4/14/2023) (Entered: 04/14/2023) |
| 04/19/2023 | 76 | Transcript of Proceedings held on 9/21/22, before Judge Jacqueline Scott Corley. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, telephone number (847) 848-4907. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 73 Transcript Order ) Redaction Request due 5/10/2023. Redacted Transcript Deadline set for 5/22/2023. Release of Transcript Restriction set for 7/18/2023. (Related documents(s) 73 ) (Patel, Dipti) (Filed on 4/19/2023) (Entered: 04/19/2023) |
| 06/13/2023 | 77 | Transcript of Proceedings held on February 2, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, telephone number (602) 391- |

6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 75 Transcript Order ) Release of Transcript Restriction set for 9/11/2023. (Related documents(s) 75 ) (mfk, COURT STAFF) (Filed on 6/13/2023) (Entered: 06/13/2023)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/17/2023 14:15:56 | | | |
| **PACER Login:** | jamespdavy | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cv-01905-JSC |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |