**Case No. 23-15399**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

**ALEXANDER BEHREND**
*Plaintiff-Appellant,*

v.

**SAN FRANCISCO ZEN CENTER, INC.,**
*Defendant-Appellee.*
_____

Appeal from the United States District Court for the
Northern District of California
Case No. 21-cv-1905, Hon. Jacqueline S. Corley
_____

## ANSWERING BRIEF
_____

**Foley & Lardner LLP**
Eileen R. Ridley
Evan L. Hamling
555 California Street
Suite 1700
San Francisco, CA 94104-1520
415.434.4484
eridley@foley.com
ehamling@foley.com

**Foley & Lardner LLP**
Sara Alexis Levine Abarbanel
11988 El Camino Real
Suite 400
San Diego, CA 92130-2594
858.847.6700
sabarbanel@foley.com

*Attorneys for Defendant-Appellee*
*SFZC, Inc.*

*Attorneys for Defendant-Appellee*
*SFZC, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee certifies that it has no parent company, and that no publicly held corporation owns 10% or more of its stock. RESPECTFULLY SUBMITTED this 18th day of October, 2023.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................. I

TABLE OF AUTHORITIES ............................................................... III

INTRODUCTION ............................................................................ 1

STATEMENT OF THE CASE ............................................................. 2

SUMMARY OF ARGUMENT ............................................................. 17

ARGUMENT ................................................................................. 22

I.    THE MINISTERIAL EXCEPTION APPLIES TO
      MINISTERIAL ROLES WITHIN A RELIGIOUS
      ORGANIZATION. ............................................................... 26
      A.    There is no dispute that SFZC may invoke the
            protection of the ministerial exception. ................... 26
      B.    Determination of ministerial status is a circumstantial
            fact-based analysis with no rigid formula. ............... 28

II.   THE MINISTERIAL EXCEPTION PRECLUDES
      APPELLANT'S CLAIM BECAUSE HE WAS A MINISTER
      AT A RELIGIOUS ENTITY GIVEN ALL THE
      CIRCUMSTANCES OF HIS ROLE. ..................................... 31
      A.    Appellant was a minister in SFZC's Zen Buddhist work
            practice-based programs. ....................................... 31
      B.    Appellant satisfies each of the *Hosanna-Tabor*
            circumstances. ...................................................... 39
      C.    Appellant's ministerial role promoted the religious
            mission of SFZC. .................................................. 54
      D.    Because SFZC is a religious organization and
            Appellant was a minister at SFZC, the ministerial
            exception applies. ................................................. 58

CONCLUSION .............................................................................. 59

CERTIFICATE OF COMPLIANCE .................................................... 60

CERTIFICATE OF SERVICE ............................................................ 61

# TABLE OF AUTHORITIES

Page(s)

Federal Cases

*Alcazar v. Corp. of Cath. Archbishop of Seattle,*
  627 F.3d 1288 (9th Cir. 2010) .................................................. 23, 44, 46

*Bollard v. Cal. Province of the Soc'y of Jesus,*
  196 F.3d 940 (9th Cir. 1999) ...................................................... passim

*Cannata v. Cath. Diocese of Austin,*
  700 F.3d 169 (5th Cir. 2012) ............................................................ 30

*Combs v. Cent. Texas Ann. Conf. of United Methodist Church,*
  173 F.3d 343 (5th Cir. 1999) ............................................................ 28

*Corp. of Presiding Bishop of Church of Jesus Christ of*
  *Latter-Day Saints v. Amos,*
  483 U.S. 327 (1987) .......................................................................... 36

*Demkovich v. St. Andrew the Apostle Par., Calumet City,*
  3 F.4th 968 (7th Cir. 2021) .............................................................. 57

*Elvig v. Calvin Presbyterian Church,*
  375 F.3d 951 (9th Cir. 2004) ...................................................... 27, 28

*Fitzgerald v. Roncalli High Sch., Inc.,*
  73 F.4th 529 (7th Cir. 2023) ..................................................... passim

*Gordon Coll. v. DeWeese-Boyd,*
  142 S. Ct. 952 (2022) ........................................................................ 48

*Grussgott v. Milwaukee Jewish Day Sch., Inc.,*
  882 F.3d 655 (7th Cir. 2018) ..................................................... passim

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,*
  132 S. Ct. 694 (2012) .................................................................. passim

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.,*
   344 U.S. 94 (1952) ................................................................ 22

*Larson v. Valente,*
   456 U.S. 228 (1982) ............................................... 43, 47, 49

*NLRB v. Cath. Bishop of Chicago,*
   440 U.S. 490 (1979) ................................................... 27, 37

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   140 S. Ct. 2049 (2020) ................................................. passim

*Puri v. Khalsa,*
   844 F.3d 1152 (9th Cir. 2017) ............................. 25, 38, 44

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
   772 F.2d 1164 (4th Cir. 1985) ..................................... 37

*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.,*
   363 F.3d 299 (4th Cir. 2004) ............................ 4, 9, 10, 27

Federal Statutes

U.S. Const. amend. I ..................................................... 23

U.S. Const. art. VI, cl. 2 ................................................ 23

Federal Rules

Fed. R. App. P. 32(a)(5) ................................................. 61

Fed. R. App. P. 32(a)(6) ................................................. 61

Fed. R. App. P. 32(a)(7)(B) ........................................... 61

Fed. R. App. P. 32(a)(7)(C) ........................................... 61

Fed. R. App. P. 32(f) ..................................................... 61

Federal Rule of Appellate Procedure 26.1 ..................... iv

## INTRODUCTION

The ministerial exception of the First Amendment safeguards the right of a religious institution to make personnel decisions about its ministers unfettered by government interference. In this case at "the heart of the religious realm," Appellee San Francisco Zen Center (Appellee or "SFZC") made such a decision regarding one of its ministers, Appellant Alex Behrend, when it asked him to leave his ministerial role. SER-8:6-7. Appellant was no "cook and housekeeper" who happened to practice Buddhism independent of his affiliation with SFZC. Appellant's Brief at 1. He was a religious apprentice practicing and training in Sōtō Zen Buddhism in a monastic temple community, who now argues that temple should unconstitutionally be forced to retain him as a minister or be punished for failing to do so. The ministerial exception precludes that state coercion. In the words of the District Court, "the undisputed facts are closer to prohibited interference in a religious institution's matters of faith and doctrine than those involving the teachers in *Hosanna-Tabor* and *Guadalupe*," the only two Supreme Court ministerial exception cases. ER-14:21-23. Thus, this case is precisely at the heart of the First Amendment.

On appeal, Appellant again misapprehends both the purpose and function of the ministerial exception, insisting that it requires that he held a leadership or teaching role. Not so. Appellant's "key roles" argument, lifted from an out-of-context Supreme Court quotation, was unpersuasive in the District Court and is also unavailing here. Supreme Court and federal Circuit case law, including Ninth Circuit precedent, addressing the scope of the ministerial exception confirms that it is not limited to leaders or teachers. Rather, the most concise formulation of what it means to be a minister is this: "[w]hat matters, at bottom, is what an employee does." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020). The District Court found that what Appellant *did* at SFZC, "given all the circumstances of [his] employment," made him a minister for the purposes of the ministerial exception. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694, 697 (2012). This Court should affirm the District Court's Order.

## STATEMENT OF THE CASE

Appellant asserts that SFZC is liable to him for discrimination under the Americans with Disabilities Act of 1990 ("ADA") because it

2

decided not to retain him as a residential Sōtō Zen Buddhist minister in one of its temples. The facts show that SFZC's decision not to retain Appellant is protected under the First Amendment to the United States Constitution—more specifically, under its ministerial exception. The ministerial exception flows from the Constitutional principle that a religious organization has the right to "decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) (citation omitted). The exception prevents governmental, including judicial, interference with a religious organization's decisions regarding minister selection and retention—even in the context of employment discrimination claims. *Id.* at 2061; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 181, 188 (2012). Here, as the District Court correctly determined, the ministerial exception applies because, first, SFZC is a religious organization and, second, Appellant was a minister. Specifically, Appellant trained in, practiced, and held himself out as a practitioner and minister of Sōtō Zen Buddhism at SFZC while living as a full-time resident in one of its temples.

## I.    SFZC Is a Religious Organization.

First, Appellant has conceded that SFZC is a religious organization. ER-10:15. *See Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 310 (4th Cir. 2004) (stating that an entity is a "religious organization" when "that entity's mission is marked by clear or obvious religious characteristics."). Thus, SFZC may invoke the protections of the Religion Clauses of the First Amendment, including the ministerial exception. Nevertheless, because this case centers on a less familiar application of the ministerial exception to a non-Western religious organization, facts describing SFZC's religious status and its practice and training programs, most importantly the Work Practice Apprentice Program, are set forth below.

