**Case No. 23-15399**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**
————————

**ALEXANDER BEHREND**
*Plaintiff-Appellant,*

v.

**SAN FRANCISCO ZEN CENTER, INC.,**
*Defendant-Appellee.*
————————

Appeal from the United States District Court for the
Northern District of California
Case No. 21-cv-1905, Hon. Jacqueline S. Corley
————————

**SUPPLEMENTAL EXCERPTS OF RECORD**
**SINGLE VOLUME**
————————

**Foley & Lardner LLP**
Eileen R. Ridley
Evan L. Hamling
555 California Street
Suite 1700
San Francisco, CA 94104-1520
415.434.4484
eridley@foley.com
ehamling@foley.com

**Foley & Lardner LLP**
Sara Alexis Levine Abarbanel
11988 El Camino Real
Suite 400
San Diego, CA 92130-2594
858.847.6700
sabarbanel@foley.com

*Attorneys for Defendant-Appellee*
*SFZC, Inc.*

*Attorneys for Defendant-Appellee*
*SFZC, Inc.*

| DOCUMENT | DATE | DOCKET # | PAGES |
|---|---|---|---|
| Transcript of Proceedings on Defendant's Motion for Summary Judgement | 02/02/23 | 77 | 5-25 |
| Appendix of Evidence In Support of Motion for Summary Judgment | 11/23/22 | 64 | 26-29 |
| Ex. 1 - Declaration of Eileen R. Ridley In Support of Motion for Summary | 11/23/22 | 64-1 | 30-33 |
| Ex. 2 - Declaration of Michael McCord In Support of Motion for Summary Judgment | 11/23/22 | 64-2 | 34-38 |
| Ex. 3 - Excerpts from the Deposition Transcript of Plaintiff Alexander Behrend | 11/23/22 | 64-3 | 39-99 |
| Ex. 4 - Excerpts from the Deposition Transcript of Barbara Machtinger | 11/23/22 | 64-4 | 100-116 |
| Ex. 5 - Excerpts from the Deposition Transcript of Seigen Johnson | 11/23/22 | 64-5 | 117-130 |
| Ex. 6 - Excerpts from the Deposition Transcript of Mary Stares | 11/23/22 | 64-6 | 131-149 |
| Ex. 7 - Excerpts from the Deposition Transcript of Michael McCord | 11/23/22 | 64-7 | 150-181 |
| Ex. 8 - San Francisco Zen Center, Inc. Articles of Incorporation | 11/23/22 | 64-8 | 182-184 |
| Ex. 10 - "Work As Practice" | 11/23/22 | 64-10 | 185-187 |
| Ex. 11 - San Francisco Zen Center City Center Residents' Handbook | 11/23/22 | 64-11 | 188-214 |

| DOCUMENT | DATE | DOCKET # | PAGES |
|---|---|---|---|
| Ex. 13 - "Room, Board, and Tuition" Program | 11/23/22 | 64-13 | 215-229 |
| Ex. 14 - Alex Behrend's Application to the Work Practice Apprentice Program | 11/23/22 | 64-14 | 230-234 |
| Ex. 15 - Alex Behrend's Application to the Dharma Bridge Program | 11/23/22 | 64-15 | 235-242 |
| Ex. 16 - Alex Behrend's Acknowledgement of Receipt of San | 11/23/22 | 64-16 | 243-245 |
| Ex. 17 - Email chain between Alex Behrend, Victoria Austin, and Rev. David Zimmerman | 11/23/22 | 64-17 | 246-248 |
| Ex. 19 - Email from Rev. David Zimmerman to San Francisco Zen Center Residents Listserv | 11/23/22 | 64-19 | 249-252 |
| Ex. 20 - Email chain between Rev. David Zimmerman, Work Practice Apprentices, and Annie Obermeyer | 11/23/22 | 64-20 | 253-255 |
| Ex. 21 - Email from Diego Miglioli to Alex Behrend and others | 11/23/22 | 64-21 | 256-257 |
| Ex. 22 - Email chain between Alex Behrend, Kim Kögen Hart, Rev. David Zimmerman | 11/23/22 | 64-22 | 258-260 |
| Ex. 23 - Email chain between Alex Behrend, Eli Brown-Stevenson, Diego Miglioi, and others | 11/23/22 | 64-23 | 261-263 |
| Ex. 24 - Email from San Francisco Zen Center Practice Committee to Alex Behrend | 11/23/22 | 64-24 | 264-267 |

| DOCUMENT | DATE | DOCKET # | PAGES |
|---|---|---|---|
| Ex. 25 - U.S. Equal Employment Opportunity Commission Notice of Charge of | 11/23/22 | 64-25 | 268-270 |
| Ex. 26 - Notice of Dismissal and Notice of Rights from U.S. Equal Employment Opportunity Commission | 11/23/22 | 64-26 | 271-274 |
| Ex. 28 - Screenshots from San Francisco Zen Center's Website | 11/23/22 | 64-28 | 275-284 |

Pages 1 - 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
ALEXANDER BEHREND,              )
                               )
          Plaintiff,           )
                               )
   VS.                         )    NO. C 21-01905 JSC
                               )
SAN FRANCISCO ZEN CENTER,      )
INC.,                          )
                               )
          Defendant.           )
_____)
```

San Francisco, California
Thursday, February 2, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff: (via videoconference)

> GIRARD SHARP, LLP
> 601 California Street - Suite 1400
> San Francisco, California  94108
> BY:  **KYLE P. QUACKENBUSH, ATTORNEY AT LAW**
>      **MIKAELA M. BOCK, ATTORNEY AT LAW**

For Defendant:

> FOLEY & LARDNER
> 555 California Street - Suite 1700
> San Francisco, California  94104
> BY:  **EILEEN R. RIDLEY, ATTORNEY AT LAW**
>      **EVAN HAMLING, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

```
 1   Thursday - February 2, 2023                      10:14 a.m.
 2                       P R O C E E D I N G S
 3                            ---oOo---
 4        THE CLERK:  Remain seated.  Come to order.  Court is
 5   in session.
 6        THE CLERK:  Okay.  Calling civil action C21-1905,
 7   Behrend versus San Francisco Zen Center, et al.
 8     Counsel starting with Plaintiff, please state your
 9   appearance.
10        MR. QUACKENBUSH:  Good morning, Your Honor, Kyle
11   Quackenbush on behalf of the Plaintiff.
12        THE COURT:  Good morning.
13        MS. BOCK:  Good morning, Mikaela Bock on behalf of the
14   Plaintiff, Mr. Behrend.
15        THE COURT:  Can you hear that, Ms. Knox?
16                     (Pause in proceedings.)
17        COURT REPORTER:  I can.
18                     (Pause in proceedings.)
19        THE COURT:  Where are we at?  I think Ms. Bock's turn.
20   Now we are getting an echo.
21        MS. BOCK:  Good morning, Your Honor, Mikaela Bock of
22   Girard Sharp on behalf of the Plaintiff.
23        THE COURT:  Good morning.
24        MS. RIDLEY:  Good morning, Your Honor, Eileen Ridley
25   on behalf of Defendant SF Zen Center, and I'm here with my
```

 1  colleague Evan Hamling.

 2       **THE COURT:**  Good morning.  Oh, we can't do that with

 3  the echo.  Hello?

 4                      (Echo sound.)

 5              (Discussion held off the record.)

 6       **THE COURT:**  I'm going to leave and join you from my

 7  chambers.

 8       **MS. RIDLEY:**  Thank you, Your Honor.

 9                  (Pause in proceedings.)

10       **THE CLERK:**  Good morning.  Court is now in session.

11  The Honorable Jacqueline Scott Corley presiding.

12     Calling civil action C21-1905, Behrend versus San

13  Francisco Zen Center.

14     Counsel starting with Plaintiff, please state your

15  appearance for the record.

16       **MR. QUACKENBUSH:**  Good morning, Your Honor, Kyle

17  Quackenbush with Girard Sharp on behalf of the Plaintiff.

18       **THE COURT:**  Good morning.

19       **MS. BOCK:**  Good morning, Your Honor, Mikaela Bock from

20  Girard Sharp on behalf of the Plaintiff Mr. Behrend.

21       **THE COURT:**  Good morning.

22       **MS. RIDLEY:**  Good morning, Your Honor, Eileen Ridley

23  on behalf of Defendant San Francisco Zen Center and --

24       **MR. HAMLING:**  Good morning, Your Honor, Evan Hamling

25  also for Defendants.

1          **THE COURT:**  Good morning.  Okay, the -- again,

2    Mr. Quackenbush and Ms. Bock, thank you very much for

3    representing Mr. Behrend.  This is a super interesting case.

4    Most of these ministerial exceptions are teachers, of course,

5    and you don't really see cases in this realm; and I think

6    that's because we are actually, like, in the heart of the

7    religious realm.

8          So, Mr. Quackenbush, let me first start with, is there any

9    dispute that -- and this is when Mr. Behrend was a work

10   practice apprentice; right?  This arises out of work practice.

11         Apprentice's claim is that the Defendants did not

12   accommodate his disability such that he had to leave the

13   center, the temple, and leave the program.

14         Is there any dispute that the work practice apprentice is

15   a religious position?

16         **MR. QUACKENBUSH:**  I believe that there is, yes,

17   Your Honor.

18         **THE COURT:**  Okay.  And what creates that genuine

19   dispute?

20         **MR. QUACKENBUSH:**  I think that under *Our Lady of*

21   *Guadalupe*, you need to look at the totality of the

22   circumstances.

23         And so I believe that Defense Counsel would point to the

24   fact that they categorize Mr. Behrend as a -- as -- as

25   functioning as a religious apprentice under their WPA program,

1  but I think that what he actually did suggests that he was not

2  fulfilling a religious role within the -- within the Zen

3  Center.

4      **THE COURT:**  Okay, because the -- the -- the policies

5  for the apprentice program specifically state that the

6  positions are part of the religious training.  The communal

7  work practice is an integral and indivisible part of the Zen

8  training and spiritual practice offered at the Zen Center;

9  right?  That's right there in the written policy.

10     So what are the facts that -- that dispute that what they

11  say there in their written policies is not true?

12     **MR. QUACKENBUSH:**  Sure.  So, several facts.  One is

13  that what he did was he worked housekeeping.  He worked briefly

14  for maintenance and he worked in the kitchen; right.  So his

15  job responsibilities in that respect were not religious, per

16  se.  I know --

17     **THE COURT:**  Well, what does the Zen Center say about

18  that?

19     **MR. QUACKENBUSH:**  Yes, I know that the Zen Center will

20  say that anything any individual does within the institution or

21  even outside if they are Buddhist is part of practice because

22  they are working and working is part of Zen Buddhism.  I

23  understand that they would say that.

24     I think that *Our Lady* and other cases -- I'll have the

25  Court look to *Tucker v. Catholic* -- give me one second --

1   *Tucker v. Catholic* -- apologies -- *Tucker v. Faith Bible Chapel*

2   *International* -- that's 2020, Westlaw 2526, 798 -- I think

3   suggests that you can't just look at what the -- what the

4   religious institution says about the role and the

5   responsibilities, but you have to look at actually what the

6   employee does.

7        In *Tucker* the handbook said that every person working at

8   the institution would be -- would be fulfilling their faith

9   based position.  They were called chaplains.

10       The handbook said to become a teacher or a full-time

11  worker at Faith Christian Academy is a calling from the Lord

12  Jesus Christ to minister.  You are joining this ministry not as

13  an employee but as a minister to FCA families and students.

14       The Court denied Defendants' summary judgment motion and

15  that decision was not disturbed at the Tenth Circuit although

16  it was on different grounds that it was denied based on

17  interlocutory appeal.

18       But I think that that case and *Our Lady* suggest that

19  complete deference to what's in a handbook about the role that

20  the employee takes -- the role that the employee is fulfilling

21  does not necessarily -- is not necessarily dispositive.

22       **THE COURT:**  Well, in this case, though, the Plaintiff

23  does engage in even what you would admit are formal religious

24  practices.  He is a practicing Zen Buddhist.

25       It is a temple and it is a center for people to come and

1    practice Zen Buddhism.  It is not a school.  It is not a school

2    that teaches, you know, children math.  It is actually an

3    institution for the teaching and training of Zen Buddhism it is

4    like a seminary or a monastery; right?

5         I was trying to figure out how this is any different from

6    a monk at a monastery where they do all the work themselves as

7    well.

8         **MR. QUACKENBUSH:**  Sure.  We don't dispute that while

9    Mr. Behrend was at SF Zen Center he was a practicing Buddhist.

10   I think where we would draw the distinction is that he was not

11   training to become -- he wasn't a student training to become an

12   ordained minister.

13        And if Your Honor may, I would just like to point out that

14   in *Our Lady*, the Court repeatedly emphasizes that ministerial

15   exception is focused on certain individuals within a religious

16   institution.  It's not broadly defined for any individual that

17   practices the religion.

18        And I'd just like to point to several areas in *Our Lady* at

19   2060 while discussing the -- how the ministerial exemption

20   derived in case law and the focus of it, the Court points to

21   certain key roles, certain important positions, and notes that

22   the reason behind the ministerial exception is that a wayward

23   minister's preaching, teaching and counseling could contradict

24   the church's tenets and lead the congregation away from the

25   faith.

1      And the concurrence for the -- the Court also cites to

2   *Hosanna-Tabor*'s concurrence noting that any employee who leads

3   a religious organization, conducts worship services or

4   important religious ceremonies or rituals or serves as a

5   messenger or teacher of its faith.

6      There are other instances in *Our Lady* and in the

7   concurrence denying certiorari in *Gordon College v. DeWeesse*

8   *Boyd* that I can point to; but the point that I'm trying to make

9   is that we don't believe that -- we believe that there is a

10  distinction between what Mr. Behrend's role was at SF Zen

11  Center and the very few cases that have analyzed a student -- I

12  think the only one is *Alcazar* -- holding that a student was a

13  minister under the ministerial exception.

14      I think there is a very clear distinction between what

15  Behrend did and the process that he was going through and a

16  student in a seminary -- a seminarian student who admits that

17  he is studying to become a -- studying to become a minister.

18      **THE COURT:**  Why?  But why?  Right?  So part of the

19  reason with the seminary is -- and maybe in a way this case

20  fits more in the church autonomy doctrine than the ministerial

21  exception.

22      I was wondering about that.  There aren't a lot of cases

23  in the church autonomy doctrine but in a way.

24      And the way I look at it here, Mr. Quackenbush, in the

25  seminary, you would -- I think you would probably agree at

 1    least under the current case law, that if the seminary decided

 2    to expel a student regardless of whether that student decided

 3    to stay and become a priest or not, that is not something that

 4    the state would interfere with because we can't force the

 5    church, a seminary, to continue to educate somebody who it

 6    doesn't think.  And I don't know how that doesn't apply here.

 7         So the remedy that Mr. Behrend is seeking is essentially

 8    or what he complains about is that he was required to leave the

 9    work apprentice -- the work practice apprenticeship.

10    Therefore, the remedy is either compensate him or order him

11    back.  Order this temple, the Zen Center, to actually allow him

12    to continue to be there and to train and to do what he does.

13    That seems to me directly interfering in the matters of the

14    church; what *Guadalupe* and *Hosanna* and the cases before that

15    says.

16         For example, what if they -- we don't know because we have

17    gotten there what their explanation would be; but what if they

18    said, "We asked him to leave because during his work practice

19    he was talking."  Something he says people did.  What if he was

20    the person that was talking?

21         And the Zen Center therefore said, "You know you are not

22    fulfilling the Zen principles and practicing -- and properly

23    practicing.  You need to leave and move out."

24         And he sued and said, "No.  You are actually doing it

25    because of my disability."

1    Wouldn't that be asking the courts to directly interfere

2    in matters of faith and doctrine of the Zen Center?

3         MR. QUACKENBUSH:  So, you raise an interesting point

4    whether this would fall under the church autonomy doctrine.

5    That issue hadn't been briefed.  It wasn't raised by Defense

6    Counsel.  We haven't focused on it.

7         With regards to the ministerial exception, I think there

8    is a threshold issue of determining whether the employee is a

9    minister, and we believe that there is a factual dispute about

10   whether he fits into these key roles that the Supreme Court has

11   outlined are ministers.

12        THE COURT:  So you think a minister has to be a

13   teacher or a leader?

14        MR. QUACKENBUSH:  No.  I think that a minister needs

15   to -- not necessarily a teacher, but I think that the Supreme

16   Court has stated that it's certain key roles, it's people who

17   spread the message of the faith or are responsible for teaching

18   others about the faith.  No one would go to Zen Center and ask

19   Mr. Behrend to tell them about how Buddhism works.

20        They are not looking at him to lead the congregation or

21   to -- to express how Buddhism is -- is practiced; right?  He

22   was -- he was in a resident facility practicing Buddhism but --

23        THE COURT:  In front of the people there.  I mean, he

24   is doing it with them.

25        MR. QUACKENBUSH:  Sure.

1        **THE COURT:**  What Justice Alioto said, of course, in

2   the concurrence in *Hosanna* is that in many religions like

3   Buddhism has no ministers or maybe everybody is a minister;

4   right.

5        I mean, the difficulty that I'm having -- perhaps, all of

6   us have with this case because I'm not a Buddhist -- is we put

7   our Western view of religion trying to frame it onto Buddhism,

8   which is really actually completely beyond our bailiwick.

9        And so we have -- so I'm not sure I agree.  I mean, I

10  understand that's where your opposition was going.

11       **MR. QUACKENBUSH:**  And, Your Honor --

12       **THE COURT:**  There's definitely a genuine dispute

13  whether he was being there to train to be a priest.  Could be.

14  And there is certainly evidence that that's what he intended,

15  but let's say there is a dispute there or a dispute as to that.

16  He was there practicing as he admits in the morning, the

17  prayers together, and the work -- I mean, I am still not sure

18  that we can say the work practice -- and, again, I get that it

19  makes us uncomfortable -- but that the work practice is not

20  part of the Zen Buddhism given that's expressly what is stated;

21  and there isn't any evidence that says San Francisco Zen Center

22  made that up; right?  That doesn't exist.  That's not there.

23       **MR. QUACKENBUSH:**  Two quick points.  One is I will

24  just note for the record, you know, we don't have any direct

25  evidence that work practice is something that's made up.  I

 1   will note for record that Zen Center knew about this exception

 2   and was using this exemption before any of these handbooks were

 3   written.

 4        And so I just -- I do believe that, perhaps, a trier of

 5   fact, a jury, should be given that information and allowed to

 6   decide what they make of it.

 7             **THE COURT:**  Why?  What is the inference that can be

 8   drawn from that?

 9             **MR. QUACKENBUSH:**  What is the inference that can't be

10   drawn?

11             **THE COURT:**  That can.  That you are asking the jury to

12   draw from that because they were aware -- because they were

13   aware of it, that somehow -- I don't know.  I mean, it seems to

14   me that is equally if not more consistent with a genuine belief

15   that the exemption applied; right?

16             **MR. QUACKENBUSH:**  Yeah -- yes, Your Honor.  And I

17   think that it's fine to have a genuine belief that the

18   exception applies, but I do think that perhaps you can -- there

19   is concern in concurrences and in *Tucker* and in other cases

20   about -- and in *Alacazar* itself about religious institutions

21   framing their -- their handbooks and their -- and things like

22   that in a way that would -- if you allow complete deference to

23   what the religious institution describes as its -- as what the

24   employee does or that, for instance, work practice is part of

25   the religion, that there is some fear that that complete

1  deference is -- you know, would be abused.

2          **THE COURT:**  Yes, I agree.  But what is the evidence

3  that it's being abused here; right?  So it could be but

4  Buddhism -- Zen Buddhism is not -- I mean, it's long-standing.

5  It's out there.  And we don't have any evidence that it's

6  actually being abused here, do we?

7          **MR. QUACKENBUSH:**  No, we don't, Your Honor.

8          **THE COURT:**  Okay.

9          **MR. QUACKENBUSH:**  Might I just -- one more thing to

10  note and I understand -- I -- this case is an interesting case,

11  and it is challenging because I do think that it is the

12  broadest application of the -- the ministerial exception that

13  would be decided.

14      And I just want to note that, you know, the dissent in --

15  in *Our Lady* kind of feared this day, right, where it looked at

16  the Seventh Day Adventist and other religions and said, okay,

17  well, what happens if the religions says that 90 percent of its

18  practitioners are, you know, are considered ministers and would

19  fall under this exception; right?

20      It had that concern and I think that that is -- I believe

21  that's one of the reasons why the majority included these

22  limiting principles was that, you know, it really needs to be

23  people that spread the message of the faith are key

24  individuals, the -- you know, in finding that the Plaintiffs in

25  *Our Lady* were -- were ministers and that summary judgment

1    should be affirmed, it noted their vital role in the

2    religion -- the religion.

3        I just -- I question whether -- whether Mr. Behrend's role

4    as a -- as a -- as practicing Buddhism for two years and not

5    training to become ordained and wanting to learn more about

6    Buddhism, sure, but not being in a position that would be

7    looked upon to spread the faith or be a role model for the

8    faith, whether he was -- whether he would be considered to

9    perform those vital roles that the Court and *Our Lady* found the

10   ministerial exception applied to.

11       **THE COURT:**  Okay.  Ms. Ridley?

12       **MS. RIDLEY:**  So thank you, Your Honor.  I think,

13   Your Honor's comments are exactly on point and I want to

14   address just the following.

15       There is no dispute one, that SF Zen Center is a religious

16   organization.  So putting that aside, there is no dispute that

17   the Plaintiff entered into SF Zen Center acknowledging it was a

18   religious institution and with knowledge of the -- of the

19   written policies and what the work practice apprenticeship

20   program was, affirmatively decided to participate in that,

21   understood the concept that he was an apprentice.  It is

22   practicing apprenticeship.

23       Again, I think it's very important that while probably all

24   of us -- I'm not a practicing Zen Buddhist, so I'm learning

25   purely as a dilettante.  I want to acknowledge that.

1      And I think all of us tend to try to measure based on what

2   we understand, which is -- to the extent we have a religious

3   background, more likely than not at least among those speaking

4   here, that it is a Western one.

5      But cases like *Hosanna* and *Guadalupe* specifically note

6   that is not an appropriate yardstick.  We have to accept the

7   religion as the religion presents itself.

8      A valuation of the religion compared to another religion

9   is not an appropriate evaluation under the First Amendment.

10     And so the question is not a rigid test.  It is not.  It

11  has to be a key role.  The question is:  How does the

12  acknowledged religion see the role and what did the individual

13  do?

14     There is no dispute that the SF Zen Center saw this role

15  as a religion position.  And, in fact, there's undisputed

16  evidence that Plaintiff, in fact, participated in that religion

17  very much living in a monastery type experience attending

18  meditation forums, going to the Full Moon ceremony,

19  acknowledging the Shingi and in acting as a doanryo actually

20  leading a ceremony.

21     And notably *Hosanna* and particularly *Guadalupe* acknowledge

22  we are not talking about a requirement for the ministerial

23  exception to apply to only apply to the head of a religion.  It

24  is not a key role analysis.  It is what did they do.

25     And in this case there is no question that the position

1    Plaintiff had was as a work practice apprentice practicing Zen

2    Buddhism acknowledging work was part of that practice.  It is

3    one in the same.  It is not separate and did so for some time

4    and actually in his own writings, undisputably and against his

5    present interest, said he was undergoing religious training.

6         So there is really no dispute about the fact that the

7    ministerial exception absolutely applies in this.  And this was

8    not -- this is not the broadest application of this.  This is

9    exactly what is foreseen in both *Hosanna* and *Guadalupe*.  It

10   just happens to be in an Eastern religion as opposed to a

11   Western religion.

12        **THE COURT:**  All right.  That's what I was thinking,

13   Mr. Quackenbush, in some ways it seems narrow in the sense that

14   we are smack in the middle of a religious institution

15   practicing the religion; whereas, in the teacher cases, they

16   may or may not even be Catholic or tend to be Catholic schools

17   or Christian schools; right?

18        But here, there is no dispute that he is practicing --

19   well, you would say there is a dispute -- there is actually no

20   dispute that he is practicing the religion even as to the

21   work -- as to the work practice and maybe we don't see those

22   cases because, again, if the remedy is what he is saying is

23   "they should have accommodated me and the law requires that

24   they keep me as a work practice apprentice," that seems to

25   go -- run smack into the First Amendment if we are telling a

1    religious institution "you have to keep this person at your

2    temple as a work practice apprentice."

3              MR. QUACKENBUSH:  Well, I'd like to just clarify a

4    couple of things that Defense Counsel said.

5         You know, I do want to note that there is an abbot at the

6    temple.  There are teachers.  There is lay ordination and

7    priest ordination.  So there is -- you know, I understand and

8    the Supreme Court has been clear that, you know, you can't put

9    a framework of Western religion onto Eastern religion, but I

10   just want to note that there is some sort of hierarchy within

11   the Buddhist temple.

12        And, you know, Ms. Johnson, who was lay ordained and

13   priest ordained and resided at Zen Center for many years, she

14   analogized -- she analogized lay ordination to baptism.  That

15   was on her own she did that.  And Mr. Behrend wasn't even lay

16   ordained.  She also said that, you know, once you become lay

17   ordained and in her words are baptized into Buddhism, then you

18   can become priest ordained and then you start -- you receive

19   training and learn about religion.

20        So, I think my fear is that this is turning the

21   ministerial exception into a religious practice exception, so

22   that anyone that is -- anyone that practices a religion would

23   then fall under the ministerial exception.  And I don't believe

24   that the Supreme Court created such a broad rule.

25             THE COURT:  No.  I mean, it would be different maybe

1    if he was someone who just came, but he was living there as

2    part of the work practice apprenticeship program but your

3    slippery slope argument, I understand the argument.  It's a

4    good argument.

5              MR. QUACKENBUSH:  Thank you.  And I just want to

6    finally note that I just belief that -- you know, that the

7    summary judgment standard is whether any reasonable juror would

8    find that -- that in favor of the Plaintiff; right.

9         And so I just feel that on this record with these facts

10   and disputed evidence in the record from Ms. Johnson,

11   Mr. Behrend, and documents that suggest, for instance, that the

12   doanryo role required little to no training and was not

13   actually leading a ceremony.  It was just participating in a

14   ceremony and anyone from the public could do it; that based on

15   these facts, I just don't think that summary judgment is

16   warranted here.

17             THE COURT:  Well, that seems to me exactly what the

18   Supreme Court is saying you don't want the courts getting

19   involved in; right?  I mean, that's just -- that -- though you

20   weren't leading it, you were just participating it.  You would

21   say, though, that I should look at *Tucker* is your best case?

22             MR. QUACKENBUSH:  I think that *Our Lady* is our best

23   case for reasons I have described.

24             THE COURT:  Okay.

25             MR. QUACKENBUSH:  That it is the totality of the

1    circumstances.  And I understand that Your Honor may disagree,

2    but I do believe that *Tucker* is also instructive.  I just --

3    *Tucker* is instructive.  It is a district court opinion so it is

4    persuasive authority.

5           THE COURT:  No.  I understand that.  These cases all

6    are -- do tend to be decided on summary judgment I think

7    because it's almost like qualified immunity in a way, right,

8    that the courts are concerned but you are right.  I mean, and I

9    have been --

10          MR. QUACKENBUSH:  So --

11          THE COURT:  -- struggling with that is I have to draw

12   inferences in the Plaintiff's favor, but I have to determine if

13   it is a material dispute; right?

14          MR. QUACKENBUSH:  And I will note that the Tenth

15   Circuit on appeal -- and I'm not sure if this was also included

16   in the en banc opinion but it was in the appellate decision --

17   clearly specified that this is not qualified immunity; that

18   this is -- that this is -- the burden is on Defense Counsel;

19   that this is a standard summary judgment issue; and that it is

20   a highly intense factual dispute.

21          And I would just, you know, recommend Your Honor that the

22   cases that -- that have been decided on summary judgment are

23   significantly different on their facts.

24          THE COURT:  Okay.  Anything further, Ms. Ridley?

25          MS. RIDLEY:  Yes.  So nothing in either *Guadalupe* or

1  *Hosanna* suggest that one must be ordained to be considered a

2  minister.  That is not actually the case.

3      And, in fact, in both instances they were teachers.  None

4  of them were ordained.  They just had particular positions that

5  the religion in question acknowledged had what I would call

6  ministerial aspects.  That is no different than what we have

7  here as a work practice apprentice.

8      And as to Ms. Johnson, we have objections to her

9  testimony.  It -- she is not an expert.  She is not -- she

10  doesn't speak for SF --

11          **THE COURT:**  Yeah, I'm aware of that.

12          **MS. RIDLEY:**  So really her position is irrelevant.

13      The last issue really is we believe the facts are

14  undisputed.  There is no material dispute -- dispute of fact.

15  And so this becomes an issue of law.  And an issue, you know,

16  right into the First Amendment, one of the highest precepts in

17  law.

18      And given the undisputed facts, given state of the law, we

19  actually think *Guadalupe* and *Hosanna* are exactly the authority

20  the Court should follow and, in fact, results in -- and should

21  result in a summary judgment in favor of SF Zen Center.

22          **THE COURT:**  Okay.  Great.  All right.  Well, thanks

23  very much.  This is an -- in 11 years my first foray into this

24  area, so I very much appreciate the briefing and the argument.

25  I will take the matter under submission.  Thank you.

1        **MS. RIDLEY:**  Thank you, Your Honor.

2        **MR. QUACKENBUSH:**  Thank you.

3              (Proceedings adjourned at 10:47 a.m.)

4

5

6                  **CERTIFICATE OF REPORTER**

7        I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   DATE:    Saturday, May 20, 2023

11

12

13

14   _____

15        Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
         United States District Court - Official Reporter

16

17

18

19

20

21

22

23

24

25

EILEEN R. RIDLEY, CA Bar No. 151735
  eridley@foley.com
EVAN L. HAMLING, CA Bar No. 339578
  ehamling@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET
SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE: 415.434.4484
FACSIMILE:  415.434.4507

SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
  sabarbanel@foley.com
**FOLEY & LARDNER LLP**
11988 EL CAMINO REAL, SUITE 400
SAN DIEGO, CA 92130-2594
TELEPHONE: 858.847.6700
FACSIMILE:  858.792.6773

Attorneys for Defendants SAN
FRANCISCO ZEN CENTER, INC.; SAN
FRANCISCO EVERYDAY, INC.; SAN
FRANCISCO THIRD WAY, INC.; THE
ZEN FOUNDATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEXANDER BEHREND,<br><br>                              Plaintiff,<br><br>          vs.<br><br>SAN FRANCISCO ZEN CENTER, INC.;<br>SAN FRANCISCO EVERYDAY, INC.; SAN<br>FRANCISCO THIRD WAY, INC.; THE ZEN<br>FOUNDATION,<br>Defendants. | Case No. 3:21-cv-01905-JSC<br><br>**DEFENDANTS' APPENDIX OF<br>SUPPORTING EVIDENCE IN SUPPORT OF<br>THEIR MOTION FOR SUMMARY<br>JUDGMENT**<br><br>Date: February 2, 2023<br>Time: 9:00 a.m.<br>Place: Courtroom 8 (via Zoom)<br>Judge: Hon. Jacqueline Scott Corley |

DEFENDANTS' APPENDIX OF SUPPORTING EVIDENCE
Case No. 3:21-cv-01905-JSC

4870-6465-5167.2

26

Defendants San Francisco Zen Center, Inc. ("SFZC"); San Francisco Everyday, Inc.; San Francisco Third Way, Inc., and the Zen Foundation (collectively, "Defendants") hereby submit this Appendix of Supporting Evidence ("AOE") with true and correct copies of the exhibits referenced below and attached hereto in support of its Motion for Summary Judgment.

| Exhibit | Description |
|---------|-------------|
| 1. | Declaration of Eileen R. Ridley |
| 2. | Declaration of Michael McCord |
| 3. | Excerpts from the Deposition Transcript of Plaintiff Alexander Behrend taken on October 17, 2022 (authenticated in Ridley Declaration at p. 2, ¶ 2 [Exhibit 1 to AOE]) |
| 4. | Excerpts from the Deposition Transcript of Barbara Machtinger taken on October 18, 2022 (authenticated in Ridley Declaration at p. 2, ¶ 3 [Exhibit 1 to AOE]) |
| 5. | Excerpts from the Deposition Transcript of Seigen Johnson taken on October 21, 2022 (authenticated in Ridley Declaration at p. 2, ¶ 4 [Exhibit 1 to AOE]) |
| 6. | Excerpts from the Deposition Transcript of Mary Stares taken on October 26, 2022 (authenticated in Ridley Declaration at p. 2, ¶ 5 [Exhibit 1 to AOE]) |
| 7. | Excerpts from the Deposition Transcript of Michael McCord taken on October 28, 2022 (authenticated in Ridley Declaration at p. 2, ¶ 6 [Exhibit 1 to AOE]) |
| 8. | San Francisco Zen Center, Inc. Articles of Incorporation (authenticated in McCord Declaration at p. 1, ¶ 9 [Ex. 2 to AOE.]) |
| 9. | Shingi (Pure Standards for Residential Living) (authenticated in McCord Declaration at p. 2, ¶ 11 [Ex. 2 to AOE.]) |
| 10. | "Work As Practice" (authenticated in McCord Declaration at p. 2, ¶ 12 [Ex. 2 to AOE.]) |
| 11. | San Francisco Zen Center City Center Residents' Handbook (authenticated in McCord Declaration at p. 2, ¶ 13 [Ex. 2 to AOE.]) |
| 12. | San Francisco Zen Center Work Practice and WPA Policies (authenticated in McCord Declaration at p. 2, ¶ 15 [Ex. 2 to AOE.]) |
| 13. | "Room, Board, and Tuition" Program (now known as Dharma Bridge Program) Policies at |

| | | |
|---|---|---|
| | | SFZC (authenticated in McCord Declaration at p. 1, ¶ 17 [Ex. 2 to AOE.]) |
| | 14. | Alex Behrend's Application to the Work Practice Apprentice Program (authenticated in McCord Declaration at p. 3, ¶ 19 [Ex. 2 to AOE.]) |
| | 15. | Alex Behrend's Application to the Dharma Bridge Program (authenticated in McCord Declaration at p. 3, ¶ 20 [Ex. 2 to AOE.]) |
| | 16. | Alex Behrend's Acknowledgement of Receipt of San Francisco Zen Center Residents' Handbook (authenticated in McCord Declaration at p. 3, ¶ 22 [Ex. 2 to AOE.]) |
| | 17. | Email chain between Alex Behrend, Victoria Austin, and Rev. David Zimmerman (then Tanto (Head of Practice) on September 12 and 13, 2017 (authenticated in McCord Declaration at p. 3, ¶ 23 [Ex. 2 to AOE.]) |
| | 18. | Email from Alex Behrend to Victoria Austin, Rev. David Zimmerman (then Tanto (Head of Practice), and T. Lien Shutt on June 10, 2018 (authenticated in McCord Declaration at p. 3, ¶ 23 [Ex. 2 to AOE.]) |
| | 19. | Email from Rev. David Zimmerman (then Tanto (Head of Practice)) to San Francisco Zen Center Residents Listserv on February 16, 2017 (authenticated in McCord Declaration at p. 3, ¶ 23 [Ex. 2 to AOE.]) |
| | 20. | Email chain between Rev. David Zimmerman (then Tanto (Head of Practice)), Work Practice Apprentices, and Annie Obermeyer on February 24 and March 1, 2017 (authenticated in McCord Declaration at p. 3, ¶ 23 [Ex. 2 to AOE.]) |
| | 21. | Email from Diego Miglioli (then Ino (Head of the Meditation Hall)) to Alex Behrend and others on December 1, 2017 (authenticated in McCord Declaration at p. 3, ¶ 23 [Ex. 2 to AOE.]) |
| | 22. | Email chain between Alex Behrend, Kim Kögen Hart (then Ino (Head of the Meditation Hall), Rev. David Zimmerman (then Tanto (Head of Practice), and others on January 27 and 29, 2017 (authenticated in McCord Declaration at p. 3, ¶ 23 [Ex. 2 to AOE.]) |
| | 23. | Email chain between Alex Behrend, Eli Brown-Stevenson (then Director of Work Practice), Diego Miglioi (then Ino (Head of the Meditation Hall), and others on January 31 and February 1, 2018 (authenticated in McCord Declaration at p. 3, ¶ 23 [Ex. 2 to AOE.]) |

DEFENDANTS' APPENDIX OF SUPPORTING EVIDENCE
-2-
Case No. 3:21-cv-01905-JSC

| 24. | Email from San Francisco Zen Center Practice Committee to Alex Behrend on March 7, 2019 (authenticated in McCord Declaration at p. 3, ¶ 23 [Ex. 2 to AOE.]) |
|---|---|
| 25. | U.S. Equal Employment Opportunity Commission Notice of Charge of Discrimination filed by Alex Behrend, EEOC Charge No. 550-2019-01657 (authenticated in McCord Declaration at p. 3, ¶ 24 [Ex. 2 to AOE.]) |
| 26. | Notice of Dismissal and Notice of Rights from U.S. Equal Employment Opportunity Commission Regarding EEOC Charge No. 550-2019-01657 (authenticated in McCord Declaration at p. 3, ¶ 24 [Ex. 2 to AOE.]) |
| 27. | Complaint |
| 28. | Screenshots from San Francisco Zen Center's Website (www.sfzc.org) of Mission Statement, Guest Student Program at City Center, and Work Practice Apprentice Program at City Center (authenticated in McCord Declaration at p. 2, ¶ 14 [Ex. 2 to AOE.]) |
| 29. | Screenshot of Alex Behrend's public Facebook page |

DATED: November 23, 2022

**FOLEY & LARDNER LLP**
Eileen R. Ridley
Evan L. Hamling
Sara Alexis Levine Abarbanel

*/s/ Eileen R. Ridley*
Eileen R. Ridley
Attorneys for Defendants SAN FRANCISCO ZEN
CENTER, INC.; SAN FRANCISCO EVERYDAY,
INC.; SAN FRANCISCO THIRD WAY, INC.; THE
ZEN FOUNDATION

DEFENDANTS' APPENDIX OF SUPPORTING EVIDENCE
-3-
Case No. 3:21-cv-01905-JSC

# EXHIBIT 1

EILEEN R. RIDLEY, CA Bar No. 151735
    eridley@foley.com
EVAN L. HAMLING, CA Bar No. 339578
    ehamling@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET
SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:   415.434.4507

SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
    sabarbanel@foley.com
**FOLEY & LARDNER LLP**
11988 EL CAMINO REAL, SUITE 400
SAN DIEGO, CA 92130-2594
TELEPHONE:  858.847.6700
FACSIMILE:   858.792.6773

Attorneys for Defendants SAN
FRANCISCO ZEN CENTER, INC.; SAN
FRANCISCO EVERYDAY, INC.; SAN
FRANCISCO THIRD WAY, INC.; THE
ZEN FOUNDATION

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ALEXANDER BEHREND, | Case No. 3:21-cv-01905-JSC |
| Plaintiff, | **DECLARATION OF EILEEN R. RIDLEY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| SAN FRANCISCO ZEN CENTER, INC.; SAN FRANCISCO EVERYDAY, INC.; SAN FRANCISCO THIRD WAY, INC.; THE ZEN FOUNDATION, | Date: February 2, 2023<br>Time: 9:00 a.m.<br>Place: Courtroom 8 (via Zoom) |
| Defendants. | Judge: Hon. Jacqueline Scott Corley |

DECLARATION OF EILEEN R. RIDLEY IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
Case No. 3:21-cv-01905-JSC

4853-9103-3151.1

31

1    I, Eileen R. Ridley, declare as follows:

2        1.       I am licensed to practice law in the State of California and I am an attorney with Foley &

3    Lardner LLP, counsel of record for Defendants Francisco Zen Center, Inc.; San Francisco Everyday,

4    Inc.; San Francisco Third Way, Inc.; The Zen Foundation ("Defendants") in this action. I have personal

5    knowledge of the facts set forth in this declaration and, if called as a witness, could and would

6    competently testify thereto. I make this Declaration in support of Defendant's Motion for Summary

7    Judgment.

8        2.       On October 17, 2022, I took the deposition of Plaintiff Alexander Behrend.  Following

9    that deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed,

10   and maintained a copy of that transcript in connection with this matter.  A true and correct copy of

11   excerpts from the transcript of Plaintiff's deposition is attached hereto as **Exhibit 3**.

12       3.       On October 18, 2022, Plaintiff's counsel deposed Barbara Machtinger.  Following that

13   deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed, and

14   maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts

15   from the transcript of Plaintiff's deposition is attached hereto as **Exhibit 4**.

16       4.       On October 21, 2022, Plaintiff's counsel deposed Seigen Johnson.  Following that

17   deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed, and

18   maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts

19   from the transcript of Plaintiff's deposition is attached hereto as **Exhibit 5**.

20       5.       On October 26, 2022, Plaintiff's counsel deposed Mary Stares.  Following that

21   deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed, and

22   maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts

23   from the transcript of Plaintiff's deposition is attached hereto as **Exhibit 6**.

24       6.       On October 28, 2022, Plaintiff's counsel deposed Defendant San Francisco Zen Center's

25   Chief Financial Officer Michael McCord.  Following that deposition, I received a certified copy of the

26   transcript of that deposition, and I have read, reviewed, and maintained a copy of that transcript in

27   connection with this matter.  A true and correct copy of excerpts from the transcript of Plaintiff's

28   deposition is attached hereto as **Exhibit 7**.

DECLARATION OF EILEEN R. RIDLEY IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
-1-                                    Case No. 3:21-cv-01905-JSC

1    I declare, under penalty of perjury under the laws of the State of California, that the foregoing is
2    true and correct.
3        Executed this 23rd day of November, 2022, in San Francisco, California.
4
5
6                                        /s/ Eileen R. Ridley
7                                        EILEEN R. RIDLEY
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF EILEEN R. RIDLEY IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
-2-                                    Case No. 3:21-cv-01905-JSC

4853-9103-3151.1

# EXHIBIT 2

EILEEN R. RIDLEY, CA Bar No. 151735
    eridley@foley.com
EVAN L. HAMLING, CA Bar No. 339578
    ehamling@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET
SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:    415.434.4507

SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
    sabarbanel@foley.com
**FOLEY & LARDNER LLP**
11988 EL CAMINO REAL, SUITE 400
SAN DIEGO, CA 92130-2594
TELEPHONE:  858.847.6700
FACSIMILE:    858.792.6773

Attorneys for Defendants SAN
FRANCISCO ZEN CENTER, INC.; SAN
FRANCISCO EVERYDAY, INC.; SAN
FRANCISCO THIRD WAY, INC.; THE
ZEN FOUNDATION

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ALEXANDER BEHREND,<br><br>                                Plaintiff,<br><br>            vs.<br><br>SAN FRANCISCO ZEN CENTER, INC.;<br>SAN FRANCISCO EVERYDAY, INC.; SAN<br>FRANCISCO THIRD WAY, INC.; THE ZEN<br>FOUNDATION,<br><br>Defendants. | Case No. 3:21-cv-01905-JSC<br><br>**DECLARATION OF MICHAEL MCCORD<br>IN SUPPORT OF DEFENDANTS' MOTION<br>FOR SUMMARY JUDGMENT**<br><br>Date: February 2, 2023<br>Time: 9:00 a.m.<br>Place: Courtroom 8 (via Zoom)<br><br>Judge: Hon. Jacqueline Scott Corley |

DECLARATION OF MICHAEL MCCORD IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
Case No. 3:21-cv-01905-JSC

4888-3766-5855.2

I, Michael McCord, declare as follows:

1.     I have been a practicing Zen Buddhist since 2007. I am both lay and priest ordained.

2.     I have been a full-time practicing monk at Defendant San Francisco Zen Center, Inc. ("SFZC") since 2009.  I have been in religious training positions as a Work Practice Apprentice (approximately 2009-2011) and as a member of staff (2011-present).

3.     I am currently the Chief Financial Officer at SFZC.  I have held this position since June 2021.  I was previously the Director of SFZC from November 2019 through 2021.

4.     Based on my years of practice as a Zen Buddhist, I am familiar with the history of Zen Buddhism.  Soto Zen Buddhism, which is the form of Zen Buddhism practiced at SFZC, is a sect of Buddhism developed in the Thirteenth Century in Japan.

5.     Based on my years of experience as a Zen Buddhist, I am familiar with the practice of Zen Buddhism. Soto Zen Buddhism is the form of Zen Buddhism practiced at SFZC, and practice here mirrors that around the world.  Soto Zen practice involves bringing one's practice wholeheartedly into the present moment, into the normal activity of one's daily life. Formal Zen practice includes many formal ceremonial activities.  An integral part of Zen Buddhist practice is "work practice."  Work itself is an essential component of Zen training and is indistinguishable from other forms of practice.

6.     I have learned through my years in residency and as a senior staff member of SFZC about its history.  SFZC was founded in 1962, and is now the largest Soto Zen Buddhist church in North America.

7.     SFZC is registered as a nonprofit religious organization, and is certified as a religious training institution by the California Bureau of Private Postsecondary Education.

8.     SFZC is made up of three training temples—City Center (also known as Beginner's Mind Temple), Tassajara Mountain Center, and Green Gulch Farm

9.     SFZC's Articles of Incorporation identify that it is a nonprofit religious organization.  A true and correct copy of the Articles of Incorporation are attached hereto as **Exhibit 8**.

10.     SFZC is a religious training institution, and offers several different types of programs for individuals interested in learning about and training in Zen Buddhism.  While some programs are available for those who live outside the three temples, SFZC has residential training programs, those

DECLARATION OF MICHAEL MCCORD IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 3:21-cv-01905-JSC

-1-

1  who come to be in residence at an SFZC temple full time live as monks.

2      11.      Those who live and train in residence at SFZC are also subject to the Shingi, the Pure

3  Standards, for residential living.  These include rules for residential practitioners regarding their

4  commitment to formal practice and work practice.  A true and correct copy of the Shingi is attached

5  hereto as **Exhibit 9**.

6      12.      In each of the residential training programs (guest student, WPA, and staff), all trainees

7  participate in work practice, which is an essential part of Zen Training.  Attached hereto as **Exhibit 10** is

8  a true and correct copy of a document written by an SFZC practitioner about the importance of work

9  practice in the practice of Zen Buddhism.

10     13.      Those who join one of SFZC's residential training programs are subject to the rules of the

11  Residents' Handbook.  A true and correct copy of the Residents' Handbook is attached hereto as

12  **Exhibit 11**.

13     14.      Practitioners who are interested in residential training may join SFZC temporarily as

14  residents through the guest student program.  Guest students stay 2-6 weeks, and follow the same

15  schedule as other practitioners in residence, including formal and work practice.  Information about the

16  guest student program is available on the SFZC website.  A true and correct copy of a screenshot of the

17  SFZC website about guest students, as well as a screenshot of the SFZC Mission Statement and the

18  WPA program, is attached hereto as **Exhibit 28**.

19     15.      After at least a 2 week guest student stay, individuals may apply to be Work Practice

20  Apprentices ("WPA"), an entry-level Zen training program that lasts 2-3 years.  WPAs follow a strict

21  practice schedule of formal and work practice.  A true and correct copy of WPA policies and practices is

22  attached hereto as **Exhibit 12**.

23     16.      Following training as a WPA, individuals may apply to practice in a position of "Staff,"

24  which is a continuation of Zen training.

25     17.      Individuals who work outside of the temple may participate in the Dharma Bridge

26  program (formerly known as Room, Board, Tuition program).  A true and correct copy of the Dharma

27  Bridge program policies are attached hereto as **Exhibit 13**.

28     18.      I am familiar with Plaintiff Alexander Behrend's application to join SFZC, his time at

DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFF'S SECOND SET OF RFPS
-2-
Case No. 3:21-cv-01905-JSC

1   SFZC, and his departure from SFZC.

2        19.    Plaintiff applied to the WPA program in December 2016.  A true and correct copy of

3   Plaintiff's application to be a WPA is attached hereto as **Exhibit 14**.

4        20.    Plaintiff applied to the Dharma Bridge program in November 2018.  A true and correct

5   copy of Plaintiff's application to the Dharma Bridge program is attached hereto as **Exhibit 15**.

6        21.    Plaintiff remained in the Dharma Bridge program until January 2019, when the SFZC

7   Practice Committee made a decision to end Plaintiff's participation in the program. Plaintiff remained in

8   residence at City Center until fall 2019.

9        22.    When Plaintiff entered residency at SDZC, he signed a document stating that he received

10  the information in the Residents' Handbook and that he would comply with the guidelines stated therein.

11  A true and correct copy of Plaintiff's document acknowledgement of receipt is attached hereto as

12  **Exhibit 16**.

13       23.    SFZC saves emails for the domain @sfzc.org in a cloud server.  SFZC does not have a

14  policy to delete any emails, and emails are kept in the usual course of business.  Attached hereto as

15  **Exhibits 17-24** are true and correct copies of emails stored on the SFZC server.

16       24.    SFZC received a copy of Plaintiff's Charge of Discrimination filed on July 19, 2019 with

17  the U.S. Equal Employment Opportunity Commission ("EEOC") alleging a violation of the Americans

18  with Disabilities Act of 1990 ("ADA"). SFZC also received a copy of the EEOC's dismissal of

19  Plaintiff's charge.  True and correct copies of Plaintiff's Charge of Discrimination and notice of

20  dismissal are attached hereto as **Exhibit 25** and **Exhibit 26**.

21       I declare, under penalty of perjury under the laws of the State of California, that the foregoing is

22  true and correct.

23       Executed this 23rd day of November, 2022, in San Francisco, California.

24

25

26

27

28
                                            MICHAEL MCCORD

    DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFF'S SECOND SET OF RFPS
                         -3-            Case No. 3:21-cv-01905-JSC

# Exhibit 3

Deposition of

# Alexander S. Behrend

October 17, 2022

Behrend

vs.

San Francisco Zen Center, Inc.



www.aptusCR.com | 866.999.8310

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4   ALEXANDER BEHREND,          )
                                 )
 5            Plaintiff,         )
                                 )
 6   vs.                         ) Case No.2:21-cv-01905-JSC
                                 )
 7   SAN FRANCISCO ZEN CENTER,   )
     INC.; SAN FRANCISCO         )
 8   EVERYDAY, INC.; SAN         )
     FRANCISCO THIRD WAY, INC.;  )
 9   THE ZEN FOUNDATION,         )
                                 )
10            Defendants.        )
                                 )
11   _____)

12

13

14   REMOTE VIDEOCONFERENCE DEPOSITION OF ALEXANDER S. BEHREND

15          Monday, October 17, 2022, at 9:09 a.m.

16

17

18

19

20

21

22

23   Reported by:
     Alyssa Pacheco
24   Stenographic Reporter
     CSR No. 13391
25   Job No. 10109190
```

```
 1                          APPEARANCES
             (All parties appeared remotely via Zoom.)
 2

 3    For the Plaintiff/Witness:

 4    GIRARD SHARP LLP
      BY:  KYLE QUACKENBUSH, Attorney at Law
 5    601 California Steet, Suite 1400
      San Francisco, CA  94108
 6    415-544-6447
      kquackenbush@girardsharp.com
 7

 8
      For the Defendants:
 9
      FOLEY & LARDNER LLP
10    BY:  EILEEN RIDLEY & EVAN HAMLING, Attorneys at Law
      555 California Street, Suite 1700
11    San Francisco, CA  94104
      415-434-4484
12    eridley@foley.com
      ehamling@foley.com
13

14
      ALSO PRESENT:  VINCENT TAISAGUE, Monitor, Aptus Court
15                    Reporting

16

17                        ---oOo---

18

19

20

21

22

23

24

25
```

Alexander S. Behrend

**Behrend vs.**
San Francisco Zen Center, Inc.

```
 1                          INDEX

 2    Examination                                     Page

 3    EXAMINATION BY ATTORNEY RIDLEY                    5

 4    EXAMINATION BY ATTORNEY QUACKENBUSH             144

 5

 6                         ---oOo---

 7

 8                         EXHIBITS

 9    No.               Description                    ID

10    Exhibit 1  Notice of Deposition                  17

11    Exhibit 2  One Page of Facebook Profile          65

12    Exhibit 3  WPA Application                       67

13    Exhibit 4  WPA Policies                          73

14    Exhibit 5  Signature Page for Residents' Handbook  81

15    Exhibit 6  Residents' Handbook                   83

16    Exhibit 7  Shingi Pure Standards                101

17    Exhibit 8  Email Re Nature of Buddha            106

18    Exhibit 9  Sept 2017 Email re Dharma            112

19    Exhibit 10 June 10, 2018 Email                  116

20    Exhibit 11 WPA Weekly Studies Email             118

21    Exhibit 12 Email re WPA Training                121

22    Exhibit 13 Fukodu Instructions Email            125

23    Exhibit 14 January 27, 2017 Email               127

24    Exhibit 15 Densho Email                         129

25    Exhibit 16 Email re Leading Zendo Forms         130
```

```
1                        EXHIBITS (CONT'D)

2      No.                 Description                      ID

3      Exhibit 17 Work as Practice                         134

4      Exhibit 18 February 17 Email                        135

5      Exhibit 19 December 2018 Tenken                     136

6      Exhibit 20 Email re Choosing Shika Crew Work Over   138

7                 Class

8      Exhibit 21 DB Program Application                   139

9      Exhibit 22 Dharma Bridge Policy                     143

10     Exhibit 23 San Francisco Zen Center Facebook Page   146

11

12                        ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Behrend vs.
Alexander S. Behrend                                    San Francisco Zen Center, Inc.

```
 1    Buddhism?
 2       A.  Yes.
 3           ATTORNEY RIDLEY:  Do you mind if we take just a
 4    five-minute break?  There's somebody knocking on my door,
 5    so I need to deal with that.
 6           ATTORNEY QUACKENBUSH:  Sure.
 7           ATTORNEY RIDLEY:  Okay.
 8           ATTORNEY QUACKENBUSH:  Sure.
 9           ATTORNEY RIDLEY:  Thanks.  Let's just take a
10    five-minute break.
11           (Break in proceedings.)
12    BY ATTORNEY RIDLEY:
13       Q.  Sir, I know we took a quick break.  You understand
14    that you're still under oath, correct?
15       A.  Yes.
16       Q.  All right.  Sir, have you -- have you ever
17    represented yourself as a Zen Buddhist?
18           ATTORNEY QUACKENBUSH:  Object to form.  Vague,
19    ambiguous.
20           THE WITNESS:  Yes.
21    BY ATTORNEY RIDLEY:
22       Q.  Okay.  And when did you do that?
23       A.  I don't remember.
24       Q.  And to whom did you do that?
25       A.  I don't remember.
```

1    Zen Center that you consider yourself a Zen Buddhist?

2        A.  I don't remember.

3        Q.  When you say you don't remember, you don't

4    remember one way or the other whether you did or you

5    didn't; is that right?

6            ATTORNEY QUACKENBUSH:  Object to form.

7            THE WITNESS:  I don't remember one way or the

8    other.

9    BY ATTORNEY RIDLEY:

10       Q.  Okay.  When did you start becoming involved with

11   San Francisco Zen Center?

12           ATTORNEY QUACKENBUSH:  Object to form.  Vague,

13   ambiguous.

14           THE WITNESS:  I believe the first time I visited

15   San Francisco Zen Center was in the summer of 2014.

16   BY ATTORNEY RIDLEY:

17       Q.  And what did you do in the summer of 2014?

18       A.  What did I do in the summer of 2014?

19       Q.  Right.  When you first visited the SF Zen Center.

20       A.  I volunteered with their food outreach program.

21       Q.  And what did that entail?

22       A.  Making food and serving -- making food and serving

23   it to people at, I believe, homeless shelters.

24       Q.  And was that a single event?

25       A.  No.

Alexander S. Behrend

**Behrend vs.**
**San Francisco Zen Center, Inc.**

1    Q.   How frequently did you do that in the summer of

2    2014?

3    A.   Three, four, five times approximately.

4    Q.   Okay.  And this was at San Francisco Zen Center?

5    A.   We made the food at San Francisco Zen Center.

6    Then we took it to a shelter.

7    Q.   Okay.  In 2014, were you participating in any

8    religious activities at San Francisco Zen Center?

9    ATTORNEY QUACKENBUSH:  Object to form.  Vague,

10   ambiguous.

11   THE WITNESS:  Could you repeat the question,

12   please.

13   ATTORNEY RIDLEY:  Would the court reporter please

14   re-read it.

15   (Whereupon the requested portion was read back.)

16   THE WITNESS:  I didn't consider activities that I

17   participated in in 2014 to be religious.

18   BY ATTORNEY RIDLEY:

19   Q.   Okay.  Where were you living in 2014?

20   A.   Oh, what's -- in the -- in the Castro

21   neighborhood, and I can see the place, but I can't

22   remember the street right now.

23   Q.   Okay.  And where were you working at the time, if

24   you were working?

25   A.   I -- I don't remember.

1    with the San Francisco Zen Center in the summer of 2014,

2    did you have any other involvement with San Francisco Zen

3    Center that year?

4           ATTORNEY QUACKENBUSH:  Object to form.

5    Mischaracterized his prior testimony.

6           THE WITNESS:  Could you repeat the question,

7    please.

8           ATTORNEY RIDLEY:  Would the court reporter please

9    re-read it.

10          (Whereupon the requested portion was read back.)

11          THE WITNESS:  I don't know.

12   BY ATTORNEY RIDLEY:

13      Q.   Okay.  Do you recall having any involvement with

14   San Francisco Zen Center in 2015?

15      A.   Yes.

16      Q.   What involvement do you recall having with San

17   Francisco Zen Center in 2015?

18      A.   I would go to the -- I would intermittently go to

19   the Wednesday and Saturday lectures.  I believe I still

20   volunteered with the food outreach program, and I started

21   participating with a group of people who didn't live or

22   work at San Francisco Zen Center called Saturday Sangha,

23   and I attended meditation.

24      Q.   Anything else?

25      A.   That's all I remember for 2015.

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1    Q.  Okay.  When you say "Saturday Sangha," how do you

2    spell "sangha"?

3    A.  S-A-N-G-H-A.

4    Q.  Okay.  Do you know -- what does it mean?  What

5    is -- what is sangha?

6    A.  I understand it to mean congregation.

7    Q.  Okay.  Did you -- do you recall what Wednesday and

8    Saturday lectures you attended to 2015?

9    A.  I don't remember the specific ones.

10   Q.  Do you generally recall what the topics were?

11   A.  I don't remember generally even the topics.

12   Q.  Okay.  Do you know whether or not they concerned

13   the practice of Zen Buddhism?

14   A.  Could you repeat that question, please.

15        ATTORNEY RIDLEY:  Could the court reporter please

16   re-read it.

17        (Whereupon the requested portion was read back.)

18        THE WITNESS:  No, I don't know if they concerned

19   the practice of Zen Buddhism.

20   BY ATTORNEY RIDLEY:

21   Q.  You don't know one way or the other, correct?

22   A.  Correct.

23   Q.  Okay.  And then you -- with regard to Saturday

24   Sangha, you said you were participating with a group of

25   people who didn't live or work at SF Zen Center; is that

Page 28

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1    correct?

2        A.   Yes.

3        Q.   Okay.  And what did you do at Saturday Sangha?

4        A.   Mostly prepare lunch and then sometimes help out

5    with meditation.  In 2015, usually it would have been,

6    like, watching the door, like, when people came and

7    entered the actual building, not entered the meditation

8    room.  And then attend the talk.  And then afterwards,

9    you know, like, four to eight of us would eat lunch

10   together and talk about -- in 2015, talk about reading

11   from a book by Pema Chödrön.

12       Q.   Okay.  When you said attend the -- was it

13   bock (phonetic)?  Is that what you said?

14       A.   Bock?

15       Q.   Yeah.  You said watching the door and then

16   attending the -- I -- I heard bock.  I didn't -- what was

17   it?

18       A.   Talk.

19       Q.   Attending the talk.  I see.  What's the talk?

20       A.   The Dharma talk.  They refer to it as -- San

21   Francisco Zen Center refers to it as the Dharma talk.

22       Q.   I see.  And what is the Dharma talk?

23       A.   It's a lecture.  It seemed to me like a -- a

24   lecture, someone would -- yeah, a lecture.

25       Q.   Okay.  Did it have to do with Zen Buddhism?

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1   I'm asking, no, you don't know, or do you know one way or

2   the other?

3        A.  No, I don't know one way or the other.

4        Q.  Was there any result of the one-on-one?

5             ATTORNEY QUACKENBUSH:  Object to form.  Vague,

6   ambiguous.

7             THE WITNESS:  I -- I liked her, and I continued to

8   participate at San Francisco Zen Center.

9   BY ATTORNEY RIDLEY:

10       Q.  Okay.  Do you recall any other activities that you

11  had with SF Zen Center in 2015?

12       A.  No, I don't recall other activities other than --

13       Q.  Okay.

14       A.  -- what we've discussed.

15       Q.  Okay.

16       A.  In 2015.

17       Q.  When did you apply to become a guest student at SF

18  Zen Center?

19       A.  The summer or fall of 2016.

20       Q.  Prior to applying to be a guest student, do you

21  recall doing any activities with SF Zen Center?

22       A.  Yes.

23       Q.  Okay.  What activities do you recall participating

24  in prior to applying to become a guest student?

25       A.  Meditation, Saturday Sangha, going to lectures.  I

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1      Q.  And how many?

2      A.  I don't remember the number.

3      Q.  Do you have an estimate?

4      A.  I estimate two or three.

5      Q.  Okay.  Did you attend sesshin in 2018?

6      A.  I don't remember.

7      Q.  Do you have an estimate?

8          ATTORNEY QUACKENBUSH:  Objection.  He said, "I

9   don't remember," and you're asking for an estimate.

10   What's the estimate?

11          ATTORNEY RIDLEY:  Whether or not he recalls any

12   time that he did so.

13          ATTORNEY QUACKENBUSH:  See if you could just

14   rephrase the question, Counsel.

15          ATTORNEY RIDLEY:  Sure.

16      Q.  In 2018, do you recall any time where you attended

17   sesshin at SF Zen Center?

18      A.  I don't remember for 2018.

19      Q.  You don't remember one way or the other, correct?

20      A.  Yes.  For 2018.

21      Q.  How about for 2019?

22      A.  I did not do any sesshins in 2019.

23      Q.  When did you ultimately leave SF Zen Center?

24      A.  August or September of 2019 is what I believe.

25      Q.  Okay.  You understand SF Zen Center to be a

**Alexander S. Behrend**

Behrend vs.
San Francisco Zen Center, Inc.

1    religious organization, correct?

2            ATTORNEY QUACKENBUSH:   Object to form.

3            THE WITNESS:   Yes.

4    BY ATTORNEY RIDLEY:

5        Q.   Okay.   Why did -- I'll go back to 2016.   Why did

6    you decide to apply --

7        A.   One five or one six?

8        Q.   One six.

9        A.   Okay.   Thank you.

10       Q.   Yeah, no problem.

11           We were talking about your applying to become a

12   guest student at SF Zen Center.   Do you recall?   What

13   did --

14       A.   Do I recall what?

15       Q.   Hang on.   In 2016, why did you decide to apply to

16   be a guest student at SF Zen Center?

17       A.   I needed a place to live.   I had lost my

18   apartment.   I had lost my job.   So it seemed like a very

19   interesting thing to do.   They were all my friends, and I

20   was interested in Zen Buddhism.

21       Q.   And why did you lose your job and your apartment?

22       A.   The job was a temp job, and they found a permanent

23   replacement for me.

24           The apartment, the master tenant was moving in his

25   son.

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1       Q.   And the lectures on Wednesday and Saturday, those
2    are the Dharma lectures?

3       A.   Yes.

4       Q.   And the work in the afternoon was from what time
5    to what time?

6       A.   Roughly, like, 1:30 to 3:30.

7            There was also a weekly meeting of the guest
8    students with the work leader, was his title.

9       Q.   So at this time you were a resident at City
10   Center, correct?

11      A.   I lived at San Francisco Zen Center as a guest
12   student.

13      Q.   At the City Center?

14      A.   Yes.

15      Q.   And where's that located?

16      A.   300 Page Street.

17      Q.   Did your participation as a guest student involve
18   religious ceremonies?

19           (Reporter clarification.)

20           ATTORNEY QUACKENBUSH:  Yeah.  Object to form.

21           ATTORNEY RIDLEY:  Start it over again.

22      Q.   When you were participating as a guest student,
23   did you participate in any religious ceremonies?

24           ATTORNEY QUACKENBUSH:  Object to form.

25           THE WITNESS:  Yes.

Page 54

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1    BY ATTORNEY RIDLEY:

2         Q.   What religious ceremonies did you participate in?

3         A.   There was service Tuesdays through Saturdays.

4    There was a -- like, we bowed to an altar at the start of

5    work circle.  I mean, I don't know if that's a ceremony.

6    And there were other ceremonies performed at San

7    Francisco Zen Center.  I don't know if those were

8    performed during the time I was a guest student, like,

9    monthly -- I forget, like -- I forget all the ceremonies

10   and I don't know if they were performed specifically when

11   I was -- during that, you know, guest student period.

12        Q.   What ceremonies are you referring to?

13        A.   There would be ceremonies at an altar that -- I

14   think called a kaisando, K-A-I-S-A-N-D-O.  There were --

15   we would bow to an altar.  If I -- if I was assigned to

16   the kitchen during my time as a guest student, you know,

17   we would bow to an altar before we started the workday,

18   and we'd recite out of a Zen scripture, the name of which

19   is escaping me right now.  Actually, we would -- we would

20   recite out of something called the Tenzo Kyokun.

21        Q.   Can you spell that?

22        A.   I think that's -- I think it's spelled T-E-N-Z-O

23   K-Y-U-K-E-N [sic].

24        Q.   Any other religious ceremonies you were thinking

25   of?

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1      A.   That's what I'm remembering now.

2      Q.   Okay.   And the meditations that you were

3   attending, did you consider those to be religious

4   activities related to Zen Buddhism?

5      A.   At that point, yes.

6      Q.   And how about the Dharma talks?   Did you

7   understand those talks to relate to the practice of Zen

8   Buddhism?

9      A.   Yes.

10      Q.   Okay.   Previously -- I want to follow up on

11   something you mentioned before and I failed to follow up

12   on.   Previously you talked about a doanryo.   Do you

13   remember that testimony?

14      A.   Yes.

15      Q.   What is doanryo?

16      A.   That's the group of people who administer the

17   meditation.   So one person would keep time.   One person

18   would watch the door as people came in and keep an eye on

19   the coat closet.   One person would strike this wooden

20   block called the han, H-A-N, letting know -- letting

21   people know that meditation was starting in -- in a

22   number of -- you know, soon.   Then after meditation --

23   not everyone in the doanryo participated in the

24   evening -- in the evenings after the meditation, there

25   was a short service, and some people in the doanryo would

**Alexander S. Behrend**                                   Behrend vs.
                                             San Francisco Zen Center, Inc.

1    participate in the service.

2         Oh, another person in the doanryo would carry

3    dried flowers and follow the priest who would, at the

4    start of meditation, go to the altar and then sprinkle

5    the -- like, sprinkle the dried flowers in the -- in some

6    water on the altar.

7         Q.  Anything else?

8         A.  There was one person -- I never did this job --

9    that they called a kokyo.  I think it's K-O-K-Y-O.  And

10   they would, you know, kind of sing, chant something

11   during the short service right after meditation.

12        Q.  So I take it you did participate in the doanryo?

13        A.  Yes.  I participated in the evening doanryo and

14   then, like, in the morning doanryo when I started living

15   there.

16        Q.  Okay.  Did you participate in the doanryo in 2016?

17        A.  Yes.

18        Q.  Did you do so in 2017?

19        A.  Yes.

20        Q.  How about 2018?

21        A.  Yes.

22        Q.  Do you recall how many times you did it in 2016?

23        A.  No.

24        Q.  Do you recall how many times you did it in 2017?

25        A.  I -- no.

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1      Q.   And you applied to become a work practice
2   apprentice, correct?
3      A.   Yes.
4      Q.   You understood the position was literally named
5   "work practice apprentice," correct?
6      A.   Yes.
7      Q.   When did you decide to apply to be a work practice
8   apprentice?
9      A.   I -- so I -- I decided to apply for the work
10   practice apprentice program in the -- you know, during
11   that conversation with David Zimmerman, even before I
12   became a guest student.
13      Q.   So you decided you were going to apply to be a
14   work practice apprentice some time in the late 2016?
15      A.   Yeah, like, summer or fall 2016.
16      Q.   Okay.  What -- why were you applying to be a work
17   practice apprentice?
18      A.   Because I needed a place to live, I liked the
19   work, and I was interested in Zen Buddhism.
20      Q.   When you were applying, did you understand that in
21   applying to be a work practice apprentice, part of the
22   apprenticeship regarding Zen Buddhism would include
23   performing work?
24      A.   Could you repeat the question, please.
25          ATTORNEY RIDLEY:   Could I have it re-read, please.

Page 63

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

```
 1             (Whereupon the requested portion was read back.)

 2             THE WITNESS:  Yes.

 3    BY ATTORNEY RIDLEY:

 4       Q.  Okay.  When you joined as a work practice

 5    apprentice, did you have any goal of being ordained as a

 6    priest in the Zen Buddhism?

 7       A.  When I joined, I don't know.

 8       Q.  Did you tell anyone that you had the goal of being

 9    ordained?

10             ATTORNEY QUACKENBUSH:  Counsel, are you referring

11    to when he joined?

12             ATTORNEY RIDLEY:  When he joined as a work

13    practice apprentice.

14             THE WITNESS:  I don't recall one way or the other

15    when I join -- saying -- communicating that when I

16    joined.

17    BY ATTORNEY RIDLEY:

18       Q.  Do you recall communicating when you were joining

19    or applying for the work practice apprenticeship that you

20    had a goal of deepening your religious practice?

21       A.  Yes, I recall that.

22       Q.  And the deepening of the religious practice was

23    Zen Buddhism, correct?

24       A.  Yes.

25       Q.  What did being an apprentice mean to you?
```

Page 64

**Alexander S. Behrend**                                        **Behrend vs.**
                                                   **San Francisco Zen Center, Inc.**

```
 1    BY ATTORNEY RIDLEY:

 2        Q.  And you received that document, too, right?

 3            ATTORNEY QUACKENBUSH:  Yes.

 4            THE WITNESS:  Yes.

 5            ATTORNEY RIDLEY:  All right.  Just to be clear,

 6    sir -- we should be back on the record.

 7            (Reporter clarification.)

 8    BY ATTORNEY RIDLEY:

 9        Q.  Sir, do you recognize what's been marked as

10    Exhibit 3?

11        A.  Yes.

12        Q.  What do you recognize it as?

13        A.  My application to the WPA Program.

14        Q.  And the WPA Program is also called the work

15    practice program, correct?  Work practice --

16        A.  Yes.

17        Q.  -- apprentice program?

18        A.  Yes.

19        Q.  Okay.  And did you fill this out?

20        A.  Yes.

21        Q.  And was everything that you put in this

22    application truthful?

23        A.  Yes.

24        Q.  Okay.  So on the first page at the bottom of the

25    first page, Bates stamp 76, it says, "Have you practiced
```

**Alexander S. Behrend**

Behrend vs.
San Francisco Zen Center, Inc.

1    in residence at Zen Center before?  If so, when and where

2    did you reside?"  And you gave dates of November 13,

3    2016, to December 22nd, 2016, and you say, "I've been a

4    guest student during this time," correct?

5        A.  Yes.

6        Q.  And when they ask, "Have you practiced in

7    residence?" the practice is practice Zen Buddhism,

8    correct?

9        A.  Yes.

10       Q.  Okay.  Okay.  On the second page, Question 1 asks,

11   "Your interest in Zen and in participating in the WPA

12   Program at this time.  What are your plans for using your

13   earned practice period credits?"

14       What did you understand to be a earned practice

15   period credit?

16       A.  At the time?  I don't remember what I understood

17   that to be at the time.

18       Q.  Okay.  In the first paragraph you talk about your

19   participation since 2014, and at the last sentence it

20   says, "My time as a guest student has been wonderful and

21   the Rohatsu sesshin, my first seven-day session, was an

22   amazing experience."

23       What made your time as a guest student wonderful?

24       A.  Living there, working in the kitchen, getting to

25   spend lots of time with people I'd become friends with

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1    and gotten to know as a -- as a nonresident.  Meditation

2    was really good for me physiologically.  The -- the quiet

3    and calm nature of the place was really good for me.  I

4    really liked the food.  Yeah, I'll leave it at that.

5         Q.  Okay.  And your time as a guest student involved

6    religious practice, too, correct?

7              ATTORNEY QUACKENBUSH:  Object to form.

8              THE WITNESS:  Yes.

9    BY ATTORNEY RIDLEY:

10        Q.  In fact, the last paragraph -- last sentence of

11   that paragraph says, "The more I sit and the more I

12   practice, the more positive impact I'm experiencing in my

13   life," correct?

14        A.  Yes, that's what that sentence says.

15        Q.  When you say "the more I sit," do you mean

16   meditation?

17        A.  Yes.

18        Q.  And when you say "the more I practice," do you

19   mean practice Zen Buddhism?

20        A.  I -- I mean Zen Buddhism and sitting meditation,

21   yes.

22        Q.  Okay.  Next paragraph says, "I would like to do a

23   work practice apprenticeship to deepen my practice and

24   continue working with how practice is helping me grow and

25   thrive."

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1            You wrote that, correct?

2        A.  Yes.

3        Q.  You didn't say you wanted to apply to work

4    practice apprenticeship in order to have housing,

5    correct?

6        A.  I did -- wait.  What's the question?

7            ATTORNEY RIDLEY:  Can the court reporter read it.

8            (Whereupon the requested portion was read back.)

9            THE WITNESS:  I didn't include that in my

10   application.

11   BY ATTORNEY RIDLEY:

12       Q.  You said "to deepen my practice."  The practice of

13   Zen Buddhism?

14       A.  Yes.

15       Q.  Did you expect that as a WPA you would continue

16   having participation in religious activities at SF Zen

17   Center?

18           ATTORNEY QUACKENBUSH:  Object to form.

19           THE WITNESS:  Yes.

20   BY ATTORNEY RIDLEY:

21       Q.  Was your time as a guest student similar to your

22   time as a WPA?

23       A.  Yes.

24       Q.  Do you recall when you started as a WPA?

25       A.  Yes.

Page 72

Alexander S. Behrend

<div align="right">Behrend vs.
San Francisco Zen Center, Inc.</div>

1        Q.  When was that?

2        A.  In January of 2017.

3        Q.  At the end of the document on page 4 it says, "It

4    is a prerequisite for being accepted to the WPA Program

5    to do at least two weeks of guest student practice at

6    City Center."

7            Do you see that?

8        A.  It says on -- yes.

9        Q.  Was that your understanding, as well, that you

10   needed to have two weeks, at least, of guest student

11   practice before being accepted to the WPA Program?

12       A.  Yes.

13       Q.  Do you recall receiving the WPA policies handbook?

14       A.  I know I received it.  I don't recall, like,

15   receiving it.

16       Q.  But you know you got it somehow; is that right?

17       A.  Yes.

18           ATTORNEY RIDLEY:  Okay.  I'm going to stop sharing

19   this document and ask that the document under Tab G be

20   sent, and I'm going to have it marked as Exhibit 4.

21           (Exhibit 4 marked for identification.)

22           ATTORNEY QUACKENBUSH:  Could you give me the tab

23   number, again?

24           ATTORNEY RIDLEY:  Sure.  G as in goat.

25           ATTORNEY QUACKENBUSH:  Thank you.

**Alexander S. Behrend**

Behrend vs.
San Francisco Zen Center, Inc.

```
1              ATTORNEY RIDLEY:  Yeah.

2              ATTORNEY HAMLING:  It's on the way.

3              ATTORNEY RIDLEY:  Thanks.  Let me know if you can

4    see it on the screen.

5              THE WITNESS:  I can see it on the screen.

6              ATTORNEY RIDLEY:  Okay.  It's a 12-page document.

7    Let me know when you get it.

8              THE WITNESS:  Okay.

9              I have it.

10             ATTORNEY RIDLEY:  Okay.  So what I have marked as

11   Exhibit 4 is a 12-page document Bates-stamped SFZC

12   Behrend 000043 to 54.

13        Q.  Do you recognize this document?

14        A.  This specific one, I don't know.

15        Q.  Okay.  It's entitled "San Francisco Zen Center

16   Work Practice and WPA Policies."  Do you recall receiving

17   a document similar to this?

18        A.  Yes.

19        Q.  Okay.  And if you go to page 2, which is

20   Bates-stamped 44 --

21        A.  Yes.

22        Q.  Are you with me?  Under "Introduction," the second

23   sentence says, "It is the responsibility of each WPA

24   student to read and understand these policies."

25             Did you understand that you were -- that was part
```

Page 74

| | Behrend vs. |
|---|---|
| Alexander S. Behrend | San Francisco Zen Center, Inc. |

1   of your responsibilities?

2       A.  I don't -- is this the one that I received when I

3   started?

4       Q.  I don't know, but I'm asking you if you understood

5   at any time that it was the responsibility of each WPA

6   student to read and understand the WPA policies.

7           ATTORNEY QUACKENBUSH:  Counsel, he has no way of

8   knowing whether this sentence is in the version he

9   received.

10          ATTORNEY RIDLEY:  He said he received a document

11  similar, so I'm asking him what he recalls.  So if he

12  doesn't recall, that's fine.

13          THE WITNESS:  Could you ask the question one more

14  time.

15  BY ATTORNEY RIDLEY:

16      Q.  Let's try it this way:

17          You understood that there were policies related to

18  being a WPA, correct?

19      A.  Yes.

20      Q.  You understood that there was a handbook similar

21  to what we have as Exhibit 4, correct?

22      A.  Yes.

23      Q.  Did you have an understanding that as a WPA, you

24  were to read the handbook and to follow what the policies

25  were?

Page 75

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1            ATTORNEY QUACKENBUSH:  Objection.  Compound.

2            ATTORNEY RIDLEY:  You can respond.

3            THE WITNESS:  Yes.

4       BY ATTORNEY RIDLEY:

5            Q.  Okay.  Do you see on page 44 there is a sentence

6       that says, "Guidelines for behavior at SFZC are contained

7       in the following" -- I always mispronounce this name --

8       "Bodhisattva precepts"?

9            A.  Bodhisattva precepts, yes.

10           Q.  Thank you.  And it's spelled

11      B-O-D-H-I-S-A-T-T-V-A.

12           Have you seen these precepts before?

13           A.  Yes.

14           Q.  Were you -- while you were a WPA, were you asked

15      to recite these precepts?

16           A.  Yes.

17           Q.  How frequently would you recite these precepts?

18           A.  I don't know.

19           Q.  Was it frequent?

20           A.  No.

21           Q.  Okay.  Did you do it more than once?

22           A.  More than once ever?

23           Q.  Yes.

24           A.  Yes.

25           Q.  Did you do it more than once while you were a WPA?

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1    A.  Yes.

2    Q.  What's your estimate of how many times you had

3  recite the precepts?

4    A.  I think every full moon.

5    Q.  Okay.  Did some people refer to the precepts as

6  the vows?

7    A.  I don't know.

8    Q.  Do you recall attending full moon ceremonies?

9    A.  Yes.

10    Q.  Did you -- did you attend full moon ceremonies as

11  a WPA?

12    A.  Yes.

13    Q.  Do you recall reciting these precepts at that

14  ceremony as a WPA?

15    A.  Yes.

16    Q.  Did you understand the full moon ceremony was a

17  religious activity?

18    A.  Yes.

19    Q.  I'm going to have you take a look at page 45 under

20  Number 3, "Work Practice and Work Practice Apprenticeship

21  Defined."  Do you see where I am?

22    A.  No.  4.  Okay.  Yes, I see it now.

23    Q.  Okay.  Do you recall ever reading a WPA policy

24  handbook that described and defined "work practice and

25  work practice apprenticeship"?

**Alexander S. Behrend**

Behrend vs.
San Francisco Zen Center, Inc.

1      A.  Yes.

2      Q.  Okay.  Do you recall it saying that WPA

3   position -- this is the first sentence on the first

4   paragraph -- "WPA positions at SFZC are part of the

5   religious training"?

6      A.  Do I recall reading that when I was an apprentice?

7      Q.  Yes.

8      A.  I don't recall.

9      Q.  Okay.  You don't recall one way or the other?

10      A.  I don't recall one way or the other.

11      Q.  Okay.  Do you recall reading that -- the next

12   sentence, "Communal work practice is an integral and

13   indivisible part of the Zen training and spiritual

14   practice offered at SFZC"?

15      A.  I don't recall reading that specifically.

16      Q.  Okay.  Do you -- but you recall being told that,

17   correct?

18      A.  Yes.

19      Q.  Okay.  Let's see.  I'm going to go to page 5.

20   It's Bates stamp 47.  Let me know when you're there.

21      A.  I'm there.

22      Q.  Okay.  Under the first bullet point it says, "Work

23   practice:  A WPA 1 apprentice will take part in 30 to

24   35 hours per week of continuous work training for three

25   to six months."

**Alexander S. Behrend**                                    **Behrend vs.**
                                            **San Francisco Zen Center, Inc.**

1        Did you understand that would be the case when you

2    applied for the WPA position?

3        A.  Yes.

4        Q.  Okay.  And you recall being a WPA 1; is that

5    correct?

6        A.  I don't recall, like, the specific, you know,

7    terminologies, like, WPA 1, or 2 or whatever.

8        Q.  Okay.  The next sentence says, "This includes

9    hands-on work experience as well as discussions related

10   to work practice in a Buddhist community."

11        Do you see that?

12        A.  Did you just read the second sentence?

13        Q.  I did.

14        A.  Okay.  And what's the question?

15        Q.  So did you understand that that would -- that was

16   part of your experience as a WPA?

17        A.  Yes.

18        Q.  I think I'm done with that document.

19        When you became a WPA, is that when you became a

20   resident at the SF Zen Center, City Center?

21        A.  Could you repeat the question.

22        Q.  Sure.  When you became a WPA, is that when you

23   became a resident of the City Center at SF Zen Center?

24        A.  No.

25        Q.  Okay.  Did you first become a resident when you

1    were a guest student?

2       A.   Yes.

3       Q.   And then that continued on when you became a WPA;

4    is that correct?

5       A.   Yes.

6       Q.   And -- and I keep referring to City Center, so I

7    just want to be clear.  Did you have an understanding

8    that there were different temples for SF Zen Center?

9       A.   Yes.

10      Q.   And how many temples did you understand there to

11   be?

12      A.   Three.

13      Q.   And what were the three temples that you

14   understood there to be?

15      A.   I understood the San Francisco Zen Center was

16   comprised of Tassajara, Green Gulch Farm and City Center.

17      Q.   Okay.  And at -- while you were a WPA, you were

18   always at City Center; is that correct?

19      A.   I visited Green Gulch, but I worked and resided at

20   City Center.

21      Q.   Okay.  Thank you.

22           Did you receive a copy of the residents' handbook?

23      A.   Yes.

24           ATTORNEY RIDLEY:  Okay.  If I could have marked

25   as, I believe, Exhibit 5, the document under Tab H.

                                                    Page 80

**Alexander S. Behrend**

Behrend vs.
San Francisco Zen Center, Inc.

1             (Exhibit 5 marked for identification.)

2             ATTORNEY RIDLEY:  Let me know when you can see the

3      document on the screen.

4             THE WITNESS:  I can see it on the screen.

5             ATTORNEY RIDLEY:  Okay.  It's a two-page document,

6      so I'll go through it here, but it should be being sent

7      to you, too.

8             THE WITNESS:  Yeah, yeah.

9      BY ATTORNEY RIDLEY:

10            Q.  Okay.  So what I have had marked as Exhibit 5 is a

11     two-page document.  It's Bates-stamped SFZC Behrend

12     000080 to 81, and at the top it's "New Checklist and

13     Signature Page."  Do you see where I am?

14            A.  Yes.

15            Q.  Okay.  And I'm toggling down on the first page,

16     page 80, and do you see your name?

17            A.  Yes.

18            Q.  Okay.  And is that your signature?

19            A.  Yes.

20            Q.  Okay.  And it is -- it -- it states that you've

21     received the information listed above and will comply

22     with the guidelines stated in the residents' handbook,

23     correct?

24            A.  Yes.

25            Q.  Okay.  And it's dated January 24, 2017, correct?

**Alexander S. Behrend**

Behrend vs.
San Francisco Zen Center, Inc.

1    A.  Yes.

2    Q.  Okay.  And the documents include a welcome letter,

3    a new residents to-do list, the residents' handbook, the

4    communication protocol and the harassment policy,

5    correct?

6    A.  Yes.

7    Q.  Okay.  And then --

8    A.  Wait.  Does it -- I'm sorry.  Did you ask if it

9    says that or did I receive those things?

10   Q.  I asked that -- whether it says that.  Now I'm

11   going to ask, did you receive those things?

12   A.  It does say that.

13   Q.  Okay.  And you signed the document saying you

14   received that information, correct?

15   A.  I did sign it, yes.

16   Q.  Okay.  And you also signed the fire and emergency

17   safety tour document, correct?

18   A.  Yes.

19        ATTORNEY RIDLEY:  Okay.  All right.  I'm done with

20   that document.

21        And as Exhibit 6 I would like to have the document

22   under Tab I.

23        THE WITNESS:  I am so sorry.  Can we take a really

24   quick break?

25        ATTORNEY RIDLEY:  Why don't we just identify this

Page 82

1    to him by counsel.

2         ATTORNEY RIDLEY:  Yeah.  And I'm not seeking it.

3     Q.  Let me -- let me be clear.  Let me start this over

4    again to make sure we're not getting into any privilege,

5    okay?

6         Is your -- is your understanding of San Francisco

7    Everyday, Inc., based on -- solely on information

8    received from counsel?

9     A.  I don't know.

10    Q.  Okay.  Prior to having counsel, did you have any

11   understanding of San Francisco Everyday, Inc.?

12    A.  Prior to -- could you repeat the -- you cut out.

13    Q.  Prior to retaining counsel, had you ever heard of

14   San Francisco Everyday, Inc.?

15    A.  Yes.

16    Q.  Where'd you hear it from?

17    A.  In the wage and hour claim filed with the state of

18   California.

19    Q.  Okay.  Separate from the wage and hour claim in

20   the state of California and your retention of counsel in

21   this case, had you ever heard of San Francisco Everyday,

22   Inc.?

23    A.  I don't know.

24    Q.  Okay.  Same question with regard to San Francisco

25   Third Way, Inc.

Alexander S. Behrend

**Behrend vs.**
**San Francisco Zen Center, Inc.**

1       A.  I don't know.

2       Q.  Same question with regard to The Zen Foundation.

3       A.  I don't know.

4       Q.  In 2017, had you ever heard of San Francisco

5    Everyday, Inc.?

6       A.  I don't know.

7       Q.  In 2018 had you ever heard of San Francisco

8    Everyday, Inc.?

9       A.  I don't know.

10       Q.  In 2019, had you ever heard of San Francisco

11    Everyday, Inc.?

12       A.  I don't know.

13       Q.  In 2017, had you ever heard of San Francisco Third

14    Way, Inc.?

15       A.  I don't know.

16       Q.  How about 2018?

17       A.  I don't know.

18       Q.  How about 2019?

19       A.  I don't know.

20       Q.  In 2017 had you ever heard of The Zen Foundation?

21       A.  I don't know.

22       Q.  How about 2018?

23       A.  I don't know.

24       Q.  How about 2019?

25       A.  I don't know.

Page 87

**Alexander S. Behrend**                          Behrend vs.
                                        San Francisco Zen Center, Inc.

1      Q.  Do you ever recall submitting any application to

2   San Francisco Everyday, Inc.?

3      A.  No, I don't recall doing that.

4      Q.  Do you ever recall receiving any materials from

5   San Francisco Everyday, Inc.?

6      A.  I don't recall -- no, I don't recall.

7      Q.  Do you recall having any communications at all

8   with San Francisco Everyday, Inc.?

9      A.  No.

10     Q.  Have you ever submitted an application to San

11   Francisco Third Way, Inc.?

12     A.  I don't know.

13     Q.  Do you recall receiving any materials from San

14   Francisco Third Way, Inc.?

15     A.  Do I recall -- no, I do not recall.

16     Q.  Do you recall having any communications with San

17   Francisco Third Way, Inc.?

18     A.  No, I do not recall.  Having communication, yeah.

19     Q.  Do you ever recall submitting an application to

20   The Zen Foundation?

21     A.  I don't recall having submitted an application.

22     Q.  Okay.  Do you recall receiving any materials from

23   The Zen Foundation?

24     A.  No.

25     Q.  Do you recall having any communications with The

**Alexander S. Behrend**                                    **Behrend vs.**
                                        **San Francisco Zen Center, Inc.**

1    **Zen Foundation?**

2        **A.   No.**

3        Q.   Okay.  Let's go back to what I had marked as

4    Exhibit 6.  I'm going to share the screen here.  Give me

5    a second.  Let me know when you can see it.

6        A.   Yes, I can see it.

7        Q.   Okay.  Take a look, please, at page 3 of the

8    document which is on the -- when it's -- when it's able

9    to be looked at right side up.  It's on the --

10       A.   Yeah.

11       Q.   -- right-hand side.  Do you see where I am?

12       A.   Yes.

13       Q.   Okay.  Do you see the picture?

14       A.   Yes.

15       Q.   And -- and do you recognize who that picture is

16   of?

17       A.   Yes.

18       Q.   Who is that?

19       A.   Shunryu Suzuki Roshi.

20       Q.   And that's the same individual you have on your

21   Facebook page, right?

22       A.   That's the same person that appeared on my face --

23   on that -- on my Facebook page.

24       Q.   Okay.  And if you could go to page 4 with -- if

25   you toggle it just down, it's on the left-hand side.  Do

Behrend vs.
San Francisco Zen Center, Inc.

Alexander S. Behrend

```
 1        Q.   Okay.  Do you -- do you remember having a schedule
 2    where in the morning you would attend zazen?
 3        A.   Yes.
 4        Q.   And, again, what's zazen?
 5        A.   I didn't hear the question.
 6        Q.   What is zazen?
 7        A.   Meditation.
 8        Q.   Okay.  The next one -- is it kinhin?
 9        A.   Yes.
10        Q.   What is that?
11        A.   Walking meditation.
12        Q.   As a WPA, did you participate in that?
13        A.   Yes.
14        Q.   As a Dharma Bridge student, did you participate in
15    that?
16        A.   I don't remember.
17        Q.   As a Dharma Bridge student, did you participate in
18    zazen?
19        A.   I don't remember.
20        Q.   Okay.  As a WPA do you remember attending zazen at
21    the second session of zazen that's mentioned in this
22    document at 6:05?
23        A.   I also want to -- yes, as a -- I want to correct a
24    previous answer.
25             As a Dharma Bridge student, I did participate in
```

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1    zazen and in kinhin at -- you know, at 5:25, and at 5:55

2    and 6:05.

3         Q.  Okay.  Thank you.

4         A.  Yes.

5         Q.  And then as a WPA, would you attend the service at

6    6:40?

7         A.  Yes.  As a WPA, yes.

8         Q.  Would you do that as a Dharma Bridge student?

9         A.  Yes.

10        Q.  And as a WPA, would you attend the soji at

11   7:10 a.m.?

12        A.  Yes.

13        Q.  And how about as a Dharma Bridge student?

14        A.  Yes.

15        Q.  Okay.  And then as a WPA, would you attend the

16   zazen at 5:40 p.m.?

17        A.  Only once or twice.  Apprentices and Dharma Bridge

18   students were not required to do the evening part of the

19   schedule.

20        Q.  Okay.  And what do you base that on?

21        A.  That's how it operated.

22        Q.  Okay.

23        A.  Like, my experience and the -- you know, that

24   was -- that was the official from the leadership rules.

25        Q.  Okay.  From what leadership?  Who are you talking

1    about?

2        A.   The abbot, the -- the tanto, the director, the

3    practice committee.  Apprentices and Dharma Bridge

4    students -- like, people who lived and worked at San

5    Francisco Zen Center were not required to do the evening

6    zazen or service ever.

7        Q.   Which -- which abbot are you talking about?

8        A.   You know, I'm not -- I -- I'm not exactly sure who

9    the abbots were at the time.  I think the abbot -- head

10   abbot was Linda Ruth Cutts and then the abbot of City

11   Center was Ed Sattizahn.

12       Q.   Can you spell their names?

13       A.   Linda, L-I-N-D-A; Ruth, R-U-T-H; Cutts, C-U-T-T-S.

14   Ed, E-D; Sattizahn, S-A-T-T-I-Z-A-N [sic], is my best

15   guess.

16       Q.   Okay.  Who is the tanto you're referring to?

17       A.   David Zimmerman.

18       Q.   Okay.  How about the director you're referring to?

19       A.   Mary Stares and then Mike Smith.

20       Q.   And the practice committee?

21       A.   I can't remember all the members of the practice

22   committee.  I know David was on it.  I know Ed Sattizahn

23   was on it.  Paul Haller was on it.  The other members I'm

24   not sure of.

25       Q.   Okay.  As a WPA, did you ever attend the service

Alexander S. Behrend                                    Behrend vs.
                                          San Francisco Zen Center, Inc.

1    at 6:20?

2         A.  As a WPA, I did attend the service at 6:20.

3         Q.  How about as a Dharma Bridge student?

4         A.  No.

5         Q.  What is a zendo?

6         A.  Meditation hall.

7         Q.  Okay.  Did you attend the Wednesday lectures at

8    7:45 as a WPA?

9         A.  Yes.

10        Q.  What is the Buddha hall?

11        A.  It's the room where the Dharma talks were given.

12   Also, meetings were held in there.  Yoga was held in

13   there.  Community events in the evenings were held in

14   there.

15        Q.  Okay.  Did you attend the Wednesday lecture as a

16   Dharma Bridge student?

17        A.  I don't know.

18        Q.  When you were a WPA -- do you see where it says

19   "Saturday morning program"?

20        A.  Yes.

21        Q.  Did you experience that program as described as a

22   WPA?

23        A.  No.

24        Q.  What was different in your experience?

25        A.  There -- there was almost never oryoki meal.

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1        Q.   Okay.   Other than that, any other difference?

2        A.   No.

3        Q.   Okay.   And did you attend those services other

4    than the oryoki -- oryoki meal?

5        A.   Yes.   I followed that schedule.

6        Q.   Okay.   And how about as a Dharma Bridge student,

7    did you follow that schedule?

8        A.   I don't remember.

9        Q.   Okay.   Earlier -- I'm turning to page 6 of the

10   document.   It's on the left-hand side when you toggle

11   down and it starts "doanryo."   Do you see where I am?

12       A.   Yes.

13       Q.   Okay.   That's in reference to the doanryo we had

14   previously talked about, correct?

15       A.   Yes.

16       Q.   Okay.   And then underneath it, it has "doan,

17   fukudo, kokyo, jiko."   Those are the Japanese names for

18   the various jobs that you were describing, correct?

19       A.   Yes.

20       Q.   Okay.   As I understand it, you've acted as the

21   doan, the sounds of the bells to begin and end, correct?

22       A.   Yes.

23       Q.   And you've acted as the fukudo, correct?

24       A.   Yes.

25       Q.   And you -- have you acted as the kokyo?

Behrend vs.
**Alexander S. Behrend**                              San Francisco Zen Center, Inc.

1       A.  No.

2       Q.  Have you acted as the jiko, J-I-K-O?

3       A.  Yes.

4       Q.  Who -- who is a doshi?  Is that the priest?

5       A.  Yes.

6       Q.  Okay.  Did you do the chiden, C-H-I-D-E-N?

7       A.  Yes.

8       Q.  And you did the door watch, correct?

9       A.  Yes.

10      Q.  Okay.  Did you ever work in the kitchen during

11  sittings or sesshin?

12      A.  Yes.

13      Q.  And did you do so when you were a W -- WPA?

14      A.  Yes.

15      Q.  And did you do so as a Dharma Bridge student?

16      A.  No.

17      Q.  Okay.  When you were a WPA, did you have a weekly

18  dishwashing shift?

19      A.  Yes.

20      Q.  Did you have a weekly temple job?

21      A.  Yes.

22      Q.  And did you have a weekly bathroom cleaning

23  assignment?

24      A.  Yes.

25      Q.  And as a Dharma Bridge student, did you have a

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

```
 1        Q.   Okay.  Let's see here.  Under "formal practice
 2    schedule," do you see where that is?
 3        A.   I do see that.
 4        Q.   Okay.  On the second paragraph it says, "Please
 5    make a commitment to completely follow the formal
 6    practice schedule."  Do you see that?
 7        A.   I do see that.
 8        Q.   And while a WPA, did you do that?
 9        A.   I did make a commitment to follow the schedule.
10        Q.   Did you do that as a Dharma Bridge student?
11        A.   Did I make the commitment?
12        Q.   Yes.
13        A.   I don't know.
14        Q.   Okay.  In the next paragraph, the second sentence,
15    it says, "Residents are asked to attend" -- I'm
16    highlighting it so you can see it.  "Residents are asked
17    to attend 100 percent of the formal practice schedule."
18             Do you see that?
19        A.   I'm sorry.  Where are you at on it --
20        Q.   You see where I highlighted it?
21        A.   Yes.  Okay.  I see.  Yeah.
22        Q.   Yeah.  Did you understand residents were asked to
23    attend 100 percent of the formal practice schedule?
24        A.   Yes.
25        Q.   And did you attempt to do so as a WPA?
```

Page 103

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

```
 1      A.  Yes.
 2      Q.  And did you attempt to do so as a Dharma Bridge
 3   student?
 4      A.  I don't know.
 5      Q.  Okay.  When you were participating in the work
 6   practice as a WPA, there were religious elements to the
 7   work you were doing, correct?
 8          ATTORNEY QUACKENBUSH:  Object to form.
 9          THE WITNESS:  And I didn't catch the first half of
10   the question.
11          ATTORNEY RIDLEY:  Sure.  Could the court reporter
12   re-read it, please.
13          (Whereupon the requested portion was read back.)
14          THE WITNESS:  Yes.
15   BY ATTORNEY RIDLEY:
16      Q.  Okay.  Did that include bowing?
17      A.  Yes.
18      Q.  Did that include a period of silence?
19      A.  Yes.
20      Q.  And in the Dharma lectures, did -- when you were a
21   WPA, did you attend lectures that talked about the -- the
22   place of work practice in the practice of Zen Buddhism?
23      A.  Could you repeat the question, please.
24          ATTORNEY RIDLEY:  Sure.  Could I have the court
25   reporter read it.
```

1      Q.   Then why would you put it in this e-mail?

2      A.   I was -- I mean, because -- I mean, I was

3   mistaken.

4      Q.   When you wrote it, did you believe you took vows

5   in morning service?

6      A.   I sent off an e-mail without, you know, checking

7   every single word, you know, so, you know, I used -- I

8   used that word.  I don't think it's correct, though.

9      Q.   Did you believe when you wrote it that you took

10   vows in morning service?

11      A.   I don't know.

12      Q.   Can't say one way or the other?

13      A.   I can't say one way or the other.

14      Q.   Did you intend to lie to Mr. Zimmerman when you

15   were e-mailing him?

16      A.   No.

17      Q.   At the bottom on page 1170 after the refuges,

18   you -- you note after two asterisks, do you see it?  It

19   says, "Please note."

20      A.   Okay.  Yeah, I see it.  Yep.

21      Q.   It says, "Please note that at the end of your PD,

22   I mentioned the gift of Dharma which I meant to refer to

23   the teachings and sutras of Zen and other schools of

24   Buddhism."

25          Does this refresh your recollection as to whether

**Alexander S. Behrend**

**Behrend vs.**
**San Francisco Zen Center, Inc.**

1    or not you, at the time, considered yourself to be a

2    practicing Zen Buddhist?

3        A.   Now that I've read it -- would you please repeat

4    the question.

5            ATTORNEY RIDLEY:   Would the court reporter please

6    read it again.

7            (Whereupon the requested portion was read back.)

8            THE WITNESS:   So I didn't convert to Zen Buddhism,

9    but I definitely practiced the Zen Buddhism that was

10   offered at San Francisco Zen Center.

11   BY ATTORNEY RIDLEY:

12       Q.   Okay.  When you wrote this in e-mail, were you

13   writing it sincerely?

14       A.   Yes.

15       Q.   Okay.  And you thought enough of it that you

16   also -- at the top of the document, it says, "Hi, Mary.

17   As I reflect on our conversation today, I thought I'd

18   share an e-mail I sent to David in November about how I

19   take refuge in Buddha, Dharma and sangha."

20           Who's the Mary you're referring to?

21       A.   Mary Stares.

22       Q.   So you thought enough of it to forward it to her?

23       A.   Yes.

24       Q.   And you did so in December of 2018?

25       A.   Yes.

Page 111

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1   looking at on Exhibit 9, correct?

2      A.   Yeah, they were the recipients on the previous

3   exhibit.

4      Q.   Okay.  And the subject of this e-mail is

5   "ordaining," correct?

6      A.   Yes.

7      Q.   Is this the document you reviewed in preparation

8   for your deposition?

9      A.   No.

10     Q.   Okay.  Do you recall sending this document?

11     A.   Yes.

12     Q.   Okay.  On the second paragraph of the e-mail, it

13   says, "Should I keep residing with SFZC for the next few

14   years, and that's what I want, I would like to work and

15   train to ordain as a priest with an eye towards

16   eventually becoming some kind of practice leader."

17        Do you remember writing that?

18     A.   Yes.

19     Q.   Did you mean it when you wrote it?

20     A.   Yes.

21     Q.   So at least by this point you considered yourself

22   a practicing Zen Buddhist?

23     A.   I really liked what San Francisco Zen Center was

24   doing, and I wanted to secure a spot there.  And I

25   definitely -- yeah, I considered myself a Zen Buddhist

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1      practitioner.

2          Q.  When you say you wanted to secure a spot there, do

3      you mean housing?

4          A.  Work and housing, yes.

5          Q.  You don't mention housing in this e-mail, correct?

6          A.  No.

7          Q.  Okay.  You tell them you want to train towards

8      ordination, correct?

9          A.  Yes.

10         Q.  Were you lying?

11         A.  In the e-mail?

12         Q.  Yes.

13         A.  No.

14         Q.  Okay.  And -- and you had been having religious

15     studies up to that point, correct?

16         A.  Yes.

17         Q.  Okay.  And this is during the time you were a WPA,

18     correct?

19         A.  Yes.

20             ATTORNEY RIDLEY:  I'm going to have marked as

21     Exhibit 11 the document under Tab P, as in panda.

22             (Exhibit 11 marked for identification.)

23     BY ATTORNEY RIDLEY:

24         Q.  Can you see the document?

25         A.  Yes.  And I'm pulling it up.  Yes.  Yes and yes.

**Alexander S. Behrend**                              Behrend vs.
                                    San Francisco Zen Center, Inc.

```
 1      A.  Yes.
 2      Q.  It says, "Please stand by to lend support to our
 3   new doanryo member, Alex, who will be the shoten on
 4   Monday."
 5           What is a shoten, S-H-O-T-E-N?
 6      A.  All I remember is that the shoten hit the big bell
 7   called the densho.
 8      Q.  And was that during a religious ceremony?
 9      A.  It was part of the meditation process.
10      Q.  So part -- so part of a religious ceremony?
11      A.  Yes.
12      Q.  Okay.  And if you look two e-mails up on
13   January 29, 2017, -- I'm highlighting it here -- you
14   write, "Good morning, all.  Just confirming I'm doing
15   shoten Monday morning.  I'm clear on how it goes, after
16   shadowing it several times last week.  Also grateful Tim
17   will be on-hand tomorrow."
18           Do you remember writing that?
19      A.  I don't remember writing that.
20      Q.  Okay.  Do you have any reason to believe you did
21   not?
22      A.  No.
23      Q.  And do you recall actually acting as shoten while
24   you were a WPA?
25      A.  Yes.
```

1    "Just a reminder that you kindly volunteered to lead

2    zendo forms this Saturday."

3         What are zendo forms?

4      A.  I don't remember.  Well -- so there are forms you

5    do when you're in the zendo, like, positions and stuff

6    like that, but I don't remember what the zendo forms was.

7      Q.  Okay.  So forms are positions, physical positions?

8      A.  Like, you know, ways that people uniformly enter

9    the meditation hall, or bow, or take their seat in -- in

10   the meditation hall and -- and other -- and things of

11   that nature.

12     Q.  Okay.  It's part of a religious practice and

13   ceremony?

14     A.  Yes.

15     Q.  And you were to take the lead; is that correct?

16     A.  I -- I -- I don't know.

17     Q.  Okay.  Well, you say you're very excited to,

18   correct?

19     A.  Yes.

20     Q.  Do you recall taking the lead on zendo forms?

21     A.  I don't -- I'm not recalling what the zendo forms

22   thing at City Center was.

23     Q.  Okay.  While you were a WPA, did you assist with

24   ceremonies?

25     A.  Yes.

Page 131

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

```
 1        Q.  Did you assist with the flower chiden?
 2        A.  Yes.
 3        Q.  While you were a WPA, did you assist with the
 4    wake-up bell?
 5        A.  Yes.
 6        Q.  While you were a WPA, did you assist with morning
 7    services?
 8        A.  Yes.
 9        Q.  While you were a WPA, did you assist with noon
10    services?
11        A.  Yes.
12        Q.  While you were a WPA, did you assist with evening
13    services?
14        A.  Occasionally, yes.
15        Q.  While you were a WPA, did you assist at
16    celebrations of Buddha's birthday?
17        A.  I don't know.
18        Q.  While you were a WPA, did you assist with lay
19    ordination?
20        A.  I don't think so.
21        Q.  Okay.  While you were a WPA, did you assist with
22    the Sejiki, S-E-J-I-K-I, ceremony?
23        A.  I don't remember that ceremony.
24        Q.  Okay.  While you were a WPA, did you ever assist
25    in the full moon ceremony?
```

Page 132

Alexander S. Behrend

Behrend vs.
San Francisco Zen Center, Inc.

1    you were a WPA, correct?

2        A.   Yes.

3        Q.   Okay.  And you -- you write, "Confirmed.  Thank

4    you for letting me be of service this way."

5             Did you consider your -- your work as being part

6    of service to the SF Zen community?

7        A.   Did I consider my work to be service to the Zen

8    Center community?

9        Q.   Yes.

10       A.   Yes.

11       Q.   And apparently at least there was one oryoki

12   service that you attended, correct?  Because you were a

13   server.

14       A.   Yes.

15           ATTORNEY RIDLEY:  Okay.  I'm going to have

16   Exhibit 19 the document under Tab X.

17           (Exhibit 19 marked for identification.)

18   BY ATTORNEY RIDLEY:

19       Q.   This is a one-page document.  It's an e-mail from

20   Alex Behrend, December 30th, 2018, to Carol Enguetsu,

21   E-N-G-U-E-T-S-U, Lefever (phonetic) or he Lefevre.  I'm

22   sure I'm mispronouncing the name L-E-F-E-V-R-E.  It is

23   Bates-stamped SFZC Behrend 001110.

24           Do you recall this e-mail?

25       A.   No.

**Alexander S. Behrend**

Behrend vs.
San Francisco Zen Center, Inc.

```
 1    entire SFZC sangha."
 2          You wrote that, correct?
 3    A.  Yes, I wrote that.
 4    Q.  Were you -- was that true when you wrote it?
 5    A.  No.
 6    Q.  So you lied?
 7    A.  I wasn't being truthful.
 8    Q.  So you lied?
 9    A.  Yes.
10    Q.  Okay.  On page 6 right before paragraph 6, you
11    state under Item 5, "Interest in continuing to train
12    beyond the initial visit."  Underlined you say, "I
13    absolutely have interest in continuing my Zen training."
14          Was that truthful at the time you wrote it?
15    A.  Sorry.  I just want to --
16    Q.  Sure.
17    A.  Okay.  Which part are you asking is truthful?
18    I -- I'm sorry.  I just kind of spaced out.
19    Q.  Under Number 5.  It's underlined.  "I
20    absolutely" --
21    A.  Yes.
22    Q.  -- "have interest in continuing my Zen training."
23    A.  That wasn't truthful.
24    Q.  So you lied in that, too, correct?
25    A.  Yes.
```

Behrend vs.
Alexander S. Behrend                                    San Francisco Zen Center, Inc.

```
 1              ATTORNEY RIDLEY:  Exhibit 22 will be under Tab AA.

 2              (Exhibit 22 marked for identification.)

 3              ATTORNEY RIDLEY:  Let me know when you can see it.

 4              THE WITNESS:  Oh, Tab AA?

 5              ATTORNEY RIDLEY:  Yes, double A.

 6              THE WITNESS:  I can see it.

 7     BY ATTORNEY RIDLEY:

 8         Q.  Okay.  It's a 14-page document.  It's entitled

 9     "Room, Board and Tuition Program Policies at SFZC,"

10     updated 1/5/17.  It's Bates-stamped SFZC Behrend

11     0000982000111.

12              Do you recall seeing this document?

13         A.  Yes.

14         Q.  Do you recall understanding that as a Dharma

15     Bridge student or RBT resident you were to -- you were

16     expected to participate in temple practice?

17         A.  Yes.

18         Q.  Did you understand you were still subject to the

19     residents' handbook?

20         A.  Yes.

21         Q.  And did you understand you were still subject to

22     the shingi pure standards?

23         A.  Yes.

24         Q.  Okay.  On pages 4 -- at the bottom of 4, which is

25     Bates-stamped 101, to 5, which is Bates-stamped 102,
```

Alexander S. Behrend

**Behrend vs.**
**San Francisco Zen Center, Inc.**

```
 1              REPORTER'S CERTIFICATE

 2          I, ALYSSA PACHECO, do hereby certify that I am a
     licensed Certified Shorthand Reporter, duly qualified and
 3   certified as such by the state of California;
              That prior to being examined, the witness named
 4   in the foregoing deposition was duly sworn by me;
              That the said deposition was recorded
 5   stenographically by me at the time and place herein
     mentioned; and the foregoing pages constitute a full,
 6   true, complete, and correct record of the testimony given
     by the said witness;
 7            That review of the transcript was requested
     pursuant to Federal Rules of Civil Procedure Rule
 8   30(e)(1);
              That I am a disinterested person, not being in
 9   any way interested in the outcome of said action, or
     connected with, nor related to any of the parties in said
10   actions, or to their respective counsel in any manner.

11   Date: 10/18/2022

12                         A Castillo

13                         _____
                           ALYSSA PACHECO, CSR NO. 13391

14

15

16   CIVIL CODE OF PROCEDURE SECTION 2025.510:

17   (b) The party noticing the deposition shall bear the cost
     of the transcription, unless the court, on motion and for
18   good cause shown, orders that the cost be borne or shared
     by another party.
19   (c) Notwithstanding subdivision (b) of Section 2025.320,
     any other party or the deponent, at the expense of that
20   party or deponent, may obtain a copy of the transcript.

21
     GOVERNMENT CODE SECTION 69954:
22
     (d) Any court, party, or person who has purchased a
23   transcript may, without paying a further fee to the
     reporter, reproduce a copy or portion thereof as an
24   exhibit pursuant to court order or rule, or for internal
     use, but shall not otherwise provide or sell a copy or
25   copies to any other party or person.
```

Page 155

Alexander S. Behrend

**Behrend vs.
San Francisco Zen Center, Inc.**

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2     Case Name: Behrend vs. San Francisco Zen Center, Inc.

 3     Date of Deposition: 10/17/2022

 4     Job No.: 10109190

 5

 6             I, ALEXANDER S. BEHREND, hereby certify

 7     under penalty of perjury under the laws of the State of

 8     _____ that the foregoing is true and correct.

 9             Executed this _____ day of

10     _____, 2022, at _____.

11

12

13                     _____

14                     ALEXANDER S. BEHREND

15

16     NOTARIZATION (If Required)

17     State of _____

18     County of _____

19     Subscribed and sworn to (or affirmed) before me on

20     this _____ day of _____, 20__,

21     by_____,    proved to me on the

22     basis of satisfactory evidence to be the person

23     who appeared before me.

24     Signature: _____ (Seal)

25
```

**Alexander S. Behrend**

**Behrend vs.**
**San Francisco Zen Center, Inc.**

```
 1   DEPOSITION ERRATA SHEET

 2   Case Name: Behrend vs. San Francisco Zen Center, Inc.
     Name of Witness: Alexander S. Behrend
 3   Date of Deposition: 10/17/2022
     Job No.: 10109190
 4   Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
 5                  3. To correct transcription errors.

 6   Page _____ Line _____ Reason _____

 7   From _____ to _____

 8   Page _____ Line _____ Reason _____

 9   From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24   Page _____ Line _____ Reason _____

25   From _____ to _____
```

Page 157

**Alexander S. Behrend**

**Behrend vs.
San Francisco Zen Center, Inc.**

```
 1   DEPOSITION ERRATA SHEET

 2   Page _____ Line _____ Reason _____

 3   From _____ to _____

 4   Page _____ Line _____ Reason _____

 5   From _____ to _____

 6   Page _____ Line _____ Reason _____

 7   From _____ to _____

 8   Page _____ Line _____ Reason _____

 9   From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   _____ Subject to the above changes, I certify that the
             transcript is true and correct
23   _____ No changes have been made. I certify that the
             transcript  is true and correct.
24
                   _____
25                      ALEXANDER S. BEHREND
```

# Exhibit 4

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4   _____
 5   ALEXANDER BEHREND,            )
 6               Plaintiff,        )
 7   v.                            )No. 3:21-cv-01905-JSC
 8   SAN FRANCISCO ZEN CENTER, INC.,)
     SAN FRANCISCO EVERYDAY, INC.,  )
 9   SAN FRANCISCO THIRD WAY, INC., )
     THE ZEN FOUNDATION,           )
10                                 )
                 Defendants.       )
11   _____
12           DEPOSITION OF BARBARA MACHTINGER

     _____
13

                      9:00 a.m.
14                 October 18, 2022
               San Francisco, California
15
16
17
18
19
20                  File #5512409
21
22
23
24
25        Reported By:  Judy Robinson, CCR #2171

                                          Page 1
```

```
 1                  A P P E A R A N C E S
 2    FOR THE PLAINTIFF, ALEXANDER BEHREND:
 3    MIKAELA M. BOCK, ESQ.
      KYLE P. QUACKENBUSH, ESQ.
 4    GIRARD SHARP, LLP
      601 California Street, Suite #1400
 5    San Francisco, California 94108
      mbock@girardsharp.com
 6    kquackenbush@girardsharp.com
 7
      FOR THE DEFENDANTS, INHOUSE COUNSEL FOR SAN FRANCISCO ZEN
 8    CENTER:
 9    GREG MCCLUNE, ESQ.
      FOLEY & LARDNER, LLP
10    555 California Street, Suite #1700
      San Francisco, California 94101
11    gmcclune@foley.com
12
      FOR THE DEFENDANTS:
13
      SARA ABARBANEL, ESQ.
14    EVAN HAMLING, ESQ.
      FOLEY & LARDNER, LLP
15    11998 El Camino Real, Suite #400
      San Diego, California 92130
16    Sabarbanel@foley.com
      Ehamling@foley.com
17
18
19
20
21
22
23
24
25
```

Page 2

I N D E X

| WITNESS | EXAMINATION | PAGES |
|---|---|---|
| BARBARA MACHTINGER | | |
| | BY MS. BOCK .............. | 4-114, 126 |
| | BY MS. ABARBANEL ......... | 114-126 |

E X H I B I T S

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 24 | 13 | Email |
| Exhibit 25 | 36 | Copy of Linked-In Page |
| Exhibit 26 | 43 | Barbara Machtinger's Bio from the Zen Center's Website from October 10th, 2022 |
| Exhibit 27 | 74 | Email |
| Exhibit 28 | 81 | Email |
| Exhibit 29 | 89 | Email |
| Exhibit 4 | 91 | Previously Marked WPA Handbook |
| Exhibit 30 | 91 | Email |
| Exhibit 31 | 100 | Email |
| Exhibit 32 | 100 | Email |
| Exhibit 21 | 123 | Previously Marked SFZC City Center RBT Application Form For Mr. Behrend |

1        BE IT REMEMBERED that the deposition upon oral

2   examination of BARBARA MACHTINGER was taken on

3   October 18, 2022, at 9:00 a.m., at 125 South 309th Street,

4   Federal Way, Washington, 98003, before Judith A. Robinson, CCR,

5   Notary Public in and for the State of Washington, residing at

6   Federal Way, Washington.

7        Whereupon, the following proceedings were had, to-wit:

8                    * * * * * *

9                 BARBARA MACHTINGER

10              having been first duly sworn

11                 on oath was examined

12               and testified as follows:

13              E X A M I N A T I O N

14   BY MS. BOCK:

15   Q    Good morning.  Can you please state your full name for

16   the record?

17   A    Barbara Machtinger.

18   Q    Hello, Ms. Machtinger.  My name is Mikaela Bock of

19   Girard Sharp, LLP, and I represent Mr. Behrend in this action.

20        So, I'm going to start with a few preliminary questions

21   and ground rules for the deposition.

22        Have you ever been deposed before?

23   A    Once.

24   Q    When was that?

25   A    In the '80s, 1980s.

<div align="right">Page 4</div>

```
1      A    Yes, I'm trying to expand it, if I can.  Yes.

2      Q    So, I'm showing you what's been marked for

3   identification purposes as exhibit 28, which is Bate Stamped in

4   this litigation as SFZC_Behrend_000190.

5          So, this is an email sent from Mr. Behrend to you at

6   the email address BMachtinger@gmail.com, correct?

7      A    Yes.

8      Q    And as far as you can tell, Exhibit 28 is a true and

9   accurate copy of this email, correct?

10     A    Yes.

11     Q    And you have no reason to doubt that Exhibit 28 is a

12  true and accurate copy of this email, correct?

13     A    Correct.

14     Q    I'll direct your attention to the second paragraph.

15  Can you please tell me what, "functional speech," is?

16     A    Functional speech is a practice which we request in our

17  crews to only speak about -- to limit our speech to what the

18  matter at happened is.  If there's a need to speak to, you know,

19  about the work assignment, then that's functional speech.

20     Q    And SF Zen Center has a policy regarding functional

21  speech during work hours, correct?

22          MS. ABARBANEL:  I'm going to just object, again, as

23     to speculation, foundation.  And as well as the fact that

24     Ms. Machtinger is here in her personal capacity, and calls

25     for a legal conclusion.
```

Page 82

1          A      I'd say in -- in the kitchen crew is where it's -- it's

2      very pronounced practice.   And it's in the Shika crew, it's also

3      -- it was encouraged and practiced.   There might be other crews

4      where it's not enforced or practiced.   I can't speak about those

5      other crews.

6              So, I can just speak about my experience on the kitchen

7      crew, and also -- and the Shika crew.  So, it was a -- yeah.

8      So, I -- did I answer your question?

9      BY MS. BOCK:

10          Q    Do you -- so, in regards to what the policy was, so is

11     it fair to say that it's a policy to only speak when necessary

12     when doing one's work?

13          A    Yes.

14              MS. ABARBANEL:  Objection.

15              WITNESS:  Okay.

16     BY MS. BOCK:

17          Q    And the purpose behind this policy, what is that?

18              MS. ABARBANEL:  Same objections.

19          A    The purpose is to help us to maintain our Zazen mind,

20     and to -- which is -- comes from our sitting meditation

21     practice, to maintain a -- a kind of inner reflection of before

22     we speak of -- for one thing, we don't want to gossip.  That's

23     not something we -- it's -- we have a precept about gossiping.

24     We don't want to get into gossiping.

25              It's a way of maintaining our concentration on what

Page 83

1    work will take precedent over practice, correct?

2        A    No.

3            MS. ABARBANEL:  Objection, misstates testimony, and

4        foundation.

5        A    In this case, it's not -- work is part of the one-day

6    sitting.  The kitchen crew is -- is practicing alongside the

7    people sitting.  It's a part of the sitting.

8    BY MS. BOCK:

9        Q    Where is the -- the kitchen crew during the one-day

10   sitting?

11       A    Where are they?  First of all, they come and sit the

12   first period in the Zendo, or outside in the hallway.  They come

13   and sit the first period.  And when they go up to the kitchen

14   and start preparing the food for the people who are sitting.

15   And it's all in silence.  The sitting -- people sitting are

16   completely in silence.  The people in the kitchen are completely

17   in silence.

18            It's a meditation in the kitchen as well as in the

19   Zendo.  The only difference is people are sitting still in the

20   Zendo, and they're doing work practice in the kitchen.  But it's

21   a very intense container of concentration and service and,

22   everybody does it.

23       Q    Okay.  And -- and physically, they're located in -- the

24   people working on the kitchen crew during the one-day sitting

25   are physically located in the kitchen?

Page 98

```
 1   different?

 2        A    First of all, priests -- with a few exceptions, priests

 3   begin with a lay ordination.

 4        Q    Okay.

 5        A    Everybody goes through a lay ordination.  And then they

 6   continue on to receive a priest ordination.  And then the priest

 7   ordination involves more robes, and shaving the head and being

 8   able to officiate at ceremonies.

 9        Q    And what is a Rakusu?  You talked about that a little

10   bit.

11        A    Rakusu.  I'm wearing one right now.  It's -- let's see.

12   This isn't being videotaped, but it's made of -- it's made of --

13   you cut -- it's a robe that you make.  You sew it, and it's

14   cut -- you cut fabric, and then you sew it together in a

15   special, prescribed way.  And it's given to you during your lay

16   ordination ceremony, or your priest ordination ceremony.

17        Q    And what's the significance of a Rakusu?

18        A    Well, for me, it's like when we receive the precepts

19   and take the -- you receive your Dharma name, and you are --

20   receive the ordination, you take a lot of vows called the Bodhi

21   Sattva vows.  And there are, like, 16 Bodhi Sattva vows.

22             So, when we receive the precepts, when we wear the

23   Rakusu, we're wearing our precepts.  We're saying I'm

24   accountable for my actions and I'm vowing to be upright in my

25   speech and my body and my mind.  I'm vowing to do all good; I'm
```

Page 107

```
1        A    I'm trying to think.  No, not that I recall.
2                MS. BOCK:  Okay.  So I think I've reached the end
3        of my outline.  But I do think it's a good idea to take a
4        short break and just let me review my notes, and make sure
5        nothing got missed.
6                So why don't we take ten minutes and come back to
7        at 2:00 o'clock?  And that will also give your Counsel time
8        to see if she is going to ask any questions, or anything
9        like that as well, okay?
10               WITNESS:  Okay.
11               MS. BOCK:  We'll see you at 2:00.  Thank you.
12               MR. MCCLUNE:  Thank you.
13               (Off the record.)
14               MS. BOCK:  So I'll go ahead and pass the witness,
15       but I may have some follow-ups after.
16               MS. ABARBANEL:  Great.
17                        E X A M I N A T I O N
18       BY MS. ABARBANEL:
19       Q    Ms. Machtinger, thank you again for taking the time to
20       speak with us today.  I really appreciate it.  And just to make
21       clear, you're still under the same oath that you took earlier
22       this morning.
23               Do you understand?
24       A    Yes.
25       Q    Wonderful.  Is -- is SF Zen Center a religious
```

Page 114

1   institution?

2        A    Yes.

3        Q    How do you know?

4        A    Well, for one thing, we're a 501C3, which I know is a

5   nonprofit.  And I -- we're a Buddhist organization, and we are

6   -- that's our mission, is to -- it's -- it's part of our mission

7   statement.  And I believe also that I've seen it in donation

8   letters and things like that.

9        Q    Is San Francisco Zen Center a place of religious

10  practice?

11       A    Yes.

12            MS. BOCK:  Objection, calls for a legal conclusion.

13       A    We have a place where we do season meditation.  We have

14  a place where we do ceremonies and services, and -- and other

15  ceremonies.

16  BY MS. ABARBANEL:

17       Q    Great.  And going back to when you started your

18  affiliation with Zen Center, you mentioned that you started at

19  Green Gulch Farm.

20            Were you a WPA at that time?

21       A    Yes.

22       Q    And how long were you a WPA?

23       A    At that time, I think the WPA program was a one-year.

24  So, I think I was just a WPA for one year.

25       Q    And then did you become staff?

1    religious training.  Communal work practice is an integral and

2    indivisible part of the Zen training, and spiritual practice

3    offered at SFZC.  The terms 'work practice,' and work as used in

4    these guidelines incorporate these fundamental principles."

5            Is that an accurate representation of what's written

6    here?

7        A    Yes.

8        Q    So, it says here, "Communal work practice is an

9    integral and indivisible part of the Zen training, and spiritual

10   practice offered at SFZC."

11           I believe you already testified that work practice is

12   religious practice; is that correct?

13       A    Yes.

14       Q    And is this also a particular practice at SF Zen

15   Center?

16       A    It is at all Zen centers, actually.

17       Q    And so, I -- I know we've spoken a bit about work sort

18   of on its own today.  But that, in and of itself, is that

19   separate from religious practice?

20           MS. BOCK:  Objection, leading.

21       A    It's -- it's indivisible.  As it says here, it's an

22   indivisible part of a Zen training and spiritual practice, so

23   it's not separate.

24   BY MS. ABARBANEL:

25       Q    I'm going to -- I'm going to -- I guess I don't need to

                                                     Page 122

```
 1    STATE OF WASHINGTON )

 2                        ) SS.

 3    COUNTY OF KING      )

 4

 5          I, the undersigned, declare under penalty of

 6    perjury that I have read the foregoing transcript, and

 7    I have made any corrections, additions, or deletions,

 8    that I was desirous of making; that the foregoing is a

 9    true and correct transcript of my testimony contained

10    therein.

11

12          EXECUTED this _____ day of _____ 2022 at

13    _____, _____.

14

15

16                             _____

17

18                             BARBARA MACHTINGER

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1                    C E R T I F I C A T E
 2
 3    STATE OF WASHINGTON )
                          )SS.
 4    COUNTY OF KING      )
 5
 6         I, Judith A. Robinson, Certified Court Reporter and an
 7    officer of the Court under my commission as a Notary Public, in
 8    and for the State of Washington, do hereby certify that the
 9    foregoing deposition was transcribed under my direction; that
10    the transcript of the deposition is a full, true and correct
11    transcript to the best of my ability; that I am neither attorney
12    for, nor a relative or employee of any of the parties to the
13    action or any attorney or Counsel employed by the parties
14    hereto, nor financially interested in its outcome.
15         IN WITNESS WHEREOF, I have hereunto set my hand
16    and affixed my official seal this 22nd day of October,
17    2022.
18
19
                        Judith A. Robinson, Notary Public
20                      in and for the State of Washington
                        residing at Seattle.
21                      My Commission expires November 4,
                        2024.
22                      CCR License #2171
23
24
25
```

Page 128

1    SARA ABARBANEL, ESQ.

2    Sabarbanel@foley.com

3                                           October 24, 2022

4    RE: ALEXANDER BEHREND vs. SAN FRANCISCO ZEN CENTER, INC.

5    October 18, 2022, BARBARA MACHTINGER, JOB NO. 5512409

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, noting the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived – Reading & Signature was waived at the

24      time of the deposition.

25

                                              Page 129

```
 1    _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

 2        Transcript - The witness should review the transcript and

 3        make any necessary corrections on the errata pages included

 4        below, notating the page and line number of the corrections.

 5        The witness should then sign and date the errata and penalty

 6        of perjury pages and return the completed pages to all

 7        appearing counsel within the period of time determined at

 8        the deposition or provided by the Federal Rules.

 9    __ Federal R&S Not Requested - Reading & Signature was not

10        requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 130

```
 1    CASE: ALEXANDER BEHREND vs. SAN FRANCISCO ZEN CENTER, INC.

 2    WITNESS: BARBARA MACHTINGER  (#JOB NO 5512409)

 3                   E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____    _____

24    WITNESS                           Date

25
```

Page 131

# Exhibit 5

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                      SAN FRANCISCO DIVISION

     _____

4    ALEXANDER BEHREND,              )

5                    Plaintiff,      )

6    v.                              ) Case No.

7    SAN FRANCISCO ZEN CENTER, INC.,) 3:21-cv-01905-JSC

8    SAN FRANCISCO EVERYDAY, INC.,   )

9    SAN FRANCISCO THIRD WAY, INC., )

10   THE ZEN FOUNDATION,             )

11                    Defendants.    )

     _____

12

13

14                   DEPOSITION OF SEIGEN JOHNSON

15                         9:00 a.m.

16                      October 21, 2022

17                  San Francisco, California

18

19

20

21   Reported By:

22   Judy Robinson, CCR #2171

23   Job No. 5541008

24

25   PAGES 1 - 111

                                              Page 1

1                 A P P E A R A N C E S

2

3    FOR THE PLAINTIFF, ALEXANDER BEHREND:

4

5    KYLE P. QUACKENBUSH, ESQ.

6    GIRARD SHARP, LLP

7    601 California Street, Suite #1400

8    San Francisco, California 94108

9    kquackenbush@girardsharp.com

10

11   FOR THE DEFENDANTS:

12

13   SARA ABARBANEL, ESQ.

14   EVAN HAMLING, ESQ.

15   FOLEY & LARDNER, LLP

16   11998 El Camino Real, Suite #400

17   San Diego, California 92130

18   Sabarbanel@foley.com

19   Ehamling@foley.com

20

21

22

23

24

25

                                              Page 2

```
 1                          I N D E X

 2

 3   WITNESS                 EXAMINATION                    PAGE

 4   SEIGEN JOHNSON

 5                      BY MR. QUACKENBUSH ........ 4-89

 6                      BY MS. ABARBANEL ........ 90-106

 7

 8

 9

10                     E X H I B I T S

11   NO.          PAGE        DESCRIPTION

12

13   Exhibit 32    47      Resident Meeting Notes, December, 2016

14   Exhibit 6     59      Previously Marked SFZC_BEHRED_0004

15                         for City Center

16   Exhibit 33    90      Subpoena

17

18

19

20

21

22

23

24

25

                                                      Page 3
```

1          BE IT REMEMBERED that the deposition upon oral

2    examination of SEIGEN JOHNSON was taken on October 21, 2022, at

3    9:00 a.m., at 125 South 309th Street, Federal Way, Washington,

4    98003, before Judith A. Robinson, CCR, Notary Public in and for

5    the State of Washington, residing at Federal Way, Washington.

6          Whereupon, the following proceedings were had, to-wit:

7               * * * * * *

8                    SEIGEN JOHNSON

9               having been first duly sworn

10                   on oath was examined

11                and testified as follows:

12                E X A M I N A T I O N

13    BY MR. QUACKENBUSH:

14    Q    Good afternoon.  My name's Kyle Quackenbush.  I

15    represent the plaintiff, Mr. Behrend, in a case against the San

16    Francisco Zen Center, Inc.

17          Can you please state your full name for the record?

18    A    Seigen Johnson.

19    Q    And could you spell that for court reporter?

20    A    Sure.  S, like Sam, E, I, G, like George, E, N, like

21    Nancy.  And my last name is J-O-H-N, S, like Sam, O-N, like

22    Nancy.

23    Q    Thank you.  So we'll start with a few preliminary

24    questions and ground rules.

25          Have you ever been deposed before?

                                             Page 4

1      Q    And what training, if any, is required to receive lay

2    ordination?

3      A    None.

4      Q    None, okay.  And how do you know that?

5      A    Because when I wanted to sow my lay Rakusu, and that's

6    R-A-K-U-S-U, that's all one word.  That's how you spell Rakusu.

7    When I wanted to receive the precepts, I just asked to receive

8    the precepts as a lay person.

9      Q    So, are you lay --

10     A    And I said yes.

11     Q    So, are you lay ordained?

12     A    In addition to being priest-ordained, yes.

13     Q    Okay.  And is there a period of time that you need to

14   practice, generally, before your -- you're allowed to be lay

15   ordained?

16     A    It depends on the --

17            MS. ABARBANEL:  Real quick, I'm just going to

18       object as to foundation.

19            But please continue.

20            WITNESS:  Okay.

21     A    That depends on the teacher, really.  Yeah.  There's no

22   hard and fast rule for that.  There's no hard and fast rule for

23   any of it.

24   BY MR. QUACKENBUSH:

25     Q    Okay.  And so, you mentioned that you need no specific

                                                    Page 35

```
 1                  (A brief break occurred.)

 2                  (Off the record.)

 3              MS. ABARBANEL:  I'm really quickly sending around

 4       what I will be marking as Exhibit 33.  It is sending now.

 5                  (Exhibit No. 33 was marked.)

 6                  E X A M I N A T I O N

 7   BY MS. ABARBANEL:

 8       Q    Good morning -- or good afternoon, I guess,

 9   Ms. Johnson.  Almost good evening for you.  My name is

10   Sara Abarbanel, and I am Counsel for Defendants in this matter.

11           You understand that even though we switched questioning

12   attorneys, you're still under the same oath you took earlier?

13       A    Yes.

14       Q    Wonderful.  And I would just like to introduce Exhibit

15   33.  It's the one document I sent around.  So, let me know when

16   folks get it.

17       A    I think I just got it.

18              MR. QUACKENBUSH:  Kyle, do you have that as well?

19              MR. QUACKENBUSH:  I do, yeah.

20              MS. ABARBANEL:  Okay, great.

21   BY MS. ABARBANEL:

22       Q    Do you recognize this document?

23       A    I'm looking at the subpoena?

24       Q    So, yes, you recognize this document?

25       A    Yes, if this document is the subpoena to testify, yes.
```

Page 90

```
 1        Q    Great.  And toward the bottom of the first page, it
 2   says the name, address, email address, and telephone number of
 3   the attorney representing Plaintiff is Mr. Quackenbush.
 4             Does Mr. Quackenbush represent you?
 5        A    No.
 6        Q    So going back toward the top-third of the page next to
 7   the check mark, it states, "You are commanded to appear at the
 8   time, date, and place set forth below to testify in deposition
 9   to be taken in the civil action."
10        A    Yes.
11        Q    And the date and time listed are October 21st at
12   11:00 a.m., and going to represent that's eastern time since you
13   are not within that time zone; is that correct?
14        A    Yes.
15        Q    And did you appear at 11:00 a.m. this morning?
16        A    No, I did not.
17        Q    So, I don't need this exhibit anymore.
18             So, you said you are not represented by Plaintiff's
19   Counsel.
20             How did you connect with Mr. Quackenbush and
21   Plaintiff's Counsel, generally?
22        A    I believe Alex requested myself and another friend of
23   ours who lived at Zen Center.  We had an initial meeting, I
24   think, back in January.
25        Q    That's January of this year, 2022?
```

                                                      Page 91

```
 1   the bottom of page 2 and beginning of 3 where we discussed
 2   earlier Natalia and Phyllis.
 3           Did Alex express agreement with these particular points
 4   at this meeting?
 5       A    At this meeting?
 6       Q    Yes.
 7       A    I don't know.  It's not reflected in the minutes, and I
 8   don't recall from memory.
 9       Q    I'm done with that exhibit.
10           You described earlier also the Doan helping with the
11   religious ceremony; is that correct?
12       A    The Doanryo?
13       Q    Or Doanryo, yes?
14       A    Yes.
15       Q    And you said that they help keep time; is that correct?
16       A    Yes.
17       Q    Is keeping time important in the religious ceremony?
18               MR. QUACKENBUSH:  Object to form.
19       A    The short answer is yes.
20   BY MS. ABARBANEL:
21       Q    All right.  And if a religious organization, in your
22   opinion, makes money, is it no longer a religious organization?
23               MR. QUACKENBUSH:  Object to form.
24       A    No, absolutely not.
25   BY MS. ABARBANEL:
```

Page 105

```
1              C E R T I F I C A T E

2

3        I, Judith A. Robinson, Certified Court Reporter and an

4    officer of the Court under my commission as a Notary Public, in

5    and for the State of Washington, do hereby certify that the

6    foregoing deposition was transcribed under my direction; that

7    the transcript of the deposition is a full, true and correct

8    transcript to the best of my ability; that I am neither attorney

9    for, nor a relative or employee of any of the parties to the

10   action or any attorney or Counsel employed by the parties

11   hereto, nor financially interested in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13   and affixed my official seal this 26th day of October,

14   2022.

15

16

17

18

19            Judith A. Robinson, Notary Public

20            in and for the State of Washington

21            residing at Seattle.

22            My Commission expires November 4, 2024.

23            CCR License #2171

24

25
```

Page 107

1   SEIGEN JOHNSON

2                                                  October 26, 2022

3   RE: BEHREND vs. SAN FRANCISCO ZEN CENTER, INC.

4   OCTOBER 21, 2022, SEIGEN JOHNSON, JOB NO. 5541008

5

6   The above-referenced transcript has been

7   completed by Veritext Legal Solutions and

8   review of the transcript is being handled as follows:

9   __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, notating the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20  __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23  __ Signature Waived – Reading & Signature was waived at the

24      time of the deposition.

25

                                                  Page 108

```
 1    xx Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

 2       Transcript - You should review the transcript and

 3       make any necessary corrections on the errata pages included

 4       below, notating the page and line number of the corrections.

 5       You should then sign and date the errata and penalty

 6       of perjury pages and return the completed pages to all

 7       appearing counsel within the period of time determined at

 8       the deposition or provided by the Federal Rules.

 9    __ Federal R&S Not Requested - Reading & Signature was not

10       requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

128

1          I, the undersigned, declare under penalty of

2     perjury that I have read the foregoing transcript, and

3     I have made any corrections, additions, or deletions,

4     that I was desirous of making; that the foregoing is a

5     true and correct transcript of my testimony contained

6     therein.

7

8          EXECUTED this _____ day of _____ 2022

9     at _____, _____.

10

11

12

13

14          _____

15                    SEIGEN JOHNSON

16

17

18

19

20

21

22

23

24

25

                                        Page 110

```
1    RE: BEHREND vs. SAN FRANCISCO ZEN CENTER, INC.

2    SEIGEN JOHNSON (JOB NO. 5541008)

3

4                 E R R A T A   S H E E T

5    PAGE_____ LINE_____ CHANGE_____

6    _____

7    REASON_____

8    PAGE_____ LINE_____ CHANGE_____

9    _____

10   REASON_____

11   PAGE_____ LINE_____ CHANGE_____

12   _____

13   REASON_____

14   PAGE_____ LINE_____ CHANGE_____

15   _____

16   REASON_____

17   PAGE_____ LINE_____ CHANGE_____

18   _____

19   REASON_____

20   PAGE_____ LINE_____ CHANGE_____

21   _____

22   REASON_____

23

24   _____   _____

25   SEIGEN JOHNSON                       Date

                                        Page 111
```

# Exhibit 6

```
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4      _____

 5      ALEXANDER BEHREND,            )

 6                   Plaintiff,       )

 7      v.                            )No. 3:21-cv-01905-JSC

 8      SAN FRANCISCO ZEN CENTER, INC.,)

        SAN FRANCISCO EVERYDAY, INC.,  )

 9      SAN FRANCISCO THIRD WAY, INC., )

        THE ZEN FOUNDATION,           )

10                                    )

                     Defendants.      )

11      _____

12                  DEPOSITION OF MARY STARES

        _____

13

                         9:00 a.m.

14                    October 26, 2022

                  San Francisco, California

15

16

17

18

19

20                    File #5516408

21

22

23

24

25         Reported By:  Judy Robinson, CCR #2171

                                           Page 1
```

```
 1                        A P P E A R A N C E S
 2          FOR THE PLAINTIFF, ALEXANDER BEHREND:
 3          KIMBERLY MACEY, ESQ.
            SCOTT GRZENCZYK, ESQ.
 4          GIRARD SHARP, LLP
            601 California Street, Suite #1400
 5          San Francisco, California 94108
            kmacey@girardsharp.com
 6          kquackenbush@girardsharp.com
 7
            FOR THE DEFENDANTS:
 8
            EVAN HAMLING, ESQ.
 9          SARA ABARBANEL, ESQ.
            FOLEY & LARDNER, LLP
10          11998 El Camino Real, Suite #400
            San Diego, California 92130
11          Sabarbanel@foley.com
            Ehamling@foley.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1                        I N D E X

 2        WITNESS           EXAMINATION              PAGE

 3        MARY STARES

 4                          BY MS. MACEY ........... 4-97

                            BY MR. HAMLING ......... 97-101

 5

 6

 7

 8

 9

10                        E X H I B I T S

11     NO.          PAGE      DESCRIPTION

12     Exhibit 34     9       Notice of Deposition for Mary Stares

13     Exhibit 35    20       Bio of Mary Stares

14     Exhibit 36    52       Saturday Doan-ryo Crew Email with

                              Paula Pietranera

15

       Exhibit 4     57       Previously Marked, SFZC_BEHREND_000043

16

       Exhibit 37    61       Sesshin Kitchen Crew Schedule Email

17

       Exhibit 38    64       Working Meeting Notes, Dated

18                            March 17, 2017

19     Exhibit 32    90       Previously Marked Residents' Meeting

                              Notes, Dated December 10, 2016

20

21

22

23

24

25

                                                    Page 3
```

```
1              BE IT REMEMBERED that the deposition upon oral

2         examination of MARY STARES was taken on

3         October 26, 2022, at 9:00 a.m., at 125 South 309th Street,

4         Federal Way, Washington, 98003, before Judith A. Robinson,

5         CCR, Notary Public in and for the State of Washington,

6         residing at Federal Way, Washington.

7               Whereupon, the following proceedings were had,

8         to-wit:

9                          * * * * * * *

10                         MARY STARES

11              having been first duly sworn

12                   on oath was examined

13                and testified as follows:

14              E X A M I N A T I O N

15        BY MR. MACEY:

16           Q.   Good morning.  My name is Kimberly Macey, on behalf

17        of Girard Sharp, LLP.  We represent Mr. Behrend in this

18        action.

19              Can you please state your name for the record?

20           A.   Yes, my name is Mary Elizabeth Stares.

21           Q.   Great, thank you.  Hello, Ms. Stares.

22              First, have you ever been deposed before?

23           A.   I have not.

24           Q.   Okay.  And so, I'm assuming you have not been

25        deposed remotely?
```

Page 4

1    Exhibit No. 35.

2        A    Yes, I see that.

3        Q    As far as you can tell, is Exhibit 35 a true and

4    accurate copy of your bio on San Francisco Zen Center's website?

5        A    Yes, it is.

6        Q    You have no reason to doubt that Exhibit 35 is a true

7    and accurate copy of your bio, correct?

8        A    That is correct.

9        Q    Here it states that you've been at San Francisco Zen

10   Center on and off since 2000, which I believe you just

11   represented to me.

12            When did you first begin working at San Francisco Zen

13   Center?

14       A    The concept of working as opposed to practicing is

15   indistinguishable.  I began living at Zen Center in the summer

16   of 2000, and I continued on and off and more permanently in the

17   -- in March of 2009, and at -- at those -- through until 2021,

18   and the concept of work as opposed to practice is an incorrect

19   concept.

20       Q    Okay.  What positions have you held at San Francisco

21   Zen Center?

22       A    So I've been in the -- the -- the workshop.  I was part

23   of a guest practice program.  I have been the Fuguten, which is

24   the manager of the kitchen.  Or the Fuguten, the Tenzo, which is

25   the kitchen manager at both Tassajara and City Center.  I have

                                                      Page 21

1   what job they would like to do.  So it was -- it was sometimes

2   about comfort.  I don't think we ever made assignments when

3   somebody said they absolutely did not want to do something.

4        Q    Okay.  And when you assigned WPAs to work on crews with

5   things that they were not familiar with, was that just to expand

6   their knowledge base?

7             MR. HAMLING:  Objection, form.

8        A    The -- one of the principles, as I understand it, about

9   living in a temple is the -- or the way that San Francisco Zen

10  Center approaches work practice is that it's -- it's to develop

11  this idea of beginner's mind.  So to do something that you know

12  really well and are familiar with means you rely on habit

13  pattern and how you always have done things.  And so we try to

14  do the exact opposite, which is have people look at discomfort,

15  look at work as a -- an element of their practice and look at

16  how their mind is working while they're practicing, and examine

17  their intention while they're both in formal practice and doing

18  work practice, and that I would say -- the idea is that we think

19  -- we thought -- we think that it's easier if you're doing

20  something that you're not familiar with.

21  BY MS. MACEY:

22       Q    Okay.  So would you say it was preferred for the

23  individual to not have any experience in the work crew that they

24  were assigned; is that fair to say?

25            MR. HAMLING:  Objection.  Foundation and vague and

                                                      Page 40

```
 1   Saturday there was a thing called meditation Zazen instruction.
 2   There was also an offering called Zendo forms.  So people that
 3   were interested in participating at San Francisco Zen Center
 4   were encouraged to do those two things.
 5           Often we invited people to do Zazen training many times
 6   with different people who are leading and to ask questions.  And
 7   the -- the Ino always noticed -- the Ino would sit facing out,
 8   so they always noticed when somebody was coming in for the first
 9   time into Zazen or service and seemed very unfamiliar, and they
10   would get up and assist people.  So I -- I -- I do not think the
11   statement that you made is true.
12   BY MS. MACEY:
13       Q    Okay.  So there was no formal training required?
14               MR. HAMLING:  Objection.  Misstates testimony.
15       A    No, I said there -- there was formal training.  There
16   was training offered but not required.
17   BY MS. MACEY:
18       Q    Okay.  Thank you.  So the practitioners involved in the
19   Doan-ryo did not have to be trained every time for performing in
20   a religious ceremony; is that correct?
21               MR. HAMLING:  Objection.  Vague and ambiguous as to
22       religious ceremony and speculation and foundation.
23       A    The members of the Doan-ryo received training before
24   they did specific jobs.  They would not -- the technical nature
25   of all those jobs, aside from door watch, would make it
```

Page 55

1    impossible to do those jobs without training.

2    BY MS. MACEY:

3       Q    Okay.  So in Ms. Pietranera's email, it seems that this

4    Doan-ryo crew was not doing -- they had not been trained on

5    these particular positions prior to performing this Doan-ryo?

6       A    I -- I would say what we're suggesting there is the way

7    people were combined.  The -- what had happened before this, if

8    my memory serves me, is that somebody was asked to do door watch

9    and they would have done door watch for many months.

10          The experiment -- again, if I'm relying on my memory,

11   was instead it have having Mary be door watch for the entire

12   length of the practice period, what I was proposing and what

13   Paulo was suggesting, directing -- by direction from me, was

14   that one week I would be door watch or one day -- one week I

15   would be door watch on the crew.  The next week with that same

16   crew, I would be a Kokyo.  The next week I would be on the Doan.

17   The next week Fukudo.  So the positions in the crew themselves

18   were rotating.  It's not that these were people that were

19   untrained to do those positions.

20      Q    Okay.  Was it ever the case that someone would serve on

21   the Doan-ryo without having performed that position previously

22   and never having received training for that position?

23              MR. HAMLING:  Objection, form and speculation.

24      A    I -- I believe that because of the technical nature of

25   the jobs on the Doan-ryo that it is impossible to perform those

                                                        Page 56

```
 1        A     Correct.
 2        Q     And is every person at San Francisco Zen Center doing
 3   those things?
 4               MR. HAMLING:  Objection, form.
 5        A     No.
 6   BY MS. MACEY:
 7        Q     Okay.  Were any Zen Center residents referred to as
 8   Ordinands?
 9        A     Yes.  That applies to a specific ceremony.
10        Q     Okay.  That's what an Ordinand is, just to clarify?
11        A     It's -- it's somebody that is either -- so there are
12   two different ceremonies.  One is lay ordination and another is
13   priest ordination.  And the -- the -- the folks that are doing
14   that ceremony are referred to as those individuals.
15        Q     Okay.  Lay and priest ordination?
16        A     Yes.
17        Q     Did you ever refer to Mr. Behrend as an Ordinand?
18        A     I do not believe that Alex was in the process of sewing
19   a Rakusu or was taking formal lay ordination.
20        Q     Okay.  What is a Rakusu?
21        A     A Rakusu is a piece of fabric that, in the tradition of
22   San Francisco Zen Center, you live at the temple for a time.
23   You have a relationship with a teacher.  You ask for permission
24   to be -- or receive lay ordination, which means that you
25   acknowledge that you're a student of Zen Buddhism.
```

Page 81

```
1        A    Yes, I am.

2        Q    Is Zen Buddhism a religion?

3        A    I would say it is a religion.  Some people say it's a

4   philosophy.  But my experience living in the temple, like the

5   fact that I'm a priest and take vows, often daily, means that I

6   feel like it's a -- it's a religion.

7        Q    So you actually just touched on my next question.

8             Is San Francisco Zen Center a religious organization?

9        A    Yes, it is.

10       Q    How do you know that?

11            MS. MACEY:  I'm going to object to speculation real

12       quick.

13       A    Because I believe in the teachings of the Buddha.  I

14   follow the Dharma and I take guidance from the Sangha.  Because

15   I'm an ordained priest in the organization, because I often

16   relate to people as a priest.

17   BY MR. HAMLING:

18       Q    And the practice of Zen Buddha is not exclusively done

19   at San Francisco Zen Center, correct?

20       A    Correct.

21            MS. MACEY:  Speculation.  Sorry.

22   BY MR. HAMLING:

23       Q    Does the fact that -- in -- in your opinion, does the

24   fact that a religious organization collects revenue mean that it

25   is no longer a religious organization?
```

                                                              Page 98

1           MS. MACEY:  Speculation, objection.

2      A    A religious organization, particularly one that has a

3  residential population who lives in -- within the walls of the

4  religious institution, needs to eat, needs to pay bills, PG and

5  E, comes up every month.  So the fact that they solicit

6  donations and have people who do work in the temple and have

7  hospitality and things like that, it doesn't mean that it is not

8  a religious institution.

9  BY MR. HAMLING:

10     Q    And did you say that you've been practicing Zen

11 Buddhism yourself since 1999?

12     A    I've been practicing Zen Buddhism since 2000.  I also

13 practiced with a Tibetan group.

14     Q    In your experience as a practitioner of Zen Buddhism,

15 is residing in a temple community considered practice?

16     A    It is -- it is one manifestation of practice.

17     Q    Is another manifestation of practice within Zen

18 Buddhism eating an Oryoki meal?

19     A    Yes.

20          MS. MACEY:  Objection for speculation and calls for

21     a legal conclusion.

22 BY MR. HAMLING:

23     Q    Is the preparation of an Oryoki meal a manifestation of

24 practice within Zen Buddhism?

25          MS. MACEY:  Objection for speculation and calling

                                                    Page 99

1        for a legal conclusion.

2        A     Yes.

3    BY MR. HAMLING:

4        Q     Is cleaning the temple within the context of Zen

5    Buddhism considered practice?

6        A     Yes, it is.

7        Q     Is sitting Zazen in a Zen Buddhist temple considered

8    practice?

9        A     Yes, it is.

10       Q     Is sitting a Sesshin considered practice within the

11   context of Zen Buddhism?

12       A     Yes, it is.

13       Q     Does the practice of Zen Buddhism by any individual

14   impact another individual's own practice of Zen Buddhism?

15             MS. MACEY:  Objection.  Speculation, foundation.

16       A     That can be answered on two levels.  Yes, absolutely.

17   As we in community touch one another, other people's actions

18   affect us and touch us.  And on a second level, we are -- we --

19   we are -- we are responsible for our own thoughts and how we

20   react to other things.  And like my -- my thoughts make my

21   world.

22   BY MR. HAMLING:

23       Q    At San Francisco Zen Center is following any schedule

24   necessary to be practicing Zen Buddhism?

25       A    It is -- it supportive to practice Zen Buddhism,

                                                Page 100

1    however there are many people who do not follow the schedule.

2    There are many people that live outside of the temple that do

3    not follow the schedule who are practitioners.

4        Q    Does that reasoning also apply to other requirements

5    that San Francisco Zen Center might impose on residents?

6        A    Yeah.  I think we provide a container.  The container

7    is provided.  The schedule exists.  The formal -- formal

8    practice exists.  Work exists.  All those things are presented

9    to residents, and for whatever reason, some residents are able

10   to follow all of those things very easily, and other residents

11   are not able to follow those things very easily, and yet both of

12   those individuals are residents of the temple and practitioners

13   of the way.

14       Q    I believe earlier you were talking about setting

15   examples through things like preparing Oryoki and being in the

16   door watch position.  Is it fair to say that teaching Zen

17   Buddhism to others can be done through example?

18       A    I -- I think it is the body to body is the primary way

19   that Zen is taught.

20            MR. HAMLING:  One moment.  I actually think has all

21       the questions that I have.

22            (The deposition of Mary Stares was concluded at

23   1:25 p.m.)

24            (Signature was reserved.)

25

                                              Page 101

```
 1    STATE OF WASHINGTON )

 2                       ) SS.

 3    COUNTY OF KING      )

 4

 5          I, the undersigned, declare under penalty of

 6    perjury that I have read the foregoing transcript, and

 7    I have made any corrections, additions, or deletions,

 8    that I was desirous of making; that the foregoing is a

 9    true and correct transcript of my testimony contained

10    therein.

11

12          EXECUTED this _____ day of _____ 2022 at

13    _____, _____.

14

15

16                              _____

17

18                              MARY STARES

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON )
                         )SS.
 4   COUNTY OF KING      )

 5

 6        I, Judith A. Robinson, Certified Court Reporter and an

 7   officer of the Court under my commission as a Notary Public, in

 8   and for the State of Washington, do hereby certify that the

 9   foregoing deposition was transcribed under my direction; that

10   the transcript of the deposition is a full, true and correct

11   transcript to the best of my ability; that I am neither attorney

12   for, nor a relative or employee of any of the parties to the

13   action or any attorney or counsel employed by the parties

14   hereto, nor financially interested in its outcome.

15        IN WITNESS WHEREOF, I have hereunto set my hand

16   and affixed my official seal this 28th day of October,

17   2022.

18

19

                     Judith A. Robinson, Notary Public

20                   in and for the State of Washington

                     residing at Seattle.

21                   My Commission expires November 4,

                     2024.

22                   CCR License #2171

23

24

25

                                              Page 103
```

1    SARA ABARBANEL, ESQ.

2    Sabarbanel@foley.com

3                                          October 31, 2022

4    RE: BEHREND vs. SAN FRANCISCO ZEN CENTER, INC.

5    October 26, 2022, MARY STARES, JOB NO. 5516408

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived – Reading & Signature was waived at the

24       time of the deposition.

25

                                              Page 104

1    _x_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, notating the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 105

```
 1   BEHREND vs. SAN FRANCISCO ZEN CENTER, INC.

 2   MARY STARES (#5516408)

 3                    E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   WITNESS                            Date

25
```

Page 106

# Exhibit 7

```
 1                  UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN FRANCISCO DIVISION
 4     _____
 5     ALEXANDER BEHREND,                )
 6                    Plaintiff,         )
 7     v.                                )No. 3:21-cv-01905-JSC
 8     SAN FRANCISCO ZEN CENTER, INC.,)
       SAN FRANCISCO EVERYDAY, INC.,  )
 9     SAN FRANCISCO THIRD WAY, INC., )
       THE ZEN FOUNDATION,               )
10                                       )
                      Defendants.        )
11     _____
12              30(B)(6) SAN FRANCISCO ZEN CENTER
                 DEPOSITION OF MICHAEL MCCORD
13     _____
14                       9:00 a.m.
                      October 28, 2022
15                 San Francisco, California
16
17
18
19
20                     File #5516419
21
22
23
24
25        Reported By:  Judy Robinson, CCR #2171
```

Page 1

```
 1                    A P P E A R A N C E S
 2      FOR THE PLAINTIFF, ALEXANDER BEHREND:
 3      KYLE QUACKENBUSH, ESQ.
        GIRARD SHARP, LLP
 4      601 California Street, Suite #1400
        San Francisco, California 94108
 5      kquackenbush@girardsharp.com
 6
        FOR THE DEFENDANTS:
 7
        EILEEN RIDLEY, ESQ.
 8      FOLEY & LARDNER, ESQ.
        555 California Street, 17th Floor
 9      San Francisco, California 94104
        eridley@foley.com
10
11      FOR THE DEFENDANTS:
12      SARA ABARBANEL, ESQ.
        EILEEN RIDLEY, ESQ.
13      FOLEY & LARDNER, LLP
        11998 El Camino Real, Suite #400
14      San Diego, California 92130
        Sabarbanel@foley.com
15
16      Also Present:  Greg McClune
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1                    I N D E X

 2    WITNESS          EXAMINATION            PAGE

 3    MICHAEL MCCORD

 4               BY MR. QUACKENBUSH ....... 4-140

 5

 6

 7

 8

 9

10                 E X H I B I T S

11    NO.          PAGE      DESCRIPTION

12    Exhibit 39     9       30(b)(6) Deposition Notice

13    Exhibit 6     64       Saturday Doan-ryo Crew Email with

                             Paula Pietranera

14
      Exhibit 4    103       Previously Marked

15                           SFZC_BEHREND_000043

16    Exhibit 7    132       Shinghi, Pure Standards for

                             Residential Training

17

18

19

20

21

22

23

24

25

                                          Page 3
```

```
 1              BE IT REMEMBERED that the 30(b)(6) deposition upon
 2        oral examination of SAN FRANCISCO ZEN CENTER BY MICHAEL
 3        MCCORD was taken on October 28, 2022, at 9:00 a.m., at 125
 4        South 309th Street, Federal Way, Washington, 98003, before
 5        Judith A. Robinson, CCR, Notary Public in and for the State
 6        of Washington, residing at Federal Way, Washington.
 7                   Whereupon, the following proceedings were
 8        had, to-wit:
 9                        * * * * * * *
10                   MICHAEL MCCORD
11                having been first duly sworn
12                     on oath was examined
13                  and testified as follows:
14                E X A M I N A T I O N
15        BY MR. QUACKENBUSH:
16           Q.    Good morning.  My name is
17        Kyle Quackenbush.  I represent the plaintiff,
18        Alex Behrend, in this case against San Francisco Zen
19        Center.
20                   Can you please state your full name for
21        the record?
22           A.    Michael McCord.
23           Q.    All right.  We'll start with a few
24        preliminary questions and some ground rules, okay?
25           A.    Great.
```

Page 4

 1          Q.      And can you describe -- strike that.

 2                  Did you receive any religious training

 3      before becoming affiliated with San Francisco Zen

 4      Center?

 5          A.      Yes --

 6                  MS. RIDLEY:  Objection, vague.

 7                  WITNESS:  Sorry, I moved too quickly.

 8                  MS. RIDLEY:  It's okay.

 9                  WITNESS:  Yes, I did.

10      BY MR. QUACKENBUSH:

11          Q.      Can you describe that training?

12          A.      I came by and took instruction in the

13      meditation practices.

14                  I also came by and took instruction for

15      what we call the Doan-ryo, which are the people who

16      lead the services and are the ones who play the -- we

17      call it:  "Play the bells to people externally."

18                  But what you're actually doing is you're

19      actually reminding people to be present at specific

20      times in a religious ceremony.  By playing a bell

21      used solely for the Tanken you're playing a wood

22      block, and the wood block has a statement on it that

23      says, you know, "Come back to the present now."

24                  And you are standing there facing that

25      wood block holding a meditation posture and hitting

                                            Page 16

1      that wood block very specifically at specific times
2      bringing people back to the present.  So you are in
3      many ways the guide to the religious ceremony.
4                     And I came and took lessons in being on
5      the Doan-ryo and being a Doan, as we call it, for
6      several months before I became affiliated officially
7      by moving into the San Francisco Zen Center.
8              Q.     What was the first job that you had at
9      San Francisco Zen Center?
10                    MS. RIDLEY:  Objection, vague.  Assumes
11     -- assumes evidence.  Calls for a legal conclusion.
12     You can respond.
13                    WITNESS:  When you say "job," what do
14     you -- what do you -- are you talking about --
15     BY MR. QUACKENBUSH:
16             Q.     Why don't I clarify the question?
17             A.     Sure.
18             Q.     When you became a resident at San
19     Francisco Zen Center, did you -- did you -- did you
20     fill a staff position?
21             A.     I filled a work practice apprentice
22     position.  Later on I filled a staff position.  But
23     when I first moved in it would have been a work
24     practice position.
25             Q.     And what was your first staff position?

                                                    Page 17

```
1        residence as a WPA first or have a -- an extensive
2        relationship with San Francisco Zen Center as a
3        practitioner before entering into the Dharma Bridge
4        Program.
5                     And then you would apply, and that would
6        be reviewed by the practice committee.
7                     And the practice committee would review
8        the application and decide whether or not they would
9        be accepted into Dharma Bridge or whether they needed
10       to potentially do a stay as the WPA for a number of
11       -- maybe a guest student stay for a longer period of
12       time.
13                    But each application would be reviewed
14       individually, and the thing that they would be
15       looking for would be whether or not this individual
16       would be able to sustain a Zen practice while
17       actually holding a job outside the temple.  And this
18       would be a unique balance for a lot of people.
19                    So it's a fairly narrow slice that it
20       would apply to.
21            Q.    What do you mean when you say a "Zen
22       practice"?  What's that?
23            A.    Well, a Zen formal practice would be
24       working with a daily meditation practice.  Being in
25       touch with a teacher and having conversations with a
```

Page 34

1    teacher.  Learning how the physical forms aren't just

2    forms but they are actually teaching moments, i.e.,

3    learning how to be on the Doan-ryo, learning via also

4    going to classes, and being a continuing student of

5    Zen, and knowing what work practice is and how it is

6    indivisible from everyday life.

7                  And so that outside of the restroom

8    there is a Gantah, a little alter, and Zen practice

9    is something that you're supposed to be doing 24/7,

10   and the temple is designed to teach people this.

11                 So when people are doing, you know,

12   their Zen practice and they are going to the

13   restroom, they pause outside the door before they go

14   into the restroom and they take a very specific hand

15   posture and they bow to the altar before going into

16   the restroom.

17                 And all of the elements that had to do

18   with working in the kitchen and how you carry the pot

19   to the water, not the water to the pot in a very

20   specific way with two hands.  Because it has to do

21   with respect to the pot and who made the pot and the

22   water that we have and what happens to the water that

23   spilled in the sink while you're washing vegetables

24   and how you don't just wash that down the drain.

25                 And the Tenzo, one of the members of the

Page 35

```
 1        practices.
 2                    But a formal teacher would be someone
 3        who has not only ordained as a Zen priest but then
 4        has been in the practice for a number of years; and
 5        then a teacher officially in Zen Buddhism is a person
 6        who could ordain other teachers.
 7                    But I, myself, am a Zen priest and I
 8        have been ordained and I have students, but I am not
 9        actually officially a teacher.  Because that is
10        another ordination usually ten or twenty years down
11        the road where you become an official, quote-unquote,
12        "teacher" and you can ordain teachers.
13                    But up until then people, when I was a
14        WPA and when I was a staff member and even after my
15        ordination as a priest, I certainly taught meditation
16        instruction on many different aspects of our
17        religious training.
18             Q.    So you were ordained as a priest; is
19        that correct?
20             A.    I was in 2014.
21             Q.    Was that lay ordination or priest
22        ordination?
23             A.    My lay ordination was in 2011 and my
24        priest ordination was in 2014.
25             Q.    What was the process for receiving
```

Page 40

1       priest ordination?

2              A.      The process for receiving priest

3       ordination is one that starts from the moment you

4       enter the temple.  There is not a -- if you were to

5       take a Western Catholic or Protestant process and lay

6       that on top of Zen Buddhism it would be a big

7       misunderstanding.

8                     Because it is not like going to Catholic

9       seminary where if you do these things, study these

10      things, and after four years then we will baptize you

11      as a priest.  That is not what is going on, and

12      that's a Westernization, if you will.  A Western

13      mindset on top of something that is not Western.

14                    So in Zen Buddhism it very much respects

15      the individual growth and the enlightenment moments

16      the students have.

17                    So, for instance, someone comes in and

18      they work with their teacher and they work with the

19      head of practice from day one; and from that point

20      forward, whether or not you should be a WPA, whether

21      or not you should be a staff member, whether or not

22      you should be Dharma Bridge, whether or not you

23      should ordain as a priest, whether or not you should

24      ordain as a teacher, it is something that is on a

25      unique timeline to each student.

Page 41

```
 1                    And it has to do with their personal
 2     growth, their emotional maturity, their awareness of
 3     the people around them, how well that they reflect
 4     the Dharma.  And so you might be in residence for
 5     20 years.
 6                    And you've got a great example that
 7     you've had in this court case right here where you've
 8     had a witness with Barbara Machtinger, who's been in
 9     residence for 21 years, she's lay ordained, and is
10     not a priest.
11                    You have Mary Stares, who has been --
12     was in residence and is no longer in residence, but
13     she was for 10 years and she is ordaining next year
14     as a teacher, and she has students, and she was a
15     former director and priest inhouse.
16                    And then you have me, where I'm ordained
17     as a priest but I'm not a teacher.
18                    And so all along this pathway people
19     have different jumps and starts for what might be
20     appropriate for their growth based upon their
21     relationship with their teacher and how they're
22     growing.
23                    And we have people who have come back
24     here and been the head of practice in 2020, or head
25     of practice was Nancy Petrin, and Nancy Petrin was
```

Page 42

1                    WITNESS:  I would say that is the
2       primary reason people join SF Zen Center.
3                         Because in order to practice Buddhism
4       you are engaging in openness to what it is that's
5       appropriate for you.  So everyone is in the exact
6       same bucket, and you know from day one that you are
7       in a religious training program.
8                         If you just want to practice Buddhism
9       and have no desire for it to ever be formalized,
10      well, you can come to the temple and you can join us
11      for meditation any day of the week and you can take
12      classes.
13                        But if you join the temple you are a
14      monk, and when I say "you are a monk," that means you
15      -- you read the Shinghi, the S-H-I-N-G-H-I, the rules
16      for monastic life, and you take the vows every month
17      in the Full Moon Ceremony to live as a Buddhist.
18                        And so the people that are on the
19      outside, they're not required to take those vows.
20      They're not required to live by the Shinghi.  They
21      are not required to end their job, carry the pot with
22      two hands, and to when you're chopping carrots you
23      put down the knife if you want to talk, and you look
24      at the person in the eyes and you, you know, you have
25      your mouth shut and you breathe through your nose.

                                            Page 49

1                    And, you know, if you're engaging in
2        this all day long you're in a religious training
3        program that you have had vows and you've committed
4        to the Shinghi and all the rest of it.
5                    Now, are you just a, quote-unquote, a
6        Buddhist practitioner?  Still to this day I am just a
7        Buddhist practitioner who is seeing how this is
8        unfolding for me.
9                    But I engaged from day one in a very
10       clear religious training program that the people who
11       are coming here from the outside do not have to
12       commit to.
13       BY MR. QUACKENBUSH:
14           Q.     So is it possible to read the Shinghi
15       and take the vows and do all those things that you
16       said and not live at San Francisco Zen Center?
17           A.     You would -- you would not commit to
18       the Shinghi if you lived outside.
19                    I mean, I guess you could personally if
20       you wanted to, but we have no process for that and
21       it's never -- there is no -- there's no setup for
22       that.
23           Q.     What does that mean there's no setup
24       for that?
25           A.     Well, it's a commitment that all the

                                              Page 50

1    practice.  And so all of these things once learned

2    could be continued in your daily life.

3    BY MR. QUACKENBUSH:

4         Q.      In your view, does anyone that attends

5    ceremonies at San Francisco Zen Center but lives

6    outside of the residence San Francisco Zen Center,

7    are they in religious training?

8         A.      In a vague way, yes.  But they are not

9    a part of a religious training program.  Because

10   they're not in the WPA policy.  They do not have that

11   structure.  They do not have to meet with a teacher.

12   They do not have to attend religious events.  They

13   don't have to say yes when someone says now you need

14   to learn how to be a Chiden.  Now you need to learn

15   how to be a Doan.  There is no relationship that has

16   been agreed to by those people.

17              So in a casual way, they could continue,

18   quote-unquote, training in all sorts of things that

19   are Zen.  But they are not a part of our religious

20   training program because there are no Zen

21   requirements on them.  And if they decide to go visit

22   their family in Hawaii for eight months and not come

23   to the temple, it's completely up to them.

24              But the people living here, well, they

25   need to go to community meetings.  They need to read

Page 52

1      the class documents that are passed out.  They need

2      to go to morning meditation.  They need to talk to

3      the head of practice.  They are in -- they are in a

4      -- in an active training program, whereas those other

5      folks are not in an active training program.

6              Q.     And residents at San Francisco Zen

7      Center have to meet all those obligations unless

8      their work interferes with those obligations,

9      correct?

10             MS. RIDLEY:  Objection, assumes facts.

11     Vague.  You can respond.

12             WITNESS:  No, that's not true.

13             MR. QUACKENBUSH:  Okay.  I'll wait to

14     bring out in the documents where it says that.

15             MS. RIDLEY:  We've been going over an

16     hour.  Can we take a break?

17             MR. QUACKENBUSH:  Yeah, happy to.

18               (Off the record.)

19             MR. QUACKENBUSH:  So I just want to

20     note on the record that defendants produced what

21     appears to be one document entitled San Francisco Zen

22     Center Work Practice Staff Policies 34 minutes into

23     this deposition, and this deposition covers staff

24     compensation, process for becoming a staff member,

25     and also handbooks and policy documents.

Page 53

1      continue with this deposition.

2      BY MR. QUACKENBUSH:

3              Q.      Mr. McCord, welcome back.

4              A.      Hi.

5              Q.      You understand that you're still under

6      oath?

7              A.      I do.

8              Q.      What is a work practice apprentice?

9              A.      A work practice apprentice is someone

10     who has applied to be a part of our training program

11     in one of our three temples during the first two

12     years of their residency and study.

13              And the work practice apprentice is a

14     person that lives as monk in a monastery, and when I

15     say "monk," I mean following the monastic guidelines

16     as set out in the Shinghi and committing to follow

17     those guidelines.

18              They are a person that is in residence.

19              They are a person that's required to

20     follow the schedule.

21              They are a person that's required to

22     have a teacher, a formal teacher that they meet with

23     once a month.

24              And the work practice apprentice is

25     assigned a work crew so they can learn work practice.

Page 55

1                    And they are also assigned house jobs.

2                    And they are assigned a dish shift.

3                    And so all of those were elements are

4       something that is designed to create a container for

5       an individual, and the name of it is a work practice

6       apprentice.

7                    And it is requested that they be in the

8       program for two years.  However, the program, based

9       upon other experiences the person might have, is

10      something that could end in one year or shorter if

11      they come in and say as an ordained priest from

12      another lineage or --

13                   Oh, I should state the WPA program was

14      not formalized until 2013, so many individuals, such

15      as myself, such as Seigen Johnson, such as Mary

16      Stares might have not been, quote-unquote, in their

17      time in service record WPAs.  That program was only

18      formalized in the last ten years or so, and that was

19      to give a little more continuity and shape to the

20      first couple of years of practice.

21                   And the WPA program, when you apply to

22      it and you're accepted, those individuals have --

23      have the most strict parameters around following the

24      schedule.  So they are not able to opt out of evening

25      classes, or they have to attend all of the practice

Page 56

1       periods that are offered in the temple that they're

2       in.  And it's really the -- the launch -- it's

3       described as the launch and the foundation for your

4       Zen training.

5               Q.    If I refer to work practice apprentice

6       as WPA will you understand what I mean?

7               A.    I will.

8               Q.    Is it a requirement at San Francisco

9       Zen Center to be -- in order to become an ordained --

10      a lay ordained member of San Francisco Zen Center, is

11      it a requirement to be a WPA?

12              A.    There's two parts to this, and it has

13      to do with the fact you said San Francisco Zen

14      Center.

15                    I want to clarify that teachers can have

16      students that are outside the temple.  So this is not

17      the only place that people do Zen training in order

18      to be lay ordained.

19                    For instance, there is no temple in some

20      parts of South America.  But students will come here

21      and maybe spend, you know, however long their Visa

22      is, six months, nine months living in the temple and

23      go back.

24                    And they will continue working with

25      their priest remotely, and they'll even sew their

Page 57

```
 1              A.    No.
 2              Q.    Is it a requirement of San Francisco
 3      Zen Center to receive priest ordination to be a WPA?
 4              A.    No.
 5              Q.    Does every WPA receive priest
 6      ordination?
 7                    MS. RIDLEY:  Asked and answered.
 8      BY MR. QUACKENBUSH:
 9              Q.    Can you describe the process for
10      becoming a teacher?
11              A.    The process for becoming a teacher is
12      the one that we were talking about earlier, which is
13      the coming in and being a person that is trained in
14      the monastic principles, lives as a monastic, and
15      graduates through different significant, I guess you
16      would say, milestones through that relationship with
17      the teacher and with San Francisco Zen Center in
18      their training program.
19                    And it will look different for each
20      person.  Some people will become a teacher after, you
21      know, 13, 15 years, and other people after 30 years.
22      It is, again, very different than the Western concept
23      of Catholic seminary or Episcopalian minister
24      training of, you know, you go and do your four to
25      six years and then you go out as a, you know, a
```

Page 59

1          minister.

2                     This is like watching corn grow on a

3          time lapsed photograph.  There are jumps and starts

4          and you don't know what stalk is going to grow to

5          what length, and if that is what is happening -- you

6          create the container.  You create the commitment.

7          You create the schedule.  And you create the

8          relationship with the Sangha and with the teacher,

9          and then you let it unfold.  And that is the process

10         of becoming a Zen teacher.

11              Q.    You mentioned graduate through

12         significant milestones.  What are those milestones?

13              A.    Well, acceptance into the WPA program

14         will be probably the first one.

15                     The graduation from the WPA program

16         would be the second one.

17                     And again, a lot of these things are not

18         -- well, anyway.

19                     So then the -- the -- the next one would

20         be, you know, being accepted to join staff.  Some

21         people would not continue on with their training

22         after being a WPA.  You have to apply to staff.  If

23         you're accepted onto staff then that's a continuation

24         of the -- the training.

25                     And in that process along the way you

Page 60

1       might receive lay ordination, you might receive

2       priest ordination, and you might receive teacher

3       ordination.  And for each person depends on really

4       their -- their -- their growth and how their life

5       unfolds.

6               Q.    Does San Francisco Zen Center have a

7       requirement that -- to become a teacher you have to

8       have been a WPA?

9               A.    No.  The program only started I think

10      officially ten, eleven years ago.  And so most

11      teachers would never have been WPAs just based on the

12      length of time it usually takes to be a teacher,

13      although I'm sure there might be one.

14                    MR. QUACKENBUSH:  Move to strike

15      everything after "no."

16                    MS. RIDLEY:  Denied.

17      BY MR. QUACKENBUSH:

18              Q.    Does San Francisco Zen Center currently

19      have a requirement that to become a teacher you have

20      to have been a WPA?

21              A.    No.

22              Q.    Does every WPA become a teacher?

23              A.    Is it okay to go back to a previous

24      question?

25              Q.    If it needs to be clarified, sure.

                                              Page 61

1    program, correct?

2          A.    Their -- their whole time at Zen

3    Center, yes.

4          Q.    So that wasn't quite my question.  When

5    you said "career," you mean WPA program?

6          A.    No.  I mean their whole time at Zen

7    Center, which would be broader than just their time

8    in the WPA program.

9          Q.    So it sounds like answer to my question

10   is there's no requirement for a WPA to have a

11   practice discussion with a -- with an Abbot?

12         A.    I would say that that's -- that would

13   be misleading for me to say that's true.  Because the

14   Abbots always want to see the students and they

15   always want to get to know the students.

16              And so when you say "requirement," I

17   would have to go back and reread all the details of

18   the WPA policy and see if in anywhere it says that

19   the students will be requested to see the Abbot.  It

20   may or may not be in writing.  Off the top of my head

21   I don't know.  But I do not know of a WPA that in my

22   knowledge wouldn't have seen the Abbot.

23         Q.    Okay.  Turning to page 8, what is a

24   Full Moon Ceremony?

25         A.    The Full Moon Ceremony is a monthly

                                              Page 83

1    recitation of the vows of Zen Buddhism, the 16

2    different precepts.

3                    And they come together in a room, and

4    they have a Kokyo, a chant leader.  And they line up

5    in rows, and the Dosha is the person all throughout

6    the ceremony who is walking up and offering incense

7    and doing vows in front of the altar while the Kokyo

8    is leading chanting during those vows and incense

9    offerings.

10                   And the Kokyo is leading them in a chant

11   of taking first refuge in Buddha, Dharma, and Sangha,

12   and then they take them through the -- the precepts.

13   And there's a call and response.

14                   And after each precept, or each refuge,

15   the Kokyo bows and then everyone bows and says the

16   vow and then stands back up and continues chanting

17   until the end of the service.

18          Q.     Were WPAs allowed to service the Kokyo?

19          A.     Yes.

20          Q.     In your experience, how many WPAs

21   served as the Kokyo?

22          A.     Over this period of time, 2016 and

23   2019?

24          Q.     Yeah.

25          A.     I don't remember.  I would estimate

Page 84

1      someone lead the Susuki Roshi Memorial Ceremony in

2      another way?

3             A.     The Doan leads by playing bells.  They

4      have a mobile bell that is called a -- it's dropping

5      out of my head now, it's so weird.  An Inkin,

6      I-N-K-I-N.

7                    And it's a mobile bell that's played

8      with a stick.  It's a bell on a stick that's played

9      with -- and so the person can walk.  And that person

10     leads everyone.  You know when to start and stop

11     everything based on the Inkin, and that person is

12     working in concert with the Kokyo to facilitate that

13     ceremony.

14            Q.     Does the Abbot or Abyss have any role

15     in the Susuki Roshi Memorial service?

16            A.     There is a food offering that is done

17     in the morning, and there -- one of them has a

18     three-tray offering, as we call it.  If you --

19     they're lacquered trays and they have food, tea, and

20     rice.  One is rice, one is tea, and one is

21     vegetables, and there's a -- yeah, so the Abbot would

22     do a three-tray offering in the morning and a

23     one-tray tea offering in the evening.

24            Q.     Now, are you aware if any -- any WPAs

25     that had to miss the Susuki Roshi Memorial Ceremony

<div align="right">Page 88</div>

<div align="right">174</div>

1     a letter of recommendation and signed transcripts by

2     the Tanto and director."

3               Do you see that?

4          A.    I do.

5          Q.    And it's true that San Francisco Zen

6     Center didn't have a formal curriculum between 2016

7     and 2019, correct?

8          A.    That is correct.

9               MS. RIDLEY:  Objection, assumes facts.

10    BY MR. QUACKENBUSH:

11         Q.    Let me --

12         A.    The --

13         Q.    Let me ask.

14         A.    Yeah.

15         Q.    If SF Zen Center didn't have a formal

16    curriculum how did it provide a formal transcript?

17         A.    So this statement in here -- you have

18    to read this whole sentence together.  "Give

19    apprentices transcripts for them to keep track in

20    what they had participated in."

21               So a transcript, if you're reading that

22    from the Western, you know, there's a transcript of

23    school and these are the classes that you took,

24    that's one thing.  But this is a transcript that just

25    keeps track of what they participated in, and that's

Page 123

1      practice at San Francisco Zen Center?

2           A.    Yeah.  So the certification that I was

3      talking about before as a nonaccredited religious

4      institution the -- the SBBE, they give us the

5      certificate every year and then we give that to the

6      Department of Homeland Security, and that allows them

7      to work with people with visas.

8                 For whatever reason it wasn't filed one

9      year, and it's only every three years the DHS asks

10     for that.  So somewhere around 2019, 2020 we became

11     aware that the DHS had taken us off of their list of

12     religious training facilities even though the State

13     of California had not.  But it was just because they

14     did not have our certificate.

15                And so we asked what's the process for

16     getting that back?  And they said, well, all the

17     forms are getting started from scratch.  Well, this

18     was during COVID and we know what happened with

19     governments during COVID.  So we're still waiting for

20     their response.

21                As it so happens it's probably in the

22     next two weeks that we will get that set back up

23     according to what we heard from the DHS about a month

24     ago.  It's a clerical error.  The State of California

25     it's never changed.

Page 127

```
1    STATE OF WASHINGTON )

                         ) SS.

2    COUNTY OF KING      )

3

4              I, the undersigned, declare under penalty

5     of perjury that I have read the foregoing transcript,

6     and I have made any corrections, additions, or

7     deletions, that I was desirous of making; that the

8     foregoing is a true and correct transcript of my

9     testimony contained therein.

10

11             EXECUTED this _____ day of _____

12    2022 at _____, _____.

13

14

15                      _____

                        MICHAEL MCCORD

16

17

18

19

20

21

22

23

24

25                     C E R T I F I C A T E
```

Page 141

```
1
2      STATE OF WASHINGTON )
                           )SS.
3      COUNTY OF KING      )
4
5          I, Judith A. Robinson, Certified Court Reporter
6      and an officer of the Court under my commission as a
7      Notary Public, in and for the State of Washington, do
8      hereby certify that the foregoing deposition was
9      transcribed under my direction; that the transcript
10     of the deposition is a full, true and correct
11     transcript to the best of my ability; that I am
12     neither attorney for, nor a relative or employee of
13     any of the parties to the action or any attorney or
14     Counsel employed by the parties hereto, nor
15     financially interested in its outcome.
16         IN WITNESS WHEREOF, I have hereunto set my hand
       and affixed my official seal this 31st day of
17     October, 2022.
18
19
                   Judy Robinson
20
                   Judith A. Robinson, Notary Public
21                 in and for the State of Washington
                   residing at Seattle.
22                 My Commission expires November 4,
                   2024.
23                 CCR License #2171
24
25
```

Page 142

1    Kyle Quackenbush

2    kquackenbush@girardsharp.com

3                                        October 31, 2022

4    RE: Behrend v. San Francisco Zen Center, et al.

5    10/28/22, San Francisco Zen Center Michael McCord, 5516419

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, noting the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived – Reading & Signature was waived at the

24      time of the deposition.

25

                                                    Page 143

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2        Transcript - The witness should review the transcript and

3        make any necessary corrections on the errata pages included

4        below, notating the page and line number of the corrections.

5        The witness should then sign and date the errata and penalty

6        of perjury pages and return the completed pages to all

7        appearing counsel within the period of time determined at

8        the deposition or provided by the Federal Rules.

9    _X_ Federal R&S Not Requested - Reading & Signature was not

10       requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 144

```
 1   Behrend v. San Francisco Zen Center, et al.

 2   San Francisco Zen Center Michael McCord (#5516419)

 3              E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   WITNESS                          Date

25

                                        Page 145
```

# Exhibit 8

1519790

## ARTICLES OF INCORPORATION
## OF
## SAN FRANCISCO ZEN CENTER

ENDORSED
FILED
In the office of the Secretary of State
of the State of California

AUG - 7 1991

MARCH FONG EU, Secretary of State

### I

The name of this corporation is San Francisco Zen Center.

### II

A.   This corporation is a nonprofit religious corporation and is not organized for the private gain of any person.   It is organized under the Nonprofit Religious Corporation Law for religious purposes.

B.   The specific and primary purpose of this corporation is to operate a church, within the scope of Internal Revenue Code Sections 170(b)(1)(A)(i) and 501(c)(3), which will encourage the practice of Zen Buddhism by operating one or more religious practice facilities and educating the public about Zen Buddhism.

### III

The name and address in this state of the corporation's initial agent for the service of process is Thomas Silk, Esq., 235 Montgomery Street, Suite 1120, San Francisco, CA 94104.

### IV

A.   This corporation is organized exclusively for religious purposes within the meaning of Section 501(c)(3).   Notwithstanding any other provision of these Articles, this corporation shall not carry on any activities not permitted to be carried on (i) by a corporation exempt from federal income tax under Section 501(c)(3), or (ii) by a corporation, contributions to which are deductible under Sections 170(c)(2), 2055(a)(2), 2106(a)(2)(A)(ii), 2522(a)(2), or 2522(b)(2).   All section references are to the Internal Revenue Code of 1986 and to corresponding provisions of any future United States Internal Revenue law.

B.   No substantial part of the activities of this corporation shall consist in the carrying on of propaganda or otherwise attempting to influence legislation, nor shall this corporation participate in or intervene in (including the publishing or distributing of statements) any political campaign on behalf of or in opposition to any candidate for public office.

V

The property of this corporation is irrevocably dedicated to religious purposes, and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer, or member of this corporation, or to the benefit of any private individual. Upon the winding up and dissolution of this corporation and after paying or adequately providing for the debts and obligations of the corporation, the remaining assets shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for religious purposes and that has established its tax exempt status under Section 501(c)(3) of the Internal Revenue Code or the corresponding provision of any future United States Internal Revenue law.

DATED:  8/6/91
at San Francisco, California

Michael Wenger  8/6/91

Michael Wenger, Incorporator

-2-

184

# Exhibit 10



## Work as Practice

As you rush to get a room ready for a guest or haul a tray-load of dishes to the dish shack or are halfway through cutting 5 gallons of small tofu cubes, you may wonder how what you are doing relates to Zen Buddhist practice. It may come as a surprise to learn that work itself is an essential component of Zen training.

For centuries Indian Buddhist monks had been prohibited from working. Instead they were supported by the generosity of their neighborhood lay community. This changed when Buddhism entered China. To the practical-minded Chinese it did not make sense that one group would not work and be supported by everyone else. This was especially true in the Zen tradition. Each member was expected to contribute their labor for the support of the community, monastic or otherwise. Old Abbot Baizhang, after his students hid his tools to spare his aging body the rigors of farm work, shouted, "a day without work is a day without food." He refused to eat. His students quickly returned his tools.

In the 13th century C.E. Dōgen Zenji (the founder of Sōtō Zen in Japan) traveled to China to study Buddhism. While there he met an old Tenzo (Head Cook) who had walked 12 miles to buy some Japanese mushrooms brought over on Dōgen's ship. Dōgen was puzzled by the distinguished monk and asked him, "Venerable Tenzo, in your advanced years why don't you wholeheartedly engage the Way by doing zazen or studying the sutras instead of troubling yourself by being Tenzo and just working? What is that good for?" The Tenzo laughed loudly and said, "Oh good friend from a foreign country, it is clear you have no idea what it means to whole-heartedly engage in the Way."*

When Master Dōgen returned to Japan, he brought with him several distinct practices, which were mainstays of Chinese Zen training. These same practices are the core of our training here at Tassajara. They include the practice of zazen (sitting meditation), face-to-face meetings with a teacher, following the monastic schedule and the Guidelines, and manual labor.

It is pretty typical to see work as only a means to an end, something that has to be done now in order to do the things we really want to do later. But Zen training takes work far beyond this small point of view. The founder of Tassajara, Suzuki Roshi, valued work so highly as to say, "First clean, then zazen." When work is practice it is seen as part of our zazen (meditation) practice itself. It is an end in itself. Work and zazen go hand in hand. Both are necessary and without one, the other suffers. When work is practice, it is a Buddha doing what a Buddha does, how a Buddha does it.

So when our work is practice, it is less about what we are doing and more about how we are doing it. This particular how in Zen training refers to bringing our zazen, or Zen, Mind to our workplace. "Zen Mind" is a willingness to engage ourselves wholeheartedly in whatever we are doing in the present moment, whether it is making up a bed, cleaning a toilet, chopping a carrot, or serving a guest in the dining

SFZC_Behrend_000122

186

room. It is a radical willingness to go beyond our usual limited, small mind; the one that is ruled by its likes and dislikes, its prejudices, narrow points of view and fixed ways of seeing and doing things. The small mind is fueled by habit energy, which says "I don't like that kind of work," or "I know all about that." When we bring our zazen practice into our work, we take a leap out of that conditioned small mind and into the freedom and generosity of the mind that is accepting, fresh, and full of possibility. This mind is the unfettered mind of a beginner; it is "Beginner's Mind."

Most of our work areas are silent, especially in the mornings. Silence supports our practice of full engagement and mindfulness. At first, this silence may feel uncomfortable. And just like in zazen, when you notice the mind wandering off into fantasy, criticism, the urge to chat, or any other distraction, you gently but firmly bring it back to the breath, the body, and the task at hand.

Since our work here can often be physically strenuous, it is very important to be attentive to your body. Be sure to speak with your crew head or the Director about past or present injuries. If you are unsure about the safest way to perform a repetitive or demanding task, please ask your crew head.
We invite you to explore the challenges and joys of work practice with us, and hope that you will experience a new understanding of yourself and work. And, we bow deeply in gratitude to you for all your innumerable labors that support the life of this temple and this ancient Way.

--Tassajara Work Leader

* A full account of this story is found in Dogen's Tenzokyokun, or Instructions to the Head Cook.

SFZC_Behrend_000123

187

# Exhibit 11

**Exhibit 6**
**Behrend, A.**
10/14/22
@ptus

52



*Residents' Handbook*

SAN FRANCISCO ZEN CENTER

*City Center*

Updated 2017

SFZC_Behrend_000004

SAN FRANCISCO ZEN CENTER

CITY CENTER RESIDENTS' HANDBOOK

# TABLE OF CONTENTS

Welcome...................................................................3

Zendo Forms and Zen Practice....................................4

Some General Guidelines and Information...................10

General Information for 366-70 Residents..................18

Financial and Guest Information................................20

Kitchen and Dining Room........................................22

Safety and Security.................................................24

Stewardship of Assets and Environmental Responsibility.......13

Practice Leadership and Senior Staff.........................32

Soto Zen and San Francisco Zen Center.....................34

Abbots and Abbesses of San Francisco Zen Center.......36

Small Verses Frequently Chanted at Zen Center...........38

Terms Used at Zen Center........................................40

City Center Layout Floor by Floor.............................42

Zen Center Organizational Chart...............................46

2

Notes

SFZC_Behrend_000005

50

SAN FRANCISCO ZEN CENTER

City Center

Updated August 2017

# WELCOME

Welcome to residential practice at San Francisco Zen Center's City Center—Beginner's Mind Temple. The purpose of this handbook is to introduce you to the basics of life and practice in this Zen temple.

To help you as you enter into the practice life at City Center, we also recommend that you read The Conflict and Communication Protocol. The Conflict and Communication Protocol of San Francisco Zen Center along with our precepts inform and guide our practice together in community. The Conflict and Communication Protocol has guidelines for resolving conflicts and transgressions within the San Francisco Zen Center community.

Of course this small handbook will not be able to answer all of the questions that you may have. So please, if you do have any further questions, feel free to ask the director, your practice leader, or a member of the City Center senior staff.



"I think we will naturally need some way of life as a group....
little by little, with patience and endurance,
we must find our way
for ourselves."

— Shunryu Suzuki Roshi

SFZC_Behrend_000006

3

# ZENDO FORMS AND ZEN PRACTICE

## Practice Schedule

All City Center residential practitioners participate in the following:

· The two morning periods of zazen.
· Morning service and soji.
· Wednesday evening lecture.
· The full Saturday morning program, including oryoki breakfast and lecture.

• All one-day sittings, and one long sesshin per year.

## Monday through Friday

| Morning: | Zazen | 5:25 a.m. |
| | Kinhin | 5:55 a.m. (walking meditation) |
| | Zazen | 6:05 a.m. |
| | Service | 6:40 a.m. (Buddha Hall) |
| | Soji | 7:10 a.m. (temple cleaning) |
| Evening: | Zazen | 5:40 p.m. |
| | Service | 6:20 p.m. (in the zendo) |

**Wed. lecture  7:45 p.m. (Buddha Hall)**

## Saturday Morning Program:

| Zazen | 6:30 a.m. |
| Service | 7:10 a.m. |
| Soji | 7:35 a.m. |
| Breakfast | 7:55 a.m. (oryoki meal) |
| Zazen | 9:25 a.m. (optional for residents) |
| Lecture | 10:15 a.m. |

4



*Aug 2017*

49

SFZC_Behrend_000007



San Francisco Zen Center
ORG Chart 2017

Brown- Level 6/7
Blue- Level 5
Yellow - Level 4
Pink- Level 2-4
Teal- Employee

Faded box- will retire after current role

Red outline- end term in 2017

Orange outline- end term Jan–June 2018

## Zendo Forms

Please do not be late for scheduled periods of zazen, lectures, or cere-
monies. It is best to plan on arriving at least ten minutes before the
posted starting times. Those arriving late for morning zazen may en-
ter after the doshi completes the morning jundo. If you arrive later,
after the zendo curtains are closed, please sit in the gaitan (the entry
hallway to the zendo). If you have arrived late for evening zazen, you
may enter the zendo quietly and take a seat near the zendo entrance.

Except during one-day sittings and sesshins, there is no required
zendo schedule from after Saturday morning Dharma talk, until Mon-
day morning.

If you are unfamiliar with City Center zendo forms, please see the ino
(head of the zendo) for instruction. If for any reason you are unable to
come to the zendo for morning zazen, please leave a note in the tenken
book in front of the ino's office for the tenken, who records attendance.
If you are so sick that you are unable to get food for yourself, please
note this on the board above the tenken book. The tenken will then
inform a residents' rep, who will bring the meal to your room. 366-370
Page Street residents can email the ino (ccino@sfzc.org) or leave a
message (415 354 0391) if they are unable to send a note.

# Doanryo

The doanryo is the group of practitioners who, with the ino's guidance and training, support the formal and ceremonial aspects of Zen practice. Doan positions are assigned by the ino. Being on the doanryo is an important aspect of one's Zen training, and all residents are expected to learn the traditional ways of using voice and instruments by rotating through each of the doanryo positions. New residents may not be assigned doanryo jobs immediately, but they will be trained and included in the schedule as vacancies open. Doans are responsible for securing a substitute and informing the ino when unable to do their doanryo job for the first week of any time away.



**Doan:** Times periods of zazen, sounds the bells to begin and end zazen, and during services. Offers the Buddha Tray at breakfast. The doan also lights the altar for zazen and for evening service.

**Fukudo:** Strikes the han before zazen to signal that zazen is beginning and calls us to practice. The fukudo also rings the wakeup bell, plays the mokugyo during service to keep time during certain chants, and plays the taiko drum for the breakfast offering.

**Kokyo:** Announces and leads the chants and dedications during service. The kokyo in the morning also acts as tenken, taking attendance for scheduled events.

**Jiko:** Carries the flower petals and attends leader and assist them as requested.

**Chiden:** There are two kinds of chidens. The light-up chiden prepares the altars for offerings or for service. The cleaning chiden cleans the altars after the day's schedule is finished.

**Doorwatch:** The person who provides security and practical help for those coming to zazen. The doorwatch arrives before the han begins, unlocks the Laguna Street door, stands near the door, and sits in the seat near the door during zazen.

6



47

SFZC_Behrend_000009

194

46

**CITY CENTER**
**Second Floor**

Floor plan labels: 16, 15, CITY CENTER Second Floor, 6, 5; 17, 14, 7, 4 SHIKA DANA LEADER; 18, 12A, 8, 3A TANTO; 19, 12, ABBESS, 3; 20, 11, CLEANING SUPPLIES, KAISANDO, 10 Session Dharma Teachers, INO CLOSET, DOKUSAN ROOM; RESIDENT MAIL & BULLETIN BOARD; 21, WOMEN'S BATHROOM, STAIRS, INO, MEN'S BATHROOM, WAITING AREA DOKUSAN, APARTMENT SUITE; 22, EXIT

● FIRE EXTINGUISHER
▲ FIRE ALARM
⌒ FIRE HOSE

STAIRS EXIT

## Practice Leaders

Every City Center residential practitioner should have a practice leader that they meet and discuss their practice with regularly, usually twice a month. It is also recommended that all residents have practice discussion with the tanto at least twice a year. New residents may be assigned an initial practice leader, but it is also possible to have practice discussion with other City Center practice leaders, and to change practice leaders. It may be helpful to talk with more than one practice leader before making a decision to establish a relationship with a practice leader. It is best to keep practice discussion with your practice leader focused and short.

## Dokusan

A formal interview with a current or former Abbot or Abbess is called dokusan. Dokusan requests can be made with the Abbot's "jisha" (attendant).



7

SFZC_Behrend_000010

## Ceremonies

Many traditional Buddhist ceremonies take place during the year. Residents are expected to participate in all temple ceremonies. Below are two of the most important monthly ceremonies:

**The Full Moon Ceremony:** This ceremony, one of the oldest in Buddhism, is a time to renew our bodhisattva precept vows. It takes place every month on or near the full moon, at the time of morning service or in the evening. Times are posted each month.

**The Suzuki Roshi Memorial Ceremony:** Every month on the evening of the 3rd and the morning of the 4th we have a memorial service for Zen Center's founder, Shunryu Suzuki Roshi — Suzuki Roshi died on the 4th of the month.



*"Our understanding of Buddhism is not just an intellectual understanding. True understanding is actual practice itself."*

*—Shunryu Suzuki Roshi*

8



45

SFZC_Behrend_000011

44



CITY CENTER—Basement

## One-day Sittings and Sesshins

A one-day sitting is held on a Saturday most months. Residents are required to attend all one-day sittings.

City Center offers multiple-day sesshins (usually three or seven days) throughout the year. Every residential practitioner is required to do at least one sesshin each year.

Residents are periodically asked to work in the kitchen for sittings or sesshin. This is supporting the community and engaging in sesshin through work-practice.

## Practice Periods

Practice period is a time when the community comes together to intensify the formal practice schedule, focus on particular teachings, and to strengthen sangha. Usually City Center will offer three yearly practice periods: winter, spring, and fall. Practice periods are led by one or two senior practice leaders. A practice period includes lectures, dharma classes, interviews with practice leaders, student talks, practice period teas, one-day sittings and a sesshin.

New residents must participate in all practice periods during the first year of residency. After the first year, every resident is expected to do at least one practice period per year, including sesshin.

## Classes

City Center offers five- to eight-week study sessions in the fall, winter, and spring. These classes range from basic Buddhism to more advanced topics. It is possible to take more than one class per study session, and classes by SFZC teachers are included in each resident's compensation or RBT fees. Not included in RBT fees are various seminars, workshops, and special lectures offered throughout the year by outside teachers. To get information about upcoming classes, check the City Center schedule of events, or the website.

## Tangaryo

All new residents sit tangaryo and thereby formally enter Beginner's Mind Temple. The ino will make arrangements with residents regarding the details of sitting tangaryo. Residents usually sit tangaryo after having completed a practice period. After this initiatory sitting, there is a formal entering ceremony.

SFZC_Behrend_000012

9

# GENERAL GUIDELINES AND INFORMATION

## Residents' Community Work

Each resident supports the community by contributing a few hours of work each week. This work includes: a weekly dish-washing shift, a weekly temple job which is expected to take one hour, and a weekly bathroom cleaning assignment. To make arrangements for a meal prep and dish-washing shift, please talk to the meal board coordinator. The work leader will let you know about your temple job. For a bathroom cleaning assignment, please talk to the job coordinator for the bathroom that you regularly use.

If for some reason you are unable to fulfill any of these responsibilities, you must secure a replacement and inform the coordinator of the change. Meal preparation and dishwashing replacements should be written on the meal board sheet posted in the kitchen.

## Residents' Meeting and Residents' Representatives

Once every month the residents meet to discuss issues relevant to our practice together as a sangha. It is expected that all City Center residents living at 300, 340, and 366-70 Page will attend. The meetings are facilitated by the residents' representatives, who are elected by the residents. The residents' reps take suggestions for agenda topics and are available to hear residents' concerns, complaints, or suggestions, which they then pass on to the director and the senior staff. Residents' reps also carry master keys and can let you into your room if you are locked out. They also bring food to residents who are sick and unable to get to the kitchen.

## Residents' Retreat

Every summer we set aside 4-6 days for residents to spend quiet quality time together. A variety of activities are included in the schedule, and it is intended to be a time of refreshment and rejuvenation for residents. Employees are invited to participate as much as they can. Our public programs are substantially reduced during this time to enable everyone to participate with as little distraction as possible. In the past, activities have included: zazen starting later in the morning, a long daily study period, yoga classes, sangha meetings to discuss issues important to the harmony of the community, a ferry outing to Angel Island, an evening visit to the Asian Art Museum, movie nights, more zazen before lunch and after dinner, and only as much work as is needed to sustain the retreat.

**Han:** The wooden block near the zendo, inscribed with a reminder about impermanence; struck to announce zazen.

**Jundo:** Ceremonial morning greeting by a leader, typically at the beginning of morning zazen. As the priest walks past, please raise your hands in gassho.

**Kaisando:** Founder's Hall upstairs, where monthly memorial services are held for our founder, Suzuki Roshi.

**Kinhin:** Walking meditation, usually between two periods of zazen.

**Kokyo:** The individual who leads the chants for services.

**Mokugyo:** The red lacquered drum used as a "heartbeat" for chants.

**Mudra:** Hand or body position or gesture with symbolic meaning.

**Okesa:** A large patched robe made like Buddha's robe, worn by priests.

**Oryoki:** Formal style of eating in the zendo, used during sesshin and on other occasions.

**Rakusu:** A small patched neck robe made like Buddha's robe, worn by people who have received precepts in an ordination.

**Seiza:** Kneeling meditation posture with buttocks resting on heels.

**Sesshin:** Literally "to unify or touch the mind". An intensive all-day schedule of zazen, lecture, work, and meals, lasting from one to seven days.

**Shashu:** Mudra used in standing or walking meditation with the right hand wrapped around the left fist held at the level of the solar plexus.

**Shoten:** The person who sounds the densho to announce events in the Buddha Hall.

**Silence:** Practice of abstaining from speaking or making contact with other people. Functional talking can be practiced as necessary, removed from the common area.

**Soji:** A brief period of mindful work; temple cleaning.

**Sutra:** A scripture attributed to Shakyamuni Buddha.

**Tan:** The raised platform for sitting in the zendo.

**Zabuton:** A rectangular, flat cushion used for zazen.

**Zafu:** A round cushion used for zazen.

**Zazen:** Total awareness in an upright posture.

**Zendo:** The meditation hall.

10

43

SFZC_Behrend_000013

198

## TERMS USED AT ZEN CENTER

**Buddha tray:** A formal food offering. Stop and bow when it goes past.

**Densho:** The large bell used to announce services and lectures.

**Dharani:** An invocation transliterated from Sanskrit often with yogic powers, usually compassion.

**Doan:** The person who keeps time in the zendo and sounds the bells.

**Dokusan:** A formal, face-to-face interview with a past or present Abbess or Abbot.

**Fukudo:** The person who sounds the han to announce zendo events, and strikes the mokugyo to accompany chanting.

**Fukuten:** Second-in-command to the tenzo in the kitchen. The person who directly supervises the kitchen crew and sees that the tenzo's menus and instructions are carried out.

**Gaitan:** The hallway leading to the zendo.

**Gassho:** A mudra or bow with palms together, it signifies gratitude.



### Time Away

Before leaving for any absence longer than a day, please speak with the director, your practice leader, and the ino. Arranging coverage for zendo, meal board, dish-washing, bathroom, and house jobs is each resident's responsibility for the first week of an absence, and the appropriate persons are to be informed of substitutes.

RBT residents who are going to be away may make arrangements with the Shika to have someone stay in their room in exchange for a prorated refund on the following month's RBT. Please discuss the details of your arrangement with the shika and director prior to your departure. When leaving and returning, residents may offer fragrance and do three bows in the Buddha Hall, behind the bowing mat.

### Transitions Out

Residents are asked to give written notice to the director and the accounting office thirty days prior to your moving out date. Make sure you speak with your practice leader during your transition out of residential practice. The tanto, ino, shika and work leader, as well as any job co-ordinators, must be informed. Departing residents are asked to leave a forwarding address with the office and to make forwarding mail arrangements. It is very helpful to check the "to do list" for moving out that is available from the director.

SFZC_Behrend_000014

## Room Changing Policy and Procedures

At any time City Center residents may make room change requests to the shika or director. A room request list for 300 Page and 366-70 Page is kept by the shika. A room request list for 340 Page apartments is kept by the director.

The City Center director approves all resident room changes for 300 Page and 366-70 Page. All moves to one of the apartments at 340 Page are approved by the Housing Committee. The director, after consultation with the City Center Practice Committee, also approves all first-time moves to the shared housing at 366-70 Page. Approval for moving from one room to another is based on the careful consideration by the director (and, when appropriate, the Practice Committee) of all current residents who have made room change requests to the shika or director.

Please Note that the "room request list" does not function as a "waiting list" in the sense that, first, there is a next person in line for consideration, and second, that this would be the person who has been on the list the longest. As such, "time" on the room request list may be taken into consideration, but it is not necessarily a factor in the approval process for room changes.

Considerations for changing rooms will take into account a combination of the following factors, usually weighted in the following order:

- Zen Center seniority.

- Zen Center staff position and/or responsibility.

- Physical and/or medical needs.

- Other considerations, which may include: willingness to live together; practice stability; family size; non-Zen Center practice experience; Zen Center needs.

Logistical arrangements related to room changes are made with the shika. This includes such issues as date of move, cleaning of room, the coming or going of any furniture, room repairs, deposit, etc. The shika will inform the resident of the basic room rate. All special financial arrangements, including any partial or prorated amounts, are made with the director.

12



### Robe Chant

Dai zai ge dappuku
Mu so fu ku denne
Hi bu nyorai kyo
Ko do sho shu jo    (x 2)

Great robe of liberation,
Field far beyond form and emptiness,
Wearing the Tathagata's teaching,
Saving all beings.

### During service

All Buddhas, ten directions, three times,
All honored ones, Bodhisattva-Mahasattvas,
Wisdom beyond wisdom, maha prajna paramita.

Ji ho san shi i shi fu,
Shi son bu sa mo ko sa
Mo ko ho ja ho ro mi

41

SFZC_Behrend_000015

40

# SMALL VERSES FREQUENTLY CHANTED AT ZEN CENTER

**Before Lecture**

Mujo jin jin mi myo no ho wa
Hyaku sen man go ni mo ai-o koto katashi
Ware ima ken-mon shi ju-ji suru koto o etari
Negawakuwa nyorai no shin-jitsu-gi o geshi tatematsuran
An unsurpassed, penetrating, and perfect Dharma
Is rarely met with, even in a hundred thousand million kalpas.
Having it to see and listen to, to remember and accept,
I vow to taste the truth of the Tathagata's words.

**After Lecture**

May our intention equally extend to every being and place,
With the true merit of Buddha's Way.
Shu-jo mu-hen sei-gan-do
Bon-no mu-jin sei-gan-dan
Ho-mon mu-ryo sei-gan-gaku
Butsu-do mu-jo sei-gan-jo
Beings are numberless, I vow to save them.
Delusions are inexhaustible, I vow to end them.
Dharma-gates are boundless, I vow to enter them.
Buddha's Way is unsurpassable, I vow to become it.



## Room Renovations

Please do not make any changes to your room, including the walls, the structure, the carpet, and the fixtures, without speaking with the director or the property manager. Do not use push-pins in the wood trim.

## Phones

A local phone for residents is on the second floor at 300 Page Street. Cell phones are to be used in the privacy of your room, but not in any public area, including the courtyard, the lounge and the roof.

## Mail

Mail for residents is delivered to the second-floor alcove via the front office. Packages are left in the main lobby and next to the front of the office. The office will leave you a note if you have a package to collect.

## Internet and Wi-Fi

Residents are welcome to use the public wireless network: SFZC-Guest. Contact the front office for the password.

Please limit heavy use to after business hours (Monday-Friday after 6pm and Saturday/Sunday after 2pm) and do not contact the IT department for issues not related to Zen Center business use.

## Flowers

Some flowers may be available for residents to use on personal altars. Check in the side courtyard by the garden shed. Flowers marked as reserved are not available for personal use at any time.



13

SFZC_Behrend_000016

## Visitors and Non-resident Sangha Members

Beginner's Mind Temple is open to many non-resident practitioners who come daily, or just occasionally, for zazen, lectures, and other practice-related activities. People also come here as guests, as guest students, and for meals. It is our practice to welcome all with cordiality and friendliness. When meeting guests or visitors at the front door, please follow the front door forms that are posted at the door and listed on page 25.

Those coming here for the first time may not understand the forms and practices in the building. Please offer assistance or information as appropriate. Refer guests or visitors to a member of the senior staff if needed, or when information is not otherwise available.

## Non-Public Areas

Visitors are not allowed to wander unescorted in City Center buildings. The residents' lounge at 300 Page Street and the roof at 300 Page Street are not considered public areas. They are open only to residents, guest students, staff, and their guests, volunteers and members of our sangha network.

The residents' lounge is located on the first floor, adjacent to the small kitchen hallway. Newspapers, books, and games are available. Please do not take the current day's newspapers out of the lounge.

The roof can be reached using the back stairs of the building. Chairs, a picnic table, and plants are located on the roof. You are asked to stay on the wooden platform. Do not approach the beehives.



14



Eijun Linda Cutts



Myogen Steve Stucky



Furyu Nancy Schroeder

Ryushin Paul Haller



Kiku Christina Lehnherr



Rinso Ed Sattizahn

39

SFZC_Behrend_000017

# OTHER ABBOTS AND ABBESSES OF ZEN CENTER



Zoketsu Norman Fisher



Tenshin Reb Anderson




Zentatsu Richard Baker





Zenkei Blanche Hartman





Sojun Mel Weitsman



Dainin Katagiri

38

## Children

Children at Zen Center are considered an important and integral part of the community. Residents are encouraged to welcome children who are visiting City Center. Please respond if there are children who need to be attended to or are engaging in behavior that is obviously dangerous or inappropriate to our lives together.

## Recycling

Each bathroom, the kitchen, small kitchen, and all offices have a box or container for recycling. At City Center we recycle paper, plastic, metal, glass and compostables. Recycling facilities exist at the bottom of the back stairs. Please follow the instructions available and ask the work leader for further information.

There are containers in the recycling area for batteries and light bulbs. Please do not leave any kind of toxic waste anywhere at City Center, including car batteries or anti-freeze.

## City Center Goodwill

City Center "goodwill" is a residents-only clothing recycling area in the basement laundry room. Goodwill exists for the benefit of the sangha. This area is maintained by the work leader, but we are all stewards of goodwill and help to keep it neat and clean by observing the following guidelines: Do not dump items in goodwill. Donate only items in good condition. Do not leave empty bags and boxes in goodwill. Do not donate electronics including TVs or computers. Do not donate furniture and other large items. If you examine items, return them arranged neatly to the assigned places.

## Storage policy

Zen Center offers its residents a small storage space in all its buildings. If you are a resident of Zen Center, you may have the equivalent of three cubic feet of storage. Anything more than that will be removed. If you are leaving Zen Center, nothing may be kept here; you must find storage outside of Zen Center. Do not store things for non-residents or for people who have left Zen Center for good. Before putting items in storage, check with the director and/or the work leader. Label and date all belongings; unlabeled items will be removed. The storage key should be put back, and not kept overnight. Do not store hazardous items. If you have any doubt about whether an item should be stored or not, please ask the director or work leader.

15

SFZC_Behrend_000018

## Environmental and Allergen Sensitivities

Due to the increase in environmental and allergenic sensitivities amongst residents and temple guests, we no longer allow: 1) burning incense 2) perfume or scented products of any kind 3) pets in any of the City Center properties

## Quiet Time

Quiet time in all City Center buildings is between the goodnight bell around 9:30 p.m. until the clackers at the end of the breakfast chant the next morning. During this time there should be no conversations in the public areas, electronic media without headphones, musical instruments, vacuum cleaners or laundry. Musical instruments may be played in rooms from 8:00 a.m. to 9:00 p.m. only. Please be sensitive to the needs of your neighbors, for the building is not soundproofed and noise is easily heard through room doors.

## Zen Center

After one year of long-term residency at Zen Center, residential practitioners at Zen Center will automatically be applied as Dharma Light members. Long-term residency is defined as Work Practice Apprentices (WPA), Staff and Room, Board and Tuition (RBT) residents. If you want to opt out of membership, please contact the membership manager: membership@sfzc.org

Zen Center residents do not pay membership dues, and membership will be applied retroactively to the start date of the student's continuous residency. One important aspect of being a member is that after one year of continuous membership, you may vote in yearly elections to determine the Zen Center Board of Directors and changes to the by-laws. Upon leaving residential practice at City Center, you are encouraged to continue Dharma Light Membership at a minimum cost of 10$/month, organized through the Development Office.



Membership

16

In 1967 Tassajara was purchased and established as the first American Zen monastery. Soon after, Beginner's Mind Temple at 300 Page Street was added as an urban temple and residential practice place in San Francisco. In 1972 the Zen Center acquired Green Gulch Farm which became Green Dragon Temple.

In 1971 Suzuki Roshi died soon after installing Zentatsu Richard Baker as his Dharma heir and the second abbot of Zen Center. Richard Baker was abbot for 12 years, during which time several businesses were started and the economic foundation of the San Francisco Zen Center was established. Baker Roshi resigned as abbot of San Francisco Zen Center in 1983 amid a series of unfortunate events that deeply affected the community. As a consequence a large number of practitioners left and those who remained worked for many years to positively change the organizational structure of San Francisco Zen Center. Among these changes was agreement that responsibility for the three centers should be shared by two abbots, and that the abbots should not have lifetime terms, but would be appointed for two limited -year terms. In 2010, the Board of Directors approved the creation of a central abbot position to help with the responsibilities of caring for Zen Center.

The San Francisco Zen Center abbacy continues in the direct lineage of Suzuki Roshi. This means that only those who have received dharma transmission from him or one of his dharma heirs can become abbot or abbess of Zen Center, a list of the teachers who have held this position is over the page...

With its three training places Zen Center is able to emphasize different aspects of Zen practice: monastic training, priest and lay training, residential and non-residential practice, work practice, classes and workshops, outreach programs, etc.

In many ways everyone who enters the community deeply affects the life of the sangha. Each individual offers and expresses their own experience of zazen, of work, of life to support the whole.

From day to day, moment to moment, Zen Center changes and evolves. The continuation and maturing of the Zen Center sangha depends on the practice of each one of us. Without your practice, our history would be different. Through your commitment to the community you give a gift that no one else can give to support each other's practice with an open heart and for the benefit of all beings.

37

SFZC_Behrend_000019

# SOTO ZEN AND THE SAN FRANCISCO ZEN CENTER

The essence of Soto Zen practice is shikantaza or "just sitting". Zen practice is also bringing our zazen practice wholeheartedly into the present moment, into the normal activity of our daily lives. At Zen Center we work and practice as sangha in relation to the sixteen bodhisattva precepts. Soto Zen practice is also the direct transmission of the teaching from teacher to disciple. It is in this way that we discover the heart of compassion, acknowledge our own suffering, renounce separation, and awaken to our true nature.

Zen developed long after Siddhartha Gotama sat down under the bodhi tree, became enlightened, and became known as Shakyamuni Buddha. The Indian sage Bodhidharma brought the practice of just sitting to China, and in the 6th century AD it blossomed into five main schools of Ch'an Buddhism. In the 13th century , Japanese monk Eihei Dogen Zenji travelled to China, received transmission, and returned to Japan and founded the Soto Zen School in that country.



Shunryu Suzuki Roshi, a Zen priest in the Soto Zen lineage of Dogen Zenji, came to San Francisco from Japan in 1959 to be the resident priest at Sokoji, a Japanese mission temple on Bush Street in San Francisco. A group of Americans began sitting zazen with Suzuki-roshi, and found themselves drawn to both the practice and the teacher. Suzuki Roshi was himself drawn to the energy and enthusiasm of these students. This mutual encouragement and inspiration of teacher and students was the beginning of San Francisco Zen Center.

36

## Relationship Practice

San Francisco Zen Center supports people in a wide variety of relationships, from celibate to committed and regardless of sexual orientation. In the interest of establishing a harmonious life together, and in accordance with the third Bodhisattva precept (*I vow not to misuse sexuality*), residents are asked to observe the following guidelines regarding romantic and sexual relationships.

Be aware of how sexual energy is communicated through speech and non-verbally through touch, eye contact, body language, and attitude. Be sensitive to offering a respectful space for practice for residents and non-residents alike. This includes being sensitive to the ways that people of different cultures and gender identities may interpret or experience unwelcome romantic and sexual interest.

If you are part of a couple, please maintain behavior that supports residential practice. Do not isolate yourself from the community, respect silent times, and be sensitive about public displays of affection.

Be aware of how the time and energy needed in relationships may conflict with the City Center practice schedule. Practice leaders are available for consultation regarding this and other relationship topics. Residents beginning a new relationship within the residential or extended sangha are asked to consult with a practice leader, the tanto, or the abbot. The purpose of this conversation is to ensure that relationships are formed with consideration for the impact on the community and individuals involved.

To support new students in finding their practice without the distractions and complications of forming relationships, residents are expected not begin or express interest in a new sexual or romantic relationship with another resident if either has lived at City Center for less than six months. Residents are also asked not to begin or express interest in relationships with a participant of the wider community (eg. non-resident) for that person's first six months of practice at the center.

Observe the policy of San Francisco Zen Center which prohibits sexual harassment. All residents are also expected to follow the law regarding age of consent, and thus are not to initiate or engage in a romantic or sexual relationship with any individual under the age of 18.

Not following the 6-month guideline or engaging in illegal relationships or sexual harassment may result in a resident being asked to leave residential practice, or not being accepted for future Practice Periods.

17

SFZC_Behrend_000020

## Alcohol and Drug Policy

Alcohol or drug intoxication within Zen Center is not appropriate and is cause for concern and possible intervention. **Important:** City Center has a zero-tolerance policy with regards to drug and alcohol use in the temple. Anyone found in possession of, or using, illegal drugs or alcohol will be asked to leave immediately.

## Smoking

Smoking is prohibited in all buildings owned by Zen Center. In addition, smoking is not allowed on the rooftop of a Zen Center owned building. Please be respectful to others by refraining from smoking at least 25 feet away from the entrance to a Zen Center owned building.

## Weapons

No firearms or other weapons may be kept by any Zen Center resident.





18

# SENIOR STAFF

## Director (Administrative Head)

The director conducts the overall administration of City Center. S/he supervises the senior staff, chairs senior staff meetings, reviews applications for residency, co-ordinates with other Zen Center practice centers, reviews the budget and attends various meetings with both residents and administration.

## Ino (Meditation hall manager)

The ino works with the tanto and is responsible for the everyday details of practice in the temple. The ino is the heart of formal practice in the zendo and Buddha Hall, supervising, attending, and assigning staffing for all sesshins and ceremonies.

## Tenzo (Head of the kitchen)

The tenzo is responsible for the daily food offering. S/he supervises the kitchen crew, and maintains the kitchen as a place of whole-hearted practice.

## Work Leader/Guest Student Manager

The work leader works closely with guest students. S/he is responsible for helping all practitioners to understand work as practice. The work leader assigns soji tasks and temple jobs, and generally oversees temple cleanliness and basic upkeep.

## Shika (Guest Manager)

The shika is responsible for housing in the temple. The shika also manages the Conference Center, makes all welcome, cleans guest rooms, and assigns housing for visitors, guests, and short-term students.

35

SFZC_Behrend_000021

## PRACTICE LEADERSHIP AND SENIOR STAFF

Some of the residential practitioners of City Center work outside the building. The others work in-house, either in the kitchen, administration, development, temple maintenance, or programs. A relatively small group of experienced practitioners, who have been training at Zen Center for some time, often many years, is asked to take on the traditional positions of responsibility within the temple. Supporting others to practice becomes their practice. Below is a brief description of the positions of practice and administrative responsibility at Beginner's Mind Temple.

## Practice Leadership



### Abbess or Abbot

Abbesses and abbots are the spiritual heads of Zen Center. An abbess or abbot is appointed by the Board of Directors and has primary responsibility for teaching at Zen Center. Zen Center has three abbots: the central abbot, and the abiding abbot or abbess at Green Gulch Farm and City Center.

### Tanto (Head of Practice)

The tanto is the head of practice in the temple, serving immediately under the abbot or abbess. The tanto is responsible for every aspect of practice in the temple including teaching, chairing the Practice Committee, speaking with students, lecturing, and acting in place of the abbess or abbot for formal ceremonies when the abbess or abbot is absent.

### Shuso or Head Student

The shuso or head student is a senior practitioner who is appointed for one practice period to provide an example for other students to follow.

34

---

## GENERAL INFORMATION FOR 366-70 RESIDENTS

### Residency

Residents at 366-70 Page Street have the same practice requirements and responsibilities as residents at 300 Page Street. The director administers 366-70 Page Street. Residency is approved by the Practice Committee.

### House Responsibilities

House responsibilities are posted on the bulletin board in the kitchen. Residents are expected to co-ordinate a time to do soji together once a week and to meet weekly for a house meal.

### Key Deposit and Cleaning Deposit

The key deposit is $20 for 366-70 Page Street. The key list is kept by the front office. Return your key to the front office to retrieve the deposit when moving out. There is a $75 cleaning deposit, also payable with the front office. This will be repaid when the shitka has determined that you are leaving your room in a satisfactory condition.

### Security

For security reasons, the Lily Alley gateway, the laundry and storage room, and the back doors for each floor are to be kept locked at all times.

### Personal Property and Possessions

All personal property and possessions must be kept inside the individual rooms and nothing should be left on the stairs or in the halls. At 366-70 the residents of each floor decide what bookcases and personal furniture may go into the common rooms. Hang paintings and art from the ceiling moldings and do not put holes in the walls. No personal artworks should be hung in the halls; 366-70 Page Street does not differ from 300 Page Street in this respect.

### Building Care

The residents at 366-70 are responsible for maintaining a clean, pleasant, and healthy environment for all to enjoy. The work leader will check on the general cleanliness. Shoes should not be worn past the entry space of each apartment. Do not make any structural changes to the property, including the hanging of shelves.

19

SFZC_Behrend_000022

## Building Heating

The property manager will set the furnace controls on each floor. Furnace hours are from 7:00-8:30am in the morning and 6:30-8:30pm. The heat will be adjusted seasonally.

## Window Shades and Curtains

Window shades and curtains in rooms are the residents' responsibility. They may either be removed or left on the windows when leaving.

## Laundry and Storage Area

There is a garbage can in the laundry area for dryer lint and empty containers. Please keep the laundry area clean and neat, and empty the garbage can at least every two weeks and add to regular garbage. Please store bicycles neatly, and abide by the Zen Center storage policy.

## Recycling and Garbage Day

Bins must be on the sidewalk the evening before collection and brought back up the stairs as soon as possible afterwards.

## Outside Cleanliness

Please keep the areas around the building clean and neat. Sweep the street in front of the building and Lily Alley regularly each week. Do not leave random articles or piles of debris for pick up on Page Street or Lily Alley.

## Altars

Each floor has a house altar and a bathroom altar. Residents are responsible for taking care of these altars.

## Musical Instruments

Musical instruments hours are the same as at 300 Page Street. Music must not be audible in other rooms. Please keep in mind that none of the floors is completely soundproof, laterally or vertically.

## Drugs, Alcohol and Vegetarian Diet

Drug, alcohol and vegetarian diet guidelines and policies are the same for 366-70 residents as they are for residents at 300 Page Street.



The ongoing energy use of a building is probably our single greatest environmental impact, so reducing our energy consumption is one of our most important efforts in harmonizing with our environment. In recent years the following measures have been taken to reduce the environmental impact of 300 Page Street: we replaced our boiler and hot water heating system; we replaced all of our washing machines and dryers with energy-efficient models; we made a decision to no longer cover floors with toxic carpets, and instead use green alternatives; and in 2005 we installed a photovoltaic solar power energy-generating system on the roof of the 300 Page Street building.

SFZC_Behrend_000023

## STEWARDSHIP OF ASSETS AND ENVIRONMENTAL RESPONSIBILITY

The five City Center buildings we live, work, and practice in are rare and valuable assets for the community, containing a wealth of material and cultural resources. Of special note is 300 Page Street., designed by the well-known architect Julia Morgan. In many cases the design, workmanship and quality of materials of this building is almost impossible to replicate today. We are committed to maintaining and conserving this gift and integrate energy-reducing measures without changing this architectural landmark. To this end, the City Center community is dedicated to the following environmental practices:

- Saving energy
- Recycling of food and materials
- Community awareness of environmental issues
- Protecting our buildings
- Selecting environmentally low-impact materials
- Maximizing the integrity and longevity of repair and maintenance work
- Saving water
- Making the buildings healthy
- Minimizing waste

32

## FINANCIAL AND GUEST INFORMATION

### RBT (room, board, and tuition)

RBT is the monthly fee that all non-staff residential practitioners pay. RBT is due on the first of each month and should be paid in the front office, or a check given to the accounting office. If RBT is not paid by the fifth of each month, residents will receive an overdue notice and are asked to submit payment immediately or speak with the accounting office and/or the director. No resident will be allowed to have an RBT debt in excess of $1,000. There is an annual RBT cost-of-living increase, usually the first of May.

Residents entering the RBT program pay a security deposit of $1200 at the time of starting the program, which can be used against the final month's RBT before moving out.

### Cleaning Deposit/Key Deposit

A cleaning deposit of $75 is required of all residents (except RBT students), and will be returned when you leave residency at City Center, dependent upon the shika's room inspection. Any repair work done related to damage to carpet or walls will be deducted from residents' cleaning deposits. There is a $20 key deposit.



## Overnight Guests

Relatives and friends may stay overnight in a resident's room no more than once per week at no charge except for meals. Residents are asked to inform the tenzo in advance if a guest is staying for meals and to see to it that all guest meals are paid for.

Residents who would like to have a friend stay in their room on a regular basis are asked to discuss the practical and practice implications beforehand with the director and their practice leader. It is important that we always know who is in the building and where they are staying.



City Center has seven guest rooms that are available under certain conditions to close friends and family members of current residents. Close friends and family may stay in guest room accommodations at a reduced rate, subject to availability; this reduced price for a guest room is a one time per year offering for no more than five days. Please see the shika for more information and to make arrangements.

Guests of City Center residents may also stay in student accommodations, subject to availability. Residents should see the shika for information on the current fees. Breakfast is included in this fee, but all other meals must be paid for. Residents are responsible for providing bedding and towels and cleaning the room after use; dust, vacuum, and empty the trash. Residents should make such guest arrangements with the shika.

## Earthquake Safety

All residents should have a working flashlight and two gallons of water in their room in the event of earthquake or other disaster. A battery-powered radio, extra batteries, and a first aid kit are also good ideas. Residents are asked to keep protective clothing, work gloves, and sturdy shoes within easy reach of bed.

In the event of an earthquake, have in mind a safe place in the room — under a sturdy table or against an inside wall and away from unsecured bookcases — where you can crouch, cover your eyes, and hold on until the shaking stops. If in bed, stay there under the covers with a pillow over your head to protect your head from glass. Earthquake supplies are located in the director's office.

## Emergency Medical Information Record

Every resident should have emergency medical information with current information on file with the director. When entering residency, each resident will receive an medical information form to fill out and return. If your emergency information should change, please make sure that you notify the director immediately.

## Medical Emergencies

In the event of a medical emergency, first aid kits are located in the front office, the small kitchen and the kitchen. An AED defibrillator is located in the ground floor hallway, between the bookstore and Guest Room #1.



SFZC_Behrend_000025

## Fire Safety

No open flames are allowed in residents' rooms, including lighted cigarettes, candles, and heaters with electric or exposed filaments. Enclosed oil or electric heaters are acceptable; quartz heaters are not. To ensure we remain within the City's fire code, please check with the director or property manager if you have any questions. It is permissible to burn incense in your room. Smoking is also not permitted inside any Zen Center building.

Fire drills and emergency evacuation drills are held periodically. Residents are required to participate in scheduled drills. A floor map is posted in each resident's room showing the location of exits, alarms, and fire extinguishers. These are also on pages 42-44. When the fire alarm sounds, everyone in the building exits immediately and meets on the sidewalk in front of 308/310 Page Street for a roll call with the shika. Please follow instructions given to you by the safety marshals, the safety crew, or any emergency worker.

There are fire alarm stations on each floor, which are for the building only and do not contact the fire department. Use doors as fire-breaks. Do not disengage automatic door closers anywhere. Fire doors are to be kept closed at all times.



**Residents who discover a fire in the building are asked to pull the nearest alarm and call 911 to report the fire. Do not try to put out a fire before first giving the alarm.**

30

## KITCHEN AND DINING ROOM

### Meals

City Center serves only vegetarian food. Generally, meals should be eaten communally in the dining room six days a week. Sharing and enjoying meals together is part of our mindfulness practice around food. Residents are asked to be on time for breakfast bow-in and chant as the end of the morning schedule. Residents who need to eat prior to that time may eat a silent breakfast in the small kitchen. Otherwise please do not eat your meals in the small kitchen or the residents' lounge, except on Sundays.

Dinner serve-up — the time between the end of evening service and the end of the evening meal chant — is silent. Those entering the dining room during the evening meal chant are asked to stand in front of the altar and to recite the chant with the group, or to wait in the kitchen until the chant has ended.



It is generally expected that residents will eat what the kitchen offers. However, allowances are made for special dietary needs. All special dietary-related medical problems, allergies and food sensitivities should be discussed with the tenzo. Special dietary needs outside the regular meal schedules should be discussed with both the tenzo and a practice leader.

On weekdays, food is left on a cart in the walk-in after meals, and is available for latecomers. No other food in the walk-in or reach-in is available to residents during the week.

23

SFZC_Behrend_000026

## Open Meals

Dinner is "open" Monday through Friday to non-residents participating in practice events, such as classes or zazen. Saturday lunch is also open to the public. There may be times when meals are not open to the public, for example, during sesshins. Residents are welcome to have guests for meals. They are asked to inform the tenzo in advance and to put a donation in the box if no one is collecting money at the kitchen door. The current suggested donation for each meal is posted by the menu board.



## Kitchen Practice

Residents are asked to respect the traditional Soto Zen kitchen guidelines and practices as handed down to us from the teachings of Dogen Zenji. During meal prep times and meal clean-up, the crew works quietly and attentively. Lunch prep is a silent work time. At dinner prep times, quiet talking is permitted. Those who are not working in the kitchen during meal preparation are asked not to use the kitchen as a passageway or as a place to talk. Ask the fukuten's permission before engaging in conversation with a member of the kitchen crew when they are working.

24

## Nightwatch

Nightwatch is responsible for answering the door late at night, ensuring that windows and doors are secure, turning off any unnecessary lights, and generally ensuring that the building is in a safe state while residents are asleep. Nightwatch follows the detailed nightwatch instructions kept in the right drawer of the lobby desk.

During nightwatch rounds, between 9:00 p.m. and 9:30 p.m. Residents using the first floor rooms after the nightwatch rounds are responsible for closing and locking windows they re-open and turning off lights they have turned on.





29

SFZC_Behrend_000027

212

## Indigent and homeless people

If a person comes to the door asking for food, they should be asked to wait on the front porch while the resident obtains what is needed from the small kitchen. Overnight shelter and other city services information that may be given out is located in the left-hand drawer of the lobby desk. It is a community guideline to not give money to those who come to the door asking for it.

## Nightwatch and Front Desk Duty

Nightwatch and desk duty are vital to the security of the building, as well as residents' safety. City Center residents are expected to do at least one nightwatch and one desk duty shift each month depending on the residential population. Residents sign up for these shifts and are expected to secure substitutes if they are unable to do the job. The nightwatch and desk duty coordinator places scheduling calendars on the bulletin board by the small kitchen two weeks before the end of the month. The coordinator also trains new residents. A wooden plaque is placed at residents' doors reminding them that their appointed evening for one of these jobs has arrived. Please remember to place it in front of the next person's door. If the next person lives up the street, leave the plaque in the drawer of the desk in the lobby and remind them the next day, either in person or by email.



## Front Desk Duty

Those on desk duty answer the Page Street front door from 6:30 to 7:45 p.m. and are a helpful and friendly presence for those arriving for classes and events in the evening. In order to be there on time, the person on desk duty may go to the kitchen just prior to meal serve-up and get their meal and then take it and eat it at the front desk. Let the fukuten or tenzo know that you are doing this.

28

## Open Kitchen

On Saturday evenings, Sundays, and holidays, when the kitchen crew is off, there is open kitchen. Residents may cook and prepare their own meals in the main kitchen or small kitchen. During open kitchen, residents may heat-up leftovers or prepare meals from food in the walk-in. Please do not take any food labeled "Reserved," or anything from the Prep shelf in the walk-in. Residents are responsible for cleaning up their cooking utensils and plates and ensuring the overall cleanliness of the kitchen during open kitchen. Individuals and groups may use the kitchen on Sunday to prepare special meals as long as the meal is offered to the community as a whole. This should only be done with the permission of the tenzo.

## Organic Local Food

As a Buddhist temple, City Center encourages the practice of compassion, and offers a vegetarian diet consisting primarily of organic foods. Realizing the impact of pesticides on lands, plants, animals and farm workers, Zen Center maintains a strong commitment to buy organic and as much as possible to buy local. Most items are purchased in bulk, reducing packaging, and an effort is made to buy from local sources to cut down on unnecessary transportation.



25

SFZC_Behrend_000028

## Small Kitchen

The small kitchen is intended for the use of Page Street residents and for City Center employees during their working hours. City Center guests, as well as visiting Green Gulch and Tassajara residents, may also use the small kitchen.

Some personal items may be kept in the kitchen refrigerator. Clearly label personal items with your name and the date. Meat or fish, including leftovers from restaurants, must not be stored in any City Center refrigerator.

A bowl of fruit is kept in the small kitchen at all times and is available to everyone. If the bowl needs to be replenished, residents may obtain fruit from the walk-in refrigerator or other food storage areas. Bread, rice cakes, peanut butter, jam, coffee, and tea are also available in the small kitchen from 7:30 a.m. through 9:30 p.m., except during sesshin.



## SAFETY AND SECURITY

### Building Security

Taking responsibility for building security and the safety of others is an important part of being a residential practitioner at City Center. Any resident encountering someone they do not recognize in the basement, second or third floors, or at 366-70 Page Street, should ask that person who they are and why they are in the building. This can be done in a welcoming and friendly manner. If you are uncomfortable doing this alone please ask another resident or staff person for assistance.

Zen Center is not responsible for personal items kept in your rooms. If you are concerned for the safety of your personal items think about purchasing insurance to cover your valuables. **Always** keep the door to your room locked. You may obtain a key for your room from the Front Office. We ask residents to carry building fob and room key separately from their personal ID. Residents must report stolen keys or those lost with ID immediately to the City Center director.

### Answering the Front Door

The front office staff generally greets visitors between 9:30 a.m. to 4:00 p.m. After 4:00 p.m. and on weekends, residents are responsible for answering the door. At 366-70 Page Street, residents are responsible for answering the door.

Welcome guests safely by following the front door forms as posted at the door. Only City Center residents should answer the front door. Guests and other visitors are asked not to. When answering the front door, please be friendly, welcoming, and helpful to all of our visitors. If, for whatever reason, you cannot do this, feel free to let another resident answer the door.

If you are answering the door out of office hours or on weekends, please do not let visitors leave the front lobby area without being accompanied by a resident. Do not allow visitors to wander in the building unescorted. Please immediately report any dangerous or suspicious activity to the front office, the director, other available senior staff members or resident representatives. If you feel you need to, do not hesitate to ask for help.

SFZC_Behrend_000029

# Exhibit 13



Exhibit 22
Behrend, A.
10/14/22
@ptus



SAN FRANCISCO ZEN CENTER

# "Room, Board, and Tuition" Program Policies at SFZC

### Updated 1.5.17

## TABLE OF CONTENTS

INTRODUCTION                                                          2

PURPOSE, IDEALS, AND VALUES                                          2

DIVERSITY, EQUITY AND INCLUSIVITY                                    3

PROGRAM OVERVIEW                                                     3

QUALIFICATION, APPLICATION PROCESS, AND MOVE IN/OUT PROCEDURES   6

PROGRAM SCOPE AND SEQUENCE                                          9

HEALTH INSURANCE AND DISABILITY POLICY                             11

HARASSMENT POLICY                                                   12

DRUG AND ALCOHOL POLICY                                             13

CONFLICT RESOLUTION                                                 13

ACKNOWLEDGEMENT                                                     14

## INTRODUCTION

1

SFZC_Behrend_000098

This document provides general information regarding the structure and policies for "Room, Board, and Tuition" (RBT) students at the San Francisco Zen Center (SFZC). RBT students are responsible for reading and understanding these policies. Upon acceptance into the RBT program, new students will receive a current copy of the policy from City Center's Director, as well as any updates to the policy throughout the student's participation in the program. These policies are subject to modification at any time.

## 1. SFZC PURPOSE, IDEALS, AND VALUES

SFZC's Mission Statement reads: "The purpose of SFZC is to express, make accessible, and embody the wisdom and compassion of the Buddha. The ideals are based on the example of the Buddha, and guided by the teachings and lineage of the Soto School as conveyed to us by our founder, Shunryu Suzuki Roshi, and other Buddhist teachers. Our central value is to express the nonduality of practice and awakening through the practice of Zen and the Bodhisattva Precepts. SFZC acknowledges and values equally the expression of practice in formal settings and in daily life: thus, we affirm both lay and monastic practice as expressions of the Bodhisattva Way."

Students at SFZC strive to embody the wisdom and compassion expressed within the Bodhisattva "ten grave precepts" as follows:

A disciple of the Buddha does not kill.
A disciple of the Buddha does not take what is not given.
A disciple of the Buddha does not misuse sexuality.
A disciple of the Buddha does not lie.
A disciple of the Buddha does not intoxicate self or others.
A disciple of the Buddha does not slander.
A disciple of the Buddha does not praise self at the expense of others.
A disciple of the Buddha is not possessive of anything.
A disciple of the Buddha does not harbor ill will.
A disciple of the Buddha does not disparage the Three Treasures.

## 1.   DIVERSITY, EQUITY AND INCLUSIVITY

2

SFZC_Behrend_000099

217

Students at SFZC aspire to view all beings as Buddha, treating each person we meet equally with care and respect. As part of a diverse community and world, SFZC acknowledges that diversity practice and dharma practice are not separate. In actively promoting, nurturing, and maintaining a diverse, equitable and inclusive community, SFZC aspires to express and manifest the Bodhisattva Way. The temple's diverse and inclusive community forms the foundation of each sangha member's spiritual well-being and development as well as the institution's integrity and vitality. In this context, SFZC as an institution commits to embody and support diversity, equity, inclusion and cultural humility.

So that all people may be warmly welcome and truly supported to join, realize and embody this way of life, SFZC does not discriminate nor tolerate discrimination on the basis of race, nationality, class, gender, sexual orientation, age, or physical ability. SFZC is committed to ongoing learning and training for teachers, staff, residents and organizational committees related to diversity, inclusivity and equity. SFZC actively supports the peer-led Cultural Awareness and Inclusivity Committee as well as the institutionally-staffed Promoting Inclusion and Equity Committee. We seek to develop and institutionalize a practice of ongoing discussion and inquiry regarding diversity, race, privilege and unconsciousness bias among residents, teachers, staff, board, and the wider sangha. We are committed to learning and practicing agreements and skills for multicultural communication and conflict resolution, as well as to developing an effective, transparent governance structure that supports accountable action and empowered leadership.

## 1. PROGRAM OVERVIEW

SFZC's RBT Program, unique to City Center, supports highly motivated students to experience intensive Zen training while maintaining career and educational commitments outside of Zen Center. RBT students receive the benefits and nourishment of residential temple life while also serving as representatives of SFZC's practice and lineage in contexts outside of the temple. RBT Program students work in a variety of professional or service-oriented fields, including education, medicine, mental health, legal services, high tech, and non-profit administration. Some students also pursue educational development to further career objectives. In this way RBT students serve as ambassadors who offer the SFZC community the value of their "marketplace" and "in-the-world" professional skill sets and interpersonal experience. The RBT Program can also serve as a support former "work practice apprentices" (WPA's) or staff members to transition to a life outside the temple.

In lieu of work exchange, RBT students pay a fee to practice and live at SFZC. The RBT Program is a two-year program, and is renewable for another two years if the student successfully meets program requirements during the first term.

Ongoing practice requirements for all RBT students include:
- Full participation in temple practice
- A consistent practice relationship with one or more SFZC practice leaders
- Observance of City Center's 'Standards for Pure Conduct'

SFZC leadership expects RBT students to prioritize their commitment to the program, exemplifying high standards of practice and conduct throughout their enrollment. Residential practice at SFZC demands vigorous engagement and strong stamina. RBT program responsibilities require a minimum of 20 hours per week; many RBT residents find that limiting their outside commitments to 35 hours per week or less leaves time, energy, and focus for temple life.

### Description of the RBT Zen Training Program

Each new RBT student shall receive a five-part packet that includes:
- SFZC's RBT Program Policy
- City Center Resident Handbook
- Pure Standards for Residential Training
- Four Core Components of Formal Practice
- Protocol for Conflict

RBT students will acknowledge receipt of the packet in writing at the time their residency begins; City Center's Director will place a copy of the signed confirmation in the student's file.

As outlined in the Resident Handbook and the Pure Standards for Residential Training, RBT students agree to the following core Zen training and communal responsibilities and commitments as City Center residents:

| DAILY | WEEKLY | MONTHLY | YEARLY |
|---|---|---|---|
| **Daily Morning Program** *(6x weekly)* | **Dharma Talks** *(2x weekly)* | **Night Watch** *(1x month)* | **Practice Period Classes** |

4

| | | | |
|---|---|---|---|
| Consisting of two periods of zazen, service and soji, as well as oryoki and a dharma talk on Saturday mornings<br><br>**Optional and Encouraged**<br>Late afternoon zazen and service | Saturday morning and Wednesday evening dharma talks | | *(2-3x yearly, depending on student)* |
| | **Doan Jobs**<br>*(2x weekly)*<br>Ceremonial roles such as ringing bells, cleaning altars, and watching the door during zazen | **Desk Duty**<br>*(1x month)* | **Sesshins**<br>*(All during first year of residency, 1x per year thereafter)* |
| | **Temple or House Job**<br>*(1x weekly)*<br>Assigned by Work Leader, requiring about one hour per week | **One-Day Sittings**<br>*(1x month)* | **Resident's Retreat**<br>*(1x yearly, approx 4-5 days)* |
| | **Dish Shift**<br>*(1x weekly)* | **Resident Meetings**<br>*(1x month)* | **Practice Periods**<br>*(All during first year of residency and 1x yearly thereafter)* |
| | **Bathroom Job**<br>*(1x weekly)*<br>Students living in the 366-368 flats perform house soji one day a week along with other flatmates | **Practice Discussion** *(1x a month, minimum)* | **Tangaryo**<br>*(1x total)*<br>Formally enter the temple as a resident after two practice periods |
| | **Kitchen Shift**<br>*(1x weekly, as needed)* | **RBT Practice Group**<br>*(1x monthly)*<br>Facilitated by the Tanto | **Practice Discussion with Head of Practice**<br>*(2x yearly, minimum)* |

The City Center leadership recognizes that outside work or school commitments may at times impact an RBT student's ability to participate in certain formal practice offerings such as one-day sittings and sesshins. RBT students make their best efforts to arrange outside commitments accordingly in order to attend as many of these practice offerings as possible. Requests for regular exceptions to (or absences from) formal practice commitments and responsibilities must be approved in advance by the Head of Practice, the student's practice leader, and the Practice Committee. One of the primary supports for RBT residents will be the monthly practice group meetings with both the Tanto and, if so they so choose, additional peer-led group meetings.  The practice group meetings with the Tanto will be an opportunity for RBT

5

residents to discuss their experiences, joys and challenges in the realms of temple practice and work practice, as well as to study together dharma books and other resources particularly focused on work practice "in the world."

In addition to the requirements above, students may also consider the following options to enhance and support their practice as RBT students:
- When offered, participation in classes, workshops, or trainings of particular interest to those practicing in the workplace
- Upon request, representation at Senior Staff or Practice Committee meetings to address and contribute to conversations about topics of concern, particularly those affecting RBT residents.

During their 1-4 year participation in the RBT Zen Training Program, the student will expand their practice participation in the following ways:
- Moving toward a role of practicing for the sake of others, such as volunteering to offer Zendo Forms, staffing the "newcomer's" table, and committing to other community-cultivation responsibilities
- Working with their practice leader towards receiving the precepts
- Moving into a leadership role in the monthly RBT practice group.

Upon completion, an RBT Program participant will receive a formal departing student ceremony and a certificate of program completion.

1.  **QUALIFICATIONS, APPLICATION PROCESS, AND MOVE IN-OUT PROCEDURES**

There are two primary entry points for becoming an RBT student: 1) entering as a new student without previous residency experience, and 2) transitioning from being a WPA/staff student to being an RBT student with the intention of eventually leaving residency.

**Qualifications for being an RBT resident are as follows:**

- The RBT Program is initially a two-year program, and is renewable for another two years.  There will be a review of the student's participation prior to the end of the second year to discern if the program has been a good match for both the student and the temple before a commitment to a second two-year term is supported.
- This parameter and review process also applies to WPA/Staff who transition to RBT status.
- In reviewing applications for the RBT program, the Practice Committee may give preference to current residents who have completed one year or more as

6

a WPA or practice period student, including participating in three practice periods (PP) and sitting one seven-day sesshin.

- In some cases, RBT applicants who have not already fulfilled the one- or two-year (WPA) requirement will be considered. Taken into consideration will be whether the RBT applicant is known to the community (e.g. through their regular participation in practice and communal programs as a non-resident or guest student), or if they have a close and respected affiliation with another sangha that can vouch for their practice and capacity to be a responsible and contributing member of the temple as a resident.
- If an RBT applicant has not been a previous WPA or PP resident for a year or more, during their first year of RBT status the student is expected to participate in both the Fall and Winter Practice Periods and sit at least one seven-day sesshin.

**Transitioning from WPA/Staff to RBT status**

The City Center Practice Committee consider the following criteria to evaluate an RBT application by a current or former WPA/Staff resident:

- Student maintains consistent zazen and formal practice schedule attendance of 80% or higher
- Student consistently fulfills residential responsibilities, e.g. temple, doan, meal board and bathroom jobs
- Student expresses interest and ability to participate in training and study opportunities offered
- Student actively participates in community life and strives to nurture community connections

**Applicants for the RBT program must provide:**

- **A formal application**, submitted to the Director.
- **One letter of recommendation**, either from a Zen teacher or other sangha member (only necessary if applicant is not a current WPA/Staff resident)
- **First month's rent***
- **Security deposit***

*\*If an applicant cannot pay the full deposit amount at once, fees may be split over a five-month period at the Director's discretion.*
**Payment Process**

- RBT residents must pay RBT fees on or before the 5th day of each month.

7

- A late payment fee of $75.00 will be added onto the monthly RBT fee if the RBT fees are not paid to SFZC by the 10ₜₕ of the month, unless the RBT person has made other arrangements ahead of time with either the Director or the accounting office.
- If rent payments are missed for two consecutive months, on the 10ₜₕ of the second missed month, the RBT student will be asked to move out.
- Delinquency of monthly fees will be taken into consideration when evaluating re-application of RBT residency

**Practice & Temple Duties Schedule**
Please see the RBT Program Overview section above for details about specific requirements for RBT students.  RBT students or applicants must submit any requests for exceptions to the program requirements to the Director for approval.

**RBT Rates**
RBT Rates are based on room size and the number of occupants in the room. Officers and Directors adjust rates each year. RBT residents will be notified two (2) months in advance of any pending rate change.  Current rates are available upon request, and are also available through the Front Office staff and the Director.

**Housing**
The Director and the Housing Committee assign housing on the basis of seniority, special needs, and position. When an RBT student does not meet the requirements of the RBT program as outlined in the Program Overview, they relinquish the privilege to live in SFZC housing and may be required to vacate immediately.

**Tuition for SFZC Classes & Workshops**
The tuition for all practice periods, one-day sittings, sesshins, and classes is included in the RBT monthly fee.  Residents pay 50% of the limited income fee for participating in workshops lead by non-resident teachers.

**SFZC Membership**
After one year of residency at Zen Center, practitioners will automatically be enrolled as Dharma Light members. Long-term residency is defined as WPA, Staff, and RBT residents.  If a resident wishes to opt out of membership, they can contact the membership manager: membership@sfzc.org

**Practice Period Credits**
RBT students do not earn practice period credits.

SFZC_Behrend_000105

**Time Out of Schedule (for Work, Vacation and Other Reasons)**
RBT residents are permitted a maximum of four weeks per year of time out of the formal practice schedule for vacation, family leave, or to attend to other personal matters. RBT residents are also permitted up to four weeks per year of time away from the temple for work commitments if their work requires travel. The Practice Committee may approve absences of greater length on a case-by-case basis. RBT students must make arrangements well in advance of their absence in consultation with the Head of Practice and their practice leader. The Director may ask residents who will be away from the temple for an extended period of time to make their room available for use by the temple.

**Sesshin Leave**
While an RBT resident may participate in other 'outside' sesshins, retreats and practice events (i.e. not at City Center), that time is considered vacation time or time that is extracurricular to their practice commitments of City Center.

**1.    PROGRAM SCOPE AND SEQUENCE**

The SFZC residential program provides practice opportunities for a limited number of people to live and/or continue work practice in one of our three centers. The RBT Program is a unique offering specifically designed to support participants to engage in residential Zen training in the City Center community. SFZC's leadership strives to promote attention, respect, and dialogue between students, teachers and resource providers as we make decisions about whether it is appropriate for each student to continue residential practice.

The purpose of the program guidelines and a two-year time-limit is to provide a clear, conscious framework of support and reflection at watershed moments in a student's career as an RBT resident.

**Next Steps**
After the first 18 months of participation in the two-year program, an RBT student has had the chance to get to know the practice and become familiar with the Dharma and the Sangha, experience how each fits into their work-life balance. They have gone through their preliminary training stages and are intimate with the experience of maintaining a rigorous practice schedule while also working or studying outside the temple. This is a time for each student in collaboration with

9

SFZC leadership to assess the student's participation in the program and determine next steps.

While City Center leadership (including the Director, Tanto, Abbot and one's own practice leader) will at times provide feedback and/or inquiry regarding a student's fulfillment of practice standards and expectations, the student is primarily responsible for acknowledging and assessing their own level of participation in the program and inquiring directly with leadership if they are uncertain whether or not they are meeting the protocols and standards outlined in this document.

All RBT students will meet with the Director and Tanto three to six months before the end of their first term to discuss student's progress. RBT residents wishing to apply for a second two-year term will enter a process of evaluation headed by the temple's Practice Committee. The student will complete a "Paths and Gates" questionnaire which will form the basis of their discussion with the Director, Head of Practice, and practice leader. The Director and Head of Practice will share the interview results with the Practice Committee, who will help to assess student's progress in the program, and to provide any additional feedback that may be helpful for them in considering their options.

At the conclusion of their (first) two-year RBT Program, the student has several options:
1. Consider their formal participation in the RBT residential training program complete and plan for their transition out of SFZC;
2. Take their training further by applying to participate in a second two-year RBT program term;
3. Take their training further by enrolling in and completing a Tassajara practice period;
4. Take their training further by apply to transition into a stipended staff position (if one is available) at one of the three SFZC temples.

**End of Second Two-Year Term (or 4ₜₕ Year) as an RBT Resident**
By the end of the second two-year term (or fourth year) of being enrolled in the RBT Program, a student will have developed a strong understanding of their relationship to practice, a commitment to the temple, and ability and understanding of how to manage a practice and work schedule and integrate practice into their life on a long-term basis. They may also be considering the value of receiving the precepts.

At this stage, the student has a few options:

1. Consider their formal participation in the RBT residential training program complete and plan for their transition out of SFZC;
2. Take their training further by enrolling in and completing a Tassajara practice period;
3. Take their training further by apply to transition into a stipended staff position (if one is available) at one of the three SFZC temples.

At the 18-month point of their second two-year term, an RBT resident will again go through another evaluation process to support them in considering next steps. The Head of Practice and the Director, after discussion(s) with the student as well as the student's practice leader, will bring a recommendation to the Practice Committee, particularly if the student intends to apply for a Tassajara practice period or transition to staff.

An RBT resident may leave at any time prior to completing their two-year term without penalty. However, it is requested that RBT residents provide a 30-day notice whenever possible if they intend to end their residency sooner than the two-year term, and that they leave not owing any RBT or other fees to SFZC. Owing any RBT or other fees upon moving out may mean the student forfeits their deposit.

Each RBT student will participate in a final exit interview with the Director shortly before departing.  The exit interview offers a medium to exchange feedback about the student's experience in the program as well as SFZC's experience of the student's participation in the program.  The exit interview also serves as an opportunity for the departing student to explore ways to stay engaged with practice and the SFZC community as an RBT program graduate.

1.      **HEALTH INSURANCE AND DISABILITY POLICY**

**Health Insurance**
The Affordable Care Act (ACA) currently requires that all legal residents of the United States maintain health insurance coverage. RBT students are expected either to apply for insurance under the exchanges offered by Covered California (see http://www.coveredca.com) or to remain on their parents' coverage if they are under 26 years of age. RBT applicants must provide evidence of insurance, which will be kept on file by the Director.

**Change in Health or Ability Status**

11

If the health or ability status of an RBT student changes at any time, at the discretion of the practice committee they will be given up to, but not more than, four weeks time to determine their health or (dis)ability status, their related needs, and their level of engagement in practice and community commitments going forward. A physician's note may be required.  The student will meet with the Director and Tanto to discuss their status and what their current health care and physical needs are, and what events they can continue to participate in while they're in a process of assessment and recuperation. If unable to fully re-engage in practice and community commitments after an initial 4 week assessment period, the RBT student may be asked to leave the RBT program and residency in order to take the time and space to properly care for themselves without causing undue strain on the rest of the community by asking it to take on the additional responsibility of providing for their care and/or covering their communal duties.

1.   **HARASSMENT POLICY**

SFZC prohibits the harassment of its students, staff members and the public. Prohibited behavior includes, but is not limited to:

- Verbal harassment: derogatory comments regarding another's race, color, age, gender, gender identity or expression, sexual orientation, national origin/ancestry, citizenship, political or union affiliation, marital status, pregnancy, disability, or any other basis prohibited by law.
- Physical harassment: unwanted physical contact, hitting, pushing or other aggressive physical conduct, or threats to take such action.
- Sexual harassment: making unwelcome sexual advances or requests for sexual favors; making submission to or rejection of such conduct the basis for decisions affecting the student, staff member or guest; sexual innuendos, propositions or threats; unwanted physical contact; creating a hostile environment that is offensive to the gender of the recipient.
- Prohibited harassment may also occur if a hostile environment has been created that is sufficiently severe, pervasive, or persistent so as to unreasonably interfere with a person's work performance or participation in Zen Center activities.

Any student, staff person or visitor to any Zen Center campus who witnesses, or who believes that they themselves have been the victim of, improper conduct should report the matter immediately to the Director or Tanto  (or, if necessary, the Abbess/Abbot or Resident Dharma Teacher) at the practice center where the incident occurred.

1.   **DRUG AND ALCOHOL POLICY**

12

SFZC_Behrend_000109

227

The possession and use of alcohol (except as part of a ceremonial toast offered on New Year's Day) and illegal drugs, and the misuse of prescription drugs are prohibited on the premises of SFZC. Anyone under the influence of such substances or ingesting such substances while on the premises, is subject to review and may be subject to appropriate disciplinary action, including being asked to leave the SFZC community. SFZC is committed to assisting those who need help with a drug or alcohol problem.

1.    **CONFLICT RESOLUTION**

San Francisco Zen Center's *Communications Protocol for Practicing with Conflicts and Disagreements* encourages members of the SFZC community to take initiative for informal, face-to- face communication when there is disagreement or conflict. The protocol features a respectful and considerate process towards promoting resolution and restoring harmony in accord with the SFZC's overarching values and practices.

In short, if a conflict arises, SFZC encourages students to try to work it out directly. If any member of the conflict needs supportive communication tools, feels unsafe, or has questions about work practice policies, practice leaders, crew heads, the Head of Practice, City Center Director, Human Resources staff, are available to help to create a neutral space in which both people can be heard and assisted to work out the conflict.  If the complaint or conflict is urgent or serious, please contact the City Center Director or Head of Practice immediately. If the Director and Head of Practice are unavailable, please contact Human Resources or a local practice leader.

All residents and staff members must observe San Francisco Zen Center's Harassment Policy, which strictly prohibits verbal, physical and sexual harassment. Please speak with the Head of Practice or Director if you believe that this policy has been violated, in an effort to prevent further harm, to seek resolution, and to reestablish harmony.  Please refer to the full document for complete detail on protocols for harassment.

SFZC_Behrend_000110



SAN FRANCISCO ZEN CENTER

# "Room, Board, and Tuition"
# Program Policies at SFZC

## ACKNOWLEDGEMENT

I have read and understand the preceding pages of the RBT Policies at SFZC.


Resident's signature                                    Date


Director's signature                                    Date

SFZC_Behrend_000111

# Exhibit 14



Exhibit 3
Behrend, A.
10/14/22
@ptus



SAN FRANCISCO ZEN CENTER

**Office Use Only**

Rcvd: _____

Accptd: _____

Notif: _____

Fee: _____

**CITY CENTER WORK PRACTICE APPRENTICE (WPA) PROGRAM APPLICATION**

Date you wish to begin Work Practice Apprenticeship Program: **January 9, 2017**

Name: **Alex Behrend**  Birthdate: **8/28/1972**     Age: **44**

Address: **San Francisco, CA**
Phone - **Cell:415-810-9047**  Work: _____ Fax_____
Email:  **alex.s.behrend@gmail.com**

In case of an emergency, whom should we notify?

Name: **Cynthia Behrend**    Relationship: **Mother**
Address:**7249 View Street, El Cerrito, CA**
Phone – **Cell: 650-888-5835**

Do you have health insurance? **Yes**  If so, please indicate insurance company:
**Healthy San Francisco**

Have you already participated in the Work Practice Apprenticeship Program? **No**
If so, for how long?

Do you have any Practice Period credits at this time? **No**

Have you practiced in residence at Zen Center before? If so, when and where did you
reside?

City Center (dates):  **11/13/2016 - 12/22/2016 ... I have been a Guest Student
during this time**

SFZC_Behrend_000076

Please attach a statement discussing each of the following, numbering your responses:

1. Your interest in Zen and in participating in the WPA Program at this time. What are your plans for using your earned practice period credit(s)?

**I have been a non-residential practitioner with San Francisco Zen Center since the summer of 2014, and my practice and involvement with SFZC has steadily increased over this time period. I started attending dharma talks on Saturdays and Wednesdays, then began participating with Saturday Sangha, and completed my first practice period earlier this year. My time as a Guest Student has been wonderful, and the Rohatsu Sesshin (my first 7-day sesshin) was an amazing experience. The more I sit and the more I practice, the more positive impact I'm experiencing in my life.**

**I would like to do a Work Practice Apprenticeship to deepen my practice and continue working with how practice is helping me grow and thrive.**

**Regarding the practice period credit, I do not have any particular plans ... I'm flexible and happy to use any credits in a manner that best furthers practice.**

**I don't officially work with a teacher yet. A few times a month I meet with David Zimmerman ... he has been so great in helping me with my zazen practice and the impact it's been having on me. I have also met several times with Victoria Austin and Jeffrey Schneider.**

2. A brief personal history.

**I grew up in the Bay Area ... My entire family still lives in the East Bay or on the Peninsula. (4th generation on both sides of my family.)**

**When I finished at UC-San Diego in 1995, I spent the next 15 years working on political campaigns for dozens of Democratic candidates all over the country. During those years, I worked in 12 different states. The chance to live all over America was great. I'm also glad to be back in the Bay Area.**

3. Your experience studying and/or practicing Buddhism or other spiritual traditions (other than at San Francisco Zen Center).

**I had no prior experience studying or practicing Buddhism before SF Zen Center. I don't have any significant experience with other spiritual traditions.**

SFZC_Behrend_000077

4. Significant physical, psychological, or emotional difficulties, particularly those for which you have received professional help or been hospitalized. Please list dates, if applicable.

**None**

5. Current use of prescription medications. List medications and briefly describe the conditions being treated.

**I take medication for Attention Deficit Hyperactivity Disorder (AdHd), and have been doing so for about 5 years. I intend to continue taking my AdHd medication while at City Center. I see a doctor monthly to check in about using this medication.**

6. History of alcohol or substance abuse. Please list any treatment programs and dates.

**I have never undergone treatment for alcohol abuse, however I do consider myself alcoholic and I no longer drink or use recreational drugs. I am in recovery and attend Alcoholics Anonymous meetings regularly.**

7. Current tobacco use.

**None**

8. Any past or current eating disorders.

**None**

9.  Any current medical problems (e.g., back, sciatica, or knee injury, repetitive stress conditions, food or other serious allergies). If so, will any of these problems prevent you from working or sitting zazen?

**None**

10.  Any other limitations that would prevent you from participating fully in the regular daily schedule?

**None**

SFZC_Behrend_000078

It is a prerequisite for being accepted to the WPA program to do at least 2 weeks of guest student practice at City Center.

All applications for the City Center Work Practice Apprentice (WPA) Program including the $70 application fee should be sent to the following address:

**City Center Work Practice Apprenticeship Program**
**City Center Director**
**San Francisco Zen Center**
**300 Page Street**
**San Francisco, CA 94102**

SFZC_Behrend_000079

# Exhibit 15



**Exhibit 21**
Behrend, A.
10/14/22
@ptus

## SFZC City Center
## Room Board Tuition (RBT) Application Form

Name  Alex  Behrend                          Date  11 | 2 | 2018

Legal Name (If different) _____ Dharma Name _____

☐ New Resident    ☐ Returning Resident    Age  46    D.O.B.  8 | 28 | 1972

Address  300  Page  Street

City  SF    State  CA    Zip  94102    Country  USA

Phone  415 - 810 - 9047    Alternate Phone _____

E-mail  alex.s.behrend@gmail.com    Social Security Number  572 - 77 - 5197

*Please put a head shot photo here or attach to the application*

Date you wish to move in _____

SFZC Practice Leader  David Zimmerman and Victoria Austin

**EMERGENCY CONTACTS**

Name  Katherine Kirbus

Relationship  Sister

Email  kvkirbus@lbl.gov

Phone  415 - 407 - 1653

Physician  Dr. Pyone Soe

Phone  415 - 391 - 9686

Insurance Company  Medi-Cal

Phone _____

Insurance Policy Number _____

**REFERENCE CONTACT (required)**

Name  John Rizzo

Relationship  former Client    Member of City College of SF Board of Trustees

Address _____

Phone  415 - 504 - 4845    Email  jrizzo@sprintmail.com

**Have you practiced at San Francisco Zen Center before?** If so, please give dates and briefly describe (Tassajara/City Center/Green Gulch, summer or guest student/WPA/RBT/practice periods)

*Yes, I am currently a Work Practice Apprentice at City Center.*

**HEALTH RECORD:** Circle Yes or No for the following questions.

- Do you have any long-term medical conditions, special medical needs, or a history of physical illness or limitations? **(Yes)**   No
- Have you had a serious illness or major surgery within the last 5 years? **(Yes)**   No
- Do you have any physical conditions or repetitive stress injuries that might limit your meditation or work practice?   Yes   **(No)**
- Have you **ever** been treated **or** hospitalized for a psychological condition? **(Yes)**   No
- Are you **currently** receiving treatment for a psychological condition? **(Yes)**   No
- Do you have any dietary or health restrictions?   Yes   **(No)**
- Do you have any serious allergies?   Yes   **(No)**
- Do you have any hearing difficulties or impairment in vision? **(Yes)**   No
- Do you smoke, or use any kind of tobacco or nicotine products?   Yes   **(No)**
- Do you have any history of substance abuse, drug or alcohol addiction, or eating disorder? **(Yes)**   No
- Have you participated in a recovery or treatment program for drug or alcohol addiction or an eating disorder? **(Yes)** ✱   No   *I'm a member of AA. I've never been in a treatment*

**If you answered Yes to any question, please describe in your Personal Statement, section** *program.* **7, (below), including dates when applicable.**

**MEDICATIONS:** Please list below any prescription medication you are taking, including purpose, dosage and frequency of intake. (No need to include birth control or cosmetic prescriptions.)

*Concerta, 18 mg, once daily, treatment of AdHd*
*Trazodone, 25-50 mg, as needed, insomnia*

Date of your last tetanus shot: _____

2

SFZC_Behrend_000035

**Have you ever been convicted of a felony or serious misdemeanor?**     Yes ☑   No ☐

If yes, please state the nature of the offense(s), when and where convicted, and disposition of the case. Convictions for marijuana-related offenses need not be listed.

In 2008 and 2009 I was convicted of Driving Under the Influence in Virginia ('08) and Maryland ('09)

Note: No applicant will be denied residency solely on the grounds of conviction of a criminal offense.

How did you hear about City Center?

I have been a regular practitioner and member since 2014

## RBT REQUIREMENTS

The grid below shows the core training schedule that City Center requires of residents, please check the box for each event you will be able to attend. Note that 5:40pm Zazen and 6:20pm service are not required but can be attended to make up for missing part of the morning schedule.

| Weekly Schedule | Mon | Tues | Wed | Thurs | Fri | | Sat | |
|---|---|---|---|---|---|---|---|---|
| 5:25am zazen | ✓ | ✓ | ✓ | ✓ | ✓ | | 6:30am zazen | ✓ |
| 6:05am zazen | ✓ | ✓ | ✓ | ✓ | ✓ | | 7:10am service | ✓ |
| 6:40am service | ✓ | ✓ | | ✓ | ✓ | | 7:40am soji | ✓ |
| 7:00 Soji | ✓ | ✓ | ✓ | ✓ | ✓ | | 7:55am oryoki breakfast | ✓ |
| 5:40pm zazen | | | | | | ★ My schedule will permit regular attendance at afternoon zazen | 9:25am zazen | ✓ |
| 6:20pm service | | | | | | | 10:15am lecture | ✓ |
| Wed 7:30pm lecture | | | ✓ | | | | | |

New residents participate in all practice periods and one sesshin their first year of residence. Beyond the first year, one practice period and a long sesshin per year is required.

The yearly schedule includes, but does not show on the grid, one day sittings, two seven and one three day sesshin yearly, the monthly Full Moon Ceremony and various other regular ceremonies, resident meetings and the resident retreat.

In addition to the schedule, residents have a dish crew job, a house job, a doan-ryo job, and monthly night watch and desk duty.

If, for some reason, you cannot fulfill any scheduled activities, please consult with the Director and Tanto as part of this application process.

SFZC_Behrend_000036

**PERSONAL STATEMENT**

Please include the following in your personal statement, and number each section as follows:

1. Brief personal history
2. Any previous experience in Buddhist or other meditation practices (other than SFZC)
3. Your interest in Zen and participating in the RBT Program at this time
4. How do you plan to support yourself while at Zen Center? If you will be working or going to school outside Zen Center, please describe your anticipated daily schedule.
5. Interest in continuing to train beyond the initial visit, if any
6. Work experience and skills (please include any form of medical training or experience)
7. Physical or mental health issues, including any noted under Health Record, above and how it might affect your ability to follow the required schedule?
8. Any other limitations that would prevent you from participating fully in the regular daily schedule?

I agree to submit a Practice Agreement every six months. I understand that twice yearly the Practice Committee will review my participation in the schedule and resident requirements, and that my continued residency depends on my full participation while I am a resident at San Francisco Zen Center.

Signature _____ Date___11/2/2018___

**It is a prerequisite for being accepted to the RBT program to do at least 2 weeks of guest student practice at City Center.**

**Applications for the City Center Room Board Tuition (RBT) Program should be sent to:**

ccdirectorassist@sfzc.org

Updated 03/2018

4

SFZC_Behrend_000037

## PERSONAL STATEMENT

### 1. Brief Personal History

I grew up in the Bay Area, and my entire family still lives within 15 miles of City Center. (I'm the 4th generation on both sides of my family to be raised and live here.)

After finishing college in 1995, I spent the next 15 years working on political campaigns for dozens of public interest candidates and causes all over the United States. During those years, I worked in 12 different states.  The chance to live in every region of this country was wonderful. I'm also very glad that I moved back to the Bay Area for good in 2011.

### 2. Any previous experience in Buddhist or other meditation practices (other than SFZC)

None

### 3. Your interest in Zen and participating in the RBT Program at this time

I have been a regular practitioner and member of SFZC since first visiting City Center in 2014. My participation has steadily increased … first coming intermittently to dharma talks, helping with the outreach meal prep and offering, sitting in on meditation instruction, and sitting evening zazen. By 2015, I was coming to Saturday Sangha every week, helping with  evening doanryo several nights a week, and taking regular classes. In late 2016, I was encouraged to consider residential practice and I spent 6 weeks at City Center as a Guest Student. In January 2017, I began as a Work Practice Apprentice.

With the support of wholehearted practice as a City Center Resident, I began to more skillfully appreciate the full impact that my AdHd and chronic PTSD were having on my capacity to meet the requirements of the WPA program.

From October 3 - 31, 2018, I was on disability leave from my regular responsibilities to both recuperate from acute symptoms of my health conditions, as well as to get a prognosis about appropriate conditions for me to continue supporting SFZC as a resident of City Center.

Under the care of both my psychiatrist and therapist, I am requesting to be transferred to the Dharma Bridge program because we believe that working "outside" of the temple is currently the best arrangement for me to meet the core functions of the role of a City Center Resident.

I remain committed to Zen practice and what is offered at City Center. I am seeking a shift from the WPA program to the Dharma Bridge program to better support my zazen practice, my participation in the full City Center schedule, the fulfillment of my Bodhisattva vows, our City Center temple, and our entire SFZC Sangha.

SFZC_Behrend_000038

4. **How do you plan to support yourself while at Zen Center?**

- I will be doing public relations and fundraising work for several community-based public interest advocacy organizations.
  - I am also developing a mindfulness-based program for people who work on election campaigns and for public-interest advocacy groups.

- I am taking part time work at local golf courses and golf shops
  - I am also developing an instruction program that will introduce mindfulness to people who play golf

- My doctors are preparing the materials necessary to secure Temporary Partial Disability benefits through State Compensation Insurance Fund (worker's compensation  insurance)

5. **Interest in continuing to train beyond the initial visit, if any.**

City Center was one of the first places I regularly visited in the immediate aftermath of almost being killed in a car accident in May 2014. City Center has been a home for me in many ways ... and I don't mean home in the sense of a residence. If it wasn't for the training that was so freely offered to me over the years at City Center, I would not have been able to cultivate the stability to look at the impact of both the 2014 car accident or living my whole life with AdHd.

I absolutely have interest in continuing my Zen training ... I shudder to think what my life might be like if I cease dharma training. I am deeply grateful to be able to train with such a large group of practitioners.

6. **Work experience and skills**

I have extensive professional experience as a fundraiser, membership/volunteer coordinator, and publicist.  And I am happy to consider or offer ideas about work or projects that would support the Development, Membership, Outreach and/or Communications departments.

7. **Physical or mental health issues, including any noted under Health Record, above and how it might affect your ability to follow the required schedule.**

I was diagnosed with AdHd years ago, and since 2014 I have been treating PTSD stemming from a catastrophic car accident.

I am seeking admittance to the Dharma Bridge program because my providers and I have determined it is the best option right now to support my full participation in the City Center schedule, as well as support my commitment to Zen practice and my Bodhisattva vows.

At this time, I am not requesting any modifications to what is offered at City Center other than joining the Dharma Bridge program.

I will make sure to be in regular contact with my Practice Leaders, the Tanto and the City Center Director about any challenges I am having with barriers to full participation in our core offerings at City Center (morning zazen, lecture and classes, work practice, and sangha relations.)

8. **Any other limitations that would prevent you from participating fully in the regular daily schedule?**

On Wednesdays, I am the Treasurer of a 7am meeting of Alcoholics Anonymous that is held near City Center … Per conversations with Tanto David Zimmerman, I will miss service each week on Wednesday mornings. *(This is the one and only commitment each I have week that will conflict with the regular daily schedule.)*

SFZC_Behrend_000040

242

# Exhibit 16



Exhibit 5
Behrend, A.
10/14/22
@ptus



SAN FRANCISCO ZEN CENTER

*City Center*

# NEW CHECKLIST & SIGNATURE PAGE

Please check that you have all the following information:

- Welcome Letter
- New Residents "To Do List"
- Residents' Handbook
- Communication Protocol
- Harassment Policy

## SIGNATURE PAGES

*Please return the pages in bold to the director.*

- Checklist and Signature Page
- CC Fire Safety Information
- Safety agreement and tour
- Emergency Contact Information

Thank you!

I, __Alex Behrend__, **have received the information listed above and will comply with the guidelines stated in the Residents' Handbook.**

**Resident's name:** ___Alex Behrend___

**Signature:** ___Alex Behrend___

**Date:** ___01/24/2017___

SFZC_Behrend_000080

In addition, in support of the security and safety of all City Center residents, I agree to not disable the smoke detector or door closer in my room.

Name: _Alex Behrend_____ Date: 01/24/2017

_Alx Behrend_

## FIRE AND EMERGENCY SAFETY TOUR

I have completed the City Center self-guided fire and emergency safety tour and I am familiar with all emergency exits, fire escapes, fire alarms, and fire extinguishers.

Name: _____Alex Behrend_____ Date: 01/24/2017

_Alx Behrend_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## CITY CENTER RESIDENT WITH EMERGENCY TRAINING

If you have any training that could be useful in the event of an emergency (First Aid, Emergency response, etc.), and are willing to make yourself available in the case of an emergency, please list your name, contact information, and specific training and/or qualifications below and cut this portion and return to the City Center Director.

Name: _____ Date: _____

Contact Number:

_____

**Emergency Training and/or Qualifications:**

_____
_____
_____
_____
___

SAN FRANCISCO ZEN CENTER

*City Center*

SFZC_Behrend_000081

245

# Exhibit 17

**Exhibit 9**
Behrend, A.
10/14/22
@ptus

| | |
|---|---|
| **From:** | Victoria Austin ⌐- - - - - - - Redacted: PII - - - - - - -⌐ |
| **Sent:** | 9/13/2017 9:46:26 AM |
| **To:** | Alex Behrend [alex.s.behrend@gmail.com]; David Zimmerman [cctanto@sfzc.org]; victoria.austin@sfzc.org |
| **Subject:** | Re: Fwd: Enjoyed our chat Monday |

Thanks, Alex.

In general, each of us bears the responsibility of manifesting the Dharma in his or her own way. To do less creates a hell of our existence.

Tozan asked a monk, "What is most painful?" The monk said, "Hell." Tozan said, "Not so. To wear the robe without reaching this realm is most painful."

Deep bow,

Vicki

This electronic message contains information from the Rev. Victoria Austin which may be confidential or protected by various legal privileges, including, but not limited to, the Clergy-Penitent privileges set forth in Evidence Code Sections 1030-1034, and is intended solely for the use of the addressee listed above. If you are neither the intended recipient nor the employee or agent responsible for delivering this electronic message to the intended recipient, you are notified that any disclosure, copying, distribution, or use of the contents of this electronic message is strictly prohibited. If you have received this message in error, please notify the sender by replying and deleting the original message.

On Tuesday, September 12, 2017 1:31 PM, Alex Behrend <alex.s.behrend@gmail.com> wrote:

Hi, David. Hi, Vicki. I thought I would share an email I sent to a friend at City Center. I took their name off the note, FYI.
Anyway ... What my friend and I had been initially chatting about is how we both deeply value the part of Buddha's story regarding his going back into town after having had his spiritual experience under the Bodhi Tree. And how Buddha shared with people about his experiences and insights.
I just wanted to pass along my thoughts below as a snap shot of some of what is  alive for me with our Practice, training and teachings.
Have a great day!
-A
---------- Forwarded message ----------
From: "Alex Behrend" <alex.s.behrend@gmail.com>
Date: Sep 12, 2017 8:44 AM
Subject: Enjoyed our chat Monday
To:
Cc:
> Hey there ... I appreciated our conversation yesterday. Couple follow up points:
>
> 1. Buddha had his spiritual experience, and then he let people know about it. He didn't ask spiritual elders and existing leaders of his society to explain his experience and insights for him. He talked about his own experience and let people know about his insight regarding his own suffering and dissatisfaction (which are things every human has to deal with.)
>
> 2. In that vein, it's not the responsibility of a someone with a brown robe at SFZC or leaders of other Sanghas to share about the part of Buddha's  story that resonates with me. I need to share about the things that resonate for me.
>

As such, I now regularly practice with the precept of not being avaricious ... And in a spirit of generosity, I share about my experience with practice and my priorities for fulfilling the stuff they ask us to chant six days a week.
>
> As I do so, I also get to notice all the ways I try to control outcomes and other people's opinions by what I do or don't share about myself and my practice. AND ... I cultivate the humility to sound dumb some times or miss the mark or realize that I don't agree with something I passionately shared in the recent past or lose my composure or be imperfect in a million other ways.
>
> By the way, Perfectionism is a thing, and I don't recall it being a virtue of any spiritual tradition ... So doing my best and learning to acclimate to the inevitability of making mistakes is a great service to our Sangha and our wider communities. Millions and millions of people in our society need to learn that it's OK to be something other than perfect and comfy/cozy.
>
> On a final note, here's part of the email a dharma friend and spiritual practitioner sent me a while back:
>
> *"I recommend you raise your hand. Raising our hand is about cultivating humility and quitting trying to control outcomes, including what other people think of us.  It's the honesty, openness and willingness to change that is the biggest gift of our programs. That and the fellowship/sangha aspects. If we hide things we rob ourselves of this gift by setting ourselves apart. The "disease" always wants to get us alone."*
>
> So ... That's enough for now. Thank you for your practice.
>
> I'm sure we'll talk again soon! :)
>
> Bowing,
> Alex

# Exhibit 19

Exhibit 11
Behrend, A.
10/14/22
@ptus

From:             sfzc-res@googlegroups.com [sfzc-res@googlegroups.com]
on behalf of      David Zimmerman [cctanto@sfzc.org]
Sent:             2/16/2017 9:34:01 AM
To:               sfzc-res [sfzc-res@googlegroups.com]
Subject:          [sfzc-residents] Re: Initiating new WPA Weekly Studies Program: first meeting Thurs. Feb. 16

Hello everyone,

For anyone -- particularly WPAs -- who weren't at Work Circle this morning, here is another reminder that the **first weekly WPA Studies Program session will meet today in the Art Lounge at 1:30pm**.  I ask that everyone attending please be early so we can start right on time.  Do be sure to remind your crew head that you'll be participating in this dharma event.  *(Dear Carmen & Nick--please include this information, and the text of the email describing the program, in today's meeting notes. Thank you.)*

The folks who are currently designated as WPAs are:

Anklow, John
Behrend, Alex
Bekrenev, Ivan
Bennett, Raven
Getschow, Kyle
Gooch, Peter
Hernandez, Jenny
Hernandez, Onshi
Higbie, Bradley
Koen, Chris
Landes, Crystal
Malagon, Alfonso
Miglioli, Diego
Mills, Carmen
Obermeyer, Annie
Pietrenara, Paula
Radtke, Ryan
Serrano, AJ
Shah, Nick


With metta and well wishes,
David

Rev. Kanzan David Zimmerman
Head of Practice (Tanto), SFZC City Center
415-354-0394

 *"There is no certain way that exists permanently. Moment after moment we have to find our own way. Our way to practice is one step at a time, one breath at a time."*
*-- Shunryu Suzuki*

On Fri, Feb 10, 2017 at 3:12 PM, David Zimmerman <cctanto@sfzc.org> wrote:

Dear WPA Students at City Center,

In order to provide additional Zen training and work practice support for all Work Practice Apprentice (WPA) students in their first two years at City Center, I would like to initiate—with the full encouragement and support of the City Center Practice Committee and Administrative leadership—a new weekly WPA Studies Program. Following is a brief overview:

*The WPA Studies Program will build upon the regular training already part of the formal practice schedule by providing additional opportunities for students to have indepth study and discussion time on a weekly basis with the City Center Tanto and other teachers. This is intended as a way to provide students a strong, clear and relational foundation in the fundamentals of Zen training in their first two years at SFZC City Center. Main forum will be weekly 1-1.25 hour study sessions on a regular weekday in which the Tanto and other teachers will lead students in studies focused on meditation training, understanding and participating in forms and ceremonies, fully engaging in work practice, being together in harmony in Sangha, and Buddhist studies of key topics such as Four Noble Truths, Sixteen Precepts, Brahaviharas, and other principle Zen/Buddhist teachings.*

*The program is similar to what is currently being offered at Green Gulch Farm for all WPA 1s and WPA 2s. Sessions will often include brief work/practice check-ins followed by time to focus on a particular area of study. While I intend to start the WPA Study sessions with WPA 1 & 2s combined, I foresee eventually splitting the WPA's into two groups, with WPA 2s organizing themselves around a particular focus of study with a teacher/mentor (not necessarily the tanto). The program will of course evolve and develop over time, with the intention of being responsive to the needs and interests of WPAs, while also staying rooted in the aim to offer foundational teachings and training parameters that tie-in to a curriculum as previously outlined by the former dean of studies and abbots.*

*Regular participation in this weekly studies program is required for all WPAs. This program has also been vetted with supervisors and department heads, who are enthusiastic about the offering and will work to support WPA's who work during the scheduled meeting times to be able to organize their time and responsibilities to enable them to participate on a weekly basis.*

I'm proposing to initially schedule the weekly WPA Study Sessions on **Thursdays from 1:30-2:30pm**. (While this time slot is during work hours for some WPAs, it is a time that doesn't conflict with the kitchen schedule. The kitchen utilizes a majority of our WPA 1s and has a much tighter window of flexibility due to daily deadlines.)

Please let me know if you have further questions or thoughts about this new program by emailing me individually (so as not to overwhelm others with email responses).

I look forward to the launch of this new initiative with the intention of offering a richer and more comprehensive experience of Zen training and dharma at SFZC for students in their initial two years.

With metta and well wishes,
David

Rev. Kanzan David Zimmerman
Head of Practice (Tanto), SFZC City Center
415-354-0394

*"There is no certain way that exists permanently. Moment after moment we have to find our own way. Our way to practice is one step at a time, one breath at a time."*
-- *Shunryu Suzuki*

--
You received this message because you are subscribed to the Google Groups "SFZC-Residents" group.
To unsubscribe from this group and stop receiving emails from it, send an email to sfzc-res+unsubscribe@googlegroups.com.
To post to this group, send email to sfzc-res@googlegroups.com.

SFZC_Behrend_001127

Visit this group at https://groups.google.com/group/sfzc-res.
For more options, visit https://groups.google.com/d/optout.

SFZC_Behrend_001128

# Exhibit 20

**Exhibit 12**

Behrend, A.
10/14/22
*@ptus*

| | |
|---|---|
| **From:** | David Zimmerman [cctanto@sfzc.org] |
| **Sent:** | 3/1/2017 9:52:05 AM |
| **To:** | Annie Obermeyer [Redacted: PII] |
| **Subject:** | Re: WPA Practice Assignment/Preparations for Thurs 3/2 |

Hi there,

Since the WPA Class is going to be weekly henceforth, [Redacted: PHI]

**Redacted: PHI**

Thank you!


With metta and well wishes,
David

Rev. Kanzan David Zimmerman
Head of Practice (Tanto), SFZC City Center
415-354-0394

*"There is no certain way that exists permanently. Moment after moment we have to find our own way. Our way to practice is one step at a time, one breath at a time."*
*-- Shunryu Suzuki*

On Wed, Mar 1, 2017 at 9:41 AM, Annie Obermeyer [Redacted: PII] wrote:
  Hi there,

  **Redacted: PHI**

On Wed, Mar 1, 2017 at 9:30 AM, David Zimmerman <cctanto@sfzc.org> wrote:
  Hello Good Friends in the Dharma,

  I made a reminder announcement this morning at work circle, and thought to also resend this email with the practice/homework reminder in preparation for tomorrow's class.

  As usual, let me know in advance if for some reason you're unable to attend tomorrow's class.  Thank you.

  With metta and well wishes,
  David
  ---------- Forwarded message ----------
  From: **David Zimmerman** <cctanto@sfzc.org>
  Date: Fri, Feb 24, 2017 at 5:50 PM
  Subject: WPA Practice Assignment/Preparations for Thurs 3/2
  To: David Zimmerman <cctanto@sfzc.org>


  Dear WPA Dharma Friends,

At the end of our last class, I asked you to take up the following Practice for our next class on March 2:

**1) Read** -- Norman Fischer's article "On Zen Work"

**2) Reflect** -- reflect further on the first 2 Noble Truths: how do you recognize dukkha & craving arising in your work practice life? Specifically, what story or concept of "self" did you notice arose with the dukkha, and what was the state of mind the accompanied it?

**3) Prepare** -- **Presentations on 8-Fold Path**

Give a brief synopsis/presentation of each of the assigned aspects of the 8-fold path, and then provide examples of how you personally apply them to the realm of work practice (4-5 minutes each person/pair).

1. Right View / Right Understanding -- Alphonso
2. Right Intention -- Nick & Jenny
3. Right Speech --  Paula Kyle
4. Right Action -- Vanya & AJ
5. Right Livelihood  -- John & Carmen
6. Right Effort  -- Chris & Ryan
7. Right Mindfulness  -- Bradley & Alex
8. Right Concentration  -- Peter

It may very well be that we won't have time for everyone to present this coming week, and may therefore spread the presentations over 2 weeks. I suggest that at least those presenting on the first four be ready on Thursday, 3/2.

Finally, I'm working on creating a google group, but am having a little technical challenge. Hope to have it up and running soon.

With metta and well wishes,
David

Rev. Kanzan David Zimmerman
Head of Practice (Tanto), SFZC City Center
415-354-0394

 *"There is no certain way that exists permanently. Moment after moment we have to find our own way. Our way to practice is one step at a time, one breath at a time."*
*-- Shunryu Suzuki*

SFZC_Behrend_001397

# Exhibit 21

**Exhibit 13**

Behrend, A.
10/14/22
*@ptus*

| | |
|---|---|
| **From:** | Diego Miglioli [ccino@sfzc.org] |
| **Sent:** | 12/1/2017 6:33:45 PM |
| **To:** | Redacted: PII        Alex Behrend [alex.s.behrend@gmail.com];   Redacted: PII |
| | Redacted: PII |
| **Subject:** | Fukudo/Shoten to end Zazen |

Dear Fukudo/Shotens

I know it is on the instructions, and I just wanted to be sure it is understood the way we end Zazen in the morning before Service.

Remember that the Fukudo and Shoten are the same person during Sesshin.

Also, there is only two bells to start Zazen (one hit 10 minutes before and 2 hits 3 minutes before). Remember you will do the three bells when the doshi sits, which are triggered by the doan standing at the doshi door, who will bow at the same time as the doshi.

There is no time drum or han. Zazen ends like it does on Saturdays after the 9:25 Zazen:

The fukudo/shoten gets up three minutes before the end of morning zazen (6:32) and opens the doshi door. The fukudo/shoten ends the period with four hits on the densho: loud-medium-soft-loud .
The robe chant begins and the densho is hit as usual for the robe chant.
The fukudo/shoten continues the densho pattern for morning service.
This pattern is on the fukudo/shoten card on the wall by the densho.
The fukudo/shoten goes promptly to the Buddha Hall and then plays the mokugyo for service. Please check which chants are being used.

Please let me know if you have any questions.

Thank you.

**Diego Miglioli**
City Center Ino
ccino@sfzc.org
(415) 354 0391

# Exhibit 22

**Exhibit 14**
Behrend, A.
10/14/22
@ptus

| | |
|---|---|
| **From:** | Kim Kōgen Hart [ccino@sfzc.org] |
| **Sent:** | 1/29/2017 5:38:18 PM |
| **To:** | Alex Behrend [alex.s.behrend@gmail.com] |
| **CC:** | Timothy Sandoe [timothy.sandoe@gmail.com]; David Zimmerman [cctanto@sfzc.org]; Sandra Lamerson [greencompassion@gmail.com] |
| **Subject:** | Re: Doan-ryo support on Monday |



**Kim Kōgen Hart**
City Center Ino
ccino@sfzc.org
415 354 0391

On 29 January 2017 at 10:30, Alex Behrend <alex.s.behrend@gmail.com> wrote:

Good morning, all! Just confirming I'm doing Shoten Monday morning ... I'm clear on how it goes after shadowing it several times last week, and also grateful Tim will be on-hand tomorrow!

Have a great Sunday!

========

This message was sent from a tiny TV pretending to be a computer or phone

On Jan 27, 2017 12:22 PM, "Timothy Sandoe" <timothy.sandoe@gmail.com> wrote:

Dear Kim,

I'll be available for support on Monday.


Tim

On Fri, Jan 27, 2017 at 12:17 PM, Kim Kōgen Hart <ccino@sfzc.org> wrote:

Dear Timbo,

Please stand by to lend support to our new doan-ryo member, Alex, who will be the Shoten on Monday. If you can stand by him while he sounds the Densho that would be great :)

The shoten/densho bell can stop after the robe chant.

And if you can help Sandy with the Doan food offering after the service review that would be great.

thanks a mill,

warmly,
Kim


**Kim Kōgen Hart**
City Center Ino

ccino@sfzc.org
415 354 0391

SFZC_Behrend_001053

# Exhibit 23

**Exhibit 18**
Behrend, A.
10/14/22
@ptus

**From:** Alex Behrend [alex.s.behrend@gmail.com]
**Sent:** 2/1/2018 8:32:14 AM
**To:** Eli Brown-Stevenson [eli.brown-stevenson@sfzc.org]
**CC:**

Redacted: PII

**Subject:** Re: Saturday, February 17th Oryoki Server

Confirmed.

Thank you for letting me be of service in this way!

Bowing,
Alex

On Jan 31, 2018 3:38 PM, "Eli Brown-Stevenson" <eli.brown-stevenson@sfzc.org> wrote:
Hai!

On Wed, Jan 31, 2018 at 3:18 PM Gaia Paola [Redacted: PII] wrote:
Confirmed!

On Wed, Jan 31, 2018 at 2:14 PM Diego Miglioli <ccino@sfzc.org> wrote:
Dear All,

This will be the Serving Crew for Saturday, February 17. Let me know if you have any questions or concerns.

Please confirm reception of this email.

**Soku:** Glenda Sell
**Head Server:** Eli Brown Stevenson
**Servers:**
Phyllis Oscar
Dillon Balmaceda
Gaia Vazquez
Yuna Choi
Alex Bherend
Takudo Bennet


Warm regards,


**Diego Miglioli**
City Center Ino
ccino@sfzc.org
(415) 354 0391
--
This
Sky
Where we live

Is no place to lose your wings
So love, love,
Love.
--
Warm bow,

Eli


Eli Brown-Stevenson

Director of Work Practice

San Francisco Zen Center

480.620.8410

# Exhibit 24

From: **Gentoku Smith** ccdirector@sfzc.org
Subject: Resolution
Date: March 7, 2019 at 5:35 PM
To: Alex Behrend alex.s.behrend@gmail.com
Cc: **Barbara Machtinger** barbara.machtinger@sfzc.org, **David Zimmerman** david.zimmerman@sfzc.org, **Ed Sattizahn**
ed.sattizahn@sfzc.org, **Engetsu Lefevre** ccino@sfzc.org, **Gentoku Smith** ccdirector@sfzc.org, **Mary Stares** cctanto@sfzc.org,
**Michael McCord** programdirector@sfzc.org, **Paul Haller** paul.haller@sfzc.org, **Victoria Austin** victoria.austin@sfzc.org
Bcc: gwmcclune@gmail.com

Dear Alex,

Please know that the Practice Committee discussed and considered your request to not
be contacted.  However, as the group which governs residency and matters regarding
practice at City Center, it's incumbent upon us to remain in communication with all
members of the residential sangha.

From the point of view of City Center Practice Committee, we see you as a sincere
student of the dharma who struggled to meet the requirements of the WPA and Dharma
Bridge programs.  We acknowledge many of these struggles may result from the fact
that you are working with disabilities that make these already difficult programs more
challenging.

The Practice Committee, in light of your experience in not meeting the basic
requirements of the Dharma Bridge program notified you on January 24, 2019, that you
would need to leave City Center by January 31, 2019.

You appealed this decision, citing that the notification resulted in extreme distress for
you.  The Practice Committee responded by extending the deadline for you to move out
of City Center to February 20, 2019, the original finish date of the three-month
provisional Dharma Bridge acceptance.  You expressed that you couldn't move out by
that date and asked to not be contacted.

On February 5th, your physician, Dr. Grinberg, recommended to us that you have a two-
month stabilization period at City Center.  You wrote that during this two month period
you would, "focus on taking care of my health and look for new employment and
housing."

Thus, it appears that all parties agree that your departure from residency at City
Center is the appropriate next step.  What remains in question is the timing of your
departure and how SFZC will be compensated for your time in residence since January
1, 2019.

Since you've expressed your intention to leave City Center and have stated you are
actively looking for "employment and housing," and since you and your doctor have
outlined a two-month time frame for that to occur in a healthy manner considering
your disabilities, the Practice Committee has decided that your move-out deadline will

SFZC_Behrend_000073

be April 3, 2019.  This extension accommodates the two-month stabilization period your doctor recommended in early February.

You are currently in arrears to City Center in the amount of $3,879 for January, February and March fees.  Your option is to pay that amount in full or to compensate City Center for your time in residence since January 1, 2019 as follows:

- For the twenty-two days from January 1 until January 22nd, the Dharma Bridge per diem fee of $43, for a total of $946, will be applied.
- For the eleven days from March 24th until April 3th, the per diem fee of $43, a total of $473, would be applied.
- If you leave between March 24th and April 3th, the $473 would be reduced at the per diem rate for each fewer day you're in residence.
- If you stay until April 3th the total fee is $1,419.  If your room is in good condition at the end of your stay, your security deposit of $430 would be returned to you.
- The Winter 2019 Practice Period began on January 23rd and ends on March 23rd.  You would use one of your practice period credits for these two months in residence.

As for the disposition of your remaining practice period credit, it will be at least twelve months before you'll apply to any of SFZC's practice centers to attend a practice period using your remaining practice period credit.  Furthermore, acceptance to a practice period is not assured, but is contingent upon both a letter from Dr. Grinberg stating that he approves of you attending a practice period, and a positive assessment by the applicable practice committee.  Non-payment of the per diem fee will result in SFZC holding the remaining practice period credit until you've paid the balance owed.

From now until your departure, you'll be expected to maintain your house job, dish shift, bathroom cleaning, and nightwatch responsibilities.  You will not be assigned a desk duty shift and your attendance in the zendo and at dharma talks is optional.  You will be expected to do your best to maintain positive sangha relations and to act in accord with the precepts.

This correspondence will be printed and put under your door.  We expect a prompt response from you to this letter.

We hope that by the time of your departure the negative sense of your experience here will diminish.  We wish for that outcome and wish the best for you.

Gassho,

City Center Practice Committee

SFZC_Behrend_000074

Ed Sattizahn, SFZC Central Abbot
David Zimmerman, City Center Abbot
Paul Haller, City Center Senior Dharma Teacher
Mary Stares, City Center Tanto
Gentoku Smith, City Center Director
Engetsu Lefevre, City Center Ino
Victoria Austin, City Center Practice Leader
Barbara Machtinger, City Center Practice Committee
Michael McCord, Shuso for Winter 2019 Practice Period
--
-----------

Gentoku Smith
City Center Director
San Francisco Zen Center
415-265-2005

SFZC_Behrend_000075

267

# Exhibit 25

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Eli Brown-Stevenson<br>**Human Resources Representative**<br>**SAN FRANCISCO ZEN CENTER INC.**<br>**300 Page Street**<br>**San Francisco, CA 94102** | **Alex Behrend** |

| THIS PERSON (check one or both) |
|---|
| **X** Claims To Be Aggrieved |
| Is Filing on Behalf of Other(s) |

EEOC CHARGE NO.
**550-2019-01657**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

☐ Title VII of the Civil Rights Act (Title VII)   ☐ The Equal Pay Act (EPA)   **X** The Americans with Disabilities Act (ADA)

☐ The Age Discrimination in Employment Act (ADEA)   ☐ The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. **X** No action is required by you at this time.

2. ☐ Please call the EEOC Representative listed below concerning the further handling of this charge.

3. ☐ Please provide by  a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

4. ☐ Please respond fully by  to the enclosed request for information and send your response to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

5. ☐ EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources.  If you would like to participate, please say so on the enclosed form and respond by
to
If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above.  Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| | |
|---|---|
| **Bryan G. Hoss,**<br>**Intake Supervisor**<br>*EEOC Representative*<br>*Telephone*  **(415) 522-3150** | **San Francisco District Office**<br>**450 Golden Gate Avenue**<br>**5 West, P.O. Box 36025**<br>**San Francisco, CA 94102**<br>**Fax: (415) 522-3415** |

Enclosure(s): ☐ Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

☐ Race   ☐ Color   ☐ Sex   ☐ Religion   ☐ National Origin   ☐ Age   **X** Disability   **X** Retaliation   ☐ Genetic Information   ☐ Other

**ISSUES:** Assignment, Discharge, Accommodation

**DATE(S) (on or about):  EARLIEST:  09-27-2018    LATEST:  01-23-2019**

| Date | Name / Title of Authorized Official | Signature | |
|---|---|---|---|
| **July 22, 2019** | **William R. Tamayo,**<br>**District Director** | *Bryan Hoss* | Digitally signed by Bryan Hoss<br>DN: cn=Bryan Hoss, o=U.S. EEOC,<br>ou=Enforcement Unit,<br>email=bryan.hoss@eeoc.gov,<br>c=US<br>Date: 2019.07.22 08:05:22 -07'00' |

Enclosure with EEOC
Form 131 (11/09)

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA.  These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge.  (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below).  Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records.  Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14   Preservation of records made or kept.**  . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action.  The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected.  The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes.  The Equal Pay Act contains similar provisions.  Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made.  Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you.  If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

# Exhibit 26

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To:  **Alexander Behrend**
**801 Morrell Ave**
**San Francisco, CA 94010**

From:  **Oakland Local Office**
**1301 Clay Street**
**Ste. 680-North**
**Oakland, CA 94612**

[ ]  On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **550-2019-01657** | **Sarah Lamm,**<br>**Investigator** | **(510) 956-0013** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other (briefly state)

#### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

For     Sarah Lamm                                      12/17/2020

Enclosures(s)                    **Steven T. Hunt,**                          *(Date Mailed)*
**Director**

cc:  **Eli Brown-Stevenson**
**Human Resources Representative**
**SAN FRANCISCO ZEN CENTER INC.**
**300 Page Street**
**San Francisco, CA 94102**

**Katherine Fiester**
**LEGAL AID AT WORK**
**180 Montgomery Street, Ste. 600**
**San Francisco, CA 94104**

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you receive this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit **before 7/1/10** – not 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➤ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
➤ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities"  now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**
➤ **Only one** major life activity need be substantially limited.
➤ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
➤ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
➤ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**
➤ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
➤ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
➤ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
➤ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

***Note:   Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment.  Beyond the initial pleading stage, some courts will require specific evidence to establish disability.***   For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# Exhibit 28

Mission and Vision

Covid-Related Opening and Closing Updates

Live the Temple Life

# Mission and Vision

## San Francisco Zen Center Mission Statement

The purpose of San Francisco Zen Center is to express, make accessible, and embody the wisdom and compassion of the Buddha.

These ideals are based on the example of Shakyamuni Buddha and guided by the teachings and lineage of the Soto Zen school as conveyed by the founder, Shunryu Suzuki Roshi, and other Buddhist teachers.

San Francisco Zen Center's central value is to express the non-duality of practice and awakening through the practice of Zen and the sixteen bodhisattva precepts, acknowledging and valuing equally the expression of the practice in formal settings and in daily life, thus affirming both lay and monastic practice as expressions of the bodhisattva way.

## Vision and Guiding Principles

### Continuing Suzuki Roshi's Way

We will ensure the strength and vitality of the Zen Center's core Zen practice offerings, maintaining our ability to train and establish Zen teachers by continually enhancing our ability to provide a supportive and effective residential training environment. In this way we will embody and express the wisdom and compassion of the Buddha and carry on Suzuki Roshi's vision of Zen practice, for the benefit of all beings.

### Creating Access, Connection, and Opportunity

Over the course of the coming years we will build on our nearly 50 years of Buddhist teachings by responding to the needs of an increasingly volatile, uncertain, and complex world by developing Zen programs and extending our ability to be a quiet, yet powerful force for a better world. We will continue to find new ways to offer Zen practice to an ever-widening circle of practitioners, providing improved access, opportunity, connection and support.

### Committing to Long-Term Sustainability

To continue to offer the practice of Zen Buddhism and to extend access to these teachings, creating practice opportunities for future generations, will require that we provide for Zen Center's long-term facilities, infrastructure, and systems needs in ways that are sustainable, efficient, and in alignment with our core values. As stewards of three practice centers and a large residential practice community, we will need to take consistently practical, appropriate and far-sighted steps to secure the long-term financial well-being and stability of the organization.

GOAL #1. Clarify Zen Center's Teacher Training Program

GOAL #2. Create an Inclusive, Effective, Diverse and Sustainable Employee and Residential Environment

GOAL #3. Enhance our Ability to Provide Zen Buddhist Practice to a Wider Audience of Practitioners

GOAL #4. Secure Long-Term Financial Well-Being of the Organization

GOAL #5. Steward our Land, Buildings, Facility Infrastructure, and IT Systems in harmony with the earth and our environmental values.

## San Francisco Zen Center

**About**
**Mission and Vision**
**Lineage**
**The Community**
**How San Francisco Zen Center Operates**
**Affiliations**
**Contact**

## Teachings

SFZC Online

Full Calendar

Upcoming Dharma Talks

Dharma Talk Archive / Dharma App

## How SFZC Operates

Diversity, Equity, Inclusion and Accessibility

DEIA Feedback Form

Conflict, Complaint, and Ethical Review Processes

More...

## Conference Programs

City Center Conference Center

Green Gulch Farm Conference Center

## Locations

CITY CENTER

Visits & Stays

Residential Practice

Teachers

Contact

GREEN GULCH FARM

Visits & Stays

Residential Practice

Teachers

Contact

TASSAJARA

Visits & Stays

Residential Practice

Teachers

Contact

## Connect

SAN FRANCISCO ZEN CENTER
Online Store

Donate

Membership

Volunteer

Branching Streams (Affiliated Sanghas)

## News and Blogs

Sign up to receive weekly newsletter

Sangha News Journal blog

Great Leap Memorial blog

© 2022 San Francisco Zen Center     Website Cookie Policy     Website Privacy Policy

Guest Student Stays at City Center

Covid-Related Opening and Closing Updates

Live the Temple Life

# Guest Student Stays at City Center

**Please note:** *At this time, the City Center guest student program is open. As a residential community, we are still in the process of post-pandemic reopening and are adjusting our protocols periodically to ensure the safety of our residents.*

**For stays between December 13, 2022 and January 24, 2023, the $25/night guest student fee will be waived for anyone who participates. (To have the fee waived, mention the "winter kitchen scholarship" when you apply.)**

**Also offered is a voucher for a sesshin of your choice (a three– to seven–day silent retreat) to anyone who commits to a full six weeks in residency. (The voucher is for use at City Center only and excludes Rohatsu 2022.) There will be time allotted over the holidays for participants to leave the temple to visit with friends/family if desired.**

For more information, please contact the Guest Student Manager/Work Leader at ccstudent@sfzc.org.

## Program Details

Guest students participate in the practice schedule and daily life of City Center. This includes morning zazen (sitting meditation), service (sutra chanting and bowing), work (often of a physical nature), and communal vegetarian meals. Zazen instruction, Dharma talks, daily Dharma discussion with the work crew, and meetings with teachers are also offered. Intensives and sesshins (silent retreats) may also be available to guest students with an additional registration fee.

## Guest Student Daily Schedule

**Tuesday through Friday***

5:10 am wake-up bell

5:40 zazen

(6:05 - 6:10 interval)

6:50 service

7:15 soji (temple cleaning)

7:30 breakfast

Break

9:00 work begins

12:30 pm lunch

1:30 resume work

4:00 end work

5:40 zazen (optional after first 2 weeks)

6:30 dinner

7:45 Dharma talk (Wednesday only)

**Saturday** - day off of work

6:00 am wake-up bell

6:30 zazen

7:10 service

7:40 soji

7:55 breakfast

10:15 Dharma talk

12:00 pm lunch

Afternoon off

**Sunday**

Day off of both work and practice schedule

**Note:** During practice periods, the afternoon schedule may vary

**\*Optional Monday morning schedule**

6:10 am zazen

6:40 kinhin

6:50 zazen

7:30 breakfast

## Length of Stay

Guest student stays are a minimum of two weeks and a maximum of six weeks. If you are interested in a longer stay, please contact the guest student manager.

## Long Term Residency

For those interested in continuing at City Center for a long term stay after being a guest student, they can apply to be a Work Practice Apprentice. Click here to learn more.  In order to apply as a WPA, students are required to do a minimum 2-week guest student stay.

## Health and Safety

City Center is a congregate living facility which includes high risk individuals. As such, the process of post-pandemic reopening and the student guidelines outside of San Francisco Zen Center may be more restrictive than City and State mandates.

Anyone applying to be a Guest Student must be fully vaccinated with one of the following vaccines: Pfizer, Moderna, Johnson & Johnson, Novavax, or AstraZeneca (please note that AstraZeneca may be known by other names). If you have a WHO approved vaccine and you don't see it listed here, please consult with the guest student manager, as it still may be possible for you to join us. One is considered fully vaccinated two weeks past the final (or only) vaccination shot plus a booster. (If you are an international student who has not received one of these vaccines, but you would still like to join us for a guest student stay, please contact the guest student manager.)

If a guest student becomes sick, they will be asked to remain in their room (or quarantine room) and take an antigen self-test onsite. For guest student stays of one month or less, if they test positive for Covid-19, they will be asked to depart City Center. If they cannot return home due to travel restrictions, we will support their quarantine to the best of our ability.

Currently, City Center is not open to the public for events such as Dharma talks and zazen. Residents may go into museums, restaurants, and stores as long as they follow the mask-use guidelines of the establishment. Though residents are not required to wear masks inside the temple, residents must wear masks when riding public transportation or going to medical appointments.

Please contact the guest student manager to learn about the most current guidelines if you think this will impact your ability to participate in community life.

## Hybrid Program

Guest students participate in a hybrid program involving in-person and online guest student activities. The majority of activities take place in person including living and working in the temple, sitting zazen in the zendo, engaging in temple ceremonies, and taking meals in the dining room. For safety reasons other activities, such as classes and Dharma talks, take place online and students participate individually from their rooms. As the temple moves closer to full reopening, these online programs will take place in person.

## Diversity, Equity, Inclusion, and Accessibility

As part of a diverse community and world, SFZC acknowledges that diversity practice and dharma practice are not separate. SFZC is engaged in practice, conversation, and study to further embody diversity, inclusion, equity, and cultural humility. Students at SFZC aspire to view all beings as Buddha, treating each person we meet equally with care and respect.

City Center welcomes people of every gender, age, race, ethnicity, class/income level, sexual orientation, political belief, language spoken, and physical ability, and will try to accommodate the requests of the sangha.

SFZC has a designated fund to support BIPOC practitioners with guest student stay fees. Please indicate to the Guest Student Manager/Work Leader if this applies to you.

## To Apply

Please complete and submit the Guest Student Application Form. Ideally applicants will have an established Zen practice; however, this is not required.

In addition to filling out the application form, send a letter of recommendation to ccstudent@sfzc.org in order to complete your application. This letter can be from a spiritual teacher, academic teacher, mentor, or employer. Please provide contact information so that we may reach your teacher/mentor if necessary, including their name, email address, and phone number.

- Please apply at least one month prior to your preferred arrival date. Applications may be submitted less than a month before; however, due to the reviewing process your application may not be accepted in time for you to begin your stay on your preferred date. Applications may be submitted up to a year ahead of your planned visit.

## Approval and Fees

Applications are reviewed and approved in the order received.

$50 non-refundable deposit covers the first two nights of one's stay.
$25/night for the remaining number of nights.

SFZC has a designated fund to support BIPOC practitioners with guest student stay fees. Please indicate to the Guest Student Manager/Work Leader if this applies to you.

## Planning Your Stay



Guest students arrive at City Center, 300 Page Street, at 9:45 am on Monday, and ring the bell at the main entrance. City Center does not provide parking so it is advisable to take public transportation, a taxi, or use an app-based car service (like Uber or Lyft), and leave your car elsewhere. Rooms are currently single occupant; however, as safety permits we may return to shared rooms with two students. We will provide you with a zafu (meditation cushion), sheets, blankets, pillows, and a bath towel. A full packing list will be provided once your application has been accepted.

In the spirit of maintaining Buddhist precepts, guest students are asked to abstain from drug and alcohol use, and from initiating new sexual relationships during their guest student stay.

## Contact



For inquiries, contact the Guest Student Manager/Work Leader at ccstudent@sfzc.org.

### City Center

**About City Center**
**City Center Calendar**
**Visits & Stays**
**Guest Accomodations**
**Guest Student Stays**
**Work Practice Apprenticeship**
**Residential Practice**

## Teachings

**SFZC Online**

**Full Calendar**

**Upcoming Dharma Talks**

**Dharma Talk Archive / Dharma App**

## How SFZC Operates

**Diversity, Equity, Inclusion and Accessibility**

**DEIA Feedback Form**

**Conflict, Complaint, and Ethical Review Processes**

## Locations

**CITY CENTER**

**Visits & Stays**

**Residential Practice**

**Teachers**

**Contact**

**GREEN GULCH FARM**

**Visits & Stays**

**Residential Practice**

**Teachers**

**Contact**

## Connect

   



**Donate**

**Membership**

**Volunteer**

**Branching Streams (Affiliated Sanghas)**

**More...**

Conference Programs

**City Center Conference Center**

**Green Gulch Farm Conference Center**

**TASSAJARA**

**Visits & Stays**

**Residential Practice**

**Teachers**

**Contact**

News and blogs

**Sign up to receive weekly newsletter**

**Sangha News Journal blog**

**Great Leap Memorial blog**

© 2022 San Francisco Zen Center          Website Cookie Policy          Website Privacy Policy

Covid-Related Opening and Closing Updates

Live the Temple Life

# Work Practice Apprenticeship at City Center



San Francisco Zen Center's Work Practice Apprenticeship (WPA) Program is a two-year, entry-level Zen training program. As a Work Practice Apprentice, each student will be working and practicing full-time at City Center, wholeheartedly engaging with all aspects of the daily practice life in the temple, as well as the many other aspects of living, working, and practicing together in sangha. The goals of the program are three-fold:

1. Support Zen students to establish a solid foundation in Zen meditation, work-practice, and the spirit of the Buddha's teachings as passed down to us by Suzuki Roshi and his Dharma heirs.

2. Offer a low-cost way for sincere students to make a commitment to full-time, residential Zen practice.

3. Reward those who successfully complete the initial three- to six-month period with the opportunity to continue and deepen their practice at Zen Center.

The initial three-month period of the WPA Program begins upon acceptance through application to the director and practice committee. All applicants must have completed a minimum of two consecutive weeks as a guest student at City Center prior to applying to the apprenticeship program. Please visit our Guest Student Program webpage for more information.

The work-practice program requires a commitment to the following practice activities:

- Early morning zazen, service, and temple cleaning six days per week
- 32.5 hours of work-practice per week (M-F, 9 am to 4:30 pm)
- Participation in practice periods and practice period classes
- Regular private meetings with a resident practice leader
- Monthly one-day sittings
- Scheduled sesshins, depending on work and practice assignments
- Saturday morning and Wednesday evening Dharma talks
- Various monthly and yearly ceremonies and events

## Health and Safety

City Center is a congregate living facility which includes high risk individuals. As such, the process of post-pandemic reopening and the student guidelines outside of San Francisco Zen Center may be more restrictive than City and State mandates.

Anyone applying to be a WPA must be fully vaccinated with one of the three FDA-approved vaccines: Pfizer, Moderna, or Johnson & Johnson. One is considered fully vaccinated two weeks past the final (or only) vaccination shot. (If you are an international student who has not received one of these vaccines, but you would still like to join us for a guest student stay, please contact the director.)

Please contact the director to learn about the most current guidelines if you think this will impact your ability to participate in community life.

## Diversity, Equity, Inclusion, and Accessibility

As part of a diverse community and world, SFZC acknowledges that diversity practice and dharma practice are not separate. SFZC is engaged in practice, conversation, and study to further embody diversity, inclusion, equity, and cultural humility. Students at SFZC aspire to view all beings as Buddha, treating each person we meet equally with care and respect.

City Center welcomes people of every gender, age, race, ethnicity, class/income level, sexual orientation, political belief, language spoken, and physical ability, and will try to accommodate the requests of the sangha.

## Additional Information about the Program

**Buddhist Precepts**: All members of the WPA Program are expected to practice in relation to the 16 Bodhisattva precepts. In particular, students are asked to refrain from initiating new sexual relationships during their first six months of residency and to refrain from all drug and alcohol use at City Center. Please obtain a copy of the Zen Center Ethical Principles and discuss any questions or concerns regarding these guidelines with the City Center director prior to submitting an application.

**Expenses and Stipends:** There is a one-time $70 application fee for the City Center WPA Program. After this initial fee, all room, meals, and tuition are provided while in residence during the apprenticeship program. During participation in the program, each apprentice will receive an allowance starting at $75 per month for essential purchases. After three months, depending on timing, the apprentice may participate in a practice period or apply for another three-month apprenticeship.

**Practice Period Credits:** After successfully completing a three-month period in the apprenticeship program, a Work Practice Apprentice is eligible to receive a credit for one practice period at Tassajara, Green Gulch Farm, or City Center. This allows students to continue in residential practice or return to SF Zen Center at a later date, acknowledging that a variety of life situations may not allow continuous residency. To attend a Tassajara practice period, one must have first completed a practice period at either City Center or Green Gulch Farm, including a sesshin. Apprentices must apply for and be accepted for each practice period. Acceptance to the practice period is subject to space availability, as well as review by the practice period applications committee at the respective practice center.

**Health Insurance:** SF Zen Center does not provide health insurance for work practice apprentices. City Center apprentices are not considered to be on staff, and thus time as a WPA participant does not count toward the accrual of the staff time necessary to qualify for SF Zen Center health insurance.

**Continuing on in a Staff Position:** Upon successful completion of the two-year WPA Program, students are eligible to apply for a City Center staff position. A description of staff policy, benefits, and stipend levels is available from the City Center director.

## To Apply

Please email the City Center Director at ccdirector@sfzc.org to request an application. Ideally applicants will have an established Zen practice; however, this is not required.

In addition to filling out the application form, please send a letter of recommendation to the director in order to complete your application. This letter can be from a spiritual teacher, academic teacher, mentor, or employer. Please provide contact information so that we may reach them if necessary, including their name, email address, and phone number.

- Please apply at least one month prior to your preferred arrival date. Applications may be submitted less than a month before; however, due to the reviewing process your application may not be accepted in time for you to begin your stay on your preferred date. Applications may be submitted up to a year ahead of your planned visit.

For more information, contact the City Center Director at ccdirector@sfzc.org.

City Center

**About City Center**

**City Center Calendar**

**Visits & Stays**

**Guest Accomodations**

**Guest Student Stays**

**Work Practice Apprenticeship**

**Zen Kitchen Apprenticeship at City Center**

**Mindful Activity Apprenticeship at City Center**

**Residential Practice**

Teachings

SFZC Online

Full Calendar

Upcoming Dharma Talks

Dharma Talk Archive / Dharma App

How SFZC Operates

Diversity, Equity, Inclusion and Accessibility

DEIA Feedback Form

Conflict, Complaint, and Ethical Review Processes

More...

Conference Programs

City Center Conference Center

Green Gulch Farm Conference Center

Locations

CITY CENTER

Visits & Stays

Residential Practice

Teachers

Contact

GREEN GULCH FARM

Visits & Stays

Residential Practice

Teachers

Contact

TASSAJARA

Visits & Stays

Residential Practice

Teachers

Contact

Connect

SAN FRANCISCO ZEN CENTER
Online Store

Donate

Membership

Volunteer

Branching Streams (Affiliated Sanghas)

News and Blogs

Sign up to receive weekly newsletter

Sangha News Journal blog

Great Leap Memorial blog

© 2022 San Francisco Zen Center

Website Cookie Policy

Website Privacy Policy