## A. SFZC Is a Sōtō Zen Buddhist Temple.

Sōtō Zen Buddhism, a Buddhist sect that developed in thirteenth-century Japan, centers on bringing one's religious practice "into the present moment" and the "normal activity of [one's] daily life." SER-36:8-10; SER-205. SFZC itself was founded in 1962 and is the largest Sōtō Zen Buddhist temple in North America. SER-36:17-19; SER-188-214. It is registered as a nonprofit religious organization with the "specific and primary purpose . . . to operate a church . . . which will

encourage the practice of Zen Buddhism by operating one or more religious practice facilities and educating the public about Zen Buddhism." SER-183. It has also been certified by the California Bureau of Private Postsecondary Education as a non-accredited religious training institution. SER-36:20-21; SER-176:2-5. In this respect, SFZC "is a religious training institution" as well as a "residential training center," (SER-36:22-37:1; ER-17), consisting of three training temples: City Center, Tassajara Mountain Center, and Green Gulch Farm. SER-36:22-37:1. In these temples, SFZC offers "several different types of programs for individuals interested in learning about and training in Zen Buddhism." SER-36-37; ER-17. As expressed in SFZC's Mission Statement,

> The purpose of SFZC is to express, make accessible, and embody the wisdom and compassion of the Buddha. The ideals are based on the example of the Buddha, and guided by the teachings and lineage of the Sōtō School as conveyed to us by our founder, Shunryu Suzuki Roshi, and other Buddhist teachers. Our central value is to express the nonduality of practice and awakening through the practice of Zen and the Bodhisattva Precepts. SFZC acknowledges and values equally the expression of practice in formal setting and in daily life; thus, we affirm both lay and monastic practice as expressions of the Bodhisattva Way.

ER-27; SER-276.

**B.    Work Practice is Religious Practice in Sōtō Zen Buddhism.**

While SFZC offers some religious programs to the public, it reserves others for those who reside full-time at a temple. There are three residential programs at SFZC, each of which requires participation in the preceding program: guest student (2-6 week residency), Work Practice Apprentice (2-3 year residency), and Staff. SER-36-37; ER-26-36. As relevant here, following at least a two-week stay as a guest student, individuals seeking further Zen training can apply to participate in the Work Practice Apprenticeship program. This is a residential Zen Buddhist training program intended as "the launch and the foundation" for an individual's Zen religious training. SER-37:13-18; SER-168:3-4; SER-275-284; ER-26-36. An individual, like Appellant, who becomes a Work Practice Apprentice ("WPA") practices Sōtō Zen Buddhism, including work practice, discussed below, full-time at City Center. SER-37:13-18; ER-26-36.

WPAs, along with all other admitted residents, agree to follow the strict monastic guidelines of the Shingi (Pure Standards or Guidelines for Conduct) as well as the Residents' Handbook. SER-37:2-5; 10-12; *see*

6

ER-16-25. The Shingi identifies the residents' commitment to following both formal practices as well as communal responsibilities. ER-16-25. In following the Shingi, WPAs and residents of SFZC participate in both formal practice and what Zen Buddhism refers to as "work practice." SER-37:2-9.

In terms of formal practice, the Shingi requires SFZC residents "to attend 100% of the formal practice schedule," with "[a]ny month in which a resident's attendance falls below 80%" being a "matter of high concern." ER-17. Formal practice includes activities such as learning *zendo* (meditation hall) forms, daily meditation practice and services, *soji* (pre-breakfast temple cleaning), dharma talks, classes, and special ceremonies and events that include Full Moon Ceremonies, one-day sit meditations, and three- to five-day *sesshin* meditations. SER-142-43; SER-157-58; SER-164-65; SER-172-73; ER-16-25; ER-20-21; ER-186-87. Meditation practice at SFZC, among other things, involves meditation in a *zendo* and includes the "*doan ryo*," an individual minister who leads the ceremony by playing bells and hitting a block as an important part of keeping the time for meditation practice. SER-155-156; SER-174; *see* SER-56-57; SER-90; SER-125; SER-138-39.

"Work practice" is an "essential" and "indivisible" part of the Shingi and of a WPA's Sōtō Zen Buddhism practice and training. SER-107; SER-136:14-15; SER-137:8-20; SER-185-87; ER-16-25. Indeed, as described by SFZC itself:

> Communal work practice is an integral and indivisible part of the Zen training and spiritual practice offered at [SFZC]. The terms "work practice" and "work" as used in these guidelines incorporate these fundamental principles.

> ER-29; ER-35.

Work practice includes activities such as cooking, dishwashing, bathroom cleaning, preparing guest rooms, and *doan ryo* ceremonial tasks that support the formal practice, like "ringing bells, cleaning altars, [and] watching the door during *zazen* [meditations]." ER-20-22. Additionally, work practice is often done in silence, with only functional speech (*i.e.*, that which is required to complete the job) allowed. *See* ER-21; SER-105:14-106:5. In this respect, work practice teaches and allows practitioners to practice Zen Buddhism in all parts of daily life. SER-186-87. Indeed, as described by a SFZC practitioner:

> When work is practice it is seen as part of our zazen (meditation) practice itself. It is an end of itself. Work and zazen go hand in hand. Both are necessary and without one, the other suffers.

8

> When work is practice, it is a Buddha doing what a Buddha does, how a Buddha does it.
>
> . . . "Zen mind" is a willingness to engage ourselves wholeheartedly in whatever we are doing in the present moment, whether it is making up a bed, cleaning a toilet, chopping a carrot, or serving a guest in the dining room. . . . When we bring our zazen practice into our work, we take a leap out of that conditioned small mind and into the freedom and generosity of the mind that is accepting, fresh, and full of possibility.
>
> . . . Silence supports our practice of full engagement and mindfulness. At first, this silence may feel uncomfortable. And just like in zazen, when you notice the mind wandering off into fantasy, criticism, the urge to chat, or any other distractions, you gently but firmly bring it back to the breath, the body, and the task at hand.

*Id.* Generally, WPAs take part in 30-35 hours of work practice per week, along with talks, discussions, and classes on work practice, and 20 hours per week of meditation and curriculum, though this schedule varies. ER-30-31. WPAs thus "participate fully in the practice, work and community schedule" at SFZC. ER-29.

## C. SFZC Offers Additional Training Programs and Ordination Paths.

Following training as a WPA, individuals may apply to practice in a position of "Staff," which is a continuation of Zen training. SER-37:19-

22; SER-170:19-24; SER-275-84; ER-26-36. Additionally, individuals who work outside of the temple may participate in the Dharma Bridge program. SER-37:25-27; *see* SER-215-229. The Dharma Bridge program still has religious training and practice; those in the program are required to follow the schedule of practice set for all residential practitioners. *See* SER-215-229. This program, however, does not involve assignment to a "crew" for work practice, and participants in this program pay a fee to SFZC, rather than receiving a stipend. *Id.*

Finally, in terms of ordination within SFZC, there are two levels: lay ordination and priest ordination. SER-140:11-14; SER-108:5-6; *see* SER-159-163. The path to ordination is not set or linear; rather, a student of Zen Buddhism may take many years before being ordained, if at all, and the timeline for each practitioner is unique. SER-159:25-161:5; SER-161:18-22; SER-169:19-170:10; SER-170:25-171:5. Within Sōtō Zen Buddhism and at SFZC, ordination is not a requirement to "participate fully in the practice, work and community schedule" at SFZC, or to serve a ministerial role. ER-29. Thus, Appellant's arguments regarding his ordination status have no merit, as discussed further below.

## II.     Appellant Was a Minister of Sōtō Zen Buddhism at SFZC.

Second, the facts demonstrate that Appellant was a minister in the monastic Zen Buddhist temple community of SFZC. Again, the ministerial exception applies to prevent "interfer[ence] with the internal governance of [SFZC] [and] depriv[ation] of control over the selection of those who will personify its beliefs." *Hosanna-Tabor*, 565 U.S. at 188; *see Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060. As the District Court correctly found, Appellant's practice and position at SFZC "lie at the very core" of SFZC's religious mission. *See id.* at 2064.

As discussed above, SFZC's City Center is a Sōtō Zen Buddhist temple, and its mission is to bring Sōtō Zen Buddhism into both formal practice and daily life through practices like work practice. The facts show Appellant fully embraced this mission by (1) taking on the title of "Work Practice Apprentice," (2) residing full-time at City Center as a WPA, (3) holding himself out as a WPA, (4) acting as a WPA by training in Sōtō Zen Buddhism and by fulfilling both the formal and work practice requirements of that role, and (5) spending nearly all of his time as a WPA practicing and training in Sōtō Zen Buddhism. *See* ER-

10-12. Therefore, the facts show that Appellant was a Sōtō Zen Buddhist minister at SFZC.

### A. Appellant Affiliates Himself with the SFZC's Sōtō Zen Buddhist Practice and Becomes a WPA.

Appellant's affiliation with the SFZC began in the summer of 2014. SER-46:10-47:3; SER-232. That summer, Appellant volunteered several times with SFZC's food outreach program. ER-6. He also began attending meditation one to three times a week, participating in Saturday Sangha (lecture, lunch, and meditation), and listening to Dharma talks (weekly talks on the practice of Zen Buddhism). SER-48:16-50:11; SER-51:23-25. After participating in SFZC events for approximately two years, in 2016, Appellant applied to the guest student program because he was "interested in Zen Buddhism." SER-53:15-20. As a guest student, Appellant participated in religious ceremonies and practice. SER-54:22-56:9; SER-62:5-8.

Appellant applied to the WPA program in December 2016. SER-60:9-62:4; SER-231. By that time, Appellant considered himself "a practicing Zen Buddhist." ER-7. Indeed, in his application, Appellant noted that he had been a "non-residential practitioner for several years"; that he experienced "more positive impact" in his life the more

he practiced Zen Buddhism; and that he intended to become a WPA to "deepen [his] practice and continue working with how practice is helping [him] grow and thrive." SER-62:22-72:2; SER-232. Before applying to the WPA program, Appellant understood that the position of a WPA involved work practice, which would include the performance of work as part of his ministerial duties. SER-58:4-6; SER-58:20-59:2; SER-62:22-70:17.

In January 2017, Appellant was accepted to the WPA program and began his practice as a WPA. SER-63:24-64:2. As a WPA, Appellant resided at SFZC, kept a similar schedule as he did when he was a guest student, and additionally received room, board, and a stipend. ER-31; ER-35; SER-63:21-23; SER-84:8-9. During his time as a WPA, Appellant participated in both the formal and the "work practice" components of Sōtō Zen Buddhism. For example, he participated in walking meditation, *zazen* (sitting meditation), morning service, *soji* (temple cleaning), and bi-weekly lectures—all activities he understood to be part of the religious practice. SER-63:15-19; SER-78:8-13; SER-78:20-23; SER-79:5-7; SER-79:10-12; SER-80:25-81:2; SER-81:7-9; SER-81:18-82:5. He also took part as a member of the *doan ryo*, which he was

13

trained to do, performing ceremonies for individuals who were both part of the residential community and non-resident practitioners. SER-82:20-83:9; *see* SER-215-234. He also participated in a WPA-specific set of Zen Buddhist classes. SER-89:14-16; SER-253-55.

During his time as a WPA, Appellant was assigned to several "work crews" in which he participated in work practice. For example, Appellant's first work practice assignment was guest services (*shika* crew), where his duties included "checking guests into the lodging that [SFZC] offered to paying customers, handling and processing payments, preparing guest rooms, preparing conference rooms and event spaces for organizations that rented the space, cleaning and folding laundry, answering guest's questions, and revising and expanding a concierge packet." ER-7. He was also later assigned to the kitchen (*tenzen* crew), where he cooked and washed dishes. *Id.* Appellant viewed his work practice to be service to the Zen community. SER-93:3-10; SER-261-63.

Additionally, while he was a WPA, Appellant identified himself as an apprentice of Zen Buddhism and practiced the religion with the other residents. SER-11:8-9; SER-14:23-25; SER-86:21-87:10. He also expressed his interest to several other members of the community in

14

spreading the word of the Buddha and becoming either lay or priest ordained. SER-246-48; ER:37-38. He voiced excitement about becoming more involved in Zen Buddhism and deepening his practice. SER-246-48; ER:37-38.

### B. Appellant Applies to the Dharma Bridge Program.

In November 2018, Appellant applied to move from the WPA program to the Dharma Bridge Program. SER-235-42. In doing so, Appellant identified himself as a Zen Buddhist practitioner, he specifically noted that he intended to become a priest, and he stated his interest in spreading the Zen teachings he had learned at SFZC to non-resident individuals. SER:52:23-24; SER-88:12-89:19; SER-235-42. While in the Dharma Bridge Program, although he was no longer assigned to a work crew, Appellant continued to reside at the SFZC and to practice and train in Sōtō Zen Buddhism.

Ultimately, Appellant remained in the Dharma Bridge program until January 2019, when the SFZC Practice Committee made the decision to end Appellant's participation in the program. SER-38:6-8. Appellant remained in residence at the City Center temple until the fall of 2019. SER-52:23-24.

## III.   The Northern District Correctly Determined the Ministerial Exception Applied.

In July 2019, Appellant filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging a violation of the ADA. SER-38:16-20; SER-268-70. The EEOC dismissed Appellant's charge on December 17, 2020, and Appellant filed his action in the Northern District of California on March 7, 2021, alleging violations of the ADA. SER-38:16-20; SER-268-70; SER-271-74. On November 23, 2022, SFZC moved for summary judgment, arguing that Appellant's claims should be dismissed because the ministerial exception to the First Amendment applied to bar his discrimination claims. Following briefing and a hearing, the Northern District agreed with SFZC and determined that SFZC established both elements of the ministerial exception as a matter of law.

Specifically, the Northern District acknowledged that there was no dispute that SFZC is a religious organization. ER-10. And it concluded that the undisputed facts—viewed in the proper context of the Sōtō Zen Buddhist religion and SFZC's religious mission— established that Appellant was a minister. ER-10-14. In doing so, the court determined this was not a close case. ER-14. It observed that

16

Appellant was asking a court or a jury to rule that SFZC "allow him to continue to practice and train in Sōtō Zen Buddhism as a resident at the Center." *Id.* And, reiterating that the First Amendment prohibits interference "in a religious institution's matters of faith and doctrine," the court explained that it "is difficult to imagine a more direct interference with a religious institution's constitutional right to decide matters of faith and doctrine than commanding it to continue to house and train a particular person in the practice of the faith." *Id.* Accordingly, the Northern District determined the SFZC had met its burden to establish the applicability of the ministerial exception as a matter of law and granted the motion. ER-15.

## SUMMARY OF ARGUMENT

This Court should affirm the District Court's Order granting summary judgment because the ministerial exception of the First Amendment applies to Appellant's role at SFZC and precludes his discrimination claim. SFZC satisfied its burden to establish both essential elements of the ministerial exception as an affirmative defense to Appellant's disability discrimination claim. First, SFZC is a religious organization entitled to invoke the ministerial exception to

17

foreclose against claims that invade the church-minister relationship. Second, Appellant was a minister while associated with SFZC, and decisions about his ministerial position fell under the ministerial exception. The First Amendment and federal case law applying the ministerial exception compel the district court's ruling, and this Court should affirm.

Appellant's own admissions, as well as the District Court's findings, amply demonstrate the satisfaction of the first necessary element of the ministerial exception. There is no dispute that SFZC is a religious organization that is entitled to invoke the ministerial exception of the First Amendment. Plaintiff explicitly acknowledges this. The only necessary question to answer is whether Plaintiff's role at Zen Center was ministerial in nature. For the reasons that follow below, Appellant's WPA position was a ministerial position at the heart of the religious realm of SFZC. Thus, the ministerial exception applies, precludes Appellant's claim, and compels affirming the District Court's Order on SFZC's motion for summary judgment.

Appellant's primary argument, that the ministerial exception necessarily requires religious instruction or leadership, is

fundamentally inapposite to the ministerial exception's purpose. Appellant's insistence that he must have held a "key role," as defined by Appellant himself, is not supported by the First Amendment or federal Circuit case law applying the ministerial exception. This Court should not credit this recycled argument rejected by the District Court. Appellant also continues to profess a fundamental misunderstanding of Zen Buddhism, despite proclaiming to have practiced it at SFZC. Appellant was and is aware that the concept of "work practice" in Zen Buddhism is not solely SFZC's "insistence," (Appellant's Brief at 21) but a fundamental component of the religion. Appellant cannot sidestep the applicability of the exception by conveniently contradicting his earlier claims on his practice of Zen Buddhism.

Appellant was not an "employee privately practic[ing] his faith while working," (Appellant's Brief at 22) but a minister whose "duties reflected a role in conveying the [Zen Center's] message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 192. Whether Appellant was a practicing Zen Buddhist at SFZC is irrelevant to the ministerial exception analysis. An individual need not be a practicing member of the religious organization's faith to be that organization's minister. *Our*

19

*Lady of Guadalupe Sch.,* 140 S. Ct. at 2068–69. Even asking the question of what it means to "practice" risks substantial and impermissible government entanglement with religion. *Id.* at 2069. Whether Appellant maintains that he was not a practicing Buddhist—the assertion he maintained earlier in this litigation—or claims to be a fervent Zen Buddhist, he was a minister at SFZC.

Contrary to Appellant's implications, his own interpretation of the ministerial role is not the determining factor for the ministerial exception's applicability. SFZC's own interpretation and explanation of Appellant's role, as with all ministerial roles in the organization, is crucial. *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2066; *see also Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 531 (7th Cir. 2023) (finding a court must "show deference to the church" in determining the ministerial status of a role). This deference is essential where, as here, the religious entity and role at issue are non-Christian and non-Western. Further, this case does differ from prior First Amendment jurisprudence on the ministerial exception—by being closer to the heart of the First Amendment than prior cases. The Northern District court noted a difference between this case and the Supreme Court case law on

20

the ministerial exception, *Hosanna-Tabor* and *Our Lady of Guadalupe Sch.*, pointing out that "[m]ost of these ministerial exception [cases] are teachers." SER-8:4. Here, however, the Northern District recognized that Plaintiff's position as a WPA falls into "the heart of the religious realm." SER-8:6-7.

Here, at the heart of the religious realm, the "general principle of church autonomy" in both "matters of faith and doctrine" and "matters of internal government" provides for the applicability the ministerial exception. *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2061. Remanding this case for a contradictory determination would "interfere[] with the internal governance of [SFZC]." *Hosanna-Tabor*, 565 U.S. at 188. This result would be unconstitutional. "[N]o compelling state interest justifies government intrusion into the ecclesiastical sphere . . . [including a] church's selection of its own clergy." *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 946 (9th Cir. 1999).

In the District Court, SFZC sustained its burden to establish its religious nature, Appellant's ministerial status, and the applicability of the ministerial exception. As the District Court found, "Mr. Behrend's work was part of a religious practice program and implicates the

organization's 'power to decide for [itself], free from state interference, matters of church government[,] . . . faith and doctrine." ER-3:17-20 (quoting *Hosanna-Tabor*, 565 U.S. at 186). Because of SFZC's religious nature and Appellant's ministerial status, the ministerial exception forecloses Appellant's claim. To avoid the unconstitutional interference with SFZC's First Amendment right to decide matters of church government, this Court should affirm.

## ARGUMENT

The First Amendment guarantees the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe Sch*, 140 S. Ct. at 2055 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). Supreme Court and federal Circuit opinions applying the Religion Clauses of the First Amendment affirm a "ministerial exception" to the breadth of law that interferes with the church-minister relationship. *See* U.S. Const. art. VI, cl. 2; U.S. Const. amend. I. Both the Free Exercise Clause and the Establishment Clause "outlaw [the] intrusion" of the state into matters of faith and doctrine as

well as "matters of church government." *Our Lady of Guadalupe Sch,* 140 S. Ct. at 2060 (citing *Hosanna-Tabor*, 565 U.S. at 186). The guarantee of church independence in matters of faith, doctrine, and church government "protect[s] [churchs'] autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* "[A] *component* of this autonomy is the selection of the individuals who play certain key roles." *Id.* (emphasis added).

As discussed below, Appellant conflates "key roles" with court-identified roles that reflect teaching or leadership roles and argues that such "key roles" determine who is a minister. This is not the proper inquiry. The ministerial exception does not "appl[y] only to leaders" of the faith and "encompasses more than a church's ordained ministers." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2067 n.26; *Alcazar v. Corp. of Cath. Archbishop of Seattle*, 627 F.3d 1288, 1291 (9th Cir. 2010). Courts must "take all relevant circumstances into account" and "determine whether each particular position implicate[s] the fundamental purpose of the exception." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2067; *see id.* at 2064 ("[T]hese . . . are not inflexible requirements and may have *far less significance in some cases*.") (emphasis added). Indeed, in some

cases, some circumstances may not even be "important" at all. *Id.* at 2063. The Supreme Court explicitly "declined 'to adopt a rigid formula for deciding when an employee qualifies as a minister,'" and this Court must therefore examine "all the circumstances of [Appellant's] employment." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2062 (quoting *Hosanna-Tabor*, 565 U.S. at 190-91. The question of Appellant's ministerial status is a totality-of-the-circumstances test depending on the particular facts of his relationship with SFZC. *See Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 661 (7th Cir. 2018). Here, those circumstances prove Appellant's status as a Zen Buddhist minister while at SFZC. The District Court, applying these principles, found "his position implicates the fundamental purpose of the ministerial exception." ER-13:3-4. Here is the "key role" analysis Appellant is searching for—an individual serves such a key role when their role "implicate[s] the fundamental purpose of the exception," "tak[ing] *all relevant circumstances* into account." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2067 (emphasis added).

The ministerial exception is an affirmative defense, which, where applicable, "flatly prohibits courts from '[r]equiring a church to accept

or retain an unwanted minister, or punishing a church for failing to do

so[.]'" *Puri v. Khalsa*, 844 F.3d 1152, 1158 (9th Cir. 2017) (alteration in

original) (citing *Hosanna-Tabor*, 565 U.S. at 188). This is exactly what

Appellant seeks, as noted by the District Court in its Order on

Appellee's Motion for Summary Judgment:

> [C]onsider what Mr. Behrend is asking a court or
> jury to do: rule, in effect, that SF Zen Center
> must allow him to continue to practice and train
> in Sōtō Zen Buddhism as a resident at the
> Center. *It is difficult to imagine a more direct
> interference with a religious institution's
> constitutional right to decide matters of faith and
> doctrine* than commanding it to continue to house
> and train a particular person in the practice of
> the faith. ER-14:24-28  (emphasis added).

Even if Appellant does not seek his reinstatement as a minister in the

WPA role, he seeks to punish SFZC for asking him to leave the temple,

using the mechanism of the courts. This is categorically prohibited. The

First Amendment supplies an absolute bar against the interference of

the state, legislatively or judicially, with the protected decision of who

acts as a minister within a church. Coercing a church like SFZC into

retaining a minister like Appellant "intrudes upon more than a mere

employment decision." *Hosanna-Tabor*, 565 U.S. at 188. Such state

invasion "interferes with the internal governance of the church,

depriving the church of control over the selection of those who will personify its beliefs." *Id.* When the state, including a court, does so, it violates both Religion Clauses. *Id.* Therefore, "it is *impermissible* for the government to contradict a church's determination of who can act as its ministers." *Id.* at 185 (emphasis added). SFZC determined that Appellant may not act as its minister. No court may contradict that determination. As a church, SFZC's interest in this "core matter" of clergy selection is so robust that it may not be invaded: "[N]o compelling state interest justifies government intrusion into the ecclesiastical sphere" of SFZC's "selection of its own clergy." *Bollard*, 196 F.3d at 946. Here, this means that the ministerial exception exempts ministers like Appellant from statutes to which SFZC would otherwise be subject, including the ADA. *Hosanna-Tabor*, 565 U.S. at 188. This Court should therefore affirm the District Court's Order.

## I. The ministerial exception applies to ministerial roles within a religious organization.

### A. There is no dispute that SFZC may invoke the protection of the ministerial exception.

As a religious organization, SFZC is entitled to invoke the protections of the Religion Clauses of the First Amendment, including the ministerial exception. This is not in dispute. SFZC is

Constitutionally entitled to deference on its self-characterization as a church. *See NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 502 (1979) (finding that the "very process of inquiry leading to findings and conclusions" regarding "the good faith of the position" asserted by a religious organization violates the Religion Clauses). If this were not enough, Appellant himself explicitly confirms SFZC is a religious entity. SER:52:25-53:3. Therefore, as an entity whose "mission is marked by clear or obvious religious characteristics," SFZC is a religious entity that may rely on the ministerial exception in making personnel decisions regarding ministers. *Shaliehsabou*, 363 F.3d at 310.

Further, SFZC "cannot be required to articulate a justification for its ministerial decisions[.]" *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 961 (9th Cir. 2004). Requiring SFZC to do so would "offend the Free Exercise Clause" because "[a] church's selection of its ministers is unfettered" and its reasons for removing a minister "are therefore unassailable." *Id.* at 961 (citing *Bollard*, 196 F.3d at 946). Other federal Circuits have confirmed that the judiciary cannot determine the legitimacy of a church's reasons for removing a minister "without inserting [itself] into a realm where the Constitution forbids [it] to

27

tread, the internal management of a church." *Combs v. Cent. Texas Ann. Conf. of United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999). Therefore, Appellant may not even compel SFZC to articulate a justification for removing him as a minister, much less compel it to undo that determination or punish it for doing so.

### B. Determination of ministerial status is a circumstantial fact-based analysis with no rigid formula.

Appellant's reduction of the ministerial exception analysis to a singular question of whether the alleged minister served a so-called "key role" is unavailing. As explained, the Supreme Court has explicitly stated that there is no "rigid formula for deciding when an employee qualifies as a minister." *Hosanna-Tabor*, 565 U.S. at 190. Instead, courts must "take all relevant circumstances into account" to determine whether the given role "implicate[s] the fundamental purpose of the exception." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2067. The Supreme Court provides that very fundamental purpose earlier in the opinion. See *id.* at 2061 ("The constitutional foundation for our holding was the general principle of church autonomy to which we have already

referred: *independence in matters of faith and doctrine and in closely linked matters of internal government*.") (emphasis added).

Ignoring this, Appellant attempts to calcify the entire analysis into a singular question of whether he served a "key role" ostensibly based on the four circumstances identified in *Hosanna-Tabor*: (1) the church holding the individual out as a minister; (2) the individual's title reflecting religious training or formalization; (3) holding oneself out as a minister; and (4) job duties that "reflect[] a role in conveying the [c]hurch's message and carrying out its mission." *See Hosanna-Tabor, 565 U.S. at 191–92*; *see also* Appellant's Brief at 27-31. In doing so, Appellant commits the exact error that the Supreme Court admonished against in *Our Lady of Guadalupe*. Appellant "treat[s] the circumstances that we found relevant in [*Hosanna-Tabor*] as checklist items to be assessed and weighed against each other . . . That approach is contrary to our admonition that we were not imposing any 'rigid formula.'" *Our Lady of Guadalupe Sch., 140 S. Ct. at 2067* (quoting *Hosanna-Tabor, 565 U.S. at 190*). Further, "even referring to [the *Hosanna-Tabor* circumstances] as 'factors' denotes the kind of formulaic inquiry that the Supreme Court has rejected." *Grussgott, 882 F.3d at*

661. Appellant imposes such a "rigid formula" by proceeding down a list of *Hosanna-Tabor* circumstances, treating them as necessary and dispositive factors, and presuming the resolution of his ministerial status depends on their satisfaction. *See* Appellant's Brief at 27-31.

This is an explicitly impermissible approach to determine whether an individual qualifies as a minister for the purpose of the ministerial exception. "*Any attempt* to calcify the particular considerations that motivated the Court in *Hosanna–Tabor* into a 'rigid formula' would not be appropriate." *Cannata v. Cath. Diocese of Austin*, 700 F.3d 169, 176 (5th Cir. 2012) (emphasis added). This is especially true where, as here, the religion under consideration is Zen Buddhism, which differs significantly from the generally Western, Christian-associated entities in most ministerial exception cases. "*Hosanna–Tabor*'s rejection of a bright-line test likely reflects the diversity of religious practice in this country . . . it may not be possible to develop a one-size-fits-all approach to the ministerial exception." *Id.* The District Court properly recognized this: "The undisputed record shows SF Zen Center considers work practice an integral part of Sōtō Zen Buddhism training. It considers all of a Work Practice Apprentice's work practice time an expression and

30

practice of faith." ER-11:3-6.  *See Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2066 ("A religious institution's explanation of the role of such employees in the life of the religion in question is important."). Justice Thomas also recognized this concept of religious deference in his *Hosanna-Tabor* concurrence: "The question whether an employee is a minister is itself religious in nature, and the answer will vary widely." *Hosanna-Tabor*, 565 U.S. at 197 (Thomas, J., concurring). Because of this wide variation depending on various circumstances that differ in significance between religious entities, "the Supreme Court's decision [in *Hosanna-Tabor*] impose[s], in essence, a totality-of-the-circumstances test." *Grussgott*, 882 F.3d at 661. Here, under the totality of the circumstances, Appellant was a minister while participating in the Work Practice Apprentice program, as detailed below.

## II. The ministerial exception precludes Appellant's claim because he was a minister at a religious entity given all the circumstances of his role.

### A. Appellant was a minister in SFZC's Zen Buddhist work practice-based programs.

As explained above, the relevant inquiry for determining the ministerial status of an individual is not the satisfaction of any "factors" or checklist, but whether the position implicates the fundamental

purpose of the exception to preserve the general principle of church autonomy in matters of faith, doctrine, and church government, given all of the circumstances. *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2061, 2067. The WPA position implicates the fundamental purpose of the exception because it is a residential religious training program that indisputably includes work practice, and work practice as a mode of religious training and practice implicates the same fundamental purpose. *See Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060 (finding that the independence of religious institutions protects their "autonomy with respect to internal management decisions that are essential to the institution's central mission."). The ministerial exception protects the autonomy of SFZC in determining what modes and forms of practice are proper training in the faith of Zen Buddhism, including work practice. Therefore, the ministerial exception protects the autonomy of SFZC in making decisions relating to "matters of church government," including removing WPAs like Appellant, who are ministers. *Id.*

On the first page of his opening Brief, Appellant implies that the WPA position could not be ministerial because Appellant "serve[d] as essentially a cook and housekeeper." Appellant's Brief at 1. Appellant

32

attempts to contrast what he sees as a mere cooking and cleaning role with responsibilities that "lie at the very core of the mission" of SFZC. *Id.*; *see Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2064. However, the full context of this quote reveals that the responsibilities at the core of a religious mission depend on the mission of *that particular religious organization*. The full quotation states: "implicit in our decision in *Hosanna-Tabor* was a recognition that educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the *mission of a private religious school*." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2064 (emphasis added). SFZC is not a private religious school. SFZC is a Zen Buddhist temple. And as the District Court recognized, "[e]very reasonable trier of fact would be compelled to find training in the practice of Sōtō Zen Buddhism, both the formal practice and the work practice, 'lie[s] at the very core of the mission of' SF Zen Center. *Guadalupe*, 140 S. Ct. at 2064." ER-12:28-13:2.

SFZC's mission is to "express, make accessible, and embody the wisdom and compassion of the Buddha . . . SFZC acknowledges and values equally the expression of practice in formal settings and *in daily*

*life.*" ER-27. Therefore, in the context of Zen Buddhism, the responsibilities of cooking and cleaning, within a monastic temple community as an expression of work practice, do in fact lie at the very core of the mission of SFZC. Plaintiff's attempt to discount the religiosity of work practice as a function of SFZC's mission or attempts to compare it to other religious modes of practice are inappropriate. SFZC is just as entitled under the First Amendment to operate in matters of faith, doctrine, and church government as any other religious entity which may do so. Plaintiff's characterization of sincere religious practice as "menial labor" evinces a complete misrepresentation of work practice that the religion itself contradicts.

In the religiously diverse United States, "judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition. A religious institution's explanation of the role of such employees in the life of the religion in question is important." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2066. Further, SFZC is Constitutionally entitled to deference on its explanation on how the WPA position implicates the functions of church government. "In

determining whether an employee served a religious role, we show deference to the church." *Fitzgerald*, 73 F.4th at 531. "[U]nder Supreme Court precedent, a [religious entity's] explanation of ministry issues is entitled to deference. See *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2066 (noting that "[a] religious institution's explanation of the role of such employees in the life of the religion in question is important"). *Id.*

Appellant's implication that the ministerial exception could not possibly apply to the WPA position because it involved so-called "menial labor" is irrelevant. Appellant's characterization of the work he performed at SFZC as "menial," or any other characterization, has no bearing whatsoever on the religious character of that work. "Menial" labor of cooking, cleaning, and so on—*within the context of Zen Buddhist work practice*—is indeed a Zen Buddhist expression of religious practice. Absolutely none of Appellant's contentions may alter that. "[Appellant's] opinion does not dictate what activities [SFZC] may genuinely consider to be religious." *Grussgott*, 882 F.3d at 660. This is especially significant where there is no breadth of case law applying the ministerial exception to a Zen Buddhist temple, and all the case law deals with Western religions. "What makes the application of a

35

religious-secular distinction difficult is that the character of an activity is not self-evident. As a result, determining whether an activity is religious or secular requires a searching case-by-case analysis. This results in considerable ongoing government entanglement in religious affairs." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 343 (1987).

To avoid this unconstitutional entanglement, a court must yield broad deference to the religious organization in its characterization of its religious practices. "[The Court] defer[s] to the organization in situations like this one, where there is no sign of subterfuge." *Grussgott*, 882 F.3d at 660. For example, "it is inappropriate [to distinguish between secular and religious teaching] when doing so involves the government challenging a religious institution's honest assertion that a particular practice is a tenet of its faith." *Id.* Such governmental entanglement in religion is impermissible on both a substantive and procedural level. "On a substantive level, applying [a] statute to the clergy-church employment relationship creates a constitutionally impermissible entanglement with religion if the church's freedom to choose its ministers is at stake." *Bollard*, 196 F.3d at 948–49. As a

procedural matter, "entanglement might also result from a protracted legal process pitting church and state as adversaries . . . ." *Id.* at 949 (quoting *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985)); *see also NLRB*, 440 U.S. at 502 ("It is not only the conclusions that may be reached by the [government] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.").

Even if SFZC were not Constitutionally entitled to deference on the religious characterization of its practices, which it is, the ministerial exception would still apply because of SFZC's religious status and Appellant's ministerial status. Although none of the *Hosanna-Tabor* circumstances are dispositive, and depending on the case, may not even be important, Appellant still satisfies those circumstances given all the circumstances of his employment, as discussed below.

First, the ministerial exception is not as narrow as Plaintiff conceives. There is no categorical limitation on the kinds of positions that fall within the ministerial exception. "[N]either the Supreme Court nor [the Ninth Circuit] has ever expressly limited the ministerial exception to particular types of positions, and both courts have

37

expressly declined to adopt any bright line rule defining the scope of the exception." *Puri*, 844 F.3d at 1159. As already discussed, there is also no condition limiting the ministerial exception to a "leader." Further, any other individuals' performance of ministerial tasks has no bearing on their religious nature when performed by a minister like Appellant. Whether any other individuals, ministers or not, performed functions that Appellant performed as part of his ministerial role has no bearing on the religious character of those functions. *See Hosanna-Tabor*, 565 U.S. at 193 (holding "it cannot be dispositive that others not formally recognized as ministers by the church perform the same functions[.]"). The performance of ministerial functions as a WPA made Appellant a minister for the purposes of the ministerial exception, without regard to any other individual. Further, SFZC's own view of Appellant's religious duties as a WPA are of the utmost significance, as recognized by the District Court. "[T]he ministerial exception protects SF Zen Center's autonomy in deciding what kinds of work practice are proper training in the faith." ER-13:14-15. *See Hosanna-Tabor*, 565 U.S. at 196 (Thomas, J., concurring) (noting his view that "the Religion Clauses require civil courts to apply the ministerial exception and to defer to a religious

organization's good-faith understanding of who qualifies as its minister"). Appellant takes great pains to point out the circumstances that the Supreme Court found relevant in *Hosanna-Tabor*, implying they were the only significant details the Court "focused on." As explained above, Appellant impermissibly condenses the entire ministerial exception analysis into a *Hosanna-Tabor* factor-based "rigid formula" that the Supreme Court specifically denounced in *Our Lady of Guadalupe. See* Appellant's Brief at 19-21; 26-31. Although no single one of the *Hosanna-Tabor* circumstances is a necessary factor and each must be considered in context, Appellant still performed and satisfied each of them here, as discussed below.

## B. Appellant satisfies each of the *Hosanna-Tabor* circumstances.

First, SFZC did in fact "h[o]ld [Appellant] out as a minister," through its inherent treatment of the religiosity and responsibilities of the WPA program, as separate and distinct from public Zen Buddhist practitioners. *See Hosanna-Tabor,* 565 U.S. at 191. As the District Court found in its Order, "The undisputed record shows SF Zen Center considers work practice an integral part of Sōtō Zen Buddhism training. It considers all of a Work Practice Apprentice's work practice time an

39

expression and practice of faith." ER-11:3-6. It is difficult to imagine how a religious organization (SFZC), which holds out a specifically religiously titled role (WPA) as a full-time expression of religious practice, does not hold out *occupants of that role as ministers* (Appellant). SFZC's own policies demonstrate how fervently it holds out WPAs as Zen Buddhist ministers, which merges with the analysis over further *Hosanna-Tabor* circumstances discussed below. *See* SER-89:14-16; SER-166:8-168:4; SER-175:5-8; SER-188-214; SER-249-252; ER-16-25.

Finally, SFZC also directly told Appellant that it viewed him as a minister. Prior to his departure from the temple, the City Center Practice Committee of SFZC stated it viewed Appellant as "a sincere student of the dharma." SER-264-267. As Justice Thomas concurred in *Hosanna-Tabor*, the case from which Appellant derives his "factors"— "the evidence demonstrates that [SFZC] sincerely considered [Appellant] a minister. That would be sufficient for me to conclude that [Appellant's] suit is properly barred by the ministerial exception." *Hosanna-Tabor*, 565 U.S. at 197–98 (Thomas, J., concurring).

Second, Appellant had a religious title that demonstrated the religious significance of his role. "Work Practice Apprentice" denotes an apprentice[1] in the religious function of performing work practice in the context of Zen Buddhism. As a religious apprentice, Appellant and other WPAs were actively training ministers. The "Work Practice Apprentice" title identifies that the calling for which an individual is an apprentice in that role is the Zen Buddhist concept of work practice. *See* ER-26-36. Appellant also performed the role of such a minister while part of the *doan ryo*, participating in leading ceremonies for both resident and public temple practitioners. *See* ER-61:20-62:9; SER-215-234. A WPA is separate and distinct from a private person who practices Zen Buddhism but who is not a WPA. *See Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2062 ("[SFZC] had given [Appellant] 'the title of [Work Practice Apprentice], *with a role distinct from that of most of its members*.'") (emphasis added) (citation omitted). For example, as a residential practitioner of Zen Buddhism including work practice, a WPA follows a

---

[1] Merriam-Webster defines "apprentice" as "one who is learning by practical experience under skilled workers a … calling." https://www.merriam-webster.com/dictionary/apprentice.

strict practice schedule and participates in communal living and practice. SER-162:3-163:4; SER-164:4-165:5. A WPA must abide by the "Shingi" and Pure Standards, where a non-residential public practitioner need not. *See* SER-162:3-163:4; SER-164:4-165:5.

Additionally, the First Amendment precludes requiring the presence of a traditionally recognizable ministerial title. Required use of *any* particular religious title is an impermissible prerequisite for the application of the ministerial exception. "[S]ince many religious traditions do not use the title 'minister,' it cannot be a necessary requirement. Requiring the use of the title would constitute impermissible discrimination, and this problem cannot be solved simply by including positions that are thought to be the counterparts of a 'minister.'" *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2064; *see also Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring) ("The term 'minister' is commonly used by many Protestant denominations to refer to members of their clergy, but the term is rarely if ever used in this way by . . . Buddhists. . . .  [I]t would be a mistake if the term 'minister' or the concept of ordination were viewed as central to the important issue of religious autonomy . . . ."). Deciding the applicability of the

ministerial exception based on a ministerial title would be an unconstitutional establishment of religion—especially here, where the jurisprudence deals almost entirely with Christian ministers. *See Larson v. Valente*, 456 U.S. 228, 244 (1982) (noting the Establishment Clause forbids any government preference for any aspect of any religion over another). Therefore, although Appellant did in fact have a ministerial title that distinguished him from mere Zen Buddhist practitioners, the presence of that title is not necessary or even "important." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2063.

Third, Appellant claims that he did not have "a significant degree of religious training followed by a formal process of commissioning," thereby impermissibly making the directly quoted *Hosanna-Tabor* circumstance a formulaic requirement. *Hosanna-Tabor*, 565 U.S. at 193. Appellant's Brief at 30. He then suggests that he must have been on a specifically defined "track that would lead to religious leadership." Appellant's Brief at 30. Appellant again misapprehends the nature of this *Hosanna-Tabor* circumstance, and again ignores the undeniable determination that the ministerial exception does not apply only to "religious leaders[]." *See Hosanna-Tabor*, 565 U.S. at 190; *Our Lady of*

*Guadalupe Sch.*, 140 S. Ct. at 2067; *Puri*, 844 F.3d at 1159; *Alcazar*, 627 F.3d at 1291. Appellant need not have *either* a "significant degree of religious training" *or* a "formal process of commissioning" for his role to "implicate the fundamental purpose of the exception." *Hosanna-Tabor*, 565 U.S. at 193; *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2067.

Further, *even if* a degree of formalized religious training were a necessary requirement to qualify as a minister, Appellant would so qualify. The WPA role is a particularized role within the context of the Zen Buddhist practice at SFZC and requires participating in training and myriad modes of religious practice. A WPA is an individual in the temple training program who joins as a monk. SER-166:8-168:4. "WPA positions at SFZC are part of the religious training" and are "the launch and the foundation for [one's] Zen training." SER-168:2-4; ER-28. A WPA commits to following the Shingi (Pure Standards) guidelines for conduct. ER-16-25; ER-26-36; SER-188-214. A WPA commits to spending at least 55 hours each week in meditation, learning, and practice. ER-26-36. A WPA commits to waking up each day at 5:10 a.m. for morning meditation. *Id.* A WPA commits to participating in full- and multi-day meditations. *Id.* Even though SFZC does not have a religious

training curriculum that resembles a formal Christian seminary, for example, a WPA is required to have a formal teacher with whom the WPA meets at least once a month. SER-166:21-23; SER-175:5-8. WPAs also have a formal training program, with classes on topics of Zen Buddhist practice. SER-89:14-16; SER-249-252.

Not only does the WPA role satisfy the circumstance of a religious training regimen, which is not necessary, but *Appellant himself* admits that he participated and trained in Zen Buddhist practice while a WPA. SER-63:15-19; SER-78:8-13; SER-78:20-23; SER-79:5-7; SER-79:10-12; SER-80:25-81:2; SER-81:7-9; SER-81:18-82:5; SER-85:5-19; SER-89:14-16. Before he even joined the WPA program, Appellant was aware of the significant religious commitment of the role, because he practiced Zen Buddhism and participated in Buddhist rituals as a guest student before becoming a full-time temple resident. SER-54:22-56:9; SER-58:4-6; SER-58:20-59:2; SER-62:5-70:17. Appellant was well aware he would participate in religious activities when he became a WPA and did so while a WPA. SER-63:15-19; SER-78:8-13; SER-78:20-23; SER-79:5-7; SER-79:10-12; SER-80:25-81:2; SER-81:7-9; SER-81:18-82:5; SER-85:5-19; SER-89:14-16. Appellant participated in Zen Buddhist religious

studies, took leading roles in Zen Buddhist religious ceremonies, and practiced Zen Buddhism. SER-82:20-83:9; SER-86:21-87:10; SER-89:14-16; SER-91:12-92:14. Not only was Appellant aware that his religious practice would involve "menial" work practice—he knew that work was an integral and inextricable mode of the practice of Zen Buddhism. SER-58:4-6; SER-58:20-59:2; SER-62:5-70:16. Each and every one of these practices that Appellant knowingly and voluntarily undertook is Zen Buddhist religious practice as a function of the WPA position.

Again, Appellant's insistence that SFZC must have had a training "track" that results in some kind of leadership position is inapposite to the fundamental purpose of the ministerial exception. Appellant's Brief at 30. Whether Appellant was ever ordained—or whether *he could have ever been ordained*—has no bearing on the applicability of the ministerial exception. "[T]he ministerial exception encompasses more than a church's ordained ministers." *Alcazar*, 627 F.3d at 1291. Appellant asks this Court to determine his Zen Buddhist ministerial status based on its degree of resemblance to a traditionally Western, formalized ordination procedure. The Constitution forbids this.

Any insistence that a particular religious role be formalized in any given way privileges religions with easily recognizable formal organization, which impermissibly discriminates against religions that follow less "formal"—or less Western—structures. *See Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2068 ("[Courts] have no warrant to second-guess [the judgment of a religious institution regarding the need for formal training] or to impose their own credentialing requirements."); *Larson*, 456 U.S. at 244 ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). Appellant's insistence on rigid training requirements to teach religion, for example, is not permitted— "religious traditions may differ in the degree of formal religious training thought to be needed in order to teach." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2064. Further, Appellant's insistence "reflects a troubling and narrow view of religious education. What many faiths conceive of as 'religious education' includes much more than instruction in explicitly religious doctrine or theology." *Gordon Coll. v. DeWeese-Boyd*, 142 S. Ct. 952, 954 (2022). Such is the case here.

47

In any event, this Court must give great weight to SFZC's own determination of the religious and ministerial status of the WPA position. "A religious institution's explanation of the role of such employees in the life of the religion in question is important." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2066. "In determining whether an employee served a religious role, we show deference to the church." *Fitzgerald*, 73 F.4th at 531. "[Appellant's] opinion does not dictate what activities [SFZC] may genuinely consider to be religious. *Grussgott*, 882 F.3d at 660. Appellant seeks to have this Court engage in an "incredibly difficult" and unconstitutional "religious line-drawing" by challenging "[SFZC's] honest assertion that a particular practice [like work practice] is a tenant of its faith." *Id.* SFZC is the ultimate authority on the religious character of its practices, including work practice—a character Appellant knew before, during, and after being a minister at SFZC.

Fourth, Appellant claims he did not "h[o]ld [him]self out as a minister of [SFZC]." *Hosanna-Tabor*, 565 U.S. at 191. In *Hosanna-Tabor*, the way petitioner Perich held herself out as a minister of the Lutheran Church was by "accepting the formal call to religious service." *Id.* As a Zen Buddhist temple, SFZC does not issue any formalized call

48

to religious service. Although Sōtō Zen Buddhism features two levels of ordination, priest and lay, there is no *Hosanna-Tabor* level of distinction between a lay teacher and a called teacher, for example. There is no set linear path to becoming lay ordained or priest ordained, nor is there a set linear path to become a teacher of Zen Buddhism. SER-170:25-171:5. A Zen Buddhist student may go for several years before becoming ordained or becoming a teacher—if that student ever becomes either *at all*. SER-159:25-161:5; SER-161:18-22; SER-169:19-170:10. Again, Appellant seeks to have this Court determine whether he held himself out as a minister of Zen Buddhism by comparing his experience to that of a "called" Lutheran teacher. Drawing a parallel between two religious practices for the purpose of seeking a legal determination of the comparative religiosity of one practice is constitutionally impermissible. *See Larson*, 456 U.S. at 244. Further, this Court has "no warrant to second-guess [SFZC's judgment regarding the need for formalized ordination] or to impose their own credentialing requirements [for the teaching of Zen Buddhism]." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2068.

In any event, however, Appellant did in fact hold himself out as minister of Zen Buddhism, most importantly, to SFZC itself. *See Fitzgerald*, 73 F.4th at 533–34. In his Work Practice Apprentice application, Appellant himself stated he wanted to be a WPA "to deepen [his] practice and continue working with how practice is helping [him] grow and thrive." SER-232. Appellant self-identified as a Zen Buddhist practitioner while a WPA and he held himself out as an apprentice of SFZC. SER-45:16-20; SER-88:21-89:1. During his tenure as a ministerial WPA, Appellant informed the head of practice at SFZC, or *tanto*, that he "would like to work and train to ordain as a priest with an eye towards eventually becoming some kind of practice leader." ER-37. While still in the ministerial role of WPA and applying for the Dharma Bridge Program, Appellant stated he sought to "better support [his] *zazen* practice, [his] participation in the full City Center schedule, the fulfillment of [his] Bodhisattva vows, [the] City Center temple, and [the] entire SFZC Sangha." SER-240. Appellant's own words demonstrate his self-presentation as a Zen Buddhist minister separate and apart from a practicing member of the public. The public need not maintain a *zazen* (sitting meditation) practice. The public need not

participate in the full City Center schedule. The public need not fulfill Bodhisattva vows. The public need not support the mission of SFZC and the Sangha. But ministers, like Appellant, do all these things at SFZC.

Appellant's self-identification as a Zen Buddhist minister extended beyond the temple walls at City Center. Not only did Appellant hold himself out as a Zen Buddhist minister internally to SFZC, he did so to the community at large and sought to promote the mission of SFZC in that community. Appellant even raised the idea to bring the religious teachings he had gained as a WPA to develop mindfulness programs for public-interest advocacy groups and even "develop[] an instruction program that will introduce mindfulness to people who play golf." *Id.* In his Dharma Bridge application, Appellant typed these words: <u>I absolutely have interest in continuing my Zen training</u> … I shudder to think what my life might be like if I cease dharma training. I am deeply grateful to be able to train with such a large group of people." SER-241 (ellipsis and emphasis in original). He also wrote that he sought admittance to the Dharma Bridge program because he "determined it is the best option right now to support my full participation in the City Center schedule, as well as support my

commitment to Zen practice and my Bodhisattva vows." SER-242. Even

further, he made sure to underline: "<u>I am not requesting any</u>

<u>modifications to what is offered at City Center other than joining the</u>

<u>Dharma Bridge program.</u>" *Id.* (emphasis in original). SFZC's "core

offerings" (also Appellant's own words) are *all* ministerial Zen Buddhist

religious practice: "morning zazen, lecture and classes, ***work practice***,

and sangha relations." (emphasis added). *Id.* Appellant called "work

practice" a "core offering" of SFZC, an indisputably religious entity, and

indicated he wanted to continue residential religious practices that lay

Zen Buddhist practitioners are not required to do. It is difficult to

imagine how Appellant did not hold himself out as a minister, when he

explicitly lauded religious practices that SFZC ministers perform, and

specifically informed SFZC he wanted to continue performing them.

Even if Appellant lied about his Zen Buddhist fervor when

applying to these programs, which he admitted to during his deposition

(SER-94-4:25), that tends to show he knew the significance of holding

himself out that way. If Appellant sought to maintain his housing by

telling SFZC what he thought it wanted to hear, he gave SFZC every

reason to believe he was sincerely holding himself out as a Zen

Buddhist minister. A 7th Cir. case from this year, *Fitzgerald*, examines exactly this situation, where an alleged minister argued against the ministerial exception by claiming she exaggerated her religious involvement in the religious entity so she could get a raise. This quotation could be transposed party-for-party in the present case:

> [Appellant] now contends that [he] exaggerated [his] involvement in the religious components of the [temple] because "it was part of the rubric" and he "wanted [housing]." But this does not help [his] case. Even if we accept that [he] exaggerated on [his application] and did not actually perform these religious duties, the fact that [he] mentioned these activities in [his application] to get [housing] supports that [he] understood these criteria to be important to the [temple]. As the defendants persuasively explain, "the very fact that [he] would exaggerate about performing religious tasks to get [housing] only underscores that it was [SFZC's] expectation that [he] perform them."
> *Fitzgerald*, 73 F.4th at 533–34.

In any event, Appellant understood the religious nature and function of the Zen Buddhist practices he participated in as a WPA, and explicitly represented himself as an individual who participated in those practices, both to SFZC and the public. Again, it is difficult to imagine how Appellant did not hold himself out as a Zen Buddhist minister. Therefore, despite Appellant's cursory dismissal of the *Hosanna-Tabor*

circumstances as unsatisfied necessary factors, Appellant satisfies each and every one of the circumstances the Supreme Court considered.

## C. Appellant's ministerial role promoted the religious mission of SFZC.

For the reasons above, not only does Appellant satisfy each of the *Hosanna-Tabor* circumstances, despite none being necessary, but the duties of his WPA role reflected the promotion of SFZC's mission and message. *See Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2062. Within the context of Zen Buddhism, Appellant's activities and responsibilities as a WPA demonstrate the interconnectedness of practice within a Zen residential temple community. That very temple community is an indistinguishable component of the religious character of SFZC that it promotes. Therefore, a WPA's actions that support the temple community as a religious expression of the promotion of SFZC's mission also demonstrate the ministerial status of the WPA position. A WPA's "job duties reflect[] a role in conveying [SFZC's] message and carrying out its mission." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2062 (quoting *Hosanna-Tabor*, 565 U.S. at 192). Those duties, which Appellant performed while holding himself out as a WPA, included expressing Buddhist practice all day every day, meditation, guiding

54

practice as a *doan ryo*, reciting Bodhisattva vows, working with a practice leader, and performing work practice with functional speech. The mission of SFZC is to "express, make accessible, and embody the wisdom and compassion of the Buddha." ER-27. All of these duties promote that mission, and Appellant performed all of them.

Further, although Appellant claims not to have taught Zen Buddhism at SFZC, he absolutely did so in the Zen Buddhist view of the SFZC residential temple community. *See* SER-143:17-18 ("As we in community touch one another, other people's actions affect us and touch us."); see also SER-144:16-19 ("Q. . . . Is it fair to say that teaching Zen Buddhism to others can be done through example? A. I—I think it is the *body to body is the primary way that Zen is taught*.") (emphasis added). "The concept of a teacher of religion is loaded with religious significance." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2067. That religious significance at SFZC is not that of a Christian teacher guiding their students at a Christian school, for example. The religious significance of the "body to body" teaching of Zen Buddhism means that WPAs *do* teach religion, and Appellant may not second-guess that determination. *See Grussgott*, 882 F.3d at 660. As discussed above, no

teaching responsibility is a necessary requirement to invoke the ministerial exception, and religions differ in their degrees of necessary formalized training. Again, however, Appellant does in fact satisfy yet another consideration for the application of the ministerial exception.

Every single moment of Appellant's tenure as a WPA demonstrates the ministerial status of his role. Although ministerial status cannot "be resolved by a stopwatch" that indicates how long an individual performed a ministerial task, that factor is relevant. *Hosanna-Tabor*, 565 U.S. at 193–94. "The amount of time an employee spends on particular activities is relevant in assessing that employee's status, but that factor cannot be considered in isolation, without regard to the nature of the religious functions performed and the other considerations . . . ." *Id.* Appellant invites this Court to consider his time performing "menial" work practice in isolation, "without regard to the nature of the religious function" of work practice in the context of Zen Buddhism. However, because work practice is religious practice, the District Court correctly found that "the record compels a finding that nearly all of his time at the Center involved the practice of Sōtō Zen Buddhism. *See Hosanna-Tabor*, 565 U.S. at 194. (. . . concluding

ministerial exception applied to employee whose 'religious duties consumed only 45 minutes of each workday.'") ER-10:24-11:1 (cleaned up). At a Zen Buddhist temple, not just at SFZC, the concept of work practice intermingles indistinguishably with other modes of practice. "Religion permeates the ministerial workplace in ways it does not in other workplaces." *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 979 (7th Cir. 2021). Clear division of work practice from other modes of Zen Buddhist practice is impossible from within the religion's own context. This Court must consider the time spent performing work practice tasks with regard to the nature of its religious function in the context of Zen Buddhism. *Hosanna-Tabor*, 565 U.S. at 193–94. That religious function establishes the ministerial nature of work practice in the WPA role. All of the duties of WPAs, including work practice, that ministers like Appellant performed at SFZC, function to "express, make accessible, and embody the wisdom and compassion of the Buddha." ER-27. Thus, the WPA position unequivocally supplied Appellant his "role in conveying [SFZC's] message and carrying out its mission." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2062 (quoting *Hosanna-Tabor*, 565 U.S. at 192).

57

**D.    Because SFZC is a religious organization and Appellant was a minister at SFZC, the ministerial exception applies.**

The "general principle of church autonomy" in both "matters of faith and doctrine" and "matters of internal government" provides for the ministerial exception of the First Amendment. *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2061. Appellant seeks to have this court "contradict [SFZC's] determination of who can act as its minister." *Hosanna-Tabor*, 565 U.S. at 185. This is "impermissible." *Id.* Remanding this case by finding the ministerial exception does not apply would "interfere[] with the internal governance of [SFZC] [and] depriv[e] [it] of control over the selection of those who will personify its beliefs. *Id.* at 188. *See also Bollard*, 196 F.3d at 946 (holding that "*no compelling state interest justifies government intrusion into the ecclesiastical sphere . . . [including a] church's selection of its own clergy*") (emphasis added). In the District Court, SFZC sustained its burden to demonstrate as a matter of law that the ministerial exception precludes Appellant's antidiscrimination claim. The religious nature of SFZC has not changed. The reality of Appellant's ministerial status as a WPA has not changed. The protections of the Religion Clauses of the

First Amendment, and SFZC's inherent right to invoke them, have not changed. As the District Court noted in its Order, it is a "matter of undisputed fact that Mr. Behrend's work was part of a religious practice program and implicates the organization's 'power to decide for [itself], free from state interference, matters of church government[,] . . . faith and doctrine." ER-3:17-20 (quoting *Hosanna-Tabor*, 565 U.S. at 186). Because of SFZC's religious status, Appellant's ministerial status, and all the foregoing reasons, the ministerial exception forecloses Appellant's claim and compels that this Court affirm.

## CONCLUSION

For the foregoing reasons, Appellee respectfully requests that this Court affirm the District Court's Order granting summary judgment.

Dated: October 18, 2023   **FOLEY & LARDNER LLP**
Eileen R. Ridley
Sara Alexis Levine Abarbanel
Evan L. Hamling


*/s/ Eileen R. Ridley*
Eileen R. Ridley

*Attorneys for Defendant-Appellee SFZC, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,328 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f). In certifying the foregoing I have relied upon the word count of the word processing system used to prepare the brief as authorized by Fed. R. App. P. 32(a)(7)(C).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, Century Schoolbook 14-point font.

Dated: October 18, 2023    /s/ *Eileen R. Ridley*
                            Eileen R. Ridley
                            *Attorneys for Defendant-Appellee*
                            *SFZC, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that we electronically filed the foregoing Answering Brief for Plaintiffs/Appellees with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system on October 18, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  October 18, 2023      /s/ *Eileen R. Ridley*

Eileen R. Ridley
Attorneys for Defendant-Appellee
SFZC, Inc